

1   JOSEPH P. RUSSONIELLO (CASBN 44332)
    United States Attorney
2
    BRIAN J. STRETCH (CASBN 163973)
3   Chief, Criminal Division

4   MATTHEW A. PARRELLA (NYSBN 2040855)
    JEFFREY D. NEDROW (CASBN 161299)
5   JEFFREY R. FINIGAN (CASBN 168285)
    J. DOUGLAS WILSON (DCBN 412811)
6   Assistant United States Attorneys

7
    450 Golden Gate Avenue
8   San Francisco, California 94102
    Telephone: (415) 436-7232
9   Facsimile: (415) 436-7234
    Email: jeffrey.finigan@usdoj.gov
10
    Attorneys for Plaintiff
11

12                      UNITED STATES DISTRICT COURT

13                    NORTHERN DISTRICT OF CALIFORNIA

14                        SAN FRANCISCO DIVISION

15

16   UNITED STATES OF AMERICA,        )    Criminal No. CR 07-0732 SI
                                       )
17       Plaintiff,                    )
                                       )    GJ INVESTIGATION NO. 2002R01596
18                                     )    REPORTER'S TRANSCRIPT OF
         v.                            )    PROCEEDINGS TESTIMONY OF
19                                     )    BARRY BONDS, DECEMBER 4, 2003
                                       )
20   BARRY LAMAR BONDS,                )
                                       )
21       Defendant.                    )    Date: February 29, 2008
     _____)    Time:11:00 a.m.
22                                          Judge: Hon. Susan Illston

23

24

25

26

27

28

ORIGINAL

1

2                          GRAND JURY

3                  NORTHERN DISTRICT OF CALIFORNIA

4

5

6      GJ INVESTIGATION NO. 2002R01596          )

7

8                          CONFIDENTIAL

9

10              REPORTER'S TRANSCRIPT OF PROCEEDINGS

11                          TESTIMONY OF

12                          BARRY BONDS

13            AT UNITED STATES DEPARTMENT OF JUSTICE

14                    450 GOLDEN GATE AVENUE

15                SAN FRANCISCO, CALIFORNIA 94102

16              THURSDAY, DECEMBER 4, 2003; 1:23 P.M.

17

18

19     FOR THE GOVERNMENT:

20     KEVIN V. RYAN, UNITED STATES ATTORNEY

21     BY:   JEFF NEDROW, ASSISTANT UNITED STATES ATTORNEY

22           ROSS NADEL, ASSISTANT UNITED STATES ATTORNEY

23     UNITED STATES DEPARTMENT OF JUSTICE

24     450 GOLDEN GATE AVENUE

25     SAN FRANCISCO, CALIFORNIA 94102

```
1                              INDEX

2    BARRY BONDS                                    Page

3

4        Examination by Mr. Nedrow                   3

5        Examination by Mr. Nadel                    11

6        Further Examination by Mr. Nedrow          12

7

8                           -o0o-

9

10                          EXHIBITS

11   Number                Description             Page

12

13   501   Plastic vial                             7

14

15   502   Cream                                    35

16

17   503   Packet of documents                      44

18

19   504   Bottle of depotestosterone               50

20

21                          -o0o-

22

23

24

25
```

```
 1                THURSDAY, DECEMBER 4, 2003; 1:23 P.M.

 2

 3                           BARRY BONDS,

 4       having been first duly sworn, testified as follows:

 5

 6                           EXAMINATION

 7       BY MR. NEDROW:

 8            Q.   Yes, please have a seat, sir.  Thank you.

 9                 Good afternoon, sir, could you please state

10       your name and spell your last name for the record?

11            A.   Barry Bonds, B-o-n-d-s.

12            Q.   Mr. Bonds, good afternoon.

13            A.   Mm-hmm.

14            Q.   Mr. Bonds, you received a subpoena to testify

15       before the grand jury today; is that correct?

16            A.   Did I receive it today or just receive it?

17       Yes, I received one, yes.

18            Q.   Previously received a subpoena --

19            A.   My lawyers did, yes.

20            Q.   And because of that subpoena you're here to

21       testify today; is that correct?

22            A.   Yes.

23            Q.   Okay.  Now, I want to go through a few things,

24       Mr. Bonds.  I know we've kind of talked in depth, but I

25       need to do it on the record here.  So, if I could just
```

1    take a moment to do that.

2         Mr. Bonds, you understand that you are present

3    here today as a witness before this grand jury; is that

4    correct?

5         A.    Yes.

6         Q.    And you do you understand that this is an

7    ongoing investigation by the grand jury into alleged

8    illegal activities undertaken by Victor Conte and Greg

9    Anderson?  Do you understand that as well?

10        A.    I understand those two people are involved,

11   yes.

12        Q.    And do you understand, if not I'll inform you,

13   that at least some of the charges being looked at as to

14   these individuals' activities include violations of

15   Title 21 United States Code, Section 846, which is

16   conspiracy to possess or distribute illegal substances.

17   And also 18 U.S.C., Section 1956, the money laundering

18   statute.

19        Do you understand -- do you understand what I'm

20   saying that those are the types of charges that this

21   grand jury is looking at in connection with Mr. Conte

22   and Mr. Anderson?

23        A.    This is the first time I've heard exactly how

24   you're stating it.  I've just seen what was in the

25   paper.

4

1    Q.    But you understand as I say it --

2    A.    As you say it, I understand what you're talking

3    about now.

4    Q.    Okay.  Thank you.

5          Mr. Bonds, I want to go over a couple of rights

6    that you have in connection with your testimony today

7    before we get to the substance.

8          Do you understand that you have the right -- if

9    you have a good faith belief that your statements are

10   going to potentially be incriminating or have a concern

11   about those statements to consult with your counsel

12   outside the grand jury room; do you understand that?

13   A.    I understand I can consult my attorney if

14   there's something I do not understand.

15   Q.    And I'd like to ask you at this point, if you

16   don't understand a question that I put to you, either

17   because I ask it badly, which does happen, or if I just

18   say it in a confusing way -- do you understand I would

19   ask you to ask me to clarify it rather than try to

20   answer or guess at it.

21         Do you understand that?

22   A.    Yes.  You are confusing.  I'm telling you.

23         Is he confusing to you guys?  I'm glad it's not

24   just me.

25   Q.    Let's try to keep it as simple as possible.

1        All right.  And I appreciate that.  I've been

2   told that before.  So, let me make sure I can keep it as

3   straightforward as I can.

4        But seriously, if you don't understand a

5   question, please ask me to rephrase it and I will, okay?

6        A.   Okay.

7        Q.   Thank you.

8        I want to talk about the Fifth Amendment for a

9   moment.  In speaking with your lawyer, we were informed

10  that you were going to assert your Fifth Amendment right

11  not to testify today in connection with this testimony,

12  actually, initially; is that correct?

13       A.   I don't understand what you mean I wasn't going

14  to testify?  Or I was going to testify under my rights

15  of immunity?

16       Q.   Let me go over that.

17       Do you understand that you have a Fifth

18  Amendment right not to make statements that will

19  incriminate yourself?  Do you understand that?

20       A.   I believe so.  I don't understand the question,

21  again, but I guess so.

22       Q.   Well, let me make it as clear as I can.

23       Do you understand under the Fifth Amendment you

24  have the right not to make incriminating statements or

25  statements that you believe might subject yourself to

6

1    criminal liability or trouble?

2              Do you understand that?

3        A.    I believe I understand the question, yes.  I

4    believe so.

5        Q.    Is there a part of that you don't understand?

6        A.    No, I just...

7        Q.    Okay.  And in connection with that, let me

8    actually go over an order.  You received an order

9    through your lawyer a short time before testifying

10   today; is that correct?

11       A.    Yes.

12       Q.    And I'm actually going to go over the text of

13   that order.  And I'd like to make sure that you're

14   comfortable with it before we proceed.  The order says

15   the following:

16              In motion of Kevin V. Ryan, United States

17                  Attorney for the Northern District of

18                  California, the Court hereby finds and

19                  orders as follows:  First, Barry Bonds may

20                  be called to testify before the grand

21                  jury; second, in the judgment of the

22                  United States Attorney, Barry Bonds is

23                  likely to refuse to testify on the basis

24                  of his Fifth Amendment privilege against

25                  self-incrimination; and three, in the

|    |                                              |
|----|----------------------------------------------|
| 1  | judgment of the United States Attorney the   |
| 2  | testimony and other information to be         |
| 3  | obtained from Barry Bonds is necessary to     |
| 4  | the public interest; and four, the motion     |
| 5  | filed here has been made with approval of     |
| 6  | the designate of the assistant attorney       |
| 7  | general in charge of the criminal division    |
| 8  | of the Department of Justice pursuant to      |
| 9  | the authority invested in him by 18           |
| 10 | U.S.C., Section 6003 and 28 C.F.R. 0.175,     |
| 11 | it is therefore ordered that Barry Bonds,     |
| 12 | as soon as he may be called, shall testify    |
| 13 | under oath and provide other information,      |
| 14 | including documents in this case, and in      |
| 15 | any further ancillary proceedings.  It is     |
| 16 | further ordered that the testimony and        |
| 17 | other information compelled from Barry        |
| 18 | Bonds pursuant to this order, including       |
| 19 | personal or business records, the fact of     |
| 20 | his production of any records, and any        |
| 21 | information directly or indirectly derived    |
| 22 | from such testimony may not be used           |
| 23 | against him in any criminal case except a     |
| 24 | prosecution for perjury, false               |
| 25 | declaration, or otherwise failing to         |

8

```
 1                     comply with this order.  It is further
 2                     ordered that the government's application
 3                     of this order be placed under seal until
 4                     further order by the court, except that a
 5                     copy of this order may be served on the
 6                     witness and/or his counsel and disclosed
 7                     to the grand jury conducting the
 8                     investigation in this matter."
 9               And this is filed on December 1 of this year
10     and signed by United States District Judge Maxine
11     Chesney, C-h-e-s-n-e-y.
12               So, Mr. Bonds, you received a copy of the order
13     that I just recited; correct?
14          A.   Yes.
15          Q.   So, again, I guess, just to make sure as best I
16     can do it, in plain-speak, we go through what that
17     means.
18               The presumption, Mr. Bonds, is that people have
19     a Fifth Amendment right not to make statements that they
20     have a belief might incriminate themselves.  After
21     reading that order do you understand that fundamental
22     principle?
23          A.   Yes.
24          Q.   Okay.  Now, do you understand that for today's
25     purposes you've been ordered to testify, but there are
```

1    limitations as to how the government could use those

2    statements against you in the future.

3          Do you understand that?

4       A.    Yes.

5       Q.    And those limitations are that, because you're

6    compelled to answer questions put by myself, Mr. Nadel,

7    or the grand jury -- because you're being compelled, the

8    government can't use those statements either directly

9    against you in any subsequent criminal proceeding or

10   indirectly to develop evidence against you in a

11   subsequent criminal proceeding.

12         Do you understand that?

13      A.    Yes.

14      Q.    Okay.  Now, there's an exception to what I just

15   said.  And so let me make sure that that exception is

16   clear.  And is exception is that if it were to be the

17   case that you were untruthful today or false -- and I

18   have no reason to think that you would be today, but I

19   say this to every witness that comes in here -- if there

20   were a prosecution for perjury, false declaration, false

21   statements or otherwise failing to comply with this

22   cord, that would be a circumstance where these

23   statements could be used against you.

24         Do you understand that?

25      A.    Yes.

1    Q.    All right.  Great.  I think that that concludes
2    the legal questions before we get to the substance of
3    things.
4         Do you have any questions about these rights
5    that I've discussed before we get to the substance of
6    the questions?
7         A.    No.
8    BY MR. NADEL:
9         Q.    Mr. Bonds, Ross Nadel.  I'm also an assistant
10   United States attorney.
11        We have had an opportunity -- namely, yourself;
12   your lawyer, Michael Rains; Mr. Nedrow; myself; and an
13   IRS agent -- to speak briefly before this session began;
14   is that right?
15        A.    Mm-hmm -- yes.
16        Q.    And did we also discuss what Mr. Nedrow just
17   summarized, the use of immunity order, during that
18   session within the last hour?
19        A.    Yes.
20        Q.    And did I explain it during that session?
21        A.    Yes.
22             We've had our disagreements.
23        Q.    Now, having had that conversation with your
24   lawyer present --
25        A.    Right.

1          Q.    Your lawyer is Michael Rains in connection with

2    this proceeding?

3          A.    Right.

4          Q.    And he is outside the grand jury room; is that

5    correct?  As far as you know.

6          A.    As far as I know.

7          Q.    And having had that conversation in the

8    presence of your attorney and then with the explanation

9    and the questions that Mr. Nedrow just asked you, is

10   there anything that you're unsure of with regard to the

11   use of immunity order compelling you to testify that we

12   need to clear up now?

13         A.    No, none at all.

14   BY MR. NEDROW:

15         Q.    Okay.  Great.  Mr. Bonds, you're a professional

16   baseball player?

17         A.    Correct.

18         Q.    And you play for the San Francisco Giants;

19   correct?

20         A.    Correct.

21         Q.    How long have you been a professional baseball

22   player?

23         A.    Since 1985.

24         Q.    And how long have you been with the Giants?

25         A.    Since 1993.

1       Q.    Okay.  And one more background question and

2    we'll move on, but what would you describe as your

3    best -- or the athletic achievement you're most proud

4    of?

5       A.    My draft in, when I was drafted in 1985.

6    There's no better achievement than fulfilling your goal.

7       Q.    Okay.  You also in 2001, I think, set the

8    single-season home run record; correct?

9       A.    Correct.

10      Q.    And you hit 73 home runs that year; is that

11   correct?

12      A.    Correct.

13      Q.    And Mr. Bonds, what's your birth date?

14      A.    July 24, 1964.

15      Q.    Mr. Bonds, I want to ask you some questions

16   about the individuals we identified as the targets of

17   this investigation.  And let me start with Greg

18   Anderson, actually.

19            How long have you known Greg Anderson?

20      A.    Since we were children.

21      Q.    And if I could be a little more -- ask you to

22   be a little more precise, I know you might not remember

23   the exact year or date, but how old approximately do you

24   think you were when you met him?  Elementary school,

25   high school?

```
 1        A.    Fifth grade, 6th grade, somewhere around there.
 2        Q.    So, you've known him -- and again, please
 3   correct me if I'm wrong if I'm wrong on this, but some
 4   25 to 30 years?
 5        A.    Right.  Greg and I also lost touch with each
 6   other, too.
 7        Q.    Okay.  During what period of time did you lose
 8   touch?
 9        A.    Since high school.  Greg's family moved.  So,
10   Greg -- I haven't seen Greg since high school.  And I
11   got in touch with Greg, I think it was 1998.  So, I
12   haven't seen Greg for a long time in between there.
13   But, I mean, we were childhood friends.
14        Q.    And then beginning in 1998 you guys
15   reestablished contact; is that correct?
16        A.    Correct.
17        Q.    At the time you reestablished contact with him,
18   what was the nature of the relationship?  Was it a
19   personal, professional relationship, or --
20        A.    I had a previous trainer that kind of did
21   everything for me.  And Greg is a weight lifting
22   trainer.  And we're friends, grew up together, go over
23   there to see what he does, I liked his philosophy, and
24   we started working out together.
25        Q.    Okay.  And has that relationship continued to
```

1    the present date or did it end at some point?

2         A.    No.   We still train today.

3         Q.    And when you said "over there" to see what he

4    was about, where was, in '98, Mr. Anderson working or

5    training out of?

6         A.    He's been training out of World's Gym, from

7    what I know of.   That's where I train is at World's Gym

8    until Burlingame.

9         Q.    At the time you got back in touch with Greg, if

10   I can just ask, did someone mention to you that Greg was

11   involved in weight training?  Or did you guys personally

12   get back in touch?  Or how did that happen?

13        A.    I don't know how that happened.   Greg and I

14   have a mutual friend, the McKercher family, which -- his

15   mother is down with cancer at this time.  And I think we

16   ran into each other and that's how we started talking

17   again.   I believe it was at the end of the '98 season.

18   I'm not exactly sure.

19        Q.    Okay.   At the time you started working out with

20   Mr. Anderson again, what was he providing to you or what

21   were you getting out of his training advice?

22        A.    Well, I felt that, you know, I was getting

23   rugged with my other trainer, you know, doing the same

24   thing over and over again.   And, you know, sometimes you

25   need a change.   You know, you need to move on, to push

15

```
 1   your body to another level, have another coach.  And
 2   that's what it came down to.
 3           And I liked Greg's philosophy.  Greg is -- I
 4   train all year-round.  I just don't train just in
 5   off-season.  I train all year-round.  That's almost -- I
 6   take three weeks -- two weeks to a month off at any
 7   given point in my career.  So, I'm in that gym every
 8   day, okay?
 9      Q.   Okay.
10      A.   And I like Greg's philosophy.  Because my other
11   trainer was, like:  You do three sets of legs, three
12   sets of this, three -- you know.  And Greg is more:  16
13   sets of chest, more biceps, to really maximize and
14   expand your muscle.  And I liked that philosophy.  And I
15   admired that.
16           And I just believe people are experts in
17   their -- you know, in each of their fields.  I have a
18   running coach, I have a stretch and flexibility coach, I
19   have a strengthening coach.  I just believe people are
20   experts in their field, and there's not a one shop stop,
21   that's all.
22      Q.   The things you've talked about are
23   prescriptions or regimens for weight training basically;
24   is that accurate?
25      A.   Yes.
```

```
 1        Q.    Besides providing you with advice on weight
 2   lifting systems, did Mr. Anderson provide you with
 3   anything else in connection with your working out with
 4   him?
 5        A.    Vitamins and protein shakes.
 6              I also was with Twin Lab too at that time.
 7        Q.    Sorry?
 8        A.    I also was with Twin Lab at that time, too.
 9        Q.    Twin Lab -- what's Twin Lab?
10        A.    Twin Lab is a vitamin company, provides
11   vitamins.
12        Q.    Did Mr. Anderson ever talk to you about giving
13   blood tests or urine tests?  I'm sorry.  Let me make it
14   more clear.
15              Did he ever ask you to provide blood samples or
16   urine samples for testing?
17        A.    Yes.
18        Q.    When did he start asking you to do that, right
19   off the bat or as time went on?
20        A.    I don't know, I believe it was maybe 2000,
21   2001, I believe so.
22        Q.    And did he explain to you why he wanted to test
23   your blood or your urine?
24        A.    He wanted to do a blood test sample to try to
25   regulate your levels, if you're lacking in zinc or
```

17

1   magnesium or, you know, like, your deficiency in your

2   body.  And I was curious about it.  You know, that's a

3   unique thing to find out.  And to supplement it with

4   food.  I have a cook.  So, I had a cook, and I had a

5   nutritionist at Stanford, a lady that was telling us,

6   you know, all the nutrition stuff, too.  And Greg was

7   also helping in that.

8          And then to take the blood test at BALCO was

9   just the thing to figure out what you're deficient in

10  and be able to supplement that with vitamins or food

11  intake.  And I thought it was just a neat idea.

12         Q.   Okay.  How many times did you provide blood

13  samples for testing?  Was that a common thing or just

14  happen a few times?  Or what would you estimate?

15         A.   I don't know, maybe five or six times, maximum.

16         Q.   And would that be all within the 2000, 2001

17  period, or would it be over the last several years?

18         A.   Over the last -- all the way until now, this

19  year.

20         Q.   And regarding the urine samples -- let me ask,

21  I guess, the same questions regarding the urine samples.

22  How often did you provide those?

23         A.   Oh, I can't recall.  Maybe four times, maybe.

24  I don't recall.

25         Q.   So, understanding four would be kind of an

 1   estimate, but kind of in the ballpark, or around four?

 2       A.    Yes.

 3       Q.    Did he ask you why -- or, excuse me, did he

 4   tell you why urine samples?

 5       A.    No.   I didn't -- we were friends.   I didn't ask

 6   Greg a bunch of questions.   We are friends, we grew up

 7   together, you know, we don't do that stuff.   If he needs

 8   something, fine, fine.

 9       Q.    Does Greg, in addition to the weight lifting,

10   have a background in terms of the nutritional-type

11   stuff?

12       A.    He says he studied, you know.   He -- to me he

13   seems pretty knowledgeable.

14       Q.    Okay, okay.

15            MR. NADEL:   Excuse me, Mr. Bonds.

16            The -- Mr. Nedrow just asked you about the

17   urine samples, and if you asked Mr. Anderson why he was

18   asking you to provide them.   Did he tell you -- besides

19   whether you asked, did he tell you why he was asking you

20   to provide urine or blood samples.

21            THE WITNESS:   For my regulations of what my

22   body intake is, that -- you know, just to regulate my

23   body, what the deficiencies is in my body.

24            My dad did it.   You know, my family did it.

25   BY MR. NADEL:

                                                            19

```
 1        Q.    Did you provide the blood samples directly to
 2    Mr. Anderson?
 3        A.    Yeah, I had my own personal doctor come up to
 4    draw my blood.  I only let my own personal doctor touch
 5    me.  And my own personal doctor came up and drew my
 6    blood and Greg took it to BALCO.
 7        Q.    What about the urine samples?
 8        A.    Same thing, come to my house, here, go.
 9        Q.    That was the doctor, that was at your house,
10    and provided it to --
11        A.    Yes.
12        Q.    -- to Mr. Anderson; right?
13        A.    Yes.
14        Q.    Did he tell you where those samples would be
15    tested?
16        A.    Where he was taking them?
17        Q.    Yes.
18        A.    I believe BALCO.
19        Q.    Did he tell you that?
20        A.    Yeah -- yes.
21        Q.    Did he tell you what he was going to test them
22    for?
23        A.    I believe it was the same thing for the blood,
24    the blood and the thing are the exact same thing.  So, I
25    didn't ask him.
```

1        Q.    I'm not asking what you believed or what you

2   asked him.   I'm asking what he told you.

3             Did he tell you --

4        A.    I can't recall, I cannot recall.

5        Q.    So, you don't know whether or not he mentioned

6   what --

7        A.    I cannot recall specifics, no, not at all.

8             MR. NADEL:   Good.

9   BY MR. NEDROW:

10       Q.    Since you -- sorry we're going to be popping up

11  and down a little bit.   But we'll try to do it at the

12  same time.

13            But you referenced BALCO, so let me now ask you

14  about BALCO.   What was Greg's connection or relationship

15  with BALCO?

16       A.    I have no idea their personal relationship or

17  any -- their relationship.   I don't get into anyone's

18  business like that.

19       Q.    Okay.   How is it -- and, well, I think you

20  already answered this question.   You knew from Greg that

21  your samples were being tested at BALCO; is that

22  correct?

23       A.    That's correct.

24       Q.    Did Greg ever explain to you what BALCO was?

25  Or what did he say to you about BALCO?

21

1        A.   He said that, you know, this is where hospitals

2   would send samples, because most hospitals don't keep

3   their blood intakes from, you know, patients and stuff

4   like that.  They send them out to labs.  Makes sense to

5   me.

6        Q.   Sure, fair enough.

7        A.   I'm like, fine, okay.  And you know, I want --

8   I was just baffled like, you know, should have been

9   doing this a long time ago, you know, drawing blood,

10  finding out what you're lacking and stuff, you know,

11  keep your energy up if you're this or that.  And that

12  was it.  That's all I thought about.

13       Q.   Did Greg actually work for BALCO?

14       A.   No.  They were friends.

15       Q.   I'm sorry?

16       A.   I think they're friends.

17       Q.   And when you say "they," who are friends?

18       A.   Greg and the guys at BALCO.

19       Q.   Let's get into that.

20            Do you know a person named Victor Conte?

21       A.   Yes.

22       Q.   Approximately when do you think you met Victor

23  Conte?

24       A.   I met Victor the first time Greg took me to

25  BALCO to explain to me how the blood deficiency thing

1   was.  And I did an ad for BALCO.  And I may have seen

2   Victor twice or three times, maximum.

3       Q.   Okay.  So -- and I want to make sure I'm right

4   on this, is Greg the person who introduced you to Victor

5   Conte?

6       A.   Yes.

7       Q.   What did Greg tell you specifically, if you can

8   remember it, about what Victor could provide to you?

9       A.   Greg only took me there for Victor for the

10  blood.

11      Q.   Okay.

12      A.   That's it.

13      Q.   All right.  Other than understanding that you

14  could get help with the blood analysis, did you ever get

15  any other services from Mr. Conte?

16      A.   Victor?

17      Q.   Yes.

18      A.   No.

19      Q.   Let me ask the same question about Greg at this

20  point, we'll go into this in a little bit more detail,

21  but did you ever get anything else from Greg besides

22  advice or tips on your weight lifting and also the

23  vitamins and the proteins that you already referenced?

24      A.   This year, in 2003 -- at the end of 2002, 2003

25  season, when I was going through -- my dad died of

23

1    cancer, you know, and everyone knows that.

2        Q.    Yes.  I'm sorry about that.

3        A.    And everyone tries to give me everything.  You

4    got companies that provide us with more junk to try than

5    anything.  And you know that as well.

6            I was fatigued, tired, just needed recovery,

7    you know.  And this guy says:  "Try this cream, try this

8    cream."  And Greg came to the ballpark and he said, you

9    know:  "This will help you recover," and he rubbed some

10   cream on my arm, like, some lotion-type stuff, and,

11   like, gave me some flax seed oil, that's what he called

12   it, called it some flax seed oil, man.  It's, like:

13   "Whatever, dude."

14           And I was at the ballpark, whatever, I don't

15   care.  What's lotion going to do to me?  How many times

16   have I heard that:  "This is going to rub into you and

17   work."  Let him be happy.  We're friends.  You know?

18       Q.    When did that happen for the first time?

19       A.    Not until 2003, this season.

20       Q.    And when you say 2003 --

21       A.    You said everything that he gave me, so that

22   means up to now.

23       Q.    Exactly, you're exactly right.  You're right

24   about my question.  All right.  So, we'll get into that

25   in some detail.  But I appreciate that.  Let me ask a

1    couple quick questions before we get to that.

2           I want to talk for a moment -- you mentioned

3    the vitamin and the protein shakes. Can we get into

4    this in a little bit more detail. And these are the

5    things that we would characterize as over-the-counter

6    type stuff. Can you give us a brief summary of that

7    type of stuff that Greg gave you?

8         A.    I was going to bring a package for you, but

9    unfortunately I got up at four o'clock this morning to

10   train before I got here and forgot it. But Greg

11   packaged it up for me, so I never saw the actual bottles

12   that he was taking it from. They would come in just

13   little, clear plastic. And they would have -- there's

14   probably like ten or 12 different pills in there. And

15   you're talking about multivitamin to vitamin E to omega

16   threes, to, you know, ZMA -- the ZMA that BALCO had --

17   to liver pills to oxygen, you know, anything -- he'd

18   abbreviate it and call it whatever.

19          But I had no reason to doubt what he was giving

20   me, because we were friends. No reason to doubt him.

21        Q.    Let me ask you, then, about this flax seed oil

22   thing that you mentioned.

23          Tell me a little bit more about what that

24   looked like, if you could, please?

25        A.    It came in, like, a -- what is that that you

1    have right there?

2         Q.   Actually, I'm sorry.  I probably should have

3    put this out to make it more efficient, and ask you if

4    this looks familiar to you at all?

5         A.   Yeah, that's what it looked like.  And he -- it

6    would be, like, this much (indicating).  And you would

7    get, like, two drops underneath your tongue, like

8    this -- you know, like -- you ain't taking this whole

9    thing (indicating).  It was this little bit right in

10   here.

11        And I was, like -- you know, to me it didn't

12   even work.  You know, me, I'm 39 years old.  I'm dealing

13   with pain.  All I want the pain relief, you know?

14        Q.   Mm-hmm.

15        A.   And, you know, to recover, you know, night

16   games to day games.  That's it.  And I didn't think the

17   stuff worked.  I was, like:  "Dude, whatever," but he's

18   my friend, you know?

19        Q.   And you know what I should do is, we previously

20   identified this item as an exhibit for the record, I

21   think, but let's re-identify it for today's record and

22   we'll match them up later on.

23        Want to make sure there's no overlap between

24   the exhibits.  But we'll call this Exhibit 501 and that

25   is the plastic vial that you have there.

26

1           And let me also ask -- I'm including 501 -- let
2    me ask you about the other item, yes, is that consistent
3    with the -- with Mr. Anderson giving you this -- did he
4    give you something to take the --
5         A.    Like this (indicating)?
6         Q.    Yes.
7         A.    No, he never gave me this.
8         Q.    Did not.  So, you don't recognize that at all?
9         A.    No.  It was in this (indicating).  He brought
10   it to the ballpark.
11        Q.    Right, okay.
12        A.    And it was in this (indicating).
13        Q.    Right.
14        A.    And it was this much (indicating) inside this.
15   Like a little bit of this.  And then I just go like this
16   (indicating) and throw it in the trash.
17        Q.    Okay.  So, you just -- it was so small you'd
18   just drink the contents in a small amount?
19        A.    Yeah, it might have been even a smaller tube
20   than this (indicating), you know.  I don't know if they
21   come in different sizes.  But it was a tube like this
22   (indicating).  I'd open it up like this (indicating),
23   take a little bit, go like this underneath my tongue,
24   and then throw it away.
25        Q.    Did he say anything about -- go ahead.

27

1    BY MR. NADEL:

2         Q.   Mr. Bonds, just to make sure -- especially, as

3    you can see, to my right there's a court reporter who's

4    taking down what's being said.  There were a lot of

5    "this's" in those questions and answers.  And I just

6    want to make sure it's clear.

7              When you referred to "this" and held up

8    something that you were given some liquid from, are you

9    referring to the tube there that has some kind of

10   gold-colored fluid in it right in front of you?

11        A.   Pertaining to a tube that was called flax seed

12   oil to me.

13        Q.   And it looked something like that tube in front

14   of you?

15        A.   It looked something exactly like that.

16        Q.   And then the other "this" which was the thing

17   you said no, you didn't see, was the thing to the right

18   that looks kind of like a hypodermic needle?

19        A.   Yes, whatever you want to call it.

20        Q.   And that you didn't -- you don't recognize at

21   all?

22        A.   That's not something I was given.

23        Q.   Just to make sure that it's clear what we're

24   talking about in the record.

25   BY MR. NEDROW:

28

1    Q.    And -- all right.  So, how many times

2    approximately do you think you got these tubes with what

3    Mr. Anderson told you was flax seed oil?

4         A.    Maybe once a home stand or something, if that.

5    Greg didn't travel with me on the road.  So, I was at

6    home, when I came home.

7         Q.    And the first time was the beginning of this

8    year's season, in 2003?

9         A.    Yes, 2003, because I was battling with the

10   problems with my father and the -- just the lack of

11   sleep, lack of everything.

12        Q.    Okay.

13        A.    And I had a bunch of massage people trying to

14   keep me going and, you know, a lot of training and stuff

15   like that.  And I was just getting fatigued and not

16   recovering.

17        Q.    Okay.  Had you ever taken flax seed oil, by the

18   way, before?

19        A.    I never asked Greg.  When he said it was flax

20   seed oil, I just said:  "Whatever."  It was in the

21   ballpark.

22        Q.    Right.

23        A.    You know, in front of everybody.  I mean, all

24   the reporters, my teammates.  I mean, they all saw it.

25   I didn't hide it.  I didn't hide -- I didn't hide

29

 1    anything.

 2              I mean, I didn't question anything when he --

 3    you know, if I'm at the ballpark or something -- you

 4    know, trainers come up to me and say: "Hey, Barry, try

 5    this." I don't really question it, move on. You know?

 6         Q.   Okay. Did you even know what flax seed oil was

 7    at the time he presented it to you?

 8         A.   Not really. Not at all.

 9         Q.   Every time he gave it to you, did it have this

10    very small amount? Did he ever give you, like, an

11    eyedropper or any other mechanism to --

12         A.   No. It all came in that (indicating) and I

13    just took it and threw it in the trash.

14         Q.   This will be approximate, probably, but

15    approximately how many home stands back and forth do you

16    have during a season? Is it --

17         A.   I have no idea.

18         Q.   No idea.

19         A.   You can look it up.

20         Q.   Look at the schedule. Okay.

21              But you think about one a home stand is

22    accurate?

23         A.   That's pretty much accurate.

24    BY MR. NADEL:

25         Q.   Did you notice after you took it that it had

                                                              30

```
 1    any affect -- appeared to you to have any affect on you

 2    at all?

 3         A.    I -- I told him:  "It's not doing crap.  I'm

 4    still in pain.  I'm still feeling the pain."

 5         Q.    You, yourself --

 6         A.    I still felt fatigued and had a heart condition

 7    in Arizona.  It's not working.

 8         Q.    And other than what Mr. Anderson told you, you

 9    didn't know what this substance consisted of at all?

10         A.    No.  I had no reason to doubt him.  We were in

11    the ballpark, inside the stadium.  You know, if I was

12    somewhere else, maybe, I probably would have -- I'm not

13    that way, sir.  Sorry.  I'm not the type of person to

14    pry into people's business.  And I really believe my

15    friends.

16         Q.    Well, let me ask you this, if Mr. Anderson came

17    to you at the ballpark with some other substance,

18    whatever it is, if he asked you to take some other

19    substance and said it was some other type of oil,

20    whatever he asked you to take, would you take it?

21         A.    I would trust that he wouldn't do anything to

22    hurt me.

23         Q.    Okay.  But you wouldn't ask any further

24    questions.  You'd just basically -- because he's your

25    friend, if he asked you to take it, you would take it?
```

```
 1        A.    He would do the same thing for me.
 2   BY MR. NEDROW:
 3        Q.    Okay.  And regarding the effects of it, were
 4   there any negative effects, like side effects, that you
 5   could remember from it?
 6        A.    Not that I know of.
 7        Q.    Other than telling you it was flax seed oil,
 8   did Greg ever tell you anything else about what the
 9   substance was?
10        A.    No.
11        Q.  . Did he ever -- and I know -- some of these
12   questions I've just got to ask.  I know you're going to
13   say:  "I just told you 'no.'"  But did he ever tell you
14   it was, like, a chemically or molecularly altered
15   steroid?  Did Greg ever tell you anything like that?
16        A.    No, because my other trainer Harvey, who is 50
17   years old, was taking the same stuff.  So, I didn't have
18   any reason to say anything.  And he said it's flax seed
19   oil.  And he gave it -- I mean, he's my strengthening
20   coach.  So, there was no reason to doubt him.
21   BY MR. NADEL:
22        Q.    Mr. Anderson had never given you anything or
23   asked you to take anything before the 2003 season; is
24   that right?
25        A.    We never had those discussions.  We don't
```

                                                          32

1  discuss about his -- you know, part of his world of

2  business is his business.  My business is my business.

3  So, we don't --

4       Q.    I'm asking --

5       A.    No.

6       Q.    That's not my question.  My question is --

7       A.    No.

8       Q.    -- prior to the last season, you never took

9  anything that he asked you to take, other than vitamins?

10      A.    Right.  We didn't have any other discussions.

11      Q.    No oils like this or anything like this before?

12      A.    No, no, no, not at all.  Not at all.

13 BY MR. NEDROW:

14      Q.    And let me ask, in the -- and I'm asking more

15 about your interactions with Victor Conte, but did you

16 ever discuss this substance specifically with Victor

17 Conte?

18      A.    I didn't ever talk to Victor Conte except the

19 times I seen him.  And those were times that he

20 presented to the blood thing to explain it to me.  And

21 when I did the ad for his muscle magazine because I

22 thought he was giving Greg all this stuff for free,

23 because I never paid for anything.  I was never charged

24 anything.

25            So, I thought Greg was getting the vitamins and

33

1    protein shakes for free. And I still believe he is but

2    I don't know the truth of it. I don't know. So, I was,

3    like, okay, he did me a favor, I could do his magazine.

4        Q.   Did Greg tell you where he got the flax seed

5    oil from?

6        A.   I never asked him, I just assumed it was BALCO.

7    I never asked him.

8        Q.   What made you assume it was BALCO?

9        A.   Because they're friends, you know. I just

10   assumed it was them.

11       Q.   But you don't recall Greg ever saying he got it

12   from BALCO or anything like that?

13       A.   I don't recall that, no.

14       Q.   During the 2003 season when you testified you

15   took that item that you understood was flax seed oil,

16   did it ever change -- did Greg ever talk to you about it

17   changing into a different form or having a different

18   kind of look to it? Or do you remember it changing at

19   all?

20       A.   No.

21       Q.   Okay. I want to ask you about another thing.

22            And as I bring it up, Mr. Bonds, let me ask you

23   this question. And that is, in connection with this --

24   thank you, I'll put that back -- did Mr. Anderson ever

25   give you an item that looks like that, Exhibit 502,

34

1    which he identified to you as a cream of some sort to

2    put on your body, basically?

3        A.    Yeah, this is that lotion stuff.  It looks like

4    it from -- just from me looking at it, it's the same

5    color.

6        Q.    Let me ask you about the lotion stuff, as you

7    called it.

8            What did Greg tell you the lotion was?

9        A.    I just told Greg that I was having problems

10   recovering.  I -- the pain -- I have bad arthritis.

11   I've played 18 years, bad knees, surgeries, so on.  And

12   I said:  "I just need to recover," you know, that's all,

13   the pain -- "Just take the pain away."  In the early

14   part of my baseball career -- you could get certain

15   pills that you could take.  And I said:  "I don't want

16   to be addicted to anything, I don't want to be addicted

17   to pain pills and stuff like this to take pain away."

18   There's got to be -- you know:  "They're rubbing all

19   this stuff on me, there's got to be something that you

20   can --" you know, that can loosen me up, you know, to

21   take the arthritis pain away that I feel in the mornings

22   when it's super cold.  And they'll -- you know, they'll

23   try certain heats, they'll try so and so, but I still

24   feel the pain.

25           And he said:  "Okay, you know, let me check."

                                                          35

```
 1    And he goes:  "Well, try this."  You know?  And he
 2    rubbed it right here (indicating).
 3        Q.   Can you indicate what you mean by "right here"
 4    so it's --
 5        A.   Right on my -- just right inside of the arm
 6    right here.
 7        Q.   Okay.  Like your elbow, whatever that is,
 8    inside your elbow, there?
 9        A.   Yeah.  He'd rub it right here.  And he was --
10    you know, I was like whatever.  You know, I was at the
11    ballpark, so I didn't really think anything.  You know,
12    sorry, but, I mean, he came to me at the ballpark.
13             MR. NADEL:  Just going back to Mr. Nedrow's
14    original question.  Did Mr. Anderson ever tell you what
15    that substance was?
16             THE WITNESS:  No.  He just said:  "Here, try
17    this, it might help."
18    BY MR. NEDROW:
19        Q.   And you didn't ask him what it was?
20        A.   No.
21        Q.   How often were you supposed to take that
22    lotion?  Or administer, I guess, whatever you want to
23    say.  How often were you supposed to put that on?
24        A.   I didn't take it that often at all.  I can't
25    recall how many times, but it wasn't much at all.
```

1    Q.    Did either this -- or actually 501, the prior

2    thing, did it come in cans -- or vials like that?  Did

3    they have any, like, labels or packaging or anything, or

4    did they just come in vials like that?

5    A.    This one didn't come in this (indicating).  I

6    believe only that (indicating) -- whatever number, right

7    there, the flax seed oil, 501 stuff, came like that.

8    Q.    Okay.

9    A.    This one he brought in like a flatter tube with

10   a top, like more of a rounded top thing.  And then he

11   had like a little -- just like a little spoon.  And he'd

12   just go like this (indicating) and just rub it on your

13   arm.

14   Q.    Okay.

15   A.    And I didn't think anything of it.  He'd rub it

16   on -- rub it right on my skin.  I didn't even think

17   anything of it.

18   Q.    Did he give you any instructions on how often

19   to -- I know you said you didn't take it that often.

20   But did he give any instructions, like, you know:  "Use

21   this once a home stand," or once a week or whatever it

22   might be?

23   A.    You're assuming that I had this -- I never had

24   any of this stuff with me.  Greg brought it to me,

25   brought it to the ballpark.

37

1         Greg comes to the ballpark every day, and we
2    train every day.

3         Q.   I see.

4         A.   So, I never held -- got anything.  I never took
5    anything home, nothing.  He came with the ballpark and
6    then, you know, I would go train -- we'd go train in the
7    gym.

8         Q.   I see.

9         A.   And then I'd come back, I'd be tired or
10   fatigued, or so and so.  And then my other trainer is
11   rubbing my ankles, feet, legs, and I'm going through the
12   whole massage thing, getting ready for a game.

13        Q.   Okay, okay.  Thank you for clarifying that.

14             Do you remember how often he recommended to you
15   about, approximately, that you take this cream, this
16   lotion?

17        A.   I can't recall.  I don't -- I wish I could.  I
18   just can't... I just know it wasn't often.  I just
19   think it was more when I was exhausted or tired than
20   like a regular regimen.  You know, it was like if I was
21   really sore or something, really tired.

22        Q.   Okay.  I'm sorry.  Were you done?

23        A.   Yeah, that's -- that's -- that's all I can
24   remember about that.

25        Q.   Would you say -- and I'll leave it at this --

1    but would you say it was more or less often or about the

2    same as the amount of times you took the liquid, the

3    flax seed oil, the thing you understood to be flax seed

4    oil?

5         A.    I don't know.   I never kept track of that

6    stuff.   I'm sorry.   I didn't sit there and monitor that

7    stuff.

8         Q.    And what were the results or the effects of

9    this lotion?   Did you find it helpful to you?

10        A.    I thought it was -- oops.

11        Q.    I'm sorry?

12        A.    Oops.   I -- I almost said something.

13              I thought it was really bad.   I didn't think it

14   did anything, to be honest with you.   I didn't think it

15   did anything.

16        Q.    Any negative side effects?

17        A.    I still felt the pain.

18        Q.    That's negative.

19        A.    Well, I was already in pain.   So, it didn't

20   help, you know?   And you put ice pack on and it will

21   take the pain away, you know.

22        Q.    Right.

23        A.    To me, I, you know -- like I say, there's a lot

24   of companies and people that come up with a lot of

25   gimmicks with us.

1       Q.    Right.

2       A.    You try it, you make them happy, instead of you

3   have these long conversations with them all day why it's

4   better than this product, this product.  You kind of

5   just say:  "Here, be happy," move on.

6       Q.    Did Greg ever talk to you about this cream

7   actually being a steroid cream that would, you know,

8   conceal steroids or testosterone in your blood, did Greg

9   ever ask -- tell you about that?

10      A.    No, no.

11      Q.    Okay.  Let me ask you about a few other

12  things -- oh, I'm sorry, one more thing.

13            Did you ever talk to Victor Conte about this

14  lotion or this cream?

15      A.    No.  I have -- like I said, I only talked to

16  Victor Conte when I saw him.  I never talked to Victor

17  Conte any time other than that, that I can recall, ever.

18      Q.    Did Greg tell you where he was getting that

19  lotion or that cream from?

20      A.    No.  But I assume it was BALCO.

21      Q.    And again, about this cream, why would you

22  assume it was from BALCO?

23      A.    Because they were friends, you know.

24      Q.    They were friends.  But of course, it wasn't

25  just because they were friends, it was because BALCO

1    made stuff or provided stuff, I mean --

2         A.    I never been in BALCO long enough to know

3    anything they did.  I was in the front room, the front

4    of the building, okay?  I had my personal doctor do my

5    blood.  That's it.  I went to the back to a weight room

6    to do an ad for them.  I can't tell you what's in that

7    building because I don't know.

8         Q.    How many times have you been into BALCO?

9         A.    Two to three times at the max.

10        Q.    And where is BALCO located in connection with

11   the gym, World Gym, that Greg uses for his workouts?

12        A.    Right down the street.

13        Q.    Did Greg ever talk to you about something

14   called norbolothone?

15        A.    Who?

16        Q.    Norbolothone.

17              Did you ever hear of that?

18        A.    I never heard of that.  Sorry.

19        Q.    All right.  Did Greg ever talk to you or give

20   you anything called human growth hormone?

21        A.    No.

22        Q.    Did he ever talk to you about anything called,

23   as a shorthand term, something called G?  The G?  And I

24   use that as an abbreviation, I guess, something called

25   the G.  Did he ever talk to you about the G?

1       A.    I don't know what G is.

2       Q.    Do you recall Greg ever trying to give you G,

3    something he called G?

4       A.    No.

5       Q.    Did Greg ever give you anything that required a

6    syringe to inject yourself with?

7       A.    I've only had one doctor touch me.  And that's

8    my only personal doctor.

9             Greg, like I said, we don't get into each

10   others' personal lives.  We're friends, but I don't --

11   we don't sit around and talk baseball, because he knows

12   I don't want -- don't come to my house talking baseball.

13   If you want to come to my house and talk about fishing,

14   some other stuff, we'll be good friends.  You come

15   around talking about baseball, you go on.  I don't talk

16   about his business.  You know what I mean?

17      Q.    Right.

18      A.    That's what keeps our friendship.  You know, I

19   am sorry, but that -- you know, that -- I was a

20   celebrity child, not just in baseball by my own

21   instincts.  I became a celebrity child with a famous

22   father.  I just don't get into other people's business

23   because of my father's situation, you see.

24            So, I don't know -- I don't know -- I've been

25   married to a woman five years, known her 17 years, and I

1 don't even know what's in her purse.  I have never

2 looked in it in my lifetime.  You know, I just -- I

3 don't do that, I just don't do it, and you know, learned

4 from my father and throughout his career, you don't get

5 in no one's business, you can't -- there's nothing they

6 can say, you can't say nothing about them.  Just leave

7 it alone.  You want to keep your friendship, keep your

8 friendship.

9  Q. Did either Mr. Anderson or Mr. Conte ever give

10 you a liquid that they told you to inject into yourself

11 to help you with this recovery type stuff, did that ever

12 happen?

13  A. No.

14  Q. Okay.  At this time, Mr. Bonds, the grand jury

15 has --

16  MR. NADEL:  If I could just go back to

17 Mr. Nedrow's question a few moments ago.

18  MR. NEDROW:  Okay.

19 BY MR. NADEL:

20  Q. I wasn't sure if I heard the answer to the

21 question.

22  Other than your own personal doctor that you

23 referred to --

24  A. Well, the team -- you know, you have to have a

25 physical.  I'm sorry.  Forgot about the team.  You have

1    to have a physical, they take blood from you then.  But

2    I wouldn't let no one, no.  That's why my personal

3    doctor drew the blood for BALCO to begin with.

4         Q.   So no one else other than perhaps the team

5    doctor and your personal physician has ever injected

6    anything in to you or taken anything out?

7         A.   Well, there's other doctors from surgeries.  I

8    can answer that question, if you're getting technical

9    like that.  Sure, there are other people that have stuck

10   needles in me and have drawn out -- I've had a bunch of

11   surgeries, yes.

12        Q.   So --

13        A.   So sorry.

14        Q.   -- the team physician, when you've had surgery,

15   and your own personal physician.  But no other

16   individuals like Mr. Anderson or any associates of his?

17        A.   No, no.

18   BY MR. NEDROW:

19        Q.   Just to follow-up before I go on to my other

20   thing, have you ever yourself injected yourself with

21   anything that Greg Anderson gave you?

22        A.   I'm not that talented, no.

23        Q.   Okay.  We have a packet that I would like to

24   identify as Exhibit 503.

25             And I have distributed copies of it.

44

```
 1              And Mr. Bonds, this is the first page.  So,
 2    we're going to refer to page one of that packet.  And
 3    I'd like to give you a moment, Mr. Bonds, to look at it.
 4    And I want to ask you a couple questions about it.
 5              Do you recognize this document, Mr. Bonds?
 6         A.   No, I do not.
 7         Q.   Do you recognize the handwriting on it?
 8         A.   No, I do not.
 9         Q.   I just want to go over what's indicated on this
10    document.  It says, obviously, the name "Barry," which
11    is your first name; correct?
12         A.   That's correct, yes.
13         Q.   Obviously, it doesn't say a full name, but it
14    says the name "Barry."  Under that it says "Blood Test,"
15    and there are dates listed and a price of $450.
16              Do you see that?
17         A.   Yes, I do.
18         Q.   Do you recall during -- well, you testified
19    that your -- I'm sorry.  Let me back up for a second.
20              Do these dates correlate, to your recollection,
21    with your giving blood samples to Greg Anderson at any
22    time during your relationship with him when you were
23    giving him blood samples?
24         A.   One, I couldn't give Greg blood samples in
25    February and March because I'm in spring training.  So,
```

45

1    how is he going to get it to him?

2         Q.   Okay.

3         A.   November 29, I cannot recall.  And --

4         Q.   And of course no year is indicated on here;

5    correct?  There's no year listed on here.

6         A.   No, there are no years.  But in February and

7    March, regardless, I'm in spring training.

8         Q.   Right.  But of course, you could -- and I'm

9    just asking, did you ever -- well, let me ask this.

10        Did you ever get a blood sample taken from your

11   doctor and have it mailed off or Fed-Ex'd off?

12        A.   Greg said he had 30 minutes to get it there, or

13   it's no good after 30 minutes.  That's why he'd come to

14   my house, and my doctor would come to my house and draw

15   my blood, and Greg would drive it down to BALCO.

16        Q.   Okay.  Did you ever -- based on that, then, did

17   you ever send him by Fed-Ex or by overnight mail a blood

18   sample to Greg?

19        A.   My doctor is here.  I'm not going to be

20   somewhere else if my doctor lives here.  No one's going

21   to -- no.

22        Q.   Does your doctor ever go to visit you in spring

23   training?

24        A.   No.

25        Q.   Okay.  Let me go --

1    BY MR. NADEL:

2        Q.   Were there ever any instances when you gave

3    blood or provided a blood sample during the time frame

4    of spring training that was provided to Mr. Anderson

5    either at spring training or anywhere else?

6        A.   Impossible.  Greg said he had 30 minutes to

7    take blood samples down there and put it in some

8    machine.

9        Q.   Has he ever received a blood sample from you at

10   spring training himself, personally?

11       A.   No.

12   BY MR. NEDROW:

13       Q.   Let me go to the next item on here, Mr. Bonds.

14            The next item on this first page says "G" with

15   exclamations around it and:  "One box off season" and:

16   "Two box season $1,500."

17            Do you see where I'm reading on the page?

18       A.   I see exactly where you're reading.

19       Q.   And let me ask you again, did Mr. Anderson ever

20   give you an item that he referred to as G, or the G, and

21   charge you money consistent with that?

22       A.   Once again, Greg and I are friends.  I never

23   paid Greg for anything.

24            I gave Greg money for his training me.  Greg

25   has never asked me for a penny, ever.  That is our

1    friendship.  So, I have never seen -- you're going to

2    bring up documents and more documents.  I have never

3    seen anything written by Greg Anderson on a piece of

4    paper.  I know he has a computer, but I have never

5    looked or seen anything in his computer.  So, I don't

6    know why this would be here.  And right then, February,

7    March, I'm not even here.  And I don't know why because

8    Greg would -- Greg and I are friends.  There's no way

9    Greg's going to come up to me and say:  "Here, do this,

10   and --" no, never.  I would never do it to him.

11   BY MR. NADEL:

12        Q.    And he never gave you any boxes that either

13   were labeled or he told you contained something referred

14   to as G?

15        A.    No.

16   BY MR. NEDROW:

17        Q.    And, again, just to be clear and then I'll

18   leave it, but he never gave you anything that you

19   understood to be human growth hormone?  Did he ever give

20   you anything like that?

21        A.    No.

22        Q.    And, again, I guess we've covered this, but --

23   and did he ever give you anything that he told you had

24   to be taken with a needle or syringe?

25        A.    Greg wouldn't do that.  He knows I'm against

48

1    that stuff.  So, he would never come up to me -- he

2    would never jeopardize our friendship like that.

3        Q.    Okay.  So, just so I'm clear, the answer is no

4    to that, he never gave you anything like that?

5        A.    Right.

6        Q.    Did he ever -- I think you answered this, but

7    did he ever even discuss it with you, like:  "You might

8    want to take some human growth hormone.  This might be

9    something might help you," and then you shot him down?

10   Do you remember something like that happening?

11       A.    You know, everyone talks about steroids at one

12   point or another, players or whatever.  But, no, we

13   didn't talk -- we didn't have a conversation like a

14   one-on-one type thing like that.

15            Conversations may have come up years and years

16   back like that, but it was like a dead issue, like

17   what's the -- whatever.

18       Q.    Right, and I guess the distinction I'd make is

19   sure, I'm not necessarily saying talking about:  "Oh,

20   look, there's something in the paper about steroids" or

21   whatever.  I'm focusing on Greg working with you as a

22   coach or a trainer for you and suggesting to you or

23   encouraging you to take the growth hormone?

24       A.    Greg wouldn't jeopardize our friendship that

25   way.

```
 1        Q.   Now next thing on -- I'll just read it.  It
 2   says:  "D-e-p-o, depo test, Cyp 3 bottle, off and reg
 3   season $450."
 4             Do you see where I'm reading from on the page?
 5        A.   I see it all.
 6        Q.   Okay.  And this -- and we'll call this
 7   Exhibit 504.  This is a bottle of depotestosterone.
 8             And let me ask, Mr. Bonds, if you recognize
 9   this item as something that you ever received?  Or does
10   that look like anything you ever got from Greg Anderson?
11        A.   I have never, ever seen this bottle or any
12   bottle pertaining that says depotestosterone.
13        Q.   And other than me just reading from the label
14   and telling you what it is, do you know what that is?
15        A.   I know it's a form of steroid.
16        Q.   Right.  It's an injectable steroid, right,
17   depotestosterone?
18        A.   Well, I -- testosterone, I believe you can get
19   a prescription from the doctor, as well.
20        Q.   Right.  For --
21        A.   So, it's not an illegal drug.  So, I don't
22   know -- what part are you talking about?
23        Q.   Right.  Without getting into all the legal
24   aspects of it right now, my question is, basically,
25   testosterone or depotestosterone, do you know one way or
```

```
 1    the other if that's an injectable steroid?
 2        A.   I would imagine -- if it comes in a liquid
 3    thing like this (indicating), I would imagine it is,
 4    yes.
 5        Q.   All right.  And again, I got to ask you these
 6    questions.
 7             Did Greg ever give you testosterone in
 8    injectable form for you to take?
 9        A.   No.
10        Q.   Would you have taken it if he gave it to you?
11        A.   He wouldn't jeopardize our friendship that way.
12        Q.   And why would that -- you're very clear that
13    that would jeopardize your friendship.
14             Why would that jeopardize your friendship?
15        A.   Greg is a good guy.  You know, this kid is a
16    great kid.  He has a child.
17        Q.   Mm-hmm.
18        A.   Greg is -- Greg has nothing, man.  You know
19    what I mean?  Guy lives in his car half the time, he
20    lives with his girlfriend, rents a room so he can be
21    with his kid, you know?  His ex takes his kid away from
22    him every single five minutes.
23             He's not that type of person.  This is the same
24    guy that goes over to our friend's mom's house and
25    massages her leg because she has cancer and she swells
```

51

1    up every night for months.  Spends time next to my dad
2    rubbing his feet every night.

3         Our friendship is a little bit different.
4         Q.   Okay.  Let me ask you about the next item on
5    this sheet.  It says:  "Clear and cream off and reg
6    season $200."

7         Does the term "clear" and "cream" mean anything
8    in terms of the things you were getting from Greg?
9         A.   No.  Unless you're talking about this stuff
10   (indicating) this lotion, cream stuff.  It's a form of
11   cream.

12        Q.   Right.  And that's what I was going to ask you
13   is certainly that's a cream.  Did he ever refer to this,
14   501, and that vial, 502 -- did he ever call those -- and
15   specifically 501, did he ever call that clear?
16        A.   He called this flax seed oil to me.  And he may
17   have said clear -- lotion, clear, to me.  I mean, to me
18   it looked like lotion.

19        Q.   Okay.  And the last item here says "Clomifend,"
20   I think, "off and reg, 100 pills for $100."

21        Do you know what Clomifend is?
22        A.   Never heard of it.
23        Q.   Have you ever taken it?
24        A.   I've never heard of it.
25        Q.   All right.  So, if I were to tell you it's an

52

1    anti-estrogen prescription drug that is not typically
2    taken by athletes, but typically taken to address
3    fertility issues, do you know anything about that?  Are
4    you aware of that?

5        A.    I've never heard of it, so I'm not aware of it.

6        Q.    All right.  Okay.  All right.

7              Let's go on.  And I'm going to go to the second
8    page for Mr. Bonds -- before I get to that, quick
9    question, Mr. Bonds.

10             Other than the things that we've talked
11   about -- and let me make sure I've got it straight:  we
12   have the vitamins, protein shakes, and please correct me
13   if I'm wrong, and then we have the flax seed oil and the
14   cream, but not, according to your testimony, the depo --
15   did Mr. Anderson ever give you anything else to take in
16   connection with your weight lifting that you can think
17   of?

18       A.    Not that I know of.  There's like Proglycem
19   (phonetic) type things like you pour in water and shake
20   it up and drink, and you have the protein shakes.

21       Q.    Right.

22       A.    No, nothing -- I left out the Proglycem things,
23   it's called the after pre-workout thing that you take.
24   I forgot, he gave me that, too.

25       Q.    Okay.  All right.  I just want to make sure --

```
 1        A.    I called it Proglycem.  It's something like
 2   that.  Because I don't know the name.  I don't have it
 3   so I don't know.  He tells me.
 4        Q.    Did he ever give you anything called EPO or I
 5   think it's erythropoietin?  Did he ever give you
 6   anything like that?
 7        A.    I couldn't even pronounce it.  So there's --
 8        Q.    I couldn't either.
 9        A.    So, no, no.
10        Q.    Did he ever give you something called modafinil
11   or vitamin M or vitamin S?  Did he ever give you
12   anything like that?
13        A.    I've never heard of it.
14        Q.    I know the answer -- let me ask you this again.
15   I know we kind of got the into this.  Let me be real
16   clear about this.  Did he ever give you anything that
17   you knew to be a steroid?  Did he ever give a steroid?
18        A.    I don't think Greg would do anything like that
19   to me and jeopardize our friendship.  I just don't think
20   he would do that.
21        Q.    Well, when you say you don't think he would do
22   that, to your knowledge, I mean, did you ever take any
23   steroids that he gave you?
24        A.    Not that I know of.
25        Q.    Let me ask you, in terms of you knowing about
```

```
 1    it, what do you mean by not that you know of?

 2         A.    Because I have suspicions over these two items

 3    right here (indicating).

 4         Q.    Okay.

 5         A.    And that's the only reason.  But I haven't

 6    asked him.  I haven't gotten there.  So, I'm just

 7    suspicious over this stuff right here (indicating).

 8    BY MR. NADEL:

 9         Q.    When did you start becoming suspicious about

10    those items?

11         A.    Like -- during this whole investigation thing

12    when you're hearing about it and reading and how it's

13    made and stuff like that.  I'm like:  "Wait a minute,"

14    you know, I'm thinking to myself, like:  "What is this

15    stuff?"

16         Q.    So, before BALCO was in the media?

17         A.    No, this was after they were in the media.

18         Q.    No suspicious previously?

19         A.    No, I didn't -- I was at the ballpark.  There

20    was no reason.  I mean, why would you think in front of

21    all these people -- I mean, I wouldn't think Greg would

22    give me something in front of all these people at the

23    ballpark.

24              But because you're presenting it to me it

25    brings some suspicion to my mind.  That's what I'm
```

1   saying.  Okay?  That's all.

2   BY MR. NEDROW:

3       Q.   Were there any affects that came from those two

4   items that made you think:  "Gee, this has effects like

5   steroids, you know, he didn't tell me it was a steroid"?

6       A.   That don't have any affect to anything, I'll

7   tell you right now.  If it's a steroid, it ain't

8   working.

9       Q.   All right.  Did Greg ever give you syringes for

10  any purpose?

11      A.   No.

12      Q.   Let's go on to the second page of Exhibit -- I

13  guess it's 503, and give Mr. Bonds a chance to look at

14  that page for a moment?

15      A.   (Examining document.)

16      Q.   Have you had a chance to look at it?  Not much

17  on there.  Let me ask about Gary.  You train, actually,

18  with Gary Sheffield; right?

19      A.   Mm-hmm.

20      Q.   When did you start training with Gary

21  Sheffield?

22      A.   Gary trained with me, what, 2000 -- 2000 --

23  after the 2001 season.

24      Q.   Okay.

25      A.   I mean, between all the times that Gary trained

56

 1    with me, if you totaled it all up it would be maybe a

 2    whole one off season.  When Gary had his child the next

 3    off season, he stayed a week or two and then went home.

 4    Gary started to work with Greg on his own.  Greg would

 5    go down to see Gary.

 6         Q.    How did Gary meet Greg?

 7         A.    Through me.

 8         Q.    And I guess just so we're clear, very quickly,

 9    Gary Sheffield plays on another professional baseball

10    team; right?

11         A.    The Atlanta Braves.  Or free agent now.

12         Q.    Or free agent now.

13               So, when we're talking about your training with

14    him, obviously it's in the off season?

15         A.    Yeah, Gary would travel up, stay for a week, go

16    back home, come back a couple weeks later.  Gary was on

17    his own program.  He'd train whenever he wanted to train

18    and go home.  But we're friends, so whatever, if I can

19    help him, I help him..

20         Q.    Okay.  And would one of the time frames he'd be

21    here be, like, late November, early December after the

22    season was over?  Does that sound consistent with the

23    time he'd come up?

24         A.    Yeah, he would come up then, yeah.

25         Q.    So, let me ask you about page, two, then, of

                                                              57

1        503.

2              Do these entries with Gary's name on it mean

3        anything to you?

4        A.    No.   I've never seen this document.   Like I

5        said, I've never seen anything Greg has ever written

6        down on a piece of paper, or I've never seen anything in

7        his computer.   So, giving this to me is not -- I've

8        never seen it.

9        Q.    Do you recognize the handwriting on here as

10       Greg's handwriting?

11       A.    I've never really seen Greg write anything

12       ever.

13       Q.    Really?   Okay.

14       A.    That's the honest truth.   Ever.   We're in there

15       training, lifting weights.   There's nothing for him to

16       write down.

17       Q.    Okay.   Did he ever give you, like, invoices of

18       the vitamins and things that he provided you, like, give

19       you written --

20       A.    Our friendship goes too far back for that, no,

21       never.   I never paid Greg for anything.

22       Q.    And on this one it says:   "Barry," I'll just

23       read from it:   "12-2-02, T, 1 CC, G" -- I think that's a

24       G, but could be a 6, I guess, dash "30," and then that

25       word is a hard one to make out.   And then under that

```
 1    "pee," p-e-e.

 2            Does that correspond to you getting, you know,

 3    growth hormone or testosterone or giving a urine test or

 4    anything of those things that you can recall to

 5    Mr. Anderson?

 6        A.    No, T could mean anything, G could mean

 7    anything, and pee could mean anything.

 8        Q.    Well, p-e-e probably means a pee test, or urine

 9    test; correct?

10        A.    You know what?  I can't answer that question.

11    Because I've never seen this and I don't know what T is

12    or G is.  I'm just assuming they're saying G is growth

13    hormone, an abbreviation for it.  But G could be Greg,

14    too.

15        Q.    True.  But do you know from your regimen with

16    Greg what those mean?  I mean, can you account for what

17    these mean?

18        A.    No, no, I wasn't -- not at all, no.

19        Q.    All right.  Let's go to the next page, and let

20    me ask before we get into this page real quick a

21    question.

22            Did Greg work with the Giants trainers in

23    connection with your training regimen?  In other

24    words --

25        A.    No.
```

1       Q.    Okay.  Well, no is the answer to that.

2       A.    No.

3       Q.    Did you also -- so, let me ask.  Did you have a

4   training regimen with the Giants as well as with Greg?

5   Or was it just with Greg?  Or how does that work?

6       A.    The training regiment is my training.  They

7   actually work for me, you know?  I'm the one who's going

8   out there playing baseball; not them.

9            It's kind of like one hand shakes the other,

10  you know?  You got to understand about sports or just

11  anybody successful, Bill Gates, anyone you want to talk

12  about.  If I took eight Advils before a game, you know,

13  a player is going to take eight Advils and think that

14  it's the thing to do.

15      Q.    Sure.

16      A.    You know, my training was -- everyone thinks

17  that, you know, because I -- I started this whole

18  training thing all year-round program.  And I had to

19  teach them a lot of things.

20           You know, Greg was into body building type

21  things.  I had to teach him some things about baseball

22  players, to keep the flexibility and stuff.

23      Q.    Mm-hmm.

24      A.    You know, we -- Greg is just a loyal person,

25  you know, he's there.  And I need somebody that can be

60

1    there.   And the trainers I have can be there on a

2    regular basis.  So, if I want to train at night or in

3    the morning or four o'clock in the morning, I don't have

4    any problems with that.  We've just all built a

5    relationship that way.

6        Q.    How many other players besides Mr. Sheffield

7    did you refer to Greg Anderson?

8        A.    Refer?

9        Q.    Yes, if any.

10       A.    I don't refer anyone to Greg Anderson.  They

11   want to train with me, and Greg Anderson happens to be

12   one of my trainers.

13       Q.    Okay.  How --

14       A.    Eric Young was one.  He lasted about two weeks

15   and went home.

16       Q.    I'm sorry.  What was the name?

17       A.    Eric Young was one.  He lasted about two weeks,

18   and he went home.

19       Q.    It's a tough regimen; right?

20       A.    It's tough.  It's no joke.

21       Q.    Well, you've referred -- I'm sorry.  That's the

22   wrong word to use.  But how many other players came to

23   you came to -- worked with Greg Anderson, whether it be

24   on the Giants or other teams, besides Mr. Young and

25   Mr. Sheffield?

61

```
 1          A.    None.

 2          Q.    None?

 3          A.    None.

 4          Q.    Did you ever talk to Armando Rios about working

 5     with Mr. --

 6          A.    Armando -- you got to understand, all these

 7     guys, if they trained with Greg, they'd be training with

 8     me, because Greg is with me every day.

 9          Q.    Okay.

10          A.    So, no, I don't believe he trained with them.

11     Because he -- he's with me.

12          Q.    What about Benito Santiago?

13          A.    No way.  There's no way.  Benito ain't training

14     that hard.  There's no way.  I'm sorry.  I love him...

15     BY MR. NADEL:

16          Q.    You said that --

17          A.    I neither is Armando.

18     BY MR. NADEL:

19          Q.    You said that Mr. Anderson is with you every

20     day.

21                Does he go with you to spring training?

22          A.    For just the weekend.  He'll come in -- because

23     he has other clients at the gym, you know, that needs

24     training.  So, he'd come from, like, Friday to Sunday.

25     And so we'd just modified my training.  Because normally
```

```
 1    I go, like, Monday, Tuesday, Wednesday off, Thursday,

 2    Friday.  So, we modified to where I worked out when he

 3    got here to make sure I trained.

 4        Q.   Was that pretty much the habit that during

 5    spring training he would come on weekend?

 6        A.   Every other weekend.

 7        Q.   Every other weekend during spring training?

 8        A.   Yeah, for the past couple years, yeah.

 9    BY MR. NEDROW:

10        Q.   Okay.  And actually I think you answered this,

11    then, but let me go back and clarify this.

12             Did the Giants training staff have any

13    involvement in working with you with Mr. Anderson?

14        A.   No way.

15        Q.   Okay.  And back --

16        A.   We don't trust the ball team.  We don't trust

17    baseball.

18        Q.   Why not?

19        A.   Because I was born in this game.  Believe me.

20    It's a business.  Last time I played baseball was in

21    college.  I work for a living now.

22        Q.   Yeah?

23        A.   Yeah.

24        Q.   Okay.

25        A.   I don't trust their doctors or nothing.
```

63

```
 1        Q.    Let me ask you about -- since you mentioned

 2   doctors, a couple other doctors.  Have you ever heard of

 3   a doctor named Dr. Brian Halavie-Goldman?

 4        A.    I ain't never heard of him.

 5        Q.    Never heard of him?

 6        A.    No.

 7        Q.    Okay.  And did Greg ever tell you when you were

 8   getting that -- what, again, you understood to be flax

 9   seed oil and that cream, did he ever tell you, like, to

10   be careful about who you talked to about it, like:

11   "Hey, you know, don't talk to other athletes --"

12        A.    No.

13        Q.    "-- or other people about it?"

14        A.    No.

15        Q.    He never told you to be careful with it or

16   anything like that?

17        A.    No, I didn't have it.

18        Q.    I'm sorry.  Okay.  I understand you didn't have

19   it right, correct.

20        A.    You're assuming I had it.  I never had it.

21        Q.    I'm sorry.  You said that before.  Well, let me

22   ask you this.  In terms of giving it to you, did he ever

23   say:  "Be cool or be quite with who you talk to it

24   about," basically?

25        A.    No.  He did it right there in the locker room
```

1    in front of everybody.

2        Q.    Okay.    Let me go to the next -- I will give you

3    all these at once because they really all go together.

4    They're five pages.    And they're going to be pages three

5    through seven of Exhibit 503 and ask you, Mr. Bonds, to

6    take a moment and page through those.

7        A.    (Examining documents.)

8        Q.    So, let's go to the first one of the five that

9    I handed you.    And this would be page three in the

10   packet.    This one has "Barry B." written down on line

11   one of that page.

12            Do you see that?

13       A.    Yeah, the third at the top?

14       Q.    Yes, exactly, right under the top.    And in the

15   right columns four, five, and six are the words:

16   "Test," E-P-I, "EPI," and then the word "ratio."

17            Do you see those words, as well?

18       A.    Mm-hmm.

19       Q.    Did Greg ever talk to you -- or Victor Conte

20   for that matter, either of them, ever talk to you about

21   testosterone, epitestosterone ratios in one's blood?

22       A.    No.    I wouldn't even understand it anyway.    So,

23   they wouldn't talk to me about that.

24       Q.    Why do you say you wouldn't understand it?    In

25   terms of, if they explained to you what that meant -- I

1    mean, you're a sharp guy.  You'd understand what that

2    meant; right?

3        A.    I wouldn't understand the ratios.

4        Q.    Okay.

5        A.    I'm not in that business.  I wouldn't

6    understand ratios.  If someone came up to me and said:

7    "This is a test," sure, I would understand what they

8    meant.

9        Q.    Okay.

10       A.    But I wouldn't understand what they're talking

11   about in ratios and stuff, no.

12       Q.    Okay.

13   BY MR. NADEL:

14       Q.    Has anyone ever attempted to explain EPI and

15   ratios relating to EPI, or epitestosterone?

16       A.    No, not at all.  Nor have I ever seen any of

17   these documents.

18       Q.    But you haven't had any conversations

19   everything ever about that subject?

20       A.    No, not at all.

21       Q.    Do you remember?

22   BY MR. NEDROW:

23       Q.    Do you recognize the handwriting on this

24   document?

25       A.    No.

```
 1        Q.   Did you ever see Victor Conte's handwriting?

 2        A.   No, not at all.

 3        Q.   I want to ask you specifically -- and I want to

 4   remember this number.  Under "Barry B." it says 11-20,

 5   it looks like 00, and then there's a number 100121.

 6             Do you see that number there?

 7        A.   Yes, I do.

 8        Q.   Does that number, in terms of being associated

 9   with you -- I mean, have any meaning to you from either

10   Victor or Greg or anybody?

11        A.   Doesn't mean anything to me at all.  Like I

12   said, I've never seen it before.

13        Q.   Okay.  And then continuing there are these

14   numbers 14.0, 10.5, and a ratio of 1.3; continuing from

15   left to right, that is.  Does that -- do those numbers

16   and that ultimate ratio, again, mean anything to you in

17   terms of a test of your blood or anything like that?

18        A.   No, not at all.

19        Q.   Okay.  The next line says "2401," and it says

20   "five days on," and it has a different number, 100145,

21   then "Tren," and then .25 and then 000.

22             Do you see the line I just read?

23        A.   Yes, I see that.

24        Q.   Okay.  Does that mean anything to you?

25        A.   I don't know what it means.  I don't understand
```

1   it.

2        Q.    Did Greg ever talk to you about something

3   called Trenbolone?

4        A.    The who?  I never even heard of it.

5        Q.    Okay.  Fair enough.  Just asking.  So, you've

6   never heard the word Trenbolone, then?

7        A.    At all.

8        Q.    Did he ever use the word Trenbolone to talk

9   about one of the components or a part of what was in

10  this clear oil that he said was flax seed oil, did he

11  ever talk to you about that?

12       A.    No.  Like I said, he just brought it to the

13  ballpark and said: "Here," and I said: "Fine."  That

14  was it.

15       Q.    The next couple lines under "Barry B.," as we

16  go on, look like they say: "4-18-01 5th-9th on."  And

17  then there's another number, 100155.

18            Do you see that?

19       A.    Yes.

20       Q.    And then under that: "17 days off 100404."

21            Do you see that?

22       A.    Mm-hmm.

23       Q.    Do those correspond to any regimen of using the

24  clear or the cream that you know of?

25       A.    No.

68

1       Q.   That is the liquid, for flax seed oil liquid or

2   what you thought was the flax seed oil and the cream?

3       A.   This is February, though.  I'm in spring

4   training.

5       Q.   Well, actually, February 4, 2001, is a little

6   bit before spring training.

7       A.   But 2-18 I'm in spring training.

8       Q.   I'm sorry.  I think I said -- yeah.

9       A.   You know what?  I don't know -- I'm not even

10   here.

11       Q.   Let's go to the next one, next page, that is.

12   This page just has the initials "BB" at the top.

13           Do you see those initials?

14       A.   Yes.

15       Q.   And then it's got these "Test," "EPI," "Ratio,"

16   entries at the top.

17           Do you see that?

18       A.   Mm-hmm.

19       Q.   I'm sorry.  Just for the court reporter if you

20   could just say yes.

21       A.   Oh, yes, sorry, sorry.

22           Yes.

23       Q.   6-27 -- reading left to right now, 100121, and

24   then 16.6 under "Test"; 5.5 for EPI, and 3.0 ratio?

25       A.   I see that.

```
 1        Q.   Do you see, again, 100404; 19 under "Test";

 2   0.0, and I'll keep going.  11-18-01, 100424, 16.2 under

 3   "Test," 8.0 under "EPI," and 2.0 under "Ratio."

 4             Do you see that?

 5        A.   Yes.

 6        Q.   Do those numbers or entries mean anything to

 7   you?

 8        A.   I don't know what it means at all.

 9        Q.   All right.  I'll just keep going then.

10             Next page, the third of this sequence, page

11   five overall, in the middle of the page, line 16, says:

12   "BB, 100424, 16.2, 8.0, and 2.0."

13             Do you see where I'm referring to there?

14        A.   Mm-hmm -- yes.

15        Q.   Thank you.

16             This one down under it, it says:  "Owes $130."

17   Do you see that handwritten note:  "Owes $130"?

18        A.   I see it.

19        Q.   Yes, and does that correspond with any

20   recollection you have of paying Greg, or Victor Conte

21   for that matter, for anything that they ever gave you?

22        A.   I have never paid Greg a penny nor have I paid

23   Victor Conte a penny.

24        Q.   Let me --

25        A.   For anything except Greg's training me.
```

```
 1         Q.   Right.  Let me try and understand that, then.
 2    I understand -- let's break it down.
 3              First of all --
 4         A.   I thought it was free, my protein and vitamins
 5    were free.
 6         Q.   So, basically all the stuff that you got to
 7    take on a nutritional or recovery -- that is, the
 8    nutritional stuff and the recovery stuff, you believed
 9    to be free; correct?
10         A.   I believed it to be free.
11         Q.   But you did pay Greg for his help on the weight
12    coaching and training?
13         A.   Exactly.
14         Q.   How much did you pay him on the weight
15    training?
16         A.   I paid Greg $15,000 for the whole year.
17         Q.   A year, okay.  And is that about how much
18    you've paid him each year you've worked with him about?
19         A.   Each year about, yes.
20              Greg didn't want any money from me.  I felt
21    guilty.  I said: "Dude, let me at least do something."
22    He would train me for free.  But he has a kid that he
23    wanted to get to school.  And he has an ex-girlfriend
24    that's nagging him about it.  So, I said: "Dude, let me
25    at least give you something."  So -- his son goes to the
```

71

1    same school my daughter goes to, a Montessori school.

2    So at least give me some money to keep your kid in

3    school.  And we'll call it even, you know, and that's

4    what we did.

5        Q.    Did you pay him in cash or checks?

6        A.    I paid him cash.

7            MR. NADEL:  All at once?

8            THE WITNESS:  Sometimes all at once, and I

9    think sometimes I split it up.  It's however he wanted

10   it.  Friend of mine.

11   BY MR. NEDROW:

12       Q.    And that's -- and understanding that $15,000,

13   depending on one's salary, may not be itself a lot of

14   money, but that's a lot of cash to have on hand at any

15   given time, like, $15,000?  I mean --

16       A.    I make 17 million.

17       Q.    Understood.  But still, having that much on

18   hand, I'm not necessarily trying to -- it's still a lot

19   of cash to have on hand at a given time, or is it not?

20       A.    It's a lot of cash to have on hand.  That's why

21   I get it out of my hands, get it into somebody else's

22   hands and let him worry about it.

23       Q.    All right.  Fair enough.  Let's go back to this

24   and look at the next page, the fourth page, page six in

25   the packet.  I'm going to go to the bottom.  It says

72

1      "Barry, 6-27, 100321, 16.6, 5.5, 3.0."

2              Do you see that line I'm reading?

3      A.    Yeah, I see it.

4      Q.    And then under that: "17 days off, 100404, 19,

5      0.0"

6      A.    Mm-hmm.

7      Q.    Okay.  Again, same question, does that mean

8      anything to you in terms of the training?

9      A.    Not at all.

10     Q.    Next page and last of this section, "Barry B.

11     100545, 7, 10, 4, 2.5," and then 2-4-03, 100 -- I think

12     it's maybe 552, and then 5, 0, and then a blank.

13             Do you see that one?

14     A.    Yes.

15     Q.    Now, earlier this year, February of this year,

16     do you recall -- were you giving him blood samples at

17     that time, say, in February of this year?  Do you

18     remember giving him blood samples or urine samples?

19     A.    February back -- I can't recall.  I don't know.

20     Q.    Okay.

21     A.    I don't know.  That's too far back for me to

22     know.

23     Q.    I'm talking about this year.

24     A.    Talking February.

25     Q.    February of this year.

```
 1        A.    It's December.

 2        Q.    Right.  I understand.

 3        A.    I don't recall February -- if I gave him blood

 4   in February.

 5        Q.    All right.  Now, the next page I want to call

 6   your attention to, and we're going to reference back --

 7   you don't have the next page -- I'm sorry.  Here's the

 8   next page.  Actually, thanks.

 9        A.    That's fine.  You want to work for me?

10        Q.    Yeah, anyway, the thing I'm going to ask you on

11   this page is, you'll see that there is a name written --

12   the fifth name down that's written is "Barry Bond" -- it

13   doesn't have an S on it, but it says "Barry Bond," and

14   then 100121.

15              Do you see that?

16        A.    Yes, I see that.

17        Q.    The thing I want to point out to you, and the

18   reason I separated them there -- let me show you what

19   I'm talking about.  When you go back to the first part

20   of this sheet, and this sheet is page three of your

21   packet, that first number indicated -- exactly.

22        A.    Right.

23        Q.    -- is the same number, 100121.

24              Do you see that number?

25        A.    Yes, I see it.
```

1     Q.    So, that's the reason for my question.  And

2     what I want to ask you again, does that number, the

3     number used as a reference number, mean anything to you?

4     A.    I don't know what this number is.  I have no

5     idea.

6     Q.    Okay.  Let's just go to the next page, then, in

7     the packet.  And let me give you this item and ask --

8     A.    Do you want me to keep these all?

9     Q.    Yes, you can keep these out (indicating).

10    A.    Keep those two out?

11    Q.    Yes, these two I'm going to keep asking about

12    (indicating) and this is the next one I'm going to ask

13    you about.

14    A.    Do you want this back (indicating)?

15    Q.    Let me set that aside.  We may still have some

16    questions about it.

17          But let me ask you to take a look at the next

18    two pages which will be, if my math is right, I think

19    pages 10 and 11 -- or, no, should be nine and ten, I

20    think, in the packet, and ask you if you recognize this

21    document or if you've ever been shown this document

22    before.

23    A.    I don't -- I've never seen this document

24    before.

25    Q.    Okay.

```
 1        A.    I see the number of 100121 that you're

 2   referencing back to this.

 3        Q.    Right.

 4        A.    But I've never seen this document before.

 5        Q.    Okay.  And let me go over a couple things on

 6   this.  First of all, do you see on the upper left it

 7   says:  "To Victor Conte" on this document?

 8        A.    Yes.

 9        Q.    I'm sorry.  Did I say -- upper left corner,

10   yes.

11              And then it says:  "Quest Diagnostics

12   Incorporated," with an address in San Diego.

13              Do you see that in the upper left below the

14   name Victor Conte?

15        A.    Yes.

16        Q.    Does that name mean anything to you?  Did you

17   ever use them to test your blood or urine?

18        A.    Is this a blood or urine?  This looks like a

19   urine test; right?

20        Q.    I -- well --

21        A.    It says:  "Specimen Type:  Urine."

22        Q.    Yes, I agree, that looks like a urine test,

23   yes.

24        A.    I gave samples to Greg.  Greg took them to

25   BALCO.
```

1      Q.    Okay.

2      A.    I only went on Greg's word what he said are

3   blood tests.  I didn't actually see -- which is my

4   fault, I didn't actually say:  "Here, give me the papers

5   for the results," because I have no reason to doubt or

6   disbelieve him.  I don't even know if this is me,

7   because it has no name on here.

8      Q.    Right, but you saw the part -- obviously, the

9   other document, that's why I wanted you to leave it out,

10   where there was a name close to your name, Barry Bond --

11   not Barry Bonds, but Barry Bond -- and that's why I

12   wanted --

13      A.    Right, you're right, you're right.

14      Q.    And this is attention Victor Conte of BALCO

15   Laboratories; correct?

16      A.    Yes.

17      Q.    And it is your understanding that BALCO had

18   something to do with testing your urine; is that

19   correct?

20      A.    Oh, definitely.

21      Q.    And then I want to go through what's on this.

22   As you pointed out the specimen type below 101121 says

23   urine; correct?

24      A.    Yes.

25      Q.    And by the way, date on this is, on the right

77

```
 1      side:  "Collected 11-28-2000" and "Received 12-2-2000";
 2      is that correct?
 3           A.    I'm seeing where you're saying, yes.
 4           Q.    And that was a period of time when you were
 5      working with Greg; correct?
 6           A.    Yes.
 7           Q.    Okay.  And then it says:  "Anabolic Steroid
 8      Panel II," with "DHEA 10," "Testosterone 14.0," and
 9      "Epitestosterone 10.5."
10                 Do you see those entries?
11           A.    Yes.
12           Q.    And below that it says:
13                 "T/E ratio is considered positive at a
14                 value greater than 6.  The following
15                 anabolic agents --"
16           A.    Where are you at?
17           Q.    I'm sorry.  It's under that dashed line there?
18           A.    Okay.  Ratio -- okay.
19           Q.    "-- at a value greater than six.  The following
20      anabolic agents were tested."  And it goes on to list
21      all these anabolic agents, anabolic steroids, basically.
22                 Do you see that?
23           A.    Yes.
24           Q.    And actually before we leave this page, let me
25      go back to page three again and show you that in
```

                                                              78

 1   addition to the 100121, these numbers actually match --

 2   the 14.0, 10.5, and 1.3, match the 14.0, 10.5, and 1.3

 3   (indicating)?

 4        A.   You're correct.

 5        Q.   Does everyone understand where I'm referencing

 6   there?  And I'm sorry.  I should be clear for the

 7   record.  I'm talking about -- I'm comparing page three

 8   of 503 and page nine of 503, which is the Quest

 9   Diagnostics test.  Okay.

10             And then let me go over to the second page of

11   this test, which would be page ten.  And on this one,

12   again, it has the 1000121 number identified with that.

13             Do you see that?

14        A.   Excuse me?  Where are you at?  Page two?

15        Q.   I'm on -- yes, page two of the test result.

16   And -- yeah, I'm sorry.  Right, page two of the test

17   result.

18             Do you see that?

19        A.   I see it.

20        Q.   And you see it says 100121 --

21        A.   Yes.

22        Q.   -- at the top?

23        A.   Yes, I see that, yes.

24        Q.   An then as we go down these substances listed

25   here, it's mostly negative, but there are two positive

1    indications, one for Methenolone, positive, and one for

2    Nandrolone indicated as positive.

3         Do you see those two entries?

4    A.    Yes.

5    Q.    And when you go back to the first page of the

6    result, on the right column of those two anabolic agent

7    columns, Nandrolone and Methenolone are both listed as

8    anabolic agents which this was a test for, basically.

9         Do you see that?

10   A.    I see it.

11   Q.    Okay.  So, I got to ask, Mr. Bonds.  There's

12   this number associated on a document with your name, and

13   corresponding to Barry B. on the other document, and it

14   does have these two listed anabolic steroids as testing

15   positive in connection with it.  Do you follow my

16   question?

17   A.    I follow where you're going, yeah.

18   Q.    So, I guess I got to ask the question again, I

19   mean, did you take steroids?  And specifically this test

20   the is in November of 2000.  So, I'm going to ask you in

21   the weeks and months leading up to November 2000, were

22   you taking steroids --

23   A.    No.

24   Q.    -- or anything like that?

25   A.    No, I wasn't at all.  I've never seen these

1    documents.  I've never seen these papers.

2

3        Q.   Okay.

4    BY MR. NADEL:

5        Q.   Besides the question of whether you've seen

6    them, has anybody, Mr. Anderson or --

7        A.   No, he wouldn't do that to our friendship.  I'm

8    telling you.

9        Q.   Excuse me.  If I could just finish my question,

10   then you can answer.

11            Has anyone, Mr. Anderson or anyone else, told

12   you about these results orally?

13       A.   No.

14       Q.   Has anyone ever explained them to you or

15   mentioned it to you?

16       A.   I never -- I asked him, like, he would just

17   take them and: "I'd say what is it?"  And he'd say:

18   "Everything is fine."  I wouldn't think anything.  And

19   he'd say: "Barry, I need you to eat this much food or I

20   need you to take this much vitamins."  That was it.  I

21   trusted him in it, you know what I mean?

22       Q.   As you sit here today, this is the first time

23   you've heard or seen anything about these --

24       A.   Oh, yes, definitely.  Definitely, yes.

25            MR. NEDROW:  Okay.  Just a quick moment,

                                                                81

1    Mr. Bonds.

2              (Discussion off the record.)

3              MR. NEDROW:  Okay.  At some point -- it's

4    around the time we should take a break.

5              Is now the time?

6              GRAND JUROR:  This would be a good time.

7              MR. NEDROW:  Mr. Bonds, the grand jury -- at

8    their request, in part, we're going to take -- and today

9    we'll take a 15-minute break, come back at 3:00 o'clock.

10   During that period of time, Mr. Bonds, you're free to

11   step down and just be back here at 3:00 o'clock.  2:48

12   p.m.

13             (A recess was taken from 2:48 p.m. to

14   3:04 p.m.)

15             MR. NEDROW:  Everyone back, everybody ready?

16   What I anticipate to do is, for scheduling, having

17   Mr. Bonds go for 45 minutes to an hour, and then, again,

18   after him we have one more witness after him,

19   Mr. Santiago.

20   BY MR. NEDROW:

21        Q.   Mr. Bonds, before we get back to the substance,

22   for the court reporter, real quick, you mentioned the

23   name earlier on of a family friend that you and Greg had

24   a long relationship with.  Was it Kercher?  Could you

25   spell that for the court reporter, please?

1       A.    McKercher, M-c-K-e-r-c-h-e-r.

2       Q.    Okay.  Mr. Bonds, I want to go back to Victor

3    for a second a just ask you a couple questions.  You

4    testified that you only actually met him two or three

5    times; is that correct?

6       A.    Yes, definitely.

7       Q.    Please tell us what you talked about with

8    Mr. Conte in those conversations with him.

9       A.    We talked about drawing the blood, the levels.

10      Q.    Right.

11      A.    And then did the ad for him.

12      Q.    All right.  And what was it that motivated you

13   to do the ad for him?  What assistance had he provided

14   you that led you to do the ad?

15      A.    Because I thought the vitamins and shakes that

16   he was giving to me, my family, other people for free --

17   not to me, to Greg, it wasn't to me, it was Greg, but it

18   was free, it was like for a favor, for a favor.

19      Q.    When you're talking about the ad you did for

20   him, that's specifically that spread where you appeared

21   with Greg and Victor in Muscle & Fitness magazine;

22   correct?

23      A.    Right.

24      Q.    And you also gave some statements in that where

25   you said, I think your words were you were shocked with

                                                              83

1   how much he had helped you or you were very pleased with

2   how much it helped you, or words that effect, does that

3   sound correct?  Is that correct?

4       A.   I don't recall the entire interview.  I don't

5   recall what was ad lib by the writer, either.  I deal

6   with media on a regular basis that exaggerate and lie

7   and tell stories.  But, I mean, I wouldn't -- I would

8   say, yes, I said, you know, that it's helped me.

9       Q.   And when you were talking about the help it

10   provided, you were referring specifically to the

11   vitamins and shakes and things of that sort?

12       A.   I was specifically saying that the drawing of

13   the blood, being able to analyze your levels of your

14   body, that's what I was pertaining it to.  Plus, boost

15   his ego.  You know, it's an ad.  You know?  There's a

16   lot of ads out there for junk that still doesn't work.

17       Q.   Again, just so I'm clear, did Mr. Conte ever

18   discuss with you those items, specifically the flax seed

19   oil and the cream, did you have any discussion with him

20   ever about that?

21       A.   Never.

22       Q.   Okay.  But you did have either the assumption

23   or the belief -- you tell me the right words -- that

24   that stuff came from BALCO Laboratories; correct?

25       A.   I assumed that's where Greg was getting it

84

1    from.  I don't know where Greg got it from.  I never

2    went with Greg or followed him or checked or anything

3    like that.  I was just assuming because they're

4    associated.

5        Q.   Okay.  All right.  And did Mr. Conte ever talk

6    to you about -- did he ever make any statements to you

7    like:  "Hey, you know, don't tell anybody you got that

8    stuff from me," or try and disassociate himself or

9    anything like that?

10       A.   No.  He was very professional when I was in

11   there.  He would talk more about ZMA.  It was a ZMA

12   interview --

13       Q.   Okay.

14       A.   -- that I did for that spread.

15       Q.   Okay.

16       A.   More ZMA.  And when I stated what they'd done

17   for me, as you quoted I stated, was the fact that it was

18   the -- the regulation of blood was the thing that I was

19   assuming to.

20       Q.   Okay.  When did you last either speak with or

21   meet Mr. Conte?  When did you last have any contact?

22       A.   Oh, I haven't seen him since the ad.  I haven't

23   seen him or talked to him since I did the interview.

24       Q.   And that was -- and again, tell me if I'm

25   right, June 2003, May or June 2003, something like that?

                                                        85

1    A.    Something like that.  I don't remember.

2    Q.    But this year, earlier this year?

3    A.    I believe so, yes.

4    Q.    And what about -- just this one question, what

5    about when you last saw or had any contact with

6    Mr. Anderson?

7    A.    I see Greg every day.

8    Q.    Okay.  You're still regularly training with

9    him?

10   A.    Right.

11   Q.    Even after all the stuff in the newspapers and

12   all that stuff?

13   A.    That's right.

14   Q.    And has Greg, you know, made any statements to

15   you about, you know, his identification as a target of

16   this thing?  Has he made any comments to you about --

17   about these matters regarding --

18   A.    Not personal matters, but he said he believes

19   he's a target.

20   Q.    Mm-hmm.

21   A.    The only thing I asked Greg:  "What's it like

22   getting your door blown down?  Dude, I never seen

23   anything like that except on TV."  That's about as far

24   as we went on it.

25         You know, I don't want to know, because it

1    keeps our friendship as it is.  I don't want to get

2    involved.  I don't want him to tell me something or me

3    to say something that is going to affect him later on or

4    anything.  And so we don't talk about it.  I mean

5    there's probably other people in that gym that probably

6    talk about it all the time.  The guy's in the paper

7    every day.  Well, so am I.  Well, I do ask him about

8    being a celebrity: "Now you know what I go through on

9    an everyday basis," stuff like that.  We talked about

10   that, but that's about it.

11       Q.   Other than just working out, have you had any

12   contact with him in connection with this case at all?

13   I'm sorry, let me ask a different question.

14            Other than working out with him and seeing him

15   as a friend, have you had any other meetings or contact

16   with him?

17       A.   You mean outside of the gym?

18       Q.   Yes.

19       A.   Yes.

20       Q.   Okay.  What kinds of meetings?

21       A.   He came over with his kid.

22       Q.   Okay.

23       A.   His kid and my daughter go to the same school.

24   They went to -- they had their -- I think it was the

25   Thanksgiving party, I believe so, I don't remember,

87

1    Thanksgiving party.  We were all there.

2        Q.    Okay.

3        A.    The kids had their school singing thing.  He

4    was there, you know.

5        Q.    Okay.  So --

6        A.    Yeah, we still see each other outside and we

7    have kids in the same school.

8        Q.    Let me move on to a different topic.  And I

9    think you've testified to this.  But I want to make sure

10   it's crystal clear.

11       Every time you got the flax seed oil and the

12   cream, did you get it in person from Greg?

13       A.    Yes.

14       Q.    Is that fair?

15       A.    Yes.

16       Q.    And where would you typically get it?  Where

17   would you guys be when he would hand it to you

18   generally?

19       A.    In front of my locker, sitting in my chair.

20       Q.    Did he ever come to your home and give it to

21   you?

22       A.    Oh, no, no, no.  It was always at the ballpark.

23       Q.    Why do you say no so quickly?  If it's no big

24   deal to get that stuff, why wouldn't he give that to you

25   at home?

 1     A.    When I go home, I go home.  I don't like people
 2  at my house after a game.  You know?  Like I say, I'm a
 3  celebrity child, and my father was never home.  I make
 4  it very important for me to be at home with my family.
 5  And I really don't like anyone around.
 6     Q.    Okay.  When you say that you usually got the
 7  items 501 and 502, specifically the liquid and the
 8  cream, from Greg at the locker room at Pac Bell Park,
 9  basically; is that correct?
10     A.    Yes.
11     Q.    Would it occur typically before a game or after
12  a game or in the morning when you're working out?  Or
13  when would you typically get it?
14     A.    It was always before the game.
15     Q.    And just to be clear -- and I'll move on after
16  this.  Again, did either he or Mr. Conte ever send you
17  anything in the mail --
18     A.    No.
19     Q.    -- whether it be a Fed Ex or overnight mail?
20     A.    No.
21     Q.    I want to go back to that test we were talking
22  about before the break.  And what I want to ask you
23  about that is -- I want to clarify something.
24           Did anybody ever talk to you about that test,
25  which is pages nine and ten of 503?

| | |
|---|---|
| 1 | A.    No.  I -- I believe Greg.  We're friends.  So, |
| 2 | you know, whatever he told me, he told me.  I didn't |
| 3 | check anything.  I didn't look at anything.  He would |
| 4 | say:  "Barry, you need to eat more, you know, |
| 5 | vegetables, you know, because your zinc level or your |
| 6 | iron's low," or what not.  And so I have a cook.  So, he |
| 7 | was, like, conveying things to my cook and telling me |
| 8 | what I'm supposed to eat more of. |
| 9 | And then other than that, giving me extra |
| 10 | vitamins or supplements for it. |
| 11 | Q.    Understood.  Let me ask another question about |
| 12 | it, then. |
| 13 | Let me make sure you still have it in front |
| 14 | of -- okay, great. |
| 15 | Here's the thing I don't understand is that |
| 16 | test, though when you read it appears to be specifically |
| 17 | for anabolic agents or anabolic steroids.  I mean, it's |
| 18 | not testing for zinc or magnesium or things of that |
| 19 | sort, at least on the face of it, is it? |
| 20 | A.    That's what it looks like, exactly. |
| 21 | Q.    Can you think of any reason why Victor Conte |
| 22 | would be referring your urine sample to go out and get |
| 23 | tested for steroids? |
| 24 | A.    This doesn't have Barry Bonds's name on it. |
| 25 | So, I'm not assuming that this is mine.  That's what you |

```
 1    just stated.

 2         Q.   Right.

 3         A.   Okay.

 4         Q.   Right.

 5         A.   This could be anybody's.  Okay?  So, that's not

 6    fair.

 7         Q.   Well, we've discussed already, but let me

 8    re-clarify why I'm asking you that, because we do have

 9    this other document with --

10         A.   I see --

11         Q.   You understand.

12         A.   I see your other documents too, as well.  But I

13    have never seen any of this stuff at all.

14         Q.   Setting aside that, let me ask the question

15    again, just taking the question as it is.

16              Can you think of any reason why Victor Conte

17    would refer your urine to get tested for steroids?

18         A.   I have no idea.

19    BY MR. NADEL:

20         Q.   Have you ever heard, before today, anyone

21    suggest that your urine or blood samples were submitted

22    or tested by BALCO Laboratories, Victor Conte,

23    et cetera, for steroids?

24         A.   Was -- was my urine test for -- no.

25         Q.   This is the first you've heard of this
```

1    suggestion?

2        A.    No.    This is the first I've ever heard of this

3    (indicating).    I know that they sent samples out for

4    people in the gym and things like that for testing of

5    steroids and stuff like that.    You know, and hospital

6    tests.    I mean, I know that.

7        Q.    Let me rephrase my question.

8            My question is, have you ever heard about BALCO

9    or Victor Conte submitting your urine or blood samples

10   to test for steroids?    Have you ever heard about that

11   before?

12       A.    No, I -- no, no, no.

13       Q.    From anyone?

14       A.    We had a test just this year for baseball,

15   which everyone knows.    It's a program.    Supposed to be

16   all anonymous.

17       Q.    Excuse me for interrupting Mr. Bonds.

18       A.    I'm just telling you.

19       Q.    My question is not about baseball.    My question

20   is about BALCO and Victor Conte.

21       A.    I don't talk to Victor Conte.

22       Q.    So, the answer is --

23       A.    No.

24       Q.    -- this is the first you've ever heard of that

25   suggestion?

92

1        A.    Of me, yes.

2    BY MR. NEDROW:

3        Q.    Let me ask you, because you've actually -- and

4    I don't want to get into this in detail in terms of the

5    media, but you have been asked before about whether or

6    not you've used steroids; correct?  You've been asked

7    that question before?

8        A.    Yes.

9        Q.    And isn't it true that you've responded that

10   you've been tested and that you -- your test results are

11   negative and you're negative for steroids, you don't use

12   steroids.  I mean, isn't that basically how you've

13   responded to that question?

14       A.    I responded to it this season.  We got tested

15   unannounced twice this season.

16            I don't trust baseball.  Okay?  They say it was

17   anonymous.  They're not supposed to know.  But, you

18   know, no one understands this whole thing when they say

19   certain medicines that you take could come up positive.

20   So, you know, everyone was like:  "Wait a minute, we're

21   supposed to stop taking Tylenols" and so and so?

22   Because they didn't really specifically explain it to us

23   in detail, you know.

24            So, then they gave -- they surprised me with a

25   test.  And that's as soon as you walk in there, they

1    take you and they do it. But then you have to put your
2    name on it. So, I don't trust baseball. So, I asked
3    Greg -- I appealed on the same day and I asked Greg: "I
4    want to know -- I want to know what baseball's doing
5    behind our backs."

6        Q.   And did Greg ever -- did Greg ever offer you
7    anything --

8        A.   I never saw the papers. Never saw the results.
9    Greg just said: "You're -- you're negative."

10       Q.   Okay. So, your basis for telling people: "I'm
11   negative" is Greg telling you you're negative; correct?

12       A.   Basically Greg. I didn't see the papers.

13       Q.   I'm sorry. Mr. Bonds, but I have to ask
14   because you are a professional athlete, and an
15   enormously successful athlete, but your trust in Greg
16   with these items that don't have packages on them and
17   trusting him on his word, without looking at these
18   results, I mean, that's a lot of trust for somebody
19   whose body is, as you said, your work, your life, isn't
20   it?

21       A.   It's exactly right. You're right. I did trust
22   Greg. And I have other people that have put stuff on my
23   skin, too. I also have trainers in the organization I
24   trust that put cream and stuff on me, too. I put a lot
25   of trust in a lot of people, we do as athletes.

1    Q.    But do you ask them questions about what this

2  stuff is, where they're getting it, you know, that sort

3  of thing?

4    A.    No, besides: "It's hot" or "It's cold" or "We

5  don't like it," that's about it. I mean, if we had to

6  ask questions about every single item, we'd be there for

7  a while. If you had to go take it to go test it to make

8  sure it's -- you know, that's not how it works in there.

9    Q.    Did you ever sign a contract, a written

10  contract of any kind, with Greg in terms of this whole

11  weight lifting thing?

12    A.    No. We're friends. We don't need contracts.

13    Q.    Did you ever sign a contract with Victor Conte?

14    A.    Never.

15    Q.    How did this whole thing of doing the ad for

16  Conte come about? Did Victor call you up, or was it all

17  through Greg?

18    A.    Greg. Greg asked me that -- asked that Victor

19  wanted to know if I would do an ad for this ZMA stuff.

20  And I said, sure, you know, he's giving me the stuff

21  free, who cares?

22    Q.    Other than that ad, did you ever give any money

23  to Victor Conte?

24    A.    I have never given money to Victor Conte,

25  period, ever.

95

1    Q.    Yeah, that was a dumb question.  Other than

2    that ad, whether it be money or anything else, any

3    benefit, anything -- compensation of any kind to Victor

4    Conte?

5        A.    No.

6        Q.    Okay.  Let's go back to the documents and let

7    me give you a series, actually, of documents, Mr. Bonds.

8    And these are in No. 503 -- make sure I've got my

9    numbers right here for a moment -- at... Okay.  These

10   are pages 11 through 17 of the packet which is 503.

11           And the first page is a December 2001 calendar,

12   and the last page is a calendar page that says April,

13   though it does not -- oh, yeah, I'm sorry, April 2003.

14           So, let me give Mr. Bonds a moment to take a

15   look at these and then we'll go forward.

16       A.    (Examining document.)

17       Q.    And you know what?  I'm sorry, I left one page

18   off.  There's an August 2003 page as well.  So, let me

19   add that.  That's 11 through 18 then.

20           Okay?

21       A.    Mm-hmm.

22       Q.    Okay.  So, first of all, Mr. Bonds, I guess I

23   want to recheck with you or ask you again exactly when

24   you started getting the -- what I'll call the recovery

25   items, what you understood to be flax seed oil and the

1    cream, when you started getting that from Greg Anderson.

2    I think that you said -- but please correct me if I'm

3    wrong -- that you thought it was prior to this current

4    baseball season.

5         But let me ask, I mean, is it possible it's

6    actually a year before, after the 2000 -- well, actually

7    two years before, after the 2001 season?  Because this

8    first calendar is dated December 2001 with "BB" on it

9    and it's got a number of entries that I'd like to ask

10   you about.

11        Were you getting items during that period of

12   time from Greg?

13        A.   No.  Like I said, I don't recall having

14   anything like this at all during that time of year.  It

15   was toward the end of 2000, after the World Series, you

16   know, when my father was going through his cancer.

17        Q.   So, starting in December 2001, on this page,

18   again, there's BB here, which obviously are consistent

19   with your initials; correct?

20        A.   He could know other BBs.

21        Q.   Correct.

22        But BB would also be your initials; is that

23   correct?

24        A.   That's correct.

25        Q.   And December 3 is an indication:  "1 CC T 200

97

1    milligrams" and ".25 G"; correct?

2        A.    Yes.

3        Q.    That's on there.  And then we have clear and

4    then alternating entries on that first week there of

5    ".25 G" and then basically as it goes on there's entries

6    on this page of 503 that list "1 CC T 200 mg .25 G" on

7    the Mondays throughout December 2001.

8        A.    Right.

9        Q.    Is that all an accurate summary of what's on

10    the page?

11        A.    What you're reading is accurate, yes.

12        Q.    Okay.  Were you obtaining testosterone from

13    Mr. Anderson during this period of time?

14        A.    Not at all.

15        Q.    And were you obtaining growth hormone from

16    Mr. Anderson?

17        A.    Not at all.

18        Q.    In December 2001.

19            And what about the -- the clear -- either the

20    clear or the cream, were you getting either of those

21    substances in December 2001 from Mr. Anderson?

22        A.    No.  Like I said, I recall it being toward the

23    end of 2002 -- 2002, after 2002 season.

24        Q.    Okay.

25        A.    And that's what I recall.

1    Q.   Well, what I'd like to ask you about,

2   basically, are the next five pages.  And we'll just go

3   through these real quick.  January 2002, actually, has

4   two calendars.  And one of them lists -- and some of

5   it's crossed out, but "1 CC test .25 G" and this is page

6   12 of 503, "clear .30, .25 G," and there's other entries

7   also on this month.  During this period of time, do

8   these entries correspond to anything you were getting

9   from Mr. Anderson?

10   A.   I've never seen these papers.

11   Q.   Okay.

12   A.   I've never seen any of these papers.

13   Q.   Well, January 2002, earlier that -- in January

14   2002, you would take your family to Aspen.  Did you go

15   to Aspen that year?

16   A.   Not in January.  We'd go to Aspen in -- just

17   before Christmas.

18   BY MR. NADEL:

19   Q.   Did you go to Aspen over the Christmas holidays

20   of -- the Christmas 2001 spilling over into the New

21   Year's --

22   A.   We have a home in Aspen.

23   Q.   Okay.  My question is, did you go there over

24   the Christmas 2001 holidays, spilling over to the first

25   of the year in 2002?

```
 1        A.    I can't recall.  Normally, my kids have to be
 2   back to school by the 2nd of January, so we have to
 3   leave to go back to get our kids back in school.
 4        Q.    But over that holiday season, regardless of
 5   the --
 6        A.    We were gone for the Christmas, but I don't
 7   believe we were in -- we were not in Aspen on this
 8   January at all.  My kids have school.  We take the kids
 9   to go to school.
10   BY MR. NEDROW:
11        Q.    Let me ask also, Mr. Bonds, on January 9, there
12   is this entry that says "Beans" and the number two.
13              Do you see that?
14        A.    Mm-hmm.
15        Q.    Did you ever get any pills that Mr. Anderson
16   described as testosterone pills or fast-acting steroid
17   pills that he called beans?  Did you ever get anything
18   like that from him?
19        A.    No, not that I know of.  I mean, he gave me a
20   package of pills.
21        Q.    Did he ever give you one he called beans?
22        A.    I didn't ask him what was in the packages.
23        Q.    Okay.
24        A.    So, I could be wrong.  There could be that in
25   the packages.  I don't know what beans are.  I'm just
```

100

1    sitting here saying is that the packages already came

2    packaged. And I had, like, ten or 12 pills in there.

3        Q.   Okay.

4        A.   So, for this particular item you're talking

5    about, beans, if it's a pill, I could have taken that

6    pill, but I wouldn't know that it was, because I didn't

7    ask Greg what all the pills' names were.

8        Q.   Okay. At the bottom of this January 2002

9    calendar is "Clow," "1 Clow." Again, you said this

10   before, but you don't recall getting Clomid or anything

11   like that from him?

12       A.   I never heard of it.

13       Q.   Let's go to the next page. This is also a

14   January 2002 calendar with different entries. And let

15   me just ask you again, does this calendar, which is a

16   little different in terms of what's indicated, reflect

17   items you were getting from Mr. Anderson, if any, in

18   January 2002?

19       A.   No. I don't -- this seems odd. I'm trying to

20   understand it myself.

21       Q.   Okay.

22       A.   It just seems -- it just seems odd. So, I

23   wasn't in Aspen after January. I was up with my kids

24   skiing and they have to go back to school.

25       Q.   In January 2002, then, again, just to be clear,

                                                          101

1    you weren't getting any testosterone or growth hormone

2    from Mr. Anderson during that period of time?

3        A.   No.

4        Q.   And you weren't getting this flax seed oil

5    stuff during that period of time?

6        A.   Not that I can recall.  Like I say, I could be

7    wrong.  But I'm -- I'm -- going from my recollection it

8    was, like, in the 2002 time and 2003 season.

9        Q.   Okay.  All right.  And so when we go to the

10   next page, the third one I've given you, and that would

11   be page 13 of the packet, it says February 2002.  And

12   it's got similar entries of clear and cream here,

13   there's a pee test on February 16, blood test on

14   February 18.

15            And we can go ahead and look at the next

16   calendar, February 2002, again, alternating clear,

17   cream, .25 G, and going on to indicate several days of

18   Clow, C-l-o-w.

19            Do these pages 12 and 13 -- I'm sorry --

20       A.   You're talking about the two February ones;

21   right?

22       Q.   The two February ones, which are actually 14

23   and 15 of 503.  Do these correspond to your recollection

24   of what you were getting from Mr. Anderson during this

25   period of time?

1          A.    It would be very hard because Greg only -- I

2    only saw Greg on the weekend, like I said before.

3          Q.    Okay.

4          A.    So, it would be very hard.  And Greg gave me

5    these things when I saw him in person.

6          Q.    Okay.

7          A.    So, it's very hard for this stuff to be around

8    just me.

9          Q.    And let me again make sure I understand that

10   right, which is he gave it to you in person and you

11   pretty much used it instantly, right at that time, you

12   never carried it home?

13         A.    At that time at the ballpark, at that time.

14         Q.    And you used all the quantity up he gave you at

15   that time?

16         A.    No, it was like a little spoon.

17         Q.    Okay.

18         A.    Like really little tiny, tiny spoon and he

19   would take it like a little scoop of it and he'd take it

20   off and just go like this (indicating).

21         Q.    I see, he'd put it on you?

22         A.    He'd put it on me himself.

23         Q.    And you're talking about the cream

24   specifically?

25         A.    Yeah, and he'd give me the -- this stuff and

                                                            103

1    he'd just say: "Take it."

2        Q.    And the "this stuff" you're talking about would

3    be the flax seed oil?

4        A.    The flax seed oil.

5        Q.    And then March 2002 just has a couple entries

6    and a blood test there.

7            During that period of time, March 2002 -- well,

8    you've already said it proceeds --

9        A.    It's literally impossible, because my doctor is

10   not there. I would not have a blood test at any point

11   in time without my doctor.

12       Q.    And you know your doctor wasn't around in March

13   2002? How do you know that so clearly?

14       A.    Because I'd be in spring training in March.

15       Q.    And he never came down to see you in spring

16   training?

17       A.    Never.

18       Q.    That's in Arizona?

19       A.    Arizona. Never, yeah.

20   BY MR. NADEL:

21       Q.    Mr. Bonds, doesn't oftentimes the baseball

22   season start right around the date of April?

23       A.    Yes.

24       Q.    And the last preseason games often are here --

25       A.    At Pac Bell.

1     Q.    At Pac Bell Park; right?

2     A.    Yes.

3     Q.    So, March 28, we don't know without looking at

4     the schedule?

5     A.    You know, you're right. We come home sometimes

6     earlier to play the Bay Series. So, you're right about

7     that. But I didn't take no blood test. I don't take no

8     blood test before the season, neither, I don't care who

9     it is.

10    Q.    You can't tell for sure without the schedule,

11    but this last weekend in March of 2002, you very well

12    may have been here in the Bay Area?

13    A.    My doctor is named Dr. Teng (phonetic). You

14    can go and ask him.

15    Q.    Well, I'm just asking you.

16          You previously stated --

17    A.    I don't believe so.

18    Q.    Please listen to my question.

19          A moment ago you said it couldn't have been a

20    blood test at the end of March because it was spring

21    training. And I take it now you would correct that to

22    say you may very well have been here at that time

23    because of the Bay Bridge Series at Pac Bell park; is

24    that right?

25    A.    That is correct. That was my misunderstanding

1    on the date. That is correct.

2    BY MR. NEDROW:

3        Q.   Okay. And let's go to the last two calendars

4    you have from, April and August 2003. By the way, this

5    April one at top has "BLB" written on it. And your

6    middle name is -- what's your middle name, Mr. Bonds?

7        A.   Lamar.

8        Q.   So, BLB actually would be specifically your

9    three initials; correct?

10       A.   You're right.

11       Q.   And this one has, right at the top where you

12   get to the dates "25-G, L-20" indicated -- and actually

13   the word "March," apparently the last few days of March,

14   and then it goes into April 2003; is that correct?

15       A.   Mm-hmm.

16       Q.   And just so we're clear, we just jumped a year.

17   Obviously, we don't have in this packet the calendars

18   for after March 2002. We're now April 2003.

19            In April 2003 during this period of time you

20   were getting the flax seed oil and the cream, as you

21   testified previously, is that correct, from

22   Mr. Anderson?

23       A.   Yes.

24       Q.   And again, just to be clear, we do have these

25   entries of G on here.

1           Do you know what that stands for?

2      A.   I have no idea.

3      Q.   It wasn't growth hormone --

4      A.   No, not at all.

5      Q.   -- that you were getting?  Okay.

6           All right.  And then there are several entries,

7      actually -- again, we could check it, but appear to

8      correspond to your schedule; correct?  "SD" for

9      San Diego, "Mil" for Milwaukee, et cetera.

10          Do you see those entries?

11     A.   Yes.

12     Q.   And along with that are entries of "cream" --

13     the word "cream" written in and also the letter "I," the

14     letter "L," and other various entries on this calendar;

15     is that correct?

16     A.   Yes.

17     Q.   Did Mr. Anderson give you this calendar so you

18     would have it with you even if you went to away games on

19     how to take things?

20     A.   I've never had a calendar with him, never had

21     anything.

22     Q.   So, you've never seen this document before?

23     A.   Greg didn't travel with me either.

24     Q.   Right, but did he ever give you --

25     A.   No, I've never seen any of this stuff.

1    Q.   All right.  Let me ask you about the "I."  Did

2    Greg ever give you insulin to take in connection with

3    any of these things?

4         A.   I'm not a diabetic.

5         Q.   Okay.  Well, and actually let me ask, did you

6    ever have a prescription or a doctor's authorization to

7    take testosterone or steroids for any medical reason?

8         A.   No.  Besides cortisone has steroids in it.

9         Q.   Right, cortisone, right.

10        A.   I mean, I've taken forms of steroids in the

11   process of -- from, you know, aches and pains or healing

12   or after surgery and stuff.  Cortisone has steroids in

13   it.  There's a lot of drugs out there that have steroids

14   in it that we do use.

15        Q.   Sure.  And that's a fair point.

16             But I guess, specifically, depotestosterone or

17   an injectable form of testosterone, was that something a

18   doctor ever authorized you to take?

19        A.   No.

20        Q.   Okay.  Let's go to August 2003.  And it's got

21   "July" handwritten in and again has -- let me read some

22   of the entries.  On August -- or excuse me, it's July,

23   at the top.  July 27, "1 CC test."  And now it looks

24   like "40 Flac" is written in, "Flac."  And as you go

25   through the calendar you see "1 CC test," on August 5,

1    "2 T3 .25 G."  August 6, "40 Flac," F-l-a-c, "2 T3,"

2    et cetera, continues that way throughout this calendar.

3         Do you know what -- this is recent now; right?

4    This is just four months ago, in August 2003; correct?

5    According to the calendar.

6        A.    Exactly.

7        Q.    And do you know what these entries for "G" and

8    "test" refer to in terms of what you were taking from

9    Mr. Anderson in August 2003?

10       A.    I have no idea what this is.

11       Q.    Okay.  But during this period of time you were

12   taking the clear and the cream; correct?

13       A.    Is this 2003?  Yes.

14       Q.    I'm sorry.  I should again be clear.  That is,

15   the thing you thought was flax seed oil and the cream,

16   you were taking that in August 2003; correct?

17       A.    Yes.

18       Q.    But is it your testimony that the "G" and the

19   "test" don't reference anything that you were taking

20   from Mr. Anderson?

21       A.    This just doesn't seem right.  I don't know

22   what this is.  I've never seen this, and it's just odd.

23   There's -- I mean, for anybody who's here that has some

24   kind of recollection of steroids, I mean, this would be

25   an odd way of doing things, I would believe.

1    Q.   Why?

2    A.   Just from my own thinking, you know, they go in

3    cycles, don't they?  And everyone stays on a normal --

4    this doesn't seem -- this seems really odd and irregular

5    to me.

6    Q.   Okay.  Well, there are, of course, days where

7    it's indicated that one is to be taking it and then days

8    with Xs through them which are presumably off days;

9    right?

10   A.   Yeah, I mean, I'm not overly naive, but I don't

11   think you would do something and then -- I mean, aren't

12   you supposed to do this every day or every other day and

13   every once a week or something like this?  And you go

14   through a cycle thing?  This is too irregular.  It just

15   seems odd to me.  That's all I'm saying, it just seems

16   real odd.

17   Q.   Can you tell of any reason why Greg would have

18   written "G" and "test" and things like that on a

19   calendar with your initials on it if he wasn't giving

20   you growth hormone and testosterone?

21   A.   I can't answer that.  Maybe he ran out of

22   paper.  I don't know.

23   BY MR. NADEL:

24   Q.   I'm sorry.  I didn't -- I'm not sure I

25   understood your answer.

1      A.   I said I don't know.  I don't know why.

2   BY MR. NEDROW:

3      Q.   Did he ever tell you that he was going to start

4   calling the clear "flax seed oil" in case anybody ever

5   asked what that was?

6      A.   No.  That's what he called it.

7      Q.   Okay.  All right.  Let's go to the next page,

8   which is number 18 in the packet.  And it's a -- and

9   I've got to give you a copy of it.  18 and 19.  It's a

10  two-page item.  And it's a -- I'll give you a chance to

11  look at it.  This is from, again, Exhibit 503, pages 18

12  and 19.  It's a LabOne test.  It's two pages.

13     A.   Mm-hmm.

14          (Examining document.)

15     Q.   So, you've had a chance to look at it,

16  Mr. Bonds?

17     A.   Mm-hmm.

18     Q.   Now, your name is actually on this document;

19  correct?

20     A.   Yes.

21     Q.   And it says July 24, 1964; correct?

22     A.   What page are you -- which one are you looking

23  at?

24     Q.   I'm looking at -- I'm sorry -- the first page,

25  four lines under your name, of Barry Bonds.  It says,

                                                        111

1    "DOB/Age:  July 24, 1964."

2          Do you see that?

3    A.    Which one are you looking at, though?  This one

4    (indicating) or this one (indicating)?

5    Q.    I'm sorry.  The one in your left hand.  It's

6    the top page.  I'm sorry.

7    A.    Okay.

8    Q.    Again, let's be clear.  It says "LabOne" in the

9    upper left corner; correct?

10    A.    Yes.

11    Q.    And then it says, "Patient:  Bonds, Barry";

12    correct?

13    A.    Yes.

14    Q.    And then below that it says, "Age/DOB:  July

15    24, 1964."

16    A.    Mm-hmm.

17    Q.    Do you see that?

18    A.    Mm-hmm.

19    Q.    And that is your birthday; correct?

20    A.    Yes.

21    Q.    And this is a test put out by BALCO Labs; is

22    that correct?

23    A.    Seems that way.

24    Q.    And on this one there's a testosterone level

25    indicated of 11.2 and then a reference of 9.5 to 29.7,

112

1    which appears to be some sort of reference as to what

2    the appropriate testosterone level ought to be.

3              Do you see that on there?

4         A.    I see that on there.

5         Q.    So, that's fine.  I guess my question is, do

6    you know why, in November of 2001 -- which is the date

7    in the upper left corner and also indicated as the time

8    collected and received -- that your testosterone was

9    being tested by this lab?  Why would they test for your

10   testosterone?

11        A.    I have no idea.  Like I said, I just gave the

12   blood.  My doctor comes up to my house, I give Greg the

13   blood.  Greg just tells me.  So, I never saw the

14   documents.  I should have.

15             Now that I think of it with the situation that

16   is now, I should have.  But I never saw them.  I

17   believed my friend.  He told me everything's okay.  I

18   didn't think anything about it.

19        Q.    Okay.  And I'm sorry, I want to make sure I'm

20   clear with the grand jury where this came from.

21             Again, this is the LabOne, the first page says

22   November 12, 2001, date completed.  Is that clear on the

23   document I'm referring to, LabOne?

24             GRAND JUROR:  I don't have it.

25             GRAND JUROR:  I don't have it.

113

```
 1              GRAND JUROR:  Specialty Labs.

 2              MR. NADEL:  I believe it's first page after the

 3      end of the calendar, after August 2003.

 4              (Multiple parties speaking simultaneously.)

 5              (Reporter interrupts.)

 6              MR. NEDROW:  Let's move on.  I think some of

 7      the packets don't have all the pages in them.  And

 8      that's why you guys don't have them.  So, let me just

 9      move on because we are a little short on time.  And I

10      think Mr. Bonds answered the question I wanted to ask

11      which is the question of why --

12      BY MR. NEDROW:

13          Q.   You don't know why your testosterone would have

14      been tested; correct?

15          A.   I wouldn't have any idea.

16          Q.   Let me move on to the next page, which --

17              I think that the next couple pages, based on

18      this hand out I have here, may also be missing from the

19      people in the back.  So, I apologize for that.  But we

20      went through them real quick.

21              This affidavit which I gave you, Mr. Bonds,

22      actually is -- actually, it's not related to the test I

23      was talking about, you can tell from the date.  So, I

24      misspoke on that.  It's February 2003.

25              But I guess the only thing I wanted to ask you
```

114

1    about here was, this affidavit appears to indicate on

2    February 5, the specimen for Greg Anderson was

3    mislabeled as "Barry B."

4              Do you see that in the top section of this

5    page?

6         A.   Yeah, I'm looking at it.

7         Q.   Okay.  And then after that there is an

8    indication that:

9              "I certify to my personal knowledge the

10             specimens labeled as indicated are in fact

11             specimens for Greg Anderson."

12             And the signatures of looks like J. Valente or

13   James Valente, and then another person with the last

14   name of -- oh, I'm sorry, it's Greg Anderson, G-r-e-g,

15   Anderson.

16             Do you see those signatures on there?

17        A.   Mm-hmm.

18        Q.   Did Mr. Anderson routinely put your samples in

19   his name to avoid having your name linked with the

20   samples?  Do you know about that?

21        A.   No, I have no -- no.  I wouldn't think he would

22   do something that dumb.

23        Q.   Did you ever tell him do to do that because you

24   had concerns about confidentiality or celebrity or

25   things like that?

115

1     A.    No.  I wasn't concerned about that.

2     BY MR. NADEL:

3          Q.    Did he ever tell you that he had done that?

4          A.    No.  He just came to get the samples and went.

5                MR. NEDROW:   Okay.

6     BY MR. NADEL:

7          Q.    Has anyone ever told you that there was a

8     sample that was mislabeled that related to you or

9     Mr. Anderson?

10         A.    No.

11    BY MR. NEDROW:

12         Q.    Okay.  And actually --

13         A.    I mean, wouldn't you have to sign for these

14    things?  Isn't it illegal?  Wouldn't you have to sign

15    for it?

16         Q.    Let me go to the next --

17         A.    Do you know what I'm saying?

18         Q.    Not clear, not clear.

19                Let's move on to the next page.  And let me

20    give you the next page, Mr. Bonds.

21                Mr. Bonds, I asked you before --

22                And you know what I'm going to do?  I'm going

23    to hand you the packet so you all can take a look at

24    this.  This page --

25                You have it, right?

1              Mr. Bonds, please take a look at this page

2    which in the original 5Q3 packet is going to be page 19.

3              And that's this (indicating).  This is the page

4    we just talked about.  And if you could pass that

5    around.  I'm sorry about that.

6              I asked you earlier, Mr. Bonds, about this

7    Dr. Goldman.  And let me re-ask it again now.  Have you

8    ever scheduled an appointment or met with a Dr. Brian

9    Halavie-Goldman who worked with BALCO Laboratories?

10        A.    I've never heard of this man or seen this man

11   and I don't know how my name is next to this name.

12   Never seen him in my life.

13        Q.    All right.  Was there ever a discussion in

14   November of 2003 -- did anyone ever suggest that you

15   make an appointment that you meet with Dr. Goldman and

16   get it cancelled or something?

17        A.    Never.

18              I don't know what he does.  I don't even know

19   what he does.  If you asked me what this man does, I

20   don't know that.  I don't know what this man does.

21   Could you explain to me what he does.

22        Q.    Have you ever heard his name before we came in

23   here?

24        A.    Never.

25        Q.    Okay.  So, you can't think of any reason why

                                                        117

1    his name would be there?

2         A.    I can't give you any reason.

3              I'm shocked at some of these things that I've

4    seen.

5         Q.    All right.  Let's move on to the next page.

6              And everybody does have this page.  This is the

7    second-to-last page in the messed up packets and the

8    second-to-last page in the good packets.  So, either 19

9    or 21, depending on your packet.

10             The -- this -- let me give -- again.  Sorry.

11   Apologize.  I want to give you a copy of it.

12             Please take a look at this.

13        A.    (Witness complies.)

14        Q.    So, on this document, Mr. Bonds, let's go to

15   the bottom.  Let me start by asking, on this one, this

16   is your signature at the bottom of this page; correct?

17        A.    Yes.

18        Q.    Do you recall what this document relates to?

19        A.    This document relates to a baseball-related

20   sample that -- I believe.

21        Q.    Okay.  Now --

22        A.    It's supposed to be anonymous.  It's supposed

23   to be private, for baseball only.  And this is one of my

24   filled-out sheets from Major League Baseball.

25        Q.    Did you share those documents either with

1   Mr. Anderson or Mr. Conte -- in other words, did

2   Mr. Anderson or Mr. Conte help you forward samples to

3   Major League Baseball?  I mean, would they have reason

4   to possess this document?

5       A.   I don't know -- I don't know -- I may have

6   given it to Greg.  Because when I took the sample --

7   when I took the test I wanted to make sure, like I said

8   earlier, because I don't trust baseball, to make sure

9   that they don't come back to me and try to say:  "X, Y,

10  Z," that I protect myself.

11          Like I said, I was born in this game.  And this

12  is a business.  And they can have doctors say whatever

13  they want them to say.  And I protect myself if they

14  want us to do anything.  All us players do that.

15      Q.   Okay.

16      A.   So, Greg may have had this in his hand and gave

17  it to them.  But this is a Major League Baseball sample

18  thing I took for baseball.

19      Q.   And this specimen was sent by Fed Ex, then,

20  according to what you testified to.

21          Now, I'll call your attention to specimen

22  bottles released to you in a Fed Ex box checked there on

23  the right side.

24          This was Fed Ex'd to Major League Baseball;

25  correct?

1          A.   Yeah, we didn't do all that we stuff.  We just

2     signed it, you know.  They had the guy, we had to pee,

3     he stared over us, he did all the checking and

4     everything else, and all he said was:  "Sign your name."

5          Q.   Okay.

6          A.   And that's all we did, signed our name and

7     moved on.  Print your name, sign your name, move on.

8          Q.   Okay.  Let's go to the last page of the packet.

9     And again this should be in everyone's packet.

10              This is one that says Specialty Laboratories.

11     And again, in your packet, and everybody else's

12     packet -- this is the last document I have for you

13     today, Mr. Bonds, I think.  And it says Specialty

14     Laboratories.  And on this one, okay, first of all,

15     there's a name and a B, comma, B.

16              Do you see that -- that indication there on the

17     right side?

18          A.   Where are you look -- oh, I see a B comma B,

19     yeah, name.

20          Q.   Okay.  And those, again, are your initials, BB?

21          A.   Yes.

22          Q.   And then there's a physician, Brian Goldman

23     indicated there as the doctor; correct?

24          A.   Correct.

25          Q.   Okay.  And it's BALCO Laboratories, attention

                                                        120

```
 1   Jim Valente.
 2              Do you see that?
 3        A.    Yes.
 4        Q.    By the way, do you know Jim Valente?
 5        A.    I know he works at BALCO.  I thought his name
 6   was John.  But it's Jim.
 7        Q.    What does he do at BALCO, do you know?
 8        A.    I have no idea.  I don't know.  I don't know
 9   what his job description is.
10        Q.    The date of birth own here is 7-24-64; is that
11   correct?
12        A.    Yes.
13        Q.    And that's your birthday; correct?
14        A.    Mm-hmm.
15        Q.    This is a sample taken on January 19, 2001, or
16   at least it indicates it is.  Do you see that entry
17   below the birth date and "sex" line?
18        A.    Mm-hmm.
19        Q.    And what I want to ask you about this one is,
20   this also is a testosterone test, but we have the entry
21   of, about a third way down the page:  "Testosterone,
22   free and total."
23              Do you see that line?
24        A.    Mm-hmm.
25        Q.    Okay.  And then below that it says:
```

1     "Testosterone total 730" and then:  "Testosterone free

2     greater than 5.00."

3             Do you see where I'm reading from?

4     . A.    Mm-hmm.

5     Q.    And then below that is:  "Reference ranges for

6     testosterone free males 20 to 49 years 0.95-4.30."

7             Do you see where I'm reading from there?

8     A.    Mm-hmm.

9     Q.    And then there's this other discussion of free

10    testosterone a little bit further down that says:

11            "The percentage of total testosterone in

12            unbound state, percent free testosterone,

13            cannot be calculated since the free

14            testosterone level is greater than the

15            highest detectable concentration."

16            Do you see that section?

17    A.    Mm-hmm.

18    Q.    Okay.  So, again, let me ask you in January

19    2001, do you know why BALCO would have been testing you

20    for your testosterone levels?

21    A.    I have no idea.

22            BALCO said they were testing the blood to check

23    your levels.  I just -- like I said, I never went to

24    BALCO.  Greg just came up.  I had my doctor at the

25    house.  He came in with the vials, my doctor drew the

 1    blood, we just gave it to Greg.  Greg went down there

 2    and dealt with it.

 3        Q.    Do you know why your testosterone would have

 4    been -- according to this result -- higher than the

 5    level the normal range as indicated for males 29 to 49

 6    years?  Do you know why that would have been?

 7        A.    I don't understand this piece of paper.  I've

 8    never seen it before, once again.  So, I would not be

 9    able to answer that question because I don't understand

10    how that works.

11            And I don't understand if some people may have

12    more testosterone levels than others.  And I just -- I

13    can't honestly believe just because this piece of paper

14    says something that there's a problem.  Everyone is

15    different.

16    BY MR. NADEL:

17        Q.    Did anyone ever tell you of anything about

18    these results of --

19        A.    No one ever told me anything.  I just was at

20    the house.  Greg came up with my doctor there, took the

21    blood, and went down there.  And then would say:  "Okay,

22    everything's fine."  And I trusted him.  I believed him.

23    I didn't think about it.

24    BY MR. NEDROW:

25        Q.    In January 2001 were you taking either the flax

```
 1    seed oil or the cream?

 2         A.    No.

 3         Q.    And were you taking any other steroids?

 4         A.    No.

 5               MR. NEDROW:  All right.

 6               Thanks, Mr. Bonds.

 7    BY MR. NADEL:

 8         Q.    Mr. Bonds, just to shift subjects just for a

 9    moment.  I'd like to go back a little -- little ways ago

10    when Mr. Nedrow was asking you about your -- your

11    contacts with Mr. Anderson.

12         A.    Mm-hmm.

13         Q.    Maybe -- I don't know -- about a half an hour

14    ago.

15               And you said something to the effect of -- I

16    don't remember the exact language, but to the effect of

17    that with regard to the subject matter of steroids,

18    testosterone, you know, this matter, that you didn't

19    want to get involved with any of that with Mr. Anderson

20    so you wouldn't discuss anything about that.

21               Do you remember something to that effect?

22         A.    I said we didn't discuss each others' personal

23    lives.  I mean, we're friends.  That's how -- I mean,

24    you have friends.  Do discuss their person lives all the

25    time?  No.  I mean, we were friends, we grew up
```

1    together.  I mean, he works in a gym.  I could suspect
2    what goes on in a gym.

3        I don't work out -- I don't work out in the
4    richie gym where everybody is rich.  I work out --

5        Q.   Let me -- let me focus --

6        A.   Can I finish?

7        Q.   Let me just focus the question a little bit.

8             I'm not asking you about --

9        A.   But can I finish?

10       Q.   Yes, go ahead.

11       A.   I work in a dungeon gym.  You know, my thinking
12   of what they may be doing is their own business.  I
13   don't get involved into their business.  That's what I'm
14   saying.  So, it never became a conversation.  Because,
15   you know, you see a body builder in a gym, how many body
16   builders going to tell you:  "No, this is all natural."
17   You know, they don't talk about it.  Whatever, you know,
18   you're only lifting weights.

19       Q.   Focusing not on the rest of your personal life
20   but the question of the subject matter of steroids,
21   testosterone levels, et cetera, that's a matter that you
22   indicated before that you wouldn't want to talk with
23   Mr. Anderson about because you didn't talk about this
24   type of thing with him; is that right?

25       A.   Like I said, we didn't talk about each others'

1    job.

2         Q.    And you wouldn't talk about issues relating to

3    steroids with him, would you?

4         A.    Like I said, I mean, if you want to talk about

5    me, the players probably talk about it more than

6    anybody.   You know, your normal friends, everyday

7    people, I mean, you bring it up in a conversation.   If

8    you're talking about pushed on me or saying "You

9    should," no.

10         Q.    My question goes back --

11         A.    Conversations, possibly, yes.

12         Q.    My question goes back to you and Mr. Anderson,

13    not other players, not other people.   Just conversations

14    and contacts between yourself and Mr. Anderson.

15         When Mr. Nedrow asked you a while ago about

16    that subject matter in relation to this investigation,

17    you said:   "We didn't talk about any of that stuff,"

18    basically, relating to this investigation, steroids, or

19    whatever?

20         A.    Right.

21         Q.    Mr. Anderson and you would not talk about that.

22    You didn't want to talk about that.

23         Is that right?

24         A.    I don't want to know anything.   That's exactly

25    right.

126

1        Q.    And basically you said, in effect, you didn't

2    want to get involved in any of that in relation to

3    Mr. Anderson?

4        A.    Exactly, toward this whole situation.

5        Q.    And similarly, you wouldn't want and didn't

6    want to get involved or talk about -- specifically,

7    about Mr. Anderson's problems in relation to this

8    investigation?

9        A.    I don't know his problems.

10       Q.    Okay.  And you didn't want to know; right?

11       A.    I don't want to know.

12       Q.    And you didn't want to talk about it with him?

13       A.    I don't want to talk about it with him.

14       Q.    And you know -- well, have you talked about it

15   with Mr. Anderson since the subject of this

16   investigation of BALCO has become public and in the

17   media?

18       A.    Besides what's it like getting your door broke

19   down or, you know, stupid things:  "How's your

20   girlfriend?"  You know:  "She must be devastated they

21   broke down her door."  You know, things of that matter,

22   that's what we discuss.  But the personal issues of

23   this, no.

24       Q.    And you know that Mr. Anderson has an attorney

25   representing him, don't you?

```
 1        A.    Mm-hmm -- yes.

 2        Q.    And what's his attorney's name?

 3        A.    I don't know his name.

 4        Q.    You don't know his name?

 5        A.    I'm not really good with names.  I'm sorry.

 6        Q.    Do you know --

 7        A.    I meet a lot of people every day.  And I'm not

 8    really good with names, so --

 9        Q.    You don't know his lawyer?

10        A.    I know his lawyer.

11        Q.    You just don't remember his name?

12        A.    I just don't remember his name.

13        Q.    Okay.

14        A.    I know the building that he's at.

15        Q.    Have you had conversations or meetings with

16    Mr. Anderson and his lawyer about this investigation?

17        A.    No.

18        Q.    You're sure of that?

19        A.    I'm sure of that.

20        Q.    Is there any reason why you and Mr. Anderson,

21    together, would have visited his lawyer's law office

22    after this investigation became public?

23        A.    Because my lawyer's across the bridge, so he

24    comes this way and he allows us to use his conference

25    room.
```

1    Q.    Okay.  Did you -- after this investigation

2    became public, when you became aware that there was a

3    matter linked to BALCO, did you, Mr. Anderson, and

4    Mr. Anderson's lawyer meeting at his law office and

5    discuss this investigation?

6    A.    No, not at all.

7    Q.    Never happened?

8    A.    No.  Not at all.

9    Q.    And how many times have you visited -- since

10   you became aware that there was an investigation, how

11   many times have you been to Mr. Anderson's lawyer's

12   office?

13   A.    You'd have to ask Mike, my attorney.

14   Q.    To your recollection, how many times have you

15   been there?

16   A.    Maybe four -- four times, maybe.  I've been

17   there twice the last two days.  And maybe two other

18   times or -- two other times prior to that.

19   Q.    Putting aside the last two days, two times

20   before that?

21   A.    Two or three, at the most.

22   Q.    Approximately when?

23   A.    Oh, I can't recall.  It's all during this whole

24   time.

25   Q.    Months ago, weeks ago?

1    A.    Weeks.

2    Q.    Okay.  The first time that you and Mr. Anderson

3    went to his lawyer's office --

4    A.    Me and Anderson has never gone to his lawyer's

5    office, ever.

6    Q.    You and Mr. Anderson have never been to his

7    lawyer's office together?

8    A.    I have never gone with Greg Anderson with him

9    to his lawyer's office, no.

10   Q.    Have you met him at his lawyer's office?

11   A.    No.  I have met his lawyer, though.  But I have

12   not met Greg there or him with his lawyer at all.

13   Q.    Have you ever been at his lawyer's law office

14   with Mr. Anderson?

15   A.    I have only been at Greg's lawyer's office with

16   my attorney.  They talk.  I'm never allowed in the room

17   with them.  They go off.  I don't -- they don't -- won't

18   talk about the thing, what they know.  That's their

19   business.

20   Q.    Okay.  Just one more question, just to make

21   sure, although it's pretty -- I think it's pretty clear

22   what you're saying, but I just want to make sure I

23   understand it.

24         You have never met with Mr. Anderson, yourself,

25   and his lawyer at his lawyer's law office?

                                                        130

```
 1         A.   No, never.

 2         Q.   And with regard to your -- a previous interview

 3    that you had with agents of the FBI, do you recall

 4    having been interviewed back in July of this year?

 5         A.   Yeah.   I went to him over an extortion case and

 6    theft.

 7         Q.   A separate matter than this?

 8         A.   Way separate than this, yes.

 9         Q.   And you were interviewed by agents of the FBI

10    and also in the presence of an assistant United States

11    attorney.

12              Do you recall that?

13         A.   I was not interviewed.   I was going to them

14    over a problem of theft, fraud, forgery, and seeing what

15    I can do to get it back, or, you know.

16         Q.   And you had a lengthy conversation with them?

17         A.   Not long.   I don't -- I don't recall most of

18    that conversation because I don't deal with it anymore.

19         Q.   And that was with a different lawyer who was

20    representing you in connection with that matter; is that

21    right?

22         A.   Yes.

23         Q.   And during that interview, at some point in

24    that interview, did the subject matter come up of

25    allegations that somebody else might make against you?
```

1    A.    They brought that up because they work both

2    sides of the fence.  That's how you guys work.

3    Q.    And in connection with allegations -- and the

4    person -- who was the person involved that there was a

5    discussion about, somebody who might be accusing you of

6    various things?

7    A.    The person that I was going after was a close

8    friend of mine named Steve Hoskins that our families --

9    his father played professional football, was friends

10    with my father.  His dad passed away, and now my

11    father's passed away.

12    Q.    Okay.  And during --

13    A.    We worked together.  And he stole my property,

14    forged my name on some things, sold it.

15    Q.    And to your knowledge that's a matter that is

16    presently being investigated by the FBI?

17    A.    I don't want any kid to ever be disappointed

18    that they got something of mine that may not be true.

19    So, I told them to go in the water somewhere.  Because

20    it's not even worth it.

21    Q.    And during that conversation or interview, did

22    the subject matter come up about what Mr. Hoskins, the

23    individual that you mentioned, what he might say about

24    you?

25    A.    No, I don't recall any of that.

132

1      Q.   Did -- were you asked during that interview, do

2  you recall having been asked, whether you had ever taken

3  steroids?

4      A.   I don't recall that conversation coming up.

5      Q.   Okay.  In fact, you said you had never ever

6  taken steroids; is that right?

7      A.   I -- I -- I -- I don't know what I talked to

8  them about.  But I don't believe that was any of the

9  conversation.

10     Q.   To your knowledge, that was never mentioned in

11  the conversation at all?

12     A.   Not that I know of.

13     Q.   Now, had you said during that conversation that

14  you -- or had you denied ever taking steroids, now, with

15  what you've seen today, do you feel comfortable as you

16  sit here today saying that you have never taken

17  steroids?

18     A.   I feel very comfortable, very comfortable.

19         MR. NEDROW:  I think that Mr. Nadel and I have

20  concluded our factual questions for Mr. Bonds.

21        So, before we let Mr. Bonds go, does anyone

22  have any factual questions for Mr. Bonds in the grand

23  jury regarding the factual matters discussed before we

24  let him go?

25        Yes, sir.

1           GRAND JUROR:  Did you ever get Mr. Anderson a
2    Christmas bonus or anything like that?
3           THE WITNESS:  Yes, I did.  I gave all my -- all
4    my friends a Christmas bonus.  Not a Christmas bonus.  I
5    gave them a bonus after I hit 73 home runs because I
6    couldn't believe it, and I was so excited.  Even my
7    publicist, my strength coach, my stretching coach.  I
8    met my bonus when I did that.  So, I met my bonus and
9    gave a bonus to everyone else.
10          GRAND JUROR:  And how much did you give
11   Mr. Anderson?
12          THE WITNESS:  20,000.  I gave everyone $20,000.
13          GRAND JUROR:  That was besides the 15,000?
14          THE WITNESS:  Yes.
15          GRAND JUROR:  Was that in cash, too?
16          THE WITNESS:  I believe so, yes.
17          GRAND JUROR:  Thank you.
18          MR. NEDROW:  And actually, thank you.  A
19   follow-up question I had forgotten.
20   BY MR. NEDROW:
21      Q.   You also after the Giants went to the World
22   Series last year after the 2002 season gave Mr. Anderson
23   a World Series ring; isn't that correct?
24      A.   I gave everyone, even everyone in my family, a
25   World Series ring.  I bought them.  You can purchase

1    them.

2         Q.   Oh, I see.

3         A.   So, from the team you can purchase them.

4              I also got Greg Anderson a 73 home run ring,

5    because that's what he wanted.  Okay?

6              But a friend of mine in New York makes these

7    things.  And he makes them all for me.  So, if I have

8    him do a big award, a friend of mine in New York will

9    just make one for me and give it to me as a gift.  Greg

10   saw it, he liked it, he wanted it.  Fine.  He wouldn't

11   charge me for training and stuff.  And I'm, like, 15 --

12   I mean, he wants it.  This is the least I can do.  It's

13   a $3,000 ring.  He wants it, what he do, here, fine.

14              MR. NEDROW:  Okay.  Other factual questions,

15   yes.

16              GRAND JUROR:  Greg Anderson -- would you

17   consider him an employ that works for you.

18              THE WITNESS:  No.  I consider him as a friend.

19              GRAND JUROR:  That you pay him $15,000, is that

20   like a tax write-off for you when you do your taxes?

21              THE WITNESS:  No, you can't write off that.

22              GRAND JUROR:  $15,000, you can't write that

23   off?

24              THE WITNESS:  It's a luxury to have a trainer.

25   It's not a tax deduction.

                                                      135

1          I did that for him so his kid could go to same

2     school.  My daughter goes to a very expensive Montessori

3     school, and his son's over there too.  And he has an

4     ex-girlfriend that won't let him see his kid, and I

5     don't want, you know, no problems.  "Here, let me give

6     you something keep her off your back."

7          So, that's basically in exchange for the

8     workouts.  You know, we're friends, so you, know you,

9     just give and get.  That's just how it works.

10    BY MR. NADEL:

11        Q.   So, you consider that a gift, really?

12        A.   Pretty much, yeah:  "Here's a gift, do what you

13    want to do with it."  You know, I didn't ask any

14    questions.

15        Q.   Just to follow-up on the grand juror's

16    question, is that -- if you're giving gifts of $15,000

17    or $20,000 a year to individuals, is that something that

18    you declare on your tax returns as a gift?

19        A.   I didn't declare it on my tax returns at all,

20    no.  Because they didn't want to have to pay tax on it.

21    I'm thinking:  "Fifteen grand, whoop-de-doo.  You know,

22    slap me on the hands, and I'll pay my taxes on it."

23            MR. NEDROW:  Yes, another question.

24            GRAND JUROR:  You've received a lot of training

25    from a lot of different coaches.

136

1           THE WITNESS:  Mm-hmm.

2           GRAND JUROR:  Is there anyone else that gives

3      you vitamins or nutritional supplements and things?

4           THE WITNESS:  Harvey Shields (phonetic), who is

5      50 years old and is one of my trainers.  This man will

6      run you into the ground.  And he always -- his -- his

7      are always like the cream stuff.  He comes up with some

8      new cream gimmick all the time.  He hasn't lately.

9           Raymond is -- he's kind of like a little shark.

10     He kind of like wants to do car shows for you or things

11     like that to make other money.  But I kind of stay away

12     from him on that.

13          But those are my three guys with me on a

14     regular basis.  And that's pretty much it.

15     BY MR. NEDROW:

16          Q.   Just for the record, Raymond, first name, last

17     name?

18          A.   Raymond Farris.

19          Q.   Can you spell his last name?

20          A.   It's F-a-r-r-i-s.

21          Q.   Thank you.

22     BY MR. NADEL:

23          Q.   How many -- how many people a year would you

24     say, first with regard to the $15,000-type gifts, that

25     you make gifts to, besides Mr. Anderson?

1      A.    I only made a gift once -- and that was after I

2   hit 73 home runs -- to everyone.  That's the only time

3   I've ever given a gift.  To me, that was a bonus gift

4   for everyone.  My publicist girls for, you know, making

5   me get to the press conferences when I needed to get

6   there.  You know, Harvey for his --

7      Q.    You're talking about the $20,000 gift there?

8      A.    Yeah, I gave each of them 20,000.

9      Q.    How many people total, would you say?

10      A.    Four.

11      Q.    Putting aside the $20,000 gifts, the thing with

12   Mr. Anderson, $15,000 a year, how many people each year

13   are there that, as a gift, you give them money, kind of

14   in exchange for whatever favors they've done for you,

15   things like --

16      A.    Besides my family, who I give a lot of gifts

17   to?

18      Q.    Yes, other than your immediate family.

19      A.    Probably -- there are some people who wash my

20   car that I'll give them money, things like that.

21      Q.    I'm talking about the things like $15,000 I

22   year.

23      A.    Oh, no, no, no, no.  I ain't giving nobody --

24      Q.    Just Mr. Anderson?

25      A.    No.  I pay Harvey $15,000, too, for my

138

```
 1    stretching.  I pay Raymond $10,000.

 2        Q.    It's Raymond, Harvey, Mr. Anderson.  Others?

 3        A.    No.  Those are my three trainers.

 4        Q.    How long have you been doing that for?

 5        A.    Since 2000.  So, he's probably made, what,

 6    $45,000 with me in three years, plus 20.

 7        Q.    And that's what you would include in your

 8    characterization of gifts?

 9        A.    No.  That was for their training.  To me, it

10    was -- to me, they wouldn't want -- they didn't want to

11    charge me.  And I didn't feel it was right.  Greg's

12    there every day.  Harvey's at the game, ballpark, every

13    day.  I just didn't feel it was right.

14        Q.    I understand.

15        A.    You know, so:  "Let me at least give you

16    something, you know, for your training," but it was for

17    training.

18        Q.    I just want to make sure I understand what

19    you're saying.

20        A.    The gift was the 20,000.

21        Q.    Okay.  The $15,000.  Earlier, in response to

22    one of grand jurors' questions, you mentioned that you

23    did not consider those individuals employees, that you

24    considered that a gift.  And so I'm just curious as to

25    whether that's a gift, or if it's a payment for work
```

1    that they have done, or what?

2        A.    Well, Greg Anderson I grew up with.  He's my

3    childhood friend.  So, when I said as a gift, I'm

4    meaning it because he's my friend.  But I'm paying him

5    for his work.  Harvey I am paying as an employee for his

6    work and Raymond.

7            I just meant Greg.  You know, Greg is my

8    friend.  And so it was more of a -- you know what I

9    mean?  Friend, but I'm paying you.  However you want to

10   call it.

11           GRAND JUROR:  I have a question.

12           You said that Greg is with you every day.

13           THE WITNESS:  Mm-hmm.

14           GRAND JUROR:  Does he have other people that he

15   is employed by?

16           THE WITNESS:  He works out of World's Gym.  He

17   has a lot of clients.

18           GRAND JUROR:  So, he has a lot --

19           THE WITNESS:  He has a lot of clients, a lot of

20   high school kids and college kids and elderly people,

21   but he has a lot of clients at that gym.

22           GRAND JUROR:  Any other athletes that you know

23   of?

24           THE WITNESS:  No, none, besides college, I

25   believe, or high school.

1          GRAND JUROR:  All right.  This is about the

2     ballpark.

3          THE WITNESS:  Mm-hmm.

4          GRAND JUROR:  About the clear and the cream.

5     When you were taking the clear at the ballpark in the

6     locker room, you said there were a lot of people around,

7     probably other ball players on the team, photographers

8     or news?

9          THE WITNESS:  Mm-hmm.

10          GRAND JUROR:  When they were all watching you

11     take this -- this so-called flax, did any of them say:

12     "Hey, how's that taste?"  Or:  "Where can I get that,

13     Barry?"  Anything like that?

14          THE WITNESS:  No one was watching me, no one's

15     sitting there going like this (indicating):  "What is he

16     doing?"  You know what I mean?  But everyone's around

17     when Greg was giving it to me.

18          But no one bothers each other before a game.

19     You know, in the locker room before a game, you don't

20     really bother the other person.  People are watching

21     films.  You may talk about something.

22          But you understand, I'm an 18-year veteran.

23     It's tough for some young kid to walk all the way over

24     here and say:  "Hey, Barry, what are you doing?"  He's

25     just not going to do that.  It's just not going to

1    happen like that.  You know what I mean?  He may ask me

2    if I can help him to hit or help him to do something,

3    but they wouldn't personally come out and ask me

4    anything like that.  It's a respect thing from veterans

5    to younger players kind of.

6              GRAND JUROR:  That couple drops that you did

7    take out of the vial, you say you took it during the

8    home stand?

9              THE WITNESS:  Mm-hmm.

10             GRAND JUROR:  Does that mean, like, once every

11   three games or four games or was it every game during

12   the home season?

13             THE WITNESS:  No, it would be like once every

14   home stand or maybe twice.  It wasn't on an everyday

15   regimen.  He didn't give it to me every day when I was

16   at home.  So, we played a seven-game -- seven-day home

17   stand, maybe that would be once.  If we were home for

18   two weeks, maybe two or three times, maybe.

19             But it wasn't on an everyday regimen.  It

20   wasn't something that he did every day.

21             But I wouldn't -- I wouldn't do everything on

22   an everyday basis.  That's just not me.  That's not my

23   style.  I may get to the ballpark late.  I got to go to

24   work.  I don't have time for rubdown, massage.  I play

25   with the pain and just go.

                                                          142

1          GRAND JUROR:  Have you ever given a gift or

2    payment to Victor Conte or BALCO Labs?

3          THE WITNESS:  No.  I've never paid Victor Conte

4    a penny ever in my life.

5          MR. NEDROW:  Other questions?

6          Go ahead.

7          GRAND JUROR:  On this specimen that was taken

8    by the baseball, do you know who the collector was?

9          MR. NEDROW:  Let's make sure we have the right

10    page.  That's the --

11          GRAND JUROR:  It's the second-to-the-last page,

12    coded test.

13          MR. NEDROW:  Second-to-the-last page, right.

14          GRAND JUROR:  The collector's name has been

15    blacked out.

16          THE WITNESS:  I don't know.

17          GRAND JUROR:  You signed this saying that you

18    sealed it and put your initials on it.

19          THE WITNESS:  Uh-huh.

20          GRAND JUROR:  Do you remember them dipping

21    anything into that urine specimen cup?

22          THE WITNESS:  Yeah, like a little color chart

23    thing or something.

24          GRAND JUROR:  Was it Greg Anderson that did

25    that or was it a doctor?

1              THE WITNESS:  No, it's a doctor from the team.

2       They come and tap you on the shoulder as soon as you

3       walk in the door.  And then you have to go in the back,

4       the guy stands in the bathroom with you, watches you go

5       in, go to the bathroom, you have to hold the cup in your

6       hand, you got to dip the thing in, and he does all the

7       fill out charts, he puts the thing on it, seals it up,

8       you have to sign it and give it to him.

9              GRAND JUROR:  So, this was your copy, then?

10             THE WITNESS:  That would have been my copy,

11      yes.

12             MR. NEDROW:  Other questions?

13             Yes.

14             GRAND JUROR:  Greg Anderson, when his house was

15      searched, did he talk to you about the search?

16             THE WITNESS:  No.

17             I just asked him:  "What's it like getting your

18      door blown down?"  Greg right now is down, you know?

19      He's a great guy.  He's a really nice person and a very

20      good guy, you know.  You know, my brothers have a lot of

21      problems, too, and I just -- you know, you just don't

22      turn your back on somebody you've known for a long time.

23      And I just haven't turned my -- I -- I'm not turning my

24      back on him, you know?

25             GRAND JUROR:  Another question.

144

1          With all the money you make, have you ever

2     thought of maybe building him a mansion or something?

3          THE WITNESS:  One, I'm black.  And I'm keeping

4     my money.  And there's not too many rich black people in

5     this world.  And I'm keeping my money.  There's more

6     wealthy Asian people and Caucasian and white.  There

7     ain't that many rich black people.  And I ain't giving

8     my money up.  That's why.  And if my friends can help

9     me, then I'll use my friends.

10          MR. NEDROW:  Actually, I think that's it for

11     Mr. Bonds.

12          I just want to clarify one thing, though.

13     BY MR. NEDROW:

14     Q.    You've testified, Mr. Bonds, and I'm sure

15     there's a miscommunication on this, that you're with

16     Mr. Anderson every day, but I think you're also clear he

17     doesn't go with you on the road.  So, let me just

18     clarify.

19          When you're home you see him pretty much every

20     day, when you're in the Bay Area?

21     A.    Well, I have to clarify that.  I don't see Greg

22     every day.

23     Q.    How many days a week, on average?

24     A.    During the season time, I'll see him every day,

25     he will be at the ballpark.

1    Q.    When you're home?

2    A.    When I'm home.

3    Q.    He does not come on the road.

4    A.    Right.  But there will be some days I don't

5    feel like working out; I don't see him.  But he will

6    still come to the ballpark.  Greg enjoys baseball.  He

7    makes that drive every day.  He'll come to the ballpark,

8    sit at my locker to try to get me to go to the gym go

9    work out.  I'll call him a couple of names I can't say

10   here.  But he's the type of person who motivates me

11   because I don't want to look at him no more, so I'll go

12   in the gym and work out with him so I'll he go home.

13       You know, you need that in your life.  You

14   know, that's why I have these people in my life, because

15   they're motivating me to take that next step that I

16   won't take the next step.  And regardless of how many

17   names I call them, how many times I say:  "You're fired,

18   I hate you," this and that, they're going stay there,

19   and they're going to irritate me.  And Greg and Raymond

20   and Harvey are those three people that I needed in my

21   career.

22       MR. NEDROW:  Okay.  Good.

23       Further questions?

24       Or I think that's it for Mr. Bonds.  Okay.

25       I'm sorry.  One last question for Mr. Bonds.

1    Okay, great.

2            GRAND JUROR:  The article in the magazine,

3    wouldn't you consider that like an endorsement on his

4    products?

5            MR. NEDROW:  Right.  I think actually Mr. Bonds

6    actually testified to that, but let's clarify that.

7    You're referring --

8    BY MR. NEDROW:

9        Q.   I think the grand juror is referring to the

10   Muscle & Fitness magazine 2003 in which you appear with

11   a photo, actually, of Mr. Anderson and Mr. Conte, please

12   correct me if I'm wrong, and following up on the

13   question, that was an endorsement for, I guess, both

14   Mr. Anderson and Mr. Conte; correct?

15       A.   It was more of an endorsement for BALCO, ZMA.

16            Like I said, they gave those protein shakes and

17   stuff to my father, you know, and my friends.  And, you

18   know, no one -- they never charged us for anything.  So,

19   it was a favor -- for a favor.

20            I didn't charge him for that thing.  I didn't

21   get paid for that or nothing.  It was just, you know:

22   "Thank you for --" you know.

23            GRAND JUROR:  I would think the free publicity

24   for, you know, just being seen in a picture is payment

25   enough for BALCO, you know?

1          THE WITNESS:  Well, basically.  That -- that's

2     true.

3          But I never -- BALCO never charged me for

4     anything.  They never asked me for a penny, nor did I

5     ever pay them anything.  And it was you know, it was the

6     least they could do.  When my dad was sick, they sent up

7     protein shakes for my father.  I didn't -- you know,

8     that was the least I could do.  Some things are worth

9     more than money.  I thought they were doing something in

10    kindness for my family.  And to me that's priceless.

11         MR. NEDROW:  Okay.  All right.  You're excused,

12    Mr. Bonds.  Thank you very much.  You're free to go.

13         THE WITNESS:  Thank you.

14

15

16              (The proceedings were concluded at 4:16

17              p.m.)

18

19

20

21

22

23

24

25

                                              148

1    STATE OF CALIFORNIA      )

2                             )    ss.

3    COUNTY OF SAN FRANCISCO)

4            I hereby certify that the foregoing proceedings

5    in the within-entitled cause were taken at the time and

6    place herein named; that the transcript is a true record

7    of the proceedings as reported by me, a duly certified

8    shorthand reporter and a disinterested person, and was

9    thereafter transcribed into typewriting by computer.

10           I further certify that I am not interested in

11   the outcome of the said action, nor connected with, nor

12   related to any of the parties in said action, nor to

13   their respective counsel.

14           IN WITNESS WHEREOF, I have hereunto set my hand

15   this 15th day of December, 2003.

16

17

18                    JAN E. WALTON, CSR# 5638

19                       STATE OF CALIFORNIA

20

21

22

23

24

25

149

LAWYER'S NOTES

| Page | Line | |
|------|------|---|
|      |      |  |