1  ALLEN RUBY (SBN 47109)
   LAW OFFICES OF ALLEN RUBY
2  125 South Market Street #1001
   San Jose, CA 95113
3  Telephone: (408) 998-8500 ext. 204
   Facsimile: (408) 998-8503
4

5  DENNIS P. RIORDAN (SBN 69320)
   DONALD M. HORGAN (SBN 121547)
6  RIORDAN & HORGAN
   523 Octavia Street
7  San Francisco, CA 94102
   Telephone: (415) 431-3472
8  Facsimile: (415) 552-2703

9  Attorneys for Defendant
   BARRY LAMAR BONDS
10

CRISTINA C. ARGUEDAS (SBN 87787)
TED W. CASSMAN (SBN 98932)
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone: (510) 845-3000
Facsimile: (510) 845-3003

MICHAEL RAINS (SBN 91013)
RAINS, LUCIA & WILKINSON, LLP
2300 Contra Costa Blvd., Suite 230
Pleasant Hill, CA 94523
Telephone: (925) 609-1699
Facsimile: (925) 609-1690

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13                **SAN FRANCISCO DIVISION**

14
   UNITED STATES OF AMERICA,                )   Case No. CR 07 0732 SI
15                                           )
                                             )
16              Plaintiff,                   )
                                             )
17                                           )
          vs.                                )
18                                           )   Date:   TBA
   BARRY LAMAR BONDS,                        )   Time:   TBA
19                                           )   Judge: The Honorable Susan Illston
                Defendant.                   )
20

21        **DEFENDANT'S MEMORANDUM IN SUPPORT OF**
            **MOTION IN LIMINE TO EXCLUDE EVIDENCE**
22

23

24

25

26

27

28
   Defendant's Memorandum In Support of
   Motion In Limine To Exclude Evidence

1

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE PROPRIETY OF PRETRIAL RESOLUTION
OF ADMISSIBILITY QUESTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PRINCIPLES RELATED TO AUTHENTICATION
AND CHAIN OF CUSTODY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

THE CHALLENGED EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A.      Urine/Blood Test Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B.      Internal Balco Documents Allegedly Recording the Receipt
        And/or Transfer of Urine And/or Blood Samples . . . . . . . . . . . . . . . . . . 9

C.      Calendars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.      The Calendars Alleged to Concern Bonds . . . . . . . . . . . . . . . . . . 10

                a.      Foundation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                b.      Relevance and Hearsay . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                        (i)     Statements Against Penal Interest
                                (Fed.R.Evid. 804(b)(3)) . . . . . . . . . . . . . . . . . . . . . . 11

                        (ii)    Statements of Co-conspirators
                                Fed.R.Evid. 801(d)(2)(E) . . . . . . . . . . . . . . . . . . . . 13

                        (iii)   The Business Records Exception
                                (Fed.R.Evid. 803(6)) . . . . . . . . . . . . . . . . . . . . . . . 15

                        (iv)    The Residual Exception (Fed.R.Evid.807) . . . . . . . . . . . 15

        2.      Calendars Unrelated To Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . 16

D.      Handwritten Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

E.      Conversations, Recorded or Otherwise, in which Barry Bonds Was
        Not a Participant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

F.      Opinion Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        1.      Expert Testimony Concerning Steroids, THG, HGH, EPO, or
                Clomid and Purported Side Effects . . . . . . . . . . . . . . . . . . . . . . . . 20

        2.      Lay Testimony Concerning Steroids, THG, HGH, EPO, or Clomid
                and Purported Side Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        3.      Expert and/or Lay Opinion Concerning Other Matters . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

# TABLE OF AUTHORITIES

## CASES

*Cornelius v. Hondo, Inc.*,
843 F. Supp. 1243 (N.D.Ill. 1994)                                    11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)                                              passim

*Latman v. Burdette*,
366 F.3d 774 (9th Cir. 2004)                                          9

*Levin v. United States*,
338 F.2d 265 (D.C. Cir. 1964)                                        17

*Mathes v. The Clipper Fleet*,
774 F.2d 980 (9th Cir.1985)                                      16, 17

*Priest v. Rotary*,
98 F.R.D. 755 (D.C.Cal. 1983)                                        17

*Roberts v. Troy*,
773 F.2d 720 (6th Cir. 1985)                                         12

*United States v. Angwin*,
271 F.3d 786 (9th Cir. 2001)                                 16, 17, 18, 19

*United States v. Clark*,
18 F.3d 1337 (6th Cir. 1994)                                         14

*United States v. Ellis*,
493 F. Supp. 1092 (D.Tenn. 1979)                                     5

*United States v. Eubanks*,
591 F.2d 513 (9th Cir. 1979)                                         14

*United States v. Fowlie*,
24 F.3d 1059 (9th Cir. 1994)                                         12

*United States v. Gordon*,
844 F.2d 1397 (9th Cir.1988)                                         13

*United States v. Harrington*,
923 F.2d 1371 (9th Cir. 1991)                                         5

*United States v. Jardina*,
747 F.2d 945 (5th  Cir.1984)                                          4

*United States v. Ladd*,
885 F.2d 954 (1st Cir. 1995)                                          5

*United States v. Layton*,
720 F.2d 548 (9th Cir. 1983)
                                                                    14

**Table of Authorities continued**

*United States v. Luna,*
585 F.2d 1 (1st Cir. 1978)      5

*United States v. Martin,*
984 F.2d 308 (9th Cir.1993)      7

*United States v. Matta-Ballesteros,*
71 F.3d 754 (9th Cir. 1995)      5

*United States v. Perez,*
526 F.3d 543 (9th Cir. 2008)      6

*United States v. Perez,*
658 F.2d 654 (9th Cir. 1981)      11

*United States v. Robinson,*
367 F. Supp. 1108 (D.Tenn. 1973)      5

*United States v. Silverman,*
861 F.2d 571 (9th Cir.1988)      13, 14

*United States v. Tamez,*
941 F.2d 770 (9th Cir. 1991)      13

*United States v. Two Shields,*
497 F.3d 789 (8th Cir. 2007)      12

*United States v. White,*
444 F.2d 1274 (5th Cir. 1971)      5

*United States v. Workinger,*
90 F.3d 1409 (9th Cir. 1996)      5

*United States v. Yarbrough,*
852 F.2d 1522 (9th Cir. 1988)      14

*Weil v. Seltzer,*
873 F.2d 1453 (D.C. Cir. 1989)      18, 19

*Williamson v. United States,*
512 U.S. 594 (1994)      12, 13

**STATUTES**

Fed.R.Crim.P. 12(b)(2)      3

Fed.R.Evid. 103 (c)      3

Fed.R.Evid. 104      3, 4

Fed. R. Evid. 404(b)      16, 18, 25

**Table of Authorities continued**

Fed.R.Evid. 406                                              16, 18

Fed.R.Evid. 701                                                 24

Fed.R.Evid. 702                                                 20

Fed.R.Evid. 703                                                 25

Fed.R.Evid. 801(d)(2)(E)                                     13, 14

Fed.R.Evid. 803(6)                                           8, 15

Fed.R.Evid. 804(b)(3)                                        11, 13

Fed.R.Evid. 806(d)(2) (E)                                       13

Fed.R.Evid. 807                                                 15

Fed.R.Evid. 901(a)                                               4

## MISCELLANEOUS

*McCormick on Evidence* 259 at 453 (6th ed. 2006)               13

Mueller & Kirkpatrick, *Evidence* 7.17 (3d ed. 2003)         1, 13

Wright & A. Miller, Federal Practice and Procedure § 5052.1 (2008)    4

**INTRODUCTION**

Whenever a party offers evidence consisting of something other than the testimony of a lay witness describing his or her sensory observations of plainly relevant events, an objection may well arise under the Federal Rules of Evidence, requiring a ruling on admissibility. Many such issues can be easily and correctly resolved without briefing or extensive argument by a mid-trial ruling from the bench. In some cases, however, proffered evidence may present a court with threshold foundational questions raising thorny factual and legal issues that simply cannot be addressed in the presence of a sitting jury, because of both the delay involved and the prejudice resulting from the jury's exposure to material later ruled inadmissible. This is such a case.

The evidence that the government will seek to introduce against Barry Bonds raises a variety of evidentiary problems, some simple, some virtually unprecedented, and many extremely complex. The discovery provided to the defense contains a number of urine or blood tests, not one of which appears accompanied by a clear and complete chain of custody or a foundation adequate to ensure the reliability of purported results. Opinion testimony on scientific matters that have yet to pass the *Daubert* test[1] is anticipated. The government apparently intends to rest its case as much on hearsay as it does on in-court testimony which can be cross-examined. Witnesses will be tendered to describe conversations with declarants who themselves will not take the witness stand.[2] Dozens of documents will be proffered, some of them garnered from garbage cans, apparently without the creator or creators of the documents being called to the stand to identify them, describe their creation, or testify to the factual basis for the assertions they contain. With the government forced here to resort to the plainly inapt residual exception to the

---

[1] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *See also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment. In short, the proponent of expert testimony must establish that "the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592-93; *see* Mueller & Kirkpatrick, *Evidence* § 7.17 (3d ed. 2003).

[2] For example, as will be discussed further below, the government has indicated that it will seek to admit certain out of court statements of Greg Anderson without Anderson being called to testify.

1    hearsay rule as a proposed ground for the admission of evidence, it is clear that the prosecutorial

2    ship will attempt to sail into uncharted waters.

3        For that reason, the defense proposed, and the government endorsed, a protocol to address

4    important admissibility questions well in advance of trial. The procedure, which is now

5    embodied in the Court's Order filed on December 16, 2008 (the "Order") was straightforward.

6    From the materials produced to date by the government in discovery, the defense was to (1)

7    identify items to which it would object at trial, and (2) state the grounds for objection. The

8    defense complied with these obligations in its letter of December 12, 2008, accompanying this

9    motion as Exhibit A (submitted under seal), which specifically identified objectionable items by

10    BATES number, and set out evidentiary objections. Under the Order, the government then had

11    two obligations: First, to "advise Defendant in writing of whether or not it intends to offer the

12    challenged items into evidence notwithstanding Defendant's objection." Then, "as to items which

13    the government intends to offer ... [to] provide an offer of proof as to how it intends to overcome

14    the Defendant's objections." (Order, at 2)

15        Unfortunately, the government has done neither in its responding letter of December 26th,

16    2008, accompanying this motion as Exhibit B (also submitted under seal). With very few

17    exceptions, the letter says nothing about specific, challenged evidence — as opposed to general

18    categories of evidence — it intends to offer at trial. As a consequence, the court and counsel need

19    to litigate a larger than necessary archive of documents.

20        Even more unfortunately, the government has not supplied an offer of proof supporting

21    the admissibility of any of the challenged items. Its letter does not even attempt to address each

22    specific item of evidence identified in the defense letter and explain how the evidence will

23    overcome the objection. Confronted with objections to specific laboratory test results for lack of

24    foundation and chain of custody, the government responds with general statements that fail to

25    identify a witness who will testify that he or she received the sample in question from Barry

26    Bonds or some other athlete. Moreover, even in its generalities, the government's letter is vague

27    and raises many more questions than it answers. For example, it suggests that hearsay may be

28    admissible under the "co-conspirator exception." What conspiracy? Who were the conspirators?

What was its object? Who will testify to the existence of this unidentified conspiracy? The letter says that chain of custody of biological samples will be established by "for example, Dr. Ting," and "agents who transported the samples." The defense is unaware of any discovery which associates Dr. Ting with any identifiable test "result," but beyond that — whose "agents" transported specimens? Were these federal agents? What are their names? What foundational testimony will they provide?

The Court's Order says that after receiving the government's offer of proof, the defense has until January 15th to file motions to exclude evidence. It now does so. The government should exclude from admission all of the evidence challenged herein.[3]

## THE PROPRIETY OF PRETRIAL RESOLUTION OF ADMISSIBILITY QUESTIONS

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." *See* Fed.R.Crim.P. 12(b)(2). Fed.R.Evid. 103 (c) provides: "In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury."). Fed.R.Evid. 104 provides, in relevant part, as follows:

> (a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b)...
>
> (b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence

---

[3] Nearly all of the evidence challenged in these motions was placed before the grand jury in one form or another. Given the lack of clarity as to the application of Rule 6(e), relating to the confidentiality of grand jury materials, we submit under seal both the correspondence identifying and describing the disputed evidence (Exhibits A and B), and certain disputed evidence itself (Exhibit C). In addition, given the intense public interest in these proceedings, the public disclosure of evidence such as test results that are unreliable and inappropriately attributed to Mr. Bonds and others — and thus likely inadmissible at trial — would greatly prejudice Mr. Bonds' rights to a fair and impartial jury.

1    sufficient to support a finding of the fulfillment of the condition.

2    (c) Hearing of jury. Hearings on the admissibility of confessions
     shall in all cases be conducted out of the hearing of the jury.
3    Hearings on other preliminary matters shall be so conducted when
     the interests of justice require, or when an accused is a witness and
4    so requests.

5    Wright & Miller discuss the rationale for judicial determination of foundational issues prior to

6    the admission of the evidence:

7    [G]iving the judge the power to determine preliminary questions of
     fact is designed to insulate the jury from inadmissible evidence and
8    thus protect the values served by the rules of evidence. As it has
     been well put, Rule 104 preserves the force of exclusionary rules
9    by assuring that inadmissible evidence will not be brought before
     the jury.

10
     21A C. Wright & A. Miller, Federal Practice and Procedure § 5052.1 (2008) (footnotes, internal
11
     quotation marks, and text alterations omitted); *see also id.* at § 5052.2 ("Rule 104(a) gives the
12
     judge the power to determine most preliminary questions of fact because that is the best way to
13
     shield the jury from inadmissible evidence and thus enforce the blank pad rule so as to preserve
14
     the jury's function of deciding the case only on the basis of properly screened evidence.")
15
     (footnote omitted).
16
         Judicial efficiency would especially counsel in favor of deciding preliminary questions
17
     pretrial where, as here, evidence must be taken to determine admissibility. Cf. Fed.R.Evid.
18
     104(a), advisory committee note (1972) ("If the question is factual in nature, the judge will of
19
     necessity receive evidence pro and con on the issue.")
20
                    **PRINCIPLES RELATED TO AUTHENTICATION**
21                        **AND CHAIN OF CUSTODY**

22       The general principles relating to the government's burden to establish an adequate chain

23   of custody to justify admission of evidence include the following:

24   The authentication of evidence is "satisfied by evidence sufficient
     to support a finding that the matter in question is what its
25   proponent claims." Fed.R.Evid. 901(a). If the evidence is an
     object connected with the commission of a crime, the proponent
26   must also establish the chain of custody. Gallego v. United States,
     276 F.2d 914, 917 (9th Cir.1960). The prosecution must introduce
27   sufficient proof so that a reasonable juror could find that the items
     . . . are in "substantially the same condition" as when they were
28   seized. Id.; see United States v. Jardina, 747 F.2d 945, 951 (5th

                                    4

Cir.1984), cert. denied, 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d
833 (1985). The district court may admit the evidence if there is a
"reasonable probability the article has not been changed in
important respects." Gallego, 276 F.2d at 917.

*United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991); *accord, United States v.*
*Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996)

    Although it has been oft stated that "a defect in the chain of custody goes to the weight,

not the admissibility, of the evidence introduced," *United States v. Matta-Ballesteros*, 71 F.3d

754, 769 (9th Cir. 1995) (citations omitted), the court must nonetheless make the preliminary

finding that a reasonable juror could conclude from the proffered evidence that "there is a

reasonable probability that the evidence has not been altered in any material respect since the

time of the crime" (*United States v. Luna*, 585 F.2d 1, 6 (1st Cir. 1978) (citations omitted); *see*

*also Gass v. United States*, 416 F.2d 767, 770 n.8 (1969) ("It is generally recognized that tangible

objects become admissible in evidence only when proof of their original acquisition and

subsequent custody forges their connection with the accused and the criminal offense."); *United*

*States v. White*, 444 F.2d 1274, 1280 (5th Cir. 1971) ("whether a writing has been authenticated

is a matter for the Court to determine"; "The specimens must be proved genuine to the

satisfaction of the Court.") (citations omitted); *United States v. Robinson*, 367 F.Supp. 1108,

1109 (D.Tenn. 1973) (granting motion for judgment of acquittal after refusing to admit firearm

allegedly possessed by defendant based on failure of chain-of-custody proof; "This Court cannot

say . . . as a matter of reasonable probability, that the possibilities of misidentification have been

eliminated," where firearm had been left unattended in public place and no identifying mark had

been placed on it); *United States v. Ellis*, 493 F.Supp. 1092, 1104 (D.Tenn. 1979) (refusing to

admit tape recording "because its chain of custody could not be established sufficiently to lay a

foundation for its admission").

    In this case, the general foundational requirements of reliability and chain of custody will

have to be satisfied in, *inter alia*, the specific context of blood and urine testing. In *United States*

*v. Ladd,* 885 F.2d 954 (1st Cir. 1995), the court held it error for the district court to have

admitted certain blood test results:

The tests conducted by the private laboratory, CSL, do not fare nearly as well. When a blood sample is received by the State Lab, it is assigned an identification number. Massey's blood sample was numbered T87-1938-BBO. When the decision was made to forward the sanguineous specimen to CSL for more critical testing, a messenger called for it. According to CSL's records, the sample it received was numbered T87-1936-BBO. The last-digit discrepancy ("1938" versus "1936") was never explained. It was later struck over – the "6" altered to look like an "8"– but the record is silent as to when, where, how or why this emendation occurred. The record is likewise inscrutable as to the identity of the reviser.

Perhaps most puzzling, the prosecution made almost no effort to clear up the discrepancy. It chose not to present the testimony of the State Lab staffer who released the sample, the courier, or the CSL staffer who logged it in. Similarly, the prosecution offered no evidence to show whether the allegedly miswritten number (T87-1936-BBO) was assigned to some other specimen still in house, or to account for that designation. In short, there was no competent proof to indicate that the sample extracted from Massey's corpse was the one which CSL tested. An important step in the custodial pavane was omitted.

The conclusion is, we think, inescapable. As to CSL's findings, the linkage was not merely rusty – it had parted. Due to the missing link, the CSL test results should not have been admitted into evidence.

*Id.* at 957.

In *United States v. Perez,* 526 F.3d 543 (9th Cir. 2008), the court reversed an order revoking the defendant's supervised release because the district court had not afforded her the opportunity to cross-examine someone with percipient knowledge regarding a urine sample that had tested positive for cocaine, which was the predicate of her alleged violation.

Perez had an obvious interest in cross-examining someone from the lab on, *inter alia,* the results of the report, the chain of custody of the sample once it arrived at STLI, their testing methodology, their findings, whether anyone there could have introduced the foreign substance into the sample [the sample had been diluted with another liquid], whether cocaine is stored at the facility, the ratio of the urine to the other liquid in the sample, the concentration of cocaine found in the sample, the time cocaine remains in a person's system, and the ways in which a sample could become "dilute." Although Perez had an opportunity to cross-examine the probation officer, Kim, who spoke to someone at STLI, Kim did not have personal knowledge regarding anything that happened at the STLI lab in Virginia. The urinalysis and Kim's testimony that someone had attempted to dilute the sample were the only evidence offered to prove Perez's guilt. Thus, Perez had a strong interest in being able to confront the person who

6

actually handled and tested the sample at STLI and who wrote the report.

*Id.* at 549. The court found a due process violation in the denial of the defendant's right to refute the test results. *Id.* at 550.

An earlier case reaching the same result was *United States v. Martin,* 984 F.2d 308 (9th Cir.1993). There, the defendant was accused of four separate violations of the conditions of his supervised release, including submission of two specimens that tested positive for cocaine. The only evidence supporting the alleged drug violations was two positive laboratory urinalysis reports offered through the testimony of a counselor who had collected the defendant's specimens. *Id.* at 309. The counselor verified the test results and testified as to collection and shipping procedures, but was unable to testify about the chain of custody or testing procedures beyond his own collection. *Id.*

The panel reversed for a denial of confrontation, finding that "Martin had virtually no opportunity to refute the test results," which amounted to a "nearly complete denial of *any* confrontation." *Id.* at 311 (emphasis in original). "[T]he importance of the test results and the denial of any meaningful opportunity to impeach the results . . . suffice[s] to conclude that Martin's right to confrontation was substantial." *Id.* at 312. In rejecting the government's argument that the test results were inherently reliable, the panel refused to create a blanket rule of admissibility for urinalysis results at revocation hearings because neither the government nor the case law demonstrated that "custody problems and testing errors happen with such rarity at testing laboratories that their reports are always inherently reliable." *Id.* at 313.

## THE CHALLENGED EVIDENCE

**A.    Urine/Blood Test Results**

The government will seek to introduce into evidence laboratory test results for urine samples allegedly attributable to Barry Bonds or to clients of Greg Anderson and/or BALCO. The BATES numbers for these test results are identified in Exhibit A, and copies of these results are included in the accompanying Exhibit C. Based on their review of the discovery, counsel for Mr. Bonds tendered to the government the following objections to the purported test results:

7

1  relevancy (Rule 402), lack of foundation and lack of authentication (Rule 901), lack of chain of

2  custody, hearsay (Rule 802), undue prejudice (Rule 403)  and fundamental unreliability of the

3  evidence under the Due Process Clause. (Exh. A, at 1-2)

4       The government responded as follows:

5            The laboratory tests identified in your letter are relevant because
              they have a tendency to make facts of consequence, e.g.
6            knowledgeable use of steroids and other substances, to the charges
              more probable than without the evidence. They also corroborate
7            witnesses connected with the tests. The tests will be authenticated
              by employees from the various labs that conducted the tests. The
8            chain of custody will also be established by the various labs that
              performed the tests, statements by individuals who submitted the
9            samples, statements by individuals who assisted in obtaining the
              samples (e.g. Dr. Ting), and agents who transported the samples.
10           Without conceding the existence of any missing links in the chain
              of custody, to the extent there are any at the time this evidence is
11           offered, they would only effect the weight of the evidence, not
              the admissibility. The lab tests are admissible as business records
12           pursuant to FRE 803(6). Your objection based on "fundamental
              unreliability of the evidence under the Due Process Clause" is
13           vague and fails to articulate a specific manner in which it is
              somehow different from or not encompassed within the other listed
14           objections.

15  (Exh. B, at 1-2)

16       Unless the government can supply persuasive, admissible evidence demonstrating that a

17  specific blood or urine sample belonged to Mr. Bonds, the Court must exclude evidence of any

18  associated test as irrelevant. The test results will also be challenged as hearsay and because of the

19  lack of a foundation, lack of authentication, lack of chain of custody, and unreliability of the test

20  results and procedures. We request a *Daubert* hearing on these issues.

21       To qualify as a business record admissible under Fed.R.Evid. 803(6), a "custodian or

22  other qualified witness" must testify that the proffered document (1) was made at or near the time

23  of the acts or events it records (2) by a person with knowledge of those events, and (3) was kept

24  in the ordinary course of business (4) by a business that made a regular practice of making and

25  keeping reports of the kind in question.

26       In terms of the qualifications of the foundational witness required by Fed.R.Evid. 803(6),

27  "[w]hat is important is that the witness be familiar with the recordmaking practices of the

28  business and with the manner in which records of the particular sort being offered are made and

8

1   kept . . . . Thus he needs firsthand knowledge about the normal processes of the business . . . ."

2   Mueller & Kirkpatrick 8.45 (3d ed. 2003) *see also Latman v. Burdette*, 366 F.3d 774, 787 & n.9

3   (9th Cir. 2004) (Error to permit trustee's counsel to lay foundation for bank records because he

4   "had no regular connection to the [bank] account bank and no knowledge of the account except

5   that gained by hearsay, [and thus was] not a "qualified witness." )

6       In addition, admission of the test results would create undue confusion and prejudice

7   under Rule 403 and should be excluded as fundamentally unreliable under the Due Process

8   Clause.

9   **B.    Internal Balco Documents Allegedly Recording the Receipt And/or Transfer of**
        **Urine And/or Blood Samples**
10

11      Any BALCO logs will be challenged on all of the applicable grounds stated above in

    section A. Although the logs themselves were allegedly authored by a witness that the
12
    government intends to call at trial, they contain information — e.g., the source of the specific
13
    blood or urine sample — that constitutes inadmissible hearsay. Thus, the logs are also
14
    inadmissible.
15

16  **C.    Calendars**

17      In their correspondence with the government, counsel for Mr. Bonds indicated that they

18  would object to the admission at trial of various documents that the government asserts are

    calendars maintained by BALCO or Greg Anderson concerning clients of one or the other. (See
19
    Exh. A, at 3-4) There is no evidence that Mr. Bonds ever saw these documents before his
20
    appearance before the grand jury, much less participated in their creation. The calendars are
21
    presented to the Court in the accompanying sealed Exhibit (C).
22

23      The defense informed the government of its intention to object to these documents on the

    grounds of relevancy (Rule 402), lack of foundation and lack of authentication (Rule 901),
24
    hearsay (Rule 802), undue prejudice (Rule 403) and fundamental unreliability of the evidence
25
    under the Due Process Clause. (See Exh. A, at 3-4)
26

27      The government has tendered to the defense the following response in its purported offer

28  of proof:

9

The calendars are relevant because they have a tendency to make facts of consequence, e.g. knowledgeable use of steroids and other substances, to the charges more probable than without the evidence. They also corroborate witnesses connected with the calendars. The calendars will be authenticated by witness testimony, including, but not limited to, testimony by athletes who received hard copies of calendars from Anderson and testimony by agents related to where the calendars were found. The calendars are potentially admissible under four hearsay exceptions: (1) as statements against Greg Anderson's interests pursuant to FRE 804(b)(3); (2) as statements of a co-conspirator pursuant to FRE 801(d)(2)(E); (3) as business records pursuant to FRE 803(6); and (4) pursuant to the residual exception in FRE 807. Along these lines, please consider this notice of the government's intent to offer this evidence pursuant to FRE 807 on the grounds that the calendars are evidence of material facts, more probative than other evidence the government can procure, and the general purposes of the FRE and the interests of justice will best be served by admitting them. Your objection based on "fundamental unreliability of the evidence under the Due Process Clause" is vague and fails to articulate a specific manner in which it is somehow different from or not encompassed within the other listed objections.

(Exh. B, at 2)

The government's response certainly suggests that it will attempt to introduce the alleged calendars without calling their creator to the stand to authenticate them. Given the likelihood that an adequate foundation for admission of the documents cannot be laid and their potential for creating undue prejudice, the defense submits that the Court must hold hearings on the admissibility of any and all of the above listed documents before they, or those of a similar nature, are shown to, or discussed in front of, trial jurors, either during opening statements or the taking of evidence.

## 1. The Calendars Alleged to Concern Bonds

### a. Foundation

To the extent that it is the government's theory that a particular document contains information that directly relates to a contested issue of fact in this case concerning Mr. Bonds — e.g., whether the defendant ingested or injected steroids or human growth hormone at a specific time, and was he aware of having done so — the government must first lay an adequate foundation for the document in question. That foundation would include competent, non-hearsay testimony as to who created the document in question; when it was created; what it purports to

1  say; and the information or observations upon which it was based.

2    Despite being directed to make an offer of proof on these foundational issues, the

3  government has not provided any information as to what witnesses can offer competent

4  testimony on these critical foundational issues as to any "Bonds" documents. That failure is

5  particularly notable given that the government claims that many, if not most, of the documents in

6  question were created by Greg Anderson, but has not indicated that the government will call Mr.

7  Anderson to lay the necessary foundation for the documents in question. Absent the tendering of

8  an adequate foundation, all of the listed documents must be excluded on this ground alone.

9              **b.    Relevance and Hearsay**

10    Unless the documents in question are offered as proof of whatever proposition of fact the

11  government maintains they contain, they are irrelevant to the matters at issue at Mr. Bonds' trial.

12  On the other hand, if these out of court statements are offered for the truth of whatever

13  propositions they purportedly contain, they are hearsay.[4] While the government has cited four

14  hearsay exceptions under the Federal Rules of Evidence which they may invoke as a basis for the

15  documents' admission, each such exception requires a foundational showing. The government

16  has made no offer of proof as to how they will satisfy the demanding showing required under

17  each cited exception.

18              **i.    Statements Against Penal Interest**
                      **(Fed.R.Evid. 804(b)(3))**

19

20    There are three enormous hurdles to the admission against Mr. Bonds of any out of court

21  "statement" in the form of a document purportedly made by Greg Anderson (or any one else who

22

23        [4] Cases have expressly noted the important distinction between authentication and
24  hearsay issues. *See, e.g., Cornelius v. Hondo, Inc.,* 843 F.Supp. 1243, 1247 (N.D.Ill. 1994)
    ("authentication or identification of a writing or speaker does not resolve any existing hearsay
25  problems. *See* Fed.R.Evid. 901(b) advisory committee's note ("It should be observed that
    compliance with requirements of authentication of identification by no means assures admission
26  of an item into evidence, as other bars, hearsay for example, may remain.") "Preliminary
    questions of fact determinative of the admissibility of evidence challenged under [the
27  coconspirator] hearsay exception are resolved by the judge, not the jury." *United States v. Perez,*
28  658 F.2d 654, 658 (9th Cir. 1981)

1    might have prepared the documents listed above).

2        The first is the foundational requirement that the statements "'at the time of their making.

3    . . so far tended to subject the declarant to. . . criminal liability. . . that a reasonable person in the

4    declarant's position would not have made the statement[s] unless believing [them] to be true.'"

5    *Williamson v. United States*, 512 U.S. 594, 603-04 (1994), quoting FRE 804(b)(3).  In general,

6    statements against penal interest involve confessions made to law enforcement, as in *Williams*, or

7    other open admissions of guilt which the declarant knows at the time of the utterance can and

8    likely will be used against him in a criminal proceeding.  "Hearsay under the declaration against

9    interest exception is unreliable unless the declarant is aware at the time of making the statement

10   that it is against his interest." *Roberts v. Troy*, 773 F.2d 720, 725 (6th Cir. 1985)*; see also United

11   States v. Two Shields*, 497 F.3d 789, 793 (8th Cir. 2007) (holding that a declarant must be aware

12   of the possibility of a legal claim before a statement harmful to that claim can be against

13   interest); *United States v. Fowlie*, 24 F.3d 1059, 1068 (9th Cir. 1994) (same).  Logically a

14   statement made to a close confidant or committed to a private diary or log cannot be admitted

15   under the penal interest exception, because there can be no showing that at the time the declarant

16   made the statement he or she believed that the pronouncement would result in criminal

17   prosecution.

18              [T]he theory underlying the hearsay exception for declarations
               against interest is that people do not make statements that are
19             harmful to their interests without substantial reason to believe that
               the statements are true. Reason indicates that the harm must exist
20             at the time the statement is made; otherwise it can exert no
               influence on declarant to speak accurately and truthfully. That the
21             statement later proves to be damaging -- or, for that matter,
               beneficial -- is without significance. Rather, the motivation and the
22             statement must be contemporaneous.

23   McCormick on Evidence 319(a) (6th ed. 2006)

24        Second, under the penal interest exception only those portions of a statement are

25   admissible which inculpate the declarant.  To the extent that the statement inculpates someone

26   other than the declarant, they are not against his or her interest, and thus not admissible under the

27   exception.  "[T]he most faithful reading of Rule 804(b)(3) is that it does not allow admission of

28   non-self-inculpatory statements, even if they are made within a broader narrative that is generally

12

1  self-inculpatory." *Williamson,* 512 U.S. at 600-601. Thus any portion of the documents in

2  question that purportedly tends to inculpate Mr. Bonds would have to be redacted from the

3  documents before the document could be proffered under Rule 804(b)(3). Were that to occur, the

4  document would be inadmissible on the ground of irrelevancy.

5          Finally, by its terms, the penal interest exception of Fed.R.Evid. 804(b)(3) can be invoked

6  only when the declarant is legally unavailable. The government has not made any proffer why

7  the purported creators of the documents in question, and Greg Anderson in particular, are

8  unavailable to testify.

9                          **(ii)    Statements of Co-conspirators**
                                **Fed.R.Evid. 801(d)(2)(E)**

10

11         In order to gain admission of documents under Fed.R.Evid. 806(d)(2) (E), the

12  government must demonstrate by a preponderance of evidence[5]: (1) the existence of the

13  conspiracy, (2) that the statement was made in furtherance of the conspiracy, and (3) that both the

14  declarant and the party against whom the statement was offered were participants in the

15  conspiracy. *See* Fed.R.Evid. 801(d)(2)(E); *McCormick on Evidence* § 259 at 453 (6th ed. 2006).

16         These foundational requirements are governed by the independent evidence rule. In order

17  to establish the foundational prerequisites, the proponent may rely on the contested statements

18  themselves, but the statements "are not alone sufficient to establish" the prerequisites.

19  Fed.R.Evid. 801(d)(2)(E). Thus, the proponent of the statement must present evidence

20  independent of the proffered statement to show, *inter alia,* the existence of the conspiracy and the

21  declarants and the defendant's involvement at the time the proffered statement was made. *United*

22  *States v. Tamez,* 941 F.2d 770, 775 (9th Cir. 1991); *United States v. Gordon,* 844 F.2d 1397,

23  1402 (9th Cir.1988); Mueller & Kirkpatrick, *Evidence* § 8.33 at 797 (3d ed. 2003).

24         Enforcing that requirement, the Ninth Circuit has held that an alleged co-conspirator's

25  statement implicating the defendant in an alleged conspiracy "must be corroborated by *fairly*

26  *incriminating evidence." United States v. Silverman,* 861 F.2d 571, 578 (9th Cir.1988) (emphasis

27

28         [5]Mueller & Kirkpatrick, *Evidence* § 8.34 at 799 (3d ed. 2003).

1 | added). "'Some' independent evidence is not merely a scintilla, but rather enough to rebut the

2 | presumed unreliability of hearsay." *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994).

3 | In *Silverman*, a witness testified that the defendant's sister made a variety of damaging

4 | statements about her brother's involvement in the cocaine trade. With very little else to tie

5 | Silverman to illicit activity, the government's case relied heavily on those statements. The

6 | Circuit found that if the independent evidence rule is to have any meaning whatsoever, it must

7 | mean that the government is required to tie the defendant to the scheme with concrete inculpatory

8 | evidence apart from that it seeks to offer as a co-conspirator statement. As the Court noted,

9 | because co-conspirator statements are presumptively unreliable, they should be admitted *only*

10 | when the government can overcome that presumption with independent evidence.

> In determining whether the proponent has made a showing sufficient to permit the introduction into evidence of the co-conspirator's statement, the district court must bear in mind that out-of-court statements are presumptively unreliable. *When the out-of-court statement is one made by a co-conspirator purporting to implicate others in an unlawful conspiracy, its reliability is doubly suspect.*

15 | 861 F.2d at 578 (emphasis added).

16 | An additional foundational showing must be made as to the requirement that the

17 | statement be made in furtherance of the conspiracy being relied on as the basis for that

18 | statement's admission under Fed.R.Evid. 801(d)(2)(E). Mere conversations between

19 | coconspirators, or merely narrative declarations among them, are not made "in furtherance" of

20 | conspiracy. *United States v. Layton*, 720 F.2d 548, 556-57 (9th Cir. 1983), cert. denied, 465 U.S.

21 | 1069 (1984) (narrations of past events inadmissible while expressions of future intent are

22 | admissible); *United States v. Eubanks*, 591 F.2d 513, 521 (9th Cir. 1979) (Declarant's statement

23 | inadmissible under co-conspirator exception because it "was, at best, nothing more than (a)

24 | casual admission of culpability to someone he had individually decided to trust.") "To be 'in

25 | furtherance,' the statements must further the common objectives of the conspiracy or set in

26 | motion transactions that are an integral part of the conspiracy. *Layton*, 720 F.2d at 556." *United*

27 | *States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988).

28 | The government has yet to suggest in furtherance of what precise conspiracy it contends

14

1 | the documents in question were made. If and when the prosecution does delineate its theory of
2 | that conspiracy, it will be its burden to establish by a preponderance of the evidence not only (1)
3 | that the declarant was a member of that specific conspiracy at the very time the statement was
4 | made, but also that (2) Mr. Bonds was a knowing member at that time as well. It will be its
5 | further burden to establish that the statement in question is not a narrative of past events but
6 | rather furthers the common objectives of the conspiracy or sets in motion transactions that are an
7 | integral part of the conspiracy.

### (iii)   The Business Records Exception (Fed.R.Evid. 803(6))

The foundational requirements for application of the business records exception are stated above in section A. It would appear unlikely that the necessary foundation can be laid under the business records exception for any of the calendars; if it can, it would require the testimony of the party that created the document.

### (iv)   The Residual Exception (Fed.R.Evid. 807)

15 | The government's response notes certain of the foundational requirements of the residual
16 | exception: that "the calendars are evidence of material facts, more probative than other evidence
17 | the government can procure, and the general purposes of the Federal Rules of Evidence and the
18 | interests of justice will best be served by admitting them." The government does not mention the
19 | requirement that there be "equivalent circumstantial guarantees of trustworthiness" to those
20 | found in the exceptions provided by Rules 803 and 804, nor does it cite the Advisory Committee
21 | caution that: "It is intended that the residual hearsay exceptions will be used *rarely, and only in*
22 | *exceptional circumstances.*" (*Ibid.*, emphasis added)

23 | If the government cannot meet the foundational requirements for the exceptions for
24 | declarations against penal interest, of statements of co-conspirators, or for business records, it
25 | will be unable to establish that the calendars are so trustworthy that they constitute the
26 | "extraordinary circumstances" required for admission under Fed.R.Evid. 807. Furthermore, the
27 | government has not met the foundational requirement of Rule 807 that it provide the
28 | "particulars" of each statement to be proffered under the rule, and the name and address of the

15

1    declarant of each document so proffered.

2    **2.    Calendars Unrelated To Bonds**

3        In its response, the government has stated that: "The calendars will be authenticated by

4    witness testimony, including, but not limited to, testimony by athletes who received hard copies

5    of calendars from Anderson ..." (Exh. B, at 2) The government thus apparently intends to offer

6    calendars purportedly created by Anderson in the course of his dealings with athletes other than

7    Mr. Bonds. These calendars are subject to all of the foundational and hearsay objections noted

8    above. Beyond those, however, there is the issue of relevance. Documents which do not concern

9    defendant Bonds have no place in his trial.

10       It may be that the government plans to argue that its athlete witnesses will lay a

11   foundation adequate to show that Anderson acted in certain ways with regard to them, permitting

12   an inference that he acted in the same fashion in his relationship with Mr. Bonds. Fed. R. Evid.

13   404(b), however, prohibits evidence of a person's "character" or past "acts" to prove that the

14   person acted in conformity with those past acts on a separate occasion. Nor is the evidence

15   admissible under Fed.R.Evid. 406, which provides that that evidence of a person's "habit" is

16   admissible to prove that the person acted in conformity therewith.

17       "[C]ourts are somewhat cautious in admitting [habit] evidence" under Rule 406 because

18   the rule stands as an "exception" to the general prohibition of character evidence. *United States*

19   *v. Angwin*, 271 F.3d 786, 799 (9th Cir. 2001) (Breyer, DJ, by designation) (overruled on other

20   grounds, *see United States v. Gonzales-Flores*, 418 F.3d 1093, n.3); *see also Mathes v. The*

21   *Clipper Fleet*, 774 F.2d 980, 984 (9th Cir.1985) (noting that proffered habit evidence must be

22   "carefully scrutinized" to ensure that it establishes a fair inference of systematic conduct; and

23   citing *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494 [4th Cir. 1977] ["Habit or pattern of

24   conduct of party is never to be lightly established, and evidence of example, for purpose of

25   establishing such habit, is to be carefully scrutinized before admission."].)

26       The burden of establishing that certain conduct qualifies as evidence of habit falls on the

27   party wishing to introduce the evidence." *Angwin*, 271 F.3d at 799. Furthermore, the Ninth

28   Circuit has held that in deciding whether certain conduct constitutes a "habit" under rule 406

16

1   district courts must consider three factors: (1) the degree to which the conduct is reflexive; (2)

2   the specificity or particularity of the conduct; and (3) the regularity or numerosity of the

3   examples of the conduct. *Angwin*, 271 F.3d at 799 (citing *Weil v. Seltzer*, 873 F.2d 1453, 1460

4   (D.C. Cir. 1989); *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293-94 (7th

5   Cir.1988).) If the anticipated evidence concerning Anderson's practice does not qualify as a

6   "habit" then it is precluded by Fed. R. Evid. 404(b). *Angwin*, 271 F.3d at 799.

7       Given this standard, and its application in this Circuit, the government's anticipated

8   evidence does not meet the criteria for establishing a "habit" under rule 406.

9       First, the government's anticipated evidence does not describe conduct that is sufficiently

10  reflective. In *Angwin*, the Ninth Circuit held that "habit" evidence must amount to conduct that

11  is "reflexive" or "semi-automatic" and not "volitional." 271 F.3d at 799. In *Mathes*, the Ninth

12  Circuit described habit evidence as equivalent to "systematic conduct." 774 F.2d at 984; *see also*

13  *Priest v. Rotary*, 98 F.R.D. 755, 759 (D.C.Cal. 1983) (holding that habit evidence must establish

14  "invariable regularity of action," or at least "sufficient regularity to make it probable that [an

15  action] would be carried out in every instance or in most instances.") (citing 1 Wigmore,

16  Evidence § 92, p. 520 (3d ed. 1940).) In one frequently cited case, the D.C. Circuit held that an

17  Orthodox Jew could not admit evidence of his lifelong weekly observation of the Sabbath to

18  establish an alibi in a criminal case. *Levin v. United States*, 338 F.2d 265, 272 (D.C. Cir. 1964).

19  In rejecting the proffered habit evidence, the Circuit court held that "the very volitional basis of

20  the activity raises serious questions as to its invariable nature, and hence its probative value."

21  *Ibid.* Under this standard, which was quoted as persuasive authority in *Priest*, 98 F.R.D. at 759

22  (T. Henderson, DJ), the government cannot meet its burden in establishing that Anderson's

23  purported practice in distributing performance enhancing drugs was sufficiently reflexive and

24  non-volitional to meet the first criteria for establishing a "habit" under rule 406.[6]

25

26      [6] At least one text describes habit evidence as a Pavlovian reaction. 22 Wright &
27  Graham, Federal Practice and Procedure, § 5233 at 354 (1978); *but see McCormick on Evidence*,
28  5th Ed. (Vol 1) § 195 (commenting that this description "overstates" the point).

1        Second, the government will be unable to prove that Anderson's relationship with Bonds
2   was closely similar to his relationship with the anticipated witnesses in order to establish that
3   Anderson's practice was reliably common. *See Angwin*, 271 F.3d at 799. Under Ninth Circuit
4   law, the relationships must be "parallel." *Ibid.* In other words, a habit is a person's regular
5   reaction to a "'particular kind of situation with a specific kind of conduct.'" *Ibid.* (quoting Fed.
6   R. Evid. 406 Advisory Committee Notes.) The analysis is necessarily fact-specific. *Ibid.* In
7   *Angwin*, a defendant sought to introduce evidence of his training by the Coast Guard Auxiliary in
8   confronting illegal aliens at sea. The Ninth Circuit ruled that the district court properly excluded
9   the proffered evidence because the facts at trial involved the defendant's confrontation of illegal
10  aliens while driving along a road. *Ibid.*

11       Third, the government cannot produce a sufficient sample size to establish Anderson's
12  habit. *See Angwin*, 271 F.3d at 799. The government's anticipated evidence is not evidence of
13  Anderson's purported habit itself but of snapshots purporting to illustrate Anderson's habit in
14  action. Testimony describing a habit itself is generally preferred over evidence of individual
15  instances of the purported habit. *Compare* Fed. R. Evid. 404(b) (prohibiting "evidence of other .
16  . . acts" to prove conformity with those acts on separate occasion) *with* Fed. R. Evid. 406
17  (permitting "evidence of habit" to prove conformity therewith); *see also McCormick on*
18  *Evidence*, 5th Ed. (Vol 1) § 195 (noting that habit evidence is most often evidence of the practice
19  rather than evidence of individual instances of the practice).

20       In *Weil v. Seltzer*, 873 F.2d 1453 (D.C. Cir. 1989), the D.C. Circuit reversed a district
21  court's decision to admit testimony from a doctor's former patients offered to establish the
22  doctor's purported habit of intentionally misinforming his patients about the medication he was
23  prescribing. The doctor was charged with wrongfully causing the death of one of his patients
24  who died from complications related to long time steroid use. It was alleged that the doctor told
25  patients he was prescribing harmless antihistamines when in fact he was furnishing steroids. The
26  district court admitted evidence from five of the doctor's former patients who testified that the
27  doctor told them he was prescribing antihistamines but actually provided steroids. The Circuit
28  Court held that, contrary to the district court's decision, the former patient testimony "certainly

18

1   [did] not meet [the] criteria" for habit evidence. *Ibid.* The Court explained:

> Before the former patient evidence could be properly admitted as
> habit evidence the witnesses must have some knowledge of the
> practice and must demonstrate this knowledge prior to giving
> testimony concerning the routine practice. Where a witness cannot
> demonstrate such knowledge, he cannot testify as to the routine
> nature of the practice. Each witness who testified against [the
> doctor] only knew of the way [the doctor] treated his own allergies.
> Although they each saw [the doctor] on more than one occasion, he
> was treating the same patient (the testifying witness) on each
> occasion. None of the patients were able to testify concerning [the
> doctor's] method of treating others. . . . For the former patient
> testimony to be at all probative it must show that [the doctor]
> responded the same way with each patient as he did with the
> testifying patient.

* * * *

> Evidence concerning [the doctor's] treatment of five former
> patients is not of the nonvolitional, habitual type that ensures its
> probative value. Rather the former patient evidence is the type of
> character evidence contemplated under Rule 404(b). This evidence
> of [the doctor's] treatment of the former patients was clearly an
> attempt to show that [the doctor] treated [the dead patient] in
> conformity with his treatment of the five testifying patients. Thus,
> the evidence was admitted for an improper purpose and was
> undoubtedly prejudicial to [the doctor's] defense.

873 F.2d at 1461 (quotation marks and citations omitted).

*Weil* was cited as persuasive authority by the Ninth Circuit in *Angwin*, 271 F.3d at 799,
and also *McCormick on Evidence*, 5th Ed. (Vol 1) § 195. The government's anticipated
witnesses will not meet the burden of establishing a "habit" as defined by rule 406 and therefore
should be prohibited from testifying under rule 404(b).

**D.    Handwritten Notes**

The defense has indicated its intention to object to: "All handwritten notations allegedly
referring to Barry Bonds or to a client of Greg Anderson or BALCO where the author (1) is
unidentified and/or (2) is not expected to testify at trial." (Exh. A, at 4-5) The documents are
submitted to the Court in the accompanying sealed Exhibit C.

These documents are subject to the foundational requirements stated above. Needless to
say, if these documents are offered for the truth of any statement contained therein they are
hearsay; if not, they are irrelevant. The government has responded to Mr. Bonds' objections by

1 asserting that: "Greg Anderson's handwritten notes are potentially admissible under at least two

2 hearsay exceptions: (1) as statements against Greg Anderson's interests pursuant to Fed.R.Evid.

3 804(b)(3); and (2) as statements of a co-conspirator pursuant to Fed.R.Evid. 801(d)(2)(E)."

4 (Exh. B, at 3) The government would have to meet the foundational requirements stated above

5 as to these two exceptions. It has not indicated how it can do so.

6 **E.      Conversations, Recorded or Otherwise, in which Barry Bonds Was Not a
           Participant**

7

8          The government also has indicated its intention to offer evidence of conversations, some

9 of which may have been recorded, involving persons other than Mr. Bonds, among them Steven

10 Hoskins and Greg Anderson. (Exh. B, at 3-4.) Again, if these conversations are offered for the

11 truth of any statement contained therein they are hearsay; if not, they are irrelevant.

12         The government contends that such conversations are "potentially admissible under two

13 hearsay exceptions: (1) as a statement against Greg Anderson's interests pursuant to FRE

14 804(b)(3); and (2) pursuant to the residual exception in FRE 807." (See Exh. B, at 3-4.) Again,

15 the government would have to meet the foundational requirements stated above as to these two

16 exceptions, and it has not indicated how it can possibly do so.

16 **F.      Opinion Evidence**

17

18              **1.      Expert Testimony Concerning Steroids, THG, HGH, EPO, or
                        Clomid and Purported Side Effects**

19         Defense counsel indicated in their December 12, 2008 correspondence that they would

20 object to expert or lay opinion that, *inter alia*, purports to describe certain purported effects of

21 anabolic steroids, THG, HGH, EPO, or Clomid on Barry Bonds or any other individual. (Exh. A,

22 at 5) The defense further indicated that such opinion to this effect would be challenged on the

23 grounds that it does not meet the criteria for admissibility set forth in Fed.R.Evid. 701, 702,

24 and/or that identified and discussed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

25 579 (1993) and related precedent. (See Exh. A, at 5).

26         In response to this initial objection, the government states that it "intends to offer

27 testimony from Donald Catlin and Lawrence Bowers pursuant to FRE 702" and that it will

28 "provide notice of experts in due course." (See Exh. B, at 3) As to Catlin and Bowers, the

1    government further represents that the substance of their proffered testimony will be as presented

2    before the grand jury. (*Ibid.*) Parroting the criteria set forth in Rule 702, the government then

3    asserts that all of its experts, Catlin and Bowers presumably included,

4                 . . . will testify based on specialized knowledge which is likely to
               assist the jury in understanding the evidence and determining the
5              facts at issue in the case. This evidence is reliable, relevant, and
               admissible.
6
     (*Ibid.*)
7
             As an initial matter, defendant observes that to the extent that the government hopes to
8
     introduce expert testimony concerning the effects of the listed substances from witnesses other
9
     than Catlin and Bowers, its purported offer of proof, once again, fails to supply anything of
10
     substance that would permit the Court to make an informed ruling on the issue of admissibility.
11
     Accordingly, any testimony that has not been described from experts whom the government has
12
     declined even to identify should be excluded for failure to meet the initial condition for
13
     admissibility — i.e., a meaningful offer of proof — that is set forth in the Court's December 16th
14
     order.
15
             Furthermore, and notwithstanding its conclusory assertion to the contrary, the government
16
     has failed to demonstrate that the proffered testimony from Mssrs. Catlin and Bowers concerning
17
     the supposed physical, psychological, and behavioral effects of steroids and other substances
18
     satisfies the conditions for admitting expert testimony set forth in Rule 702[7] and the precedent
19
     which applies it. As the Ninth Circuit explained in an opinion following remand, in *Daubert v.*
20
     *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court
21
                 held . . . that federal judges perform a "gatekeeping role" . . .; to do
22

23        [7] Fed.R.Evid. 702 provides:

24        If scientific, technical, or other specialized knowledge will assist the trier of fact
          to understand the evidence or to determine a fact in issue, a witness qualified as an
25        expert by knowledge, skill, experience, training, or education, may testify thereto
          in the form of an opinion or otherwise, if (1) the testimony is based upon
26        sufficient facts or data, (2) the testimony is the product of reliable principles and
          methods, and (3) the witness has applied the principles and methods reliably to the
27        facts of the case.
28

                                           21

1
2
3
4

> so they must satisfy themselves that scientific evidence meets a
> certain standard of reliability before it is admitted. This means that
> the expert's bald assurance of validity is not enough. Rather, *the*
> *party presenting the expert must show that the expert's findings are*
> *based on sound science, and this will require some objective,*
> *independent validation of the expert's methodology.*

5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (emphasis added); see also

6

*Daubert*, 509 U.S. at 597 ("[T]he Rules of Evidence – especially Rule 702 – ... assign to the trial

7

judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is

8

relevant to the task at hand.")

9

As is further explained in the Advisory Committee Notes to Rule 702's 2000

10

Amendment,

11
12
13
14
15
16
17

> *Daubert* set forth a non-exclusive checklist for trial courts to use in
> assessing the reliability of scientific expert testimony. The specific
> factors explicated by the Daubert Court are (1) whether the expert's
> technique or theory can be or has been tested---that is, whether the
> expert's theory can be challenged in some objective sense, or
> whether it is instead simply a subjective, conclusory approach that
> cannot reasonably be assessed for reliability; (2) whether the
> technique or theory has been subject to peer review and
> publication; (3) the known or potential rate of error of the
> technique or theory when applied; (4) the existence and
> maintenance of standards and controls; and (5) whether the
> technique or theory has been generally accepted in the scientific
> community.

18

*Ibid.*

19

Assessed by the foregoing measures, and with few exceptions, the grand jury testimony of

20

Catlin and Bowers concerning many purported side effects of the cited substances patently fails

21

to demonstrate the type of reliability and relevance that would render it admissible at trial.

22

Defendant has included the objectionable portions of such testimony in the sealed exhibit. The

23

following can be said about that testimony without infringing on grand jury secrecy.

24

Catlin is a medical doctor who has been the director of the U.C.L.A. Olympic Analytical

25

Laboratory and was a founder and director of the Antidoping Research Institute. He has no

26

degree in pharmacology. The opinions he expressed were based on the most fleeting of

27

references to research and/or methodology. Catlin offered opinions on the effect of steroid use

28

while granting that there was "not much research" on the issue. Bowers has a Ph.D. in chemistry

22

1    but, like Catlin, no degree in pharmacology.

2        The defense contends that the vast majority of the testimony elicited from Catlin and

3    Bowers concerning the side effects of steroids and HGH during their grand jury appearance is

4    nothing more than anecdotal junk science and, specifically, that it is inadmissible at trial on the

5    following grounds:

6        First, the witnesses lack the necessary expertise in the relevant field;

7        Second, the described side effects are not established by scientifically reliable principles,

8    facts, data or methods and;

9        Third, the testimony is irrelevant and unduly prejudicial. *Daubert*, 509 U.S. at 591-594

10   (1973); Rules 402, 403 and 702.

11       Defendant Bonds accordingly moves for exclusion of such evidence on all the foregoing

12   bases.

13       **2.    Lay Testimony Concerning Steroids, THG, HGH, EPO, or**
         **Clomid and Purported Side Effects**

14
         As noted, defendant's December 12, 2008 correspondence objected to all lay opinion

15
     concerning the purported side effects of Steroids, THG, HGH, EPO, or Clomid. (Exh. A, at 5-6)

16
     On this point, the government's response simply states, "You have not identified with any

17
     particularity any lay opinions you object to." Exh. B, at 3.

18
         Here again, the government wholly misconstrues the nature and extent of its obligation

19
     under the Court's December 16th order. Under that order, the government bears the burden of

20
     identifying any lay opinion on side effects it hopes to introduce at trial and to support it with an

21
     appropriate offer of proof. Having declined to do so, defendant — and the Court — understands

22
     that the government will not seek to introduce any such opinion testimony from any lay witness,

23
     including but not limited to agent Jeff Novitsky, Kimberly Bell, Steven Hoskins and Stanley

24
     Conte.

25
         Apart from its statement concerning lay opinion, the government has stated an intent to

26
     introduce *percipient* lay testimony if relevant to the expert opinion on which it wishes to rely:

27
                 To the extent [Catlin and Bowers] rely upon statements by any
28               other witness related to the defendant's physical characteristics or

                                            23

1

2   changes thereto, those statements are relevant and admissible.
    Likewise, to the extent [Catlin and Bowers] or any other witness
    provide testimony that makes any other witness' statement related
3   to the defendant's physical characteristics or changes thereto
    relevant, those statements are admissible.  For example, Lawrence
    Bowers may testify that one common effect of steroid use is
4   increased muscle mass.  Presumably he will not need to rely upon
    any statement from another witness to draw that conclusion.
5   Nevertheless, if another witness can testify that defendant
    experienced an increased muscle mass during a relevant time
6   period, that observation would be admissible.

7   (Exh. B, at 3)

8       As stated in defendant's December 12th correspondence (Exh. A, at 6), Mr. Bonds hereby

9   moves to exclude any such lay "observations" from Novitsky, Bell, Hoskins, Conte and all others

10  concerning defendant's physical condition, mental condition, or behavior for purposes of

11  supporting the testimony of government experts.  Defendant's motion on this point is founded on

12  the following grounds:

13      First, the government has failed to identify the lay witnesses on whom it intends to rely

14  for these purposes and has therefore failed yet again to comply with the Court's December 16th

15  order.

16      Second, with the possible exception of certain testimony concerning muscle mass, reports

17  of changes in defendant's physical or mental condition are flatly irrelevant under Rule 402

18  because the scientific claims to which they relate are, as stated above, fundamentally unreliable

19  under Rule 702 and *Daubert*.

20      Third, while cast as percipient (rather than opinion) evidence, any testimony concerning

21  purported changes in defendant's condition or behavior is, in fact, lay opinion which fails to

22  satisfy the requirements set forth in Fed.R.Evid. 701[8] and otherwise lacks an adequate

23

24          [8] Fed.R.Evid. 701 provides:

25      If the witness is not testifying as an expert, the witness' testimony in the form of
        opinions or inferences is limited to those opinions or inferences which are (a)
26      rationally based on the perception of the witness, (b) helpful to a clear
        understanding of the witness' testimony or the determination of a fact in issue, and
27      (c) not based on scientific, technical, or other specialized knowledge within the
        scope of Rule 702.
28

                                            24

1    foundation.

2          Fourth, the described testimony is more prejudicial than probative within the meaning of

3    Rule 403. Such testimony is of use to the prosecution not because it tends to prove any element

4    of the alleged offenses, but rather because it places before the jury evidence meant to unfairly

5    impugn defendant's character in defiance of the strict limitations on such evidence set forth in

6    Fed.R.Evid. 404.

7          Fifth, the government has not demonstrated, and in any event would be unable to

8    demonstrate, that the percipient testimony on which its experts hope to rely is "of a type

9    reasonably relied upon by experts in the particular field in forming opinions or inferences upon

10   the subject. . . ." See Fed.R.Evid. 703.

11       **3.**     **Expert and/or Lay Opinion Concerning Other Matters**

12         Relying on Rules 701, 702, and *Daubert*, the defense's December 12th correspondence

13   also raised an initial objection to expert or lay opinion purporting to explain the meaning of

14   laboratory tests; the purposes that a person or entity would request a particular lab test on urine or

15   blood; the meaning of calendar entries discussed above; entries on internal BALCO documents;

16   and handwritten notes. (Exh. A, at 5)

17         The government has made no statement of its intent to offer any such opinion testimony.

18   Accordingly, defendant understands that no such proffer will be made. Defendant notes that any

19   purported expert testimony concerning these matters is, in any event, subject to the same

20   strictures which govern the admission of scientific evidence under *Daubert.* See *Kumho Tire Co.*

21   *v. Carmichael*, 526 U.S. 137, 140 (1999) ("We conclude that Daubert's general holding —

22   setting forth the trial judge's general 'gatekeeping' obligation — applies not only to testimony

23   based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other

24   specialized' knowledge.").

25                               //

26                               //

27

28

**CONCLUSION**

For the foregoing reasons, the Court should (1) conduct such further proceedings as are necessary to assess the admissibility of the evidence that defendant has moved to exclude and (2) issue an order excluding such evidence as the Court deems inadmissible.

Dated: January 15, 2009

Respectfully submitted,

LAW OFFICES OF ALLEN RUBY

ARGUEDAS, CASSMAN & HEADLEY, LLP

RAINS, LUCIA & WILKINSON, LLP

RIORDAN & HORGAN

By __/s/__ Dennis P. Riordan
        Dennis P. Riordan

By __/s/__ Donald M. Horgan
        Donald M. Horgan

Counsel for Defendant
Barry Lamar Bonds