ALLEN RUBY (SBN 47109)
SKADDEN, ARPS, MEAGHER & FLOM, LLP
525 University Avenue, Ste. 1100
Palo Alto, CA 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

CRISTINA C. ARGUEDAS (SBN 87787)
TED W. CASSMAN (SBN 98932)
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone: (510) 845-3000
Facsimile: (510) 845-3003

DENNIS P. RIORDAN (SBN 69320)
DONALD M. HORGAN (SBN 121547)
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Facsimile: (415) 552-2703

Attorneys for Defendant
BARRY LAMAR BONDS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> BARRY LAMAR BONDS, <br><br> Defendant. | ) Case No. CR 07 0732 SI <br> ) <br> ) **DEFENDANT'S RESPONSE TO** <br> ) **GOVERNMENT'S MOTIONS IN** <br> ) **LIMINE** <br> ) <br> ) Date:  March 1, 2011 <br> ) Time: 2:00 p.m. <br> ) Judge:  The Honorable Susan Illston <br> ) |

Defendant's Response to
Government's Motions in LImine

# TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

THE RELEVANT LAW ......................................................... 1

    1.    Cross-Examination and the Right to Present a Defense .................... 1

    2.    The Scope of Rule 608(b) ........................................... 3

ARGUMENT .................................................................... 5

OPPOSITION TO GOVERNMENT MOTION IN LIMINE A ......................... 5

OPPOSITION TO GOVERNMENT MOTION IN LIMINE B ......................... 7

OPPOSITION TO GOVERNMENT MOTION IN LIMINE C ......................... 8

OPPOSITION TO GOVERNMENT MOTION IN LIMINE D ......................... 9

OPPOSITION TO GOVERNMENT MOTION IN LIMINE E ........................ 10

OPPOSITION TO GOVERNMENT MOTION IN LIMINE F ........................ 10

OPPOSITION TO GOVERNMENT MOTION IN LIMINE G ....................... 11

OPPOSITION TO GOVERNMENT MOTION IN LIMINE H ....................... 13

NON-OPPOSITION TO GOVERNMENT MOTION IN LIMINE I ................... 15

OPPOSITION TO GOVERNMENT MOTION IN LIMINE J ........................ 16

NON-OPPOSITION TO GOVERNMENT MOTIONS IN LIMINE K AND L ............ 16

OPPOSITION TO GOVERNMENT MOTION IN LIMINE M ....................... 17

OPPOSITION TO GOVERNMENT MOTION IN LIMINE N ....................... 18

OPPOSITION TO GOVERNMENT MOTION IN LIMINE O ....................... 18

1

## TABLE OF AUTHORITIES

2

### CASES

3

*Alford v. United States*,
282 U.S. 687 (1931)                                                                          2

4

*Apprendi v. New Jersey*,
5       530 U.S. 466 (2000)                                                                 17

6       *Banks v. Dretke*,
540 U.S. 668 (2004)                                                                          19

7

*Bell v. Bell*,
8       512 F.3d 223 (6th Cir. 2008)                                                        20

9       *Bowen v. Maynard*,
799 F.2d 593 (CA10 1986)                                                                     7

10

*Bronston v. United States*,
11      409 U.S. 352 (1973)                                                                 17

12      *Burr v. Sullivan*,
618 F.2d 583 (9th Cir. 1980)                                                             18, 19

13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
14      43 F.3d 1311 (9th Cir. 1995)                                                        14

15      *Davis v. Alaska*,
415 U.S. 308 (1974)                                                                          2

16

*Douglas v. Workman*,
17      560 F.3d 1156 (10th Cir. 2009)                                                      20

18      *Holmes v. South Carolina*,
547 U.S. 319 (2006)                                                                          1

19

*Kyles v. Whitley*,
20      514 U.S. 419 (1995)                                                                 7, 8

21      *Lindsey v. King*,
769 F.2d 1034 (CA5 1985)                                                                     7

22

*Olden v. Kentucky*,
23      488 U.S. 227 (1988)                                                                 2

24      *Pennsylvania v. Ritchie*,
480 U.S. 39 (1987)                                                                           1

25

*United States v. Abel*,
26      469 U.S. 45 (1984)                                                             passim

27

28                                                      -ii-

*United States v. Arnold,*
486 F.3d 177 (6th Cir. 2007)                                          16

*United States v. Becerra,*
992 F.2d 960 (9th Cir. 1993)                                         16

*United States v. Castillo,*
181 F.3d 1129 (9th Cir. 1999)                                      5, 10

*United States v. Collicott,*
92 F.3d 973 (9th Cir. 1996)                                          17

*United States v. Dees,*
34 F.3d 838 (9th Cir. 1994)                                           2

*United States v. Drapeau,*
414 F.3d 869 (8th Cir. 2005)                                         12

*United States v. Epstein,*
426 F.3d 431 (1st Cir. 2005)                                          4

*United States v. Fusco,*
748 F.2d 996 (5th Cir.1984)                                           4

*United States v. Howell,*
231 F.3d 615 (9th Cir. 2000)                                          8

*United States v. Kincaid-Chauncey,*
556 F.3d 923 (9th Cir. 2006)                                       5, 10

*United States v. Lindemann,*
85 F.3d 1232 (7th Cir. 1996)                                          3

*United States v. Mahdi,*
598 F.3d 883 (D.C. Cir. 2010)                                        10

*United States v. McCoy,*
23 F.3d 216 (9th Cir. 1994)                                          11

*United States v. Pagan-Santini,*
451 F.3d 258 (1st Cir. 2006)                                         16

*United States v. Sager,*
227 U.S. 1138 (9th Cir. 2000);                                       7

*United States v. Salem,*
578 F.3d 682 (7th Cir. 2009)                                         11

*United States v. Shaffer,*
789 F.2d 682 (9th Cir. 1986)                                      2, 20

*United States v. Skelton*,
514 F.3d 433 (5th Cir. 2008)                                             11

*United States v. Smith*,
232 F.3d 236 (D.C. Cir. 2000)                                            11

*United States v. Wallach*,
935 F.2d 445 (2d Cir. 1991)                                               2

*Washington v. Texas*,
388 U.S. 14 (1967)                                                        2

*In re Winship*,
397 U.S. 358 (1970)                                                      17

**STATUTES**

Fed. R. Evid. 106                                                        17

Fed. R. Evid. 403                                                         2

Fed. R. Evid. 404(a)                                                     13

Fed. R. Evid. 608(b)                                                   4, 10

Fed. R. Evid. 613                                                        10

Fed. R. Evid. 801(d)(1)(A)                                                5

**MISCELLANEOUS**

3 Mueller & Kirkpatrick, *Federal Evidence* § 6.76 (3d ed. 2008)       2, 3

*McCormick on Evidence* § 33 (6th ed. 2006)                              3

-iv-

1

**INTRODUCTION**

2   The government has submitted a document entitled "Motions in Limine" (hereafter

3   "Govt. Mot.") that contains fifteen requests — lettered A to O — to either permit the

4   introduction of prosecution evidence (F, H, J, K, L and N), to bar defense evidence, or to prohibit

5   cross-examination or argument by the defense on certain topics. (A, B, C, D, E, G, I, and M) The

6   defense does not object to the government's request that the Court ask Greg Anderson whether

7   he is available to testify for the defense. (I) Nor does the defense object to the introduction of the

8   Valente and Anderson plea agreements. (K and L)

9   Many of the government's other requests cannot be meaningfully considered, much less

10   decided, by the Court at this time. As was brought to the Court's attention at the status

11   conference last Friday, in several instances the government has not proffered to the defense or the

12   Court the material it seeks to introduce, rendering impossible a ruling on admissibility. In others,

13   the Court cannot possibly assess what forms of cross-examination are appropriate until it hears

14   the direct examination of the witness in question, and certainly cannot decide the scope of

15   permissible closing argument before the parties have rested.

16   As to certain other of the government's requests, however, the Court is in a position to

17   deny them even at this early date because they rest on a fundamental misunderstanding of the

18   controlling rules of evidence and of the constitutional rights to confrontation and to present a

19   defense. Because that law is critical not only to the evidentiary issues now before the Court but

20   also to others that will arise during the course of his trial, defendant Bonds begins with a brief

21   summary of the relevant legal principles before turning to the specific items listed in the

22   government's motion.

23

**THE RELEVANT LAW**

24

**1.   Cross-Examination and the Right to Present a Defense**

25   "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present

26   a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v.*

27   *Kentucky*, 476 U.S. 683, 690 (1986)). This right includes, "at a minimum, ... the right to put

28   before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*,

1

1  480 U.S. 39, 56 (1987); *accord Washington v. Texas*, 388 U.S. 14, 19 (1967). This right is

2  vindicated in part by the Sixth Amendment, which by its terms guarantees a criminal defendant

3  the right to confront the witnesses against him.

4     The primary purpose of the Sixth Amendment's right of an accused "to be confronted

5  with the witnesses against him," in turn, is to "*secure for the opponent the opportunity of cross-*

6  *examination.*" *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (quoting 5 Wigmore, Evidence, p.

7  123 (3d ed. 1940))(emphasis in original). In *Davis*, the trial court refused to permit the defendant

8  to cross-examine Green, a key prosecution witness, concerning his probationary status. The

9  Supreme Court reversed the defendant's conviction, stating that

10           [t]he accuracy and truthfulness of Green's testimony were key
             elements in the State's case against petitioner. The claim of bias
11           which the defendant sought to develop was admissible to afford a
             basis for an inference of undue pressure because of Green's
12           vulnerable status as a probationer, cf. *Alford v. United States*, 282
             U.S. 687 (1931), as well as of Green's possible concern that he
13           might be a suspect in the investigation.

14  415 U.S. at 317-318; *see also United States v. Wallach*, 935 F.2d 445, 458 (2d Cir. 1991)("[A]

15  witnesses's credibility could very well be a factor of central importance to the jury, indeed every

16  bit as important as the factual elements of the crime itself."); *United States v. Dees*, 34 F.3d 838,

17  844 (9th Cir. 1994) (Noting that evidence of a potential benefit which may influence a witness's

18  testimony indisputably evinces witness bias and interest.); *United States v. Shaffer*, 789 F.2d 682

19  (9th Cir. 1986); 3 Mueller & Kirkpatrick, *Federal Evidence* § 6.76 (3d ed. 2008) (Explaining that

20  whether a witness "likes or dislikes" a party, or has "something to gain or lose by the tenor of her

21  testimony," reflects prototypical forms of bias.)

22     Constitutional considerations limit the degree to which Fed. R. Evid. 403 may be applied

23  to prevent a defendant's introduction of evidence demonstrating bias, interest, or other matters

24  affecting witness credibility. In *Olden v. Kentucky* 488 U.S. 227 (1988), the Kentucky Court of

25  Appeals had ruled that a line of cross-examination tending to show that the state's chief witness

26  had a motive to lie, although relevant, was properly excluded at trial because "its probative value

27  [was] outweighed by its possibility for prejudice." 488 U.S. at 230-31. The excluded line of

28  inquiry sought to establish that the alleged victim in a rape case, a married white woman, had

1  fabricated the accusation to cover up the fact that she was having an affair with a black man.

2      Relying on *Davis, supra,* the *Olden* Court found that "the exposure of a witness'
3  motivation in testifying is a proper and important function of the constitutionally protected right
4  of cross-examination." *Id.* (emphasis added). The Sixth Amendment is violated when a defendant
5  is "prohibited from engaging in otherwise proper cross-examination designed to show a
6  prototypical form of bias on the part of the witness." *Id.*

7      **2.    The Scope of Rule 608(b)**

8      The government has moved in limine "to preclude the defendant from [offering] extrinsic
9  evidence that a witness's testimony is false unless the testimony in issue was provided during
10  direct examination." (Govt. Mot., at 13). Thus, in the government's view, if a witness on cross-
11  examination denied he or she hated a defendant because he was black, the defense would be
12  stuck with that denial and precluded from offering irrefutable extrinsic evidence that the witness
13  was a virulent racist. Likewise, if an eyewitness denied on cross-examination that his vision was
14  poor, the defense could not prove by extrinsic evidence that witness was legally blind. In
15  advancing that benighted position, the government repeatedly misinterprets the scope and
16  meaning of Rule 608(b).

17      In order to understand the proper application of the rule, it is necessary to distinguish
18  between different methods of impeachment. In evidence law, there are five recognized methods
19  of impeachment: (a) bias and self-interest, (b) sensory or mental incapacity, (c) character for
20  dishonesty, (d) prior inconsistent statements, and (e) contradiction. 3 Mueller & Kirkpatrick,
21  *Federal Evidence* § 6.75 (3d ed. 2008); *accord United States v. Lindemann*, 85 F.3d 1232, 1243
22  (7th Cir. 1996); *see also McCormick on Evidence* § 33 (6th ed. 2006) ("There are five main
23  modes of attack on a witness's credibility.").

24      Rule 608(b), by its plain terms, applies only to attacks on a witness's "character for
25  truthfulness." It applies, in other words, only to character-based impeachment — not to any of
26  the other methods. After the Rules were enacted, some courts mistakenly interpreted Rule
27  608(b) as applying to all methods of impeachment. As a result, the Rule was amended in 2003 to
28  clarify that it applies only to attacks on "character for truthfulness," not all attacks on

3

1 "credibility." Put simply, Rule 608(b) applies only to evidence of "truthfulness or untruthfulness

2 in the abstract." *United States v. Fusco*, 748 F.2d 996, 998 (5th Cir.1984) (cited by Fed. R.

3 608(b), advisory committee's note to 2003 amendment).

> The originally-enacted version of Fed. R. Evid. 608(b) covered the use of conduct to impeach the "credibility" of a witness, but this term was broader than the meaning intended by the framers because "credibility" is affected by matters such as motive and influence and "credibility" can be attacked indirectly by offering proof that contradicts what a witness says. As the phrasing in Fed. R. Evid. 608(a) has always indicated, however, the focus of Fed. R. Evid. 608 is not on credibility in these broad senses, but on the aspect of credibility that we describe as "character for truthfulness or untruthfulness." Hence Fed. R. Evid. 608(b) was amended in 2003 by deleting the word "credibility" and substituting the phrase "character for truthfulness." The purpose was to make it clear that Fed. R. Evid. 608(b) applies to questions directed to a witness on his own prior acts when the purpose is to shed light on his character or disposition toward truthfulness, and also to questions directed to character witnesses, where the examining lawyer asks such witnesses about prior acts by the witness whose credibility is in issue, but only in the context of testing such character witnesses on their knowledge or understanding of the character of the person that they have described. *That is to say, Fed. R. Evid. 608(b) has nothing to do with other forms of impeachment, such as showing bias, or contradicting a witness, or showing a problem in perception, or impeaching a witness by proving a prior inconsistent statement.*

3 Mueller & Kirkpatrick, *supra*, at § 6.29 (emphasis added). In short, "the amendment intended

to clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for

proffering that evidence is to attack or support the witness' character for truthfulness." *United*

*States v. Epstein*, 426 F.3d 431, 439 n.4 (1st Cir. 2005) (emphasis in original).

The government's argument repeats the very mistake that led to the 2003 amendment.

Relying part on pre-amendment authority, the government suggests that Rule 608(b) bars

extrinsic evidence introduced for any method of impeachment. (Govt. Mot., at 13; *see also id.* at

15-16.) That is simply false. For example, in *United States v. Abel*, 469 U.S. 45 (1984), the

Court rejected a claim that Rule 608 (b) precluded the admission of extrinsic evidence to prove

bias and interest. The Court explained:

> Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like,

4

1

2

3

> dislike, or fear of a party, or by the witness' self-interest. *Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.*

4   469 U.S. at 51. (emphasis added)

5       Indeed, many of the cases cited by the government make clear that impeachment by

6   contradiction or impeachment by a showing of bias is simply not governed by Rule 608(b). *See*

7   *United States v. Castillo*, 181 F.3d 1129, 1132 (9th Cir. 1999) ("[C]ounsel and courts sometimes

8   have difficulty distinguishing between Rule 608 impeachment and impeachment by

9   contradiction.") (internal quotation marks omitted); *see also United States v. Kincaid-Chauncey*,

10  556 F.3d 923, 932 n.1 (9th Cir. 2006) (noting that the court in *Castillo* had properly "abjured

11  reliance on Rule 608(b) when analyzing questions of impeachment by contradiction")

12                                  **ARGUMENT**

13                **OPPOSITION TO GOVERNMENT MOTION IN LIMINE A**

14      Defendant does not know, prior to the prosecution case, whether the documents listed in

15  Section 1 (Grand Jury Transcripts) and 2 (Interview Reports) of his Exhibit List will be offered

16  into evidence at trial. That is why the Exhibit List "respectfully submits a partial list of exhibits,

17  all or parts of which Defendant *may seek* to admit at trial." (Emphasis added.)

18      The listed documents, or parts of them, are potentially admissible for at least the

19  following reasons:

20      1. Grand Jury testimony may constitute an inconsistent statement of a witness at trial

21  under Fed. R. Evid. 801(d)(1)(A). If a witness is unavailable to testify at trial, his/her Grand Jury

22  testimony may be admissible as former testimony under Rule 804(b)(1). The Grand Jury

23  testimony of Agent Novitzky may be admissible under Rule 801(d)(2).

24      2. Interview reports may contain prior statements of witnesses which are admissible

25  under Rule 613(a). In cross-examination, the inconsistent statement need not be shown to the

26  witness, "but on request the same shall be shown or disclosed to opposing counsel." It therefore

27  seemed to make sense to list potentially impeaching statements prior to trial so they will have

28  exhibit numbers and the trial doesn't need to be interrupted while exhibit numbers are assigned

5

1   and copies of the newly-marked exhibits are handed out.

2       3. It also seemed prudent to mark Grand Jury exhibits and interview reports that may be
3   used to refresh the recollection of witnesses who, if the Government calls them, will be asked
4   about events that took place many years ago. Although a document used only for purposes of
5   refreshing recollection isn't always admitted into evidence, for purposes of the record it still
6   needs an exhibit number for identification purposes.

7       4. Depending on the prosecution evidence, the Grand Jury transcripts and interview
8   reports may be relevant for non-hearsay purposes, like proving that a particular individual was
9   interviewed on a particular date. For example, the Government's Witness List says that Agent
10  Novitzky "will testify regarding the IRS-CID investigation for which the defendant was
11  subpoenaed to the Grand Jury in 2003 ..." The Government also apparently wants Agent
12  Novitzky to testify "about the manner in which the defendant's false statements in the Grand Jury
13  influenced the criminal investigation of Conte and Anderson."

14      Defendant has moved *in limine* to prevent Agent Novitzky from offering his opinions
15  about who told the truth in the Grand Jury. Even if that motion is granted, however, the
16  Government apparently has in mind a very expansive presentation about the "BALCO
17  investigation," which may seek to describe who was brought before the Grand Jury, and who was
18  interviewed and when. Depending on what Agent Novitzky says on direct, the interview reports
19  and Grand Jury transcripts may be helpful in cross-examination.

20      5. There are other potential uses of the documents listed in Categories 1 and 2, which
21  involve confidential defense strategy, and which the defense would respectfully ask not to reveal
22  except in sealed, *ex parte* communications.

23      In summary, Government Motion A is vastly overbroad. It seeks to exclude evidence
24  whose admissibility cannot be evaluated until the Government puts on its case. The potential
25  admissibility of the Grand Jury transcripts and interview reports is plain. At this point there
26  seems little benefit in trying to speculate which exhibits may be used at trial, and for what
27  purpose.

28

6

1

**OPPOSITION TO GOVERNMENT MOTION IN LIMINE B**

2    The government correctly notes that the issue of whether the case against a defendant

3 must be dismissed due to selective prosecution is one for the Court, and that the defendant has

4 not made such a motion. (Govt. Mot., at 7) The government then leaps to the proposition that:

5 "Any question regarding whether the government or its agents have engaged in misconduct or

6 violated the defendant's due process rights is a question of law that should not be referred to the

7 jury." (Govt. Mot., at 5; *see also id.* at 9, stating that all issues of misconduct are for Court, not

8 jury.) Not so.

9    In *Kyles v. Whitley*, 514 U.S. 419, 446 n.15 (1995), the Supreme Court overturned a

10 murder conviction on the ground that the prosecution had violated its duty to disclose to the

11 defense all material evidence tending to exculpate the defendant or impeach the credibility of

12 prosecution witnesses. One basis on which the Court found the undisclosed evidence to have

13 been material — i.e., of such a character that its suppression undermined confidence in the

14 verdict — was the evidence could have permitted the defense to

15           attack[] the reliability of the investigation in failing even to
16           consider [another suspect's] possible guilt and in tolerating (if not
             countenancing) serious possibilities that incriminating evidence
             had been planted. *See, e.g., Bowen v. Maynard,* 799 F.2d 593, 613
17           (CA10 1986) ("A common trial tactic of defense lawyers is to
             discredit the caliber of the investigation or the decision to charge
18           the defendant, and we may consider such use in assessing a
             possible *Brady* violation"); *Lindsey v. King,* 769 F.2d 1034, 1042
19           (CA5 1985) (awarding new trial of prisoner convicted in Louisiana
             state court because withheld *Brady* evidence "carried within it the
20           potential ... for the ... discrediting ... of the police methods
             employed in assembling the case").
21

514 U.S. at 446.

22

23    The Court continued: "When, for example, the probative force of evidence depends on

24 the circumstances in which it was obtained and those circumstances raise a possibility of fraud,

25 indications of conscientious police work will enhance probative force and slovenly work will

26 diminish it." *Id.* at n. 15; *see also United States v. Sager,* 227 U.S. 1138, 1145-46 (9th Cir.

27 2000) (holding that the trial court committed plain error in barring inquiry into quality of

28 investigation because "[d]etails of the investigatory process potentially affected [the lead

7

1  investigator's] credibility and, perhaps more importantly, the weight to be given to evidence
2  produced by his investigation."); *United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000)
3  (holding that facts regarding investigatory error concerned "a critical piece of evidence certainly
4  raises the opportunity to attack the thoroughness, and even good faith, of the investigation.").

5  Thus evidence that tends to prove that an investigation was not conducted in "good faith"
6  *(Howell*, at 625) but rather in an unreliable or slovenly manner, or that challenges "the caliber of
7  the investigation or the decision to charge the defendant" (*Kyles*, 514 U.S. at 446 and n.15) may
8  well be admissible. The government concedes that "[q]uestions going to the bias or improper
9  motive of government witnesses are, of course, appropriate impeachment," as are questions
10 going to the reliability of the investigation. (Govt. Mot., at 7, 9). Some of those government
11 witnesses are, of course, the instigators of this prosecution. At this procedural juncture, the
12 Court is certainly not in a position to issue a blanket order that bars the admission of any and all
13 evidence tending to prove that "the government or its agents have engaged in misconduct or
14 violated the defendant's due process rights." (Govt. Mot., at 5)

15                    **OPPOSITION TO GOVERNMENT MOTION IN LIMINE C**

16 This is another premature and ill-advised motion. Communications between Mr. Rains
17 and the government may or may not be relevant depending upon how the Government tries to
18 present its case. For example, the government may try to prove that the immunity order which
19 was read to Mr. Bonds while he was in the Grand Jury, unaccompanied by counsel, had been
20 previously reviewed by Mr. Rains. In that circumstance, communications or their absence
21 between the government and Mr. Rains would obviously become material, and Mr. Rains should
22 not be disabled as a witness ahead of time. This is only one example of the many ways in which
23 the government might make Mr. Rains an important witness.

24 Defendant's Witness List also discloses Mr. Rains as a potential witness to "interactions
25 between the government and Mr. Bonds after ... promises and representations were made, but
26 before he testified." Motion *in limine* C does not seek to exclude evidence of these interactions
27 ("The United States moves *in limine* to exclude defense attorney Rains from testifying about
28 communications between the Government's representatives and himself."), so defendant will not

8

1    address their potential relevance and admissibility. By the same token, Motion *in limine* C does

2    not challenge the relevance of exchanges between Mr. Rains and government lawyers, if any,

3    which may have taken place in the immediate presence of Mr. Bonds before he testified.

4         The defense does not intend to call Mr. Rains to testify about confidential

5    communications between himself and Mr. Bonds.

6                    **OPPOSITION TO GOVERNMENT MOTION IN LIMINE D**

7         Defense counsel are well aware of the rules governing the admission of evidence and the

8    proper limits on closing argument. Counsel intend to demonstrate to the jury that Mr. Bonds

9    must be acquitted for the reason that the government will have failed to meet its burden of

10   proving Mr. Bonds' guilt beyond a reasonable doubt.

11        The government's request for a pre-trial order barring defense questioning, evidence, and

12   argument referring to the matters described in its motion is both premature and misguided.

13   (Govt. Mot., at 11-13) The matters the government seeks to place off-limits — i.e., the scope of

14   the prosecution's investigation, defendant's past achievements, the passage of time since the

15   alleged crime, and/or defendant's response to the prosecution — may well be relevant, and

16   therefore the proper subject of evidence and argument, depending on the context in which the

17   defense seeks to address them or the prosecution itself places them in issue.

18        For example, the government has stated its intention to introduce "[e]vidence of the

19   defendant's athletic accomplishments." (Govt. Mot., at 18), yet at the same time seeks to place

20   limits on arguments made by the defense concerning "the defendant's achievements as an

21   athlete." (*Id.*, at 12) This Court cannot possibly assess the propriety of the defense response to

22   evidence introduced by the government on the subject of athletic achievements until it can view

23   the matter in context and make an informed response to whatever objection the prosecution

24   asserts. In no event should the prosecution be permitted to impose ground rules that interfere

25   with defendant's fundamental rights to present a defense and to meaningfully confront the

26   witnesses against him. *See Holmes v. South Carolina, supra; Davis v. Alaska, supra.*

27                                            //

28                                            //

                                             9

1

## OPPOSITION TO GOVERNMENT MOTION IN LIMINE E

2          Defendant Bonds may call Government agents to testify, among other things, to prior
3   inconsistent statements made by Government witnesses. The central figures in the Government's
4   case — ballplayer Estalella, Ms. Bell, brother and sister Hoskins — have given many conflicting
5   statements about material facts, and they have earned the right to be fully impeached under Fed.
6   R. Evid. 613.

7          The Government doesn't want its witnesses to be impeached with their prior inconsistent
8   statements, which is understandable. Less understandable is the Government's invocation of a
9   "rule" that "if a Government witness gives testimony during cross-examination that is subject to
10  impeachment, extrinsic evidence may not be admitted to impeach their testimony." (Govt. Mot.,
11  at 14.) There is no such rule. First, the Ninth Circuit has explicitly stated that the rule described
12  by the government does not apply "in all circumstances." *Castillo*, 181 F.3d at 1133; see also
13  *United States v. Kincaid-Chauncey, supra*, 556 F.3d at 932-33 (holding that a district court acted
14  within its discretion when it admitted some, but not all, evidence proffered to contradict
15  statements made on cross).

16         Second, as noted above, there is no such rule under 608(b), since in light of the 2003
17  amendment, 608(b) does not apply to impeachment by contradiction at all. The only rule that
18  governs this situation is Rule 403. See Fed. R. Evid. 608(b) (advisory committee note to 2003
19  amendment) (stating that the amendment "leaves the admissibility of extrinsic evidence offered
20  for other grounds of impeachment[,] such as contradiction, . . . to rules 402 and 403"); *accord*
21  *United States v. Mahdi*, 598 F.3d 883, 893 n.11 (D.C. Cir. 2010); *see also Castillo*, 181 F.3d at
22  1133 ("[C]ourts should analyze such evidence under Rule 403."). The government has not made
23  any showing about how it would be unfairly prejudiced by the admission of such evidence.

24         Motion in Limine E rests on a fundamental legal error, and must be denied.

25

## OPPOSITION TO GOVERNMENT MOTION IN LIMINE F

26         Following the discussion of this matter on February 18, the government has provided the
27  defense with nothing additional to the photographs which are referenced, but not identified in
28  Motion in Limine F. On February 17, the government e-mailed 9 photographs, with no

10

1    indication of where they came from or how (or if) they might be authenticated. The government
2    has provided no revisions to its Exhibit List, nor its Witness List, so the defense does not know
3    which witnesses, if any, the government will call to authenticate photographs and otherwise talk
4    about them.

5         In light of the Court's comments on February 18, defendant respectfully submits that, on
6    the present record, Motion in Limine F must be denied.[1]

7                   **OPPOSITION TO GOVERNMENT MOTION IN LIMINE G**

8         The defense will offer evidence that demonstrates Kim Bell's bias, her motive to testify
9    on the government's behalf, and her self-interest in the case. The government agrees that cross-
10   examination of Ms. Bell on topics such as "an interview she has given to Playboy accompanied
11   by nude photographs of herself" is "relevant to the jury's assessment of Bell's character for
12   truthfulness or untruthfulness, *and her motives for testifying*." (Govt. Mot., at 15; emphasis
13   added). Relying on Rule 608(b), however, the government argues that the defense should be
14   prohibited from admitting any *extrinsic evidence* that goes to Bell's bias, motive, and credibility.
15   (Govt. Mot., at 15-16.) .The government's argument for limiting the impeachment of Kim Bell
16   rests on the same legal error concerning Rule 608(b) that taints so many of its evidentiary
17   arguments.

18        As noted above, in rejecting the very argument under Rule 608(b) that the government
19   makes here, the Supreme Court ruled that extrinsic evidence of bias "is almost always relevant
20   because the jury, as finder of fact and weigher of credibility, has historically been entitled to
21   assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Abel*,
22   469 U.S. at 51. "Proof of bias or motive to lie is admissible impeachment evidence. . . . And a
23   party may introduce extrinsic evidence to show it." *United States v. Salem*, 578 F.3d 682, 686
24   (7th Cir. 2009); *accord, United States v. Skelton*, 514 F.3d 433, 441-42 (5th Cir. 2008); *United*
25   *States v. Smith*, 232 F.3d 236, 242 (D.C. Cir. 2000); *United States v. McCoy*, 23 F.3d 216, 217

26
27   [1] If the government provides additional information on this issue before the March 1st pretrial
     hearing, defendant Bonds will attempt to address that information before the hearing commences.
28

                                                  11

1  (9th Cir. 1994); *see also Abel*, 469 U.S. at 55-56 (upholding the admissibility of extrinsic

2  evidence to show bias). "In courtroom parlance, facts showing bias are not collateral." *United*

3  *States v. Drapeau*, 414 F.3d 869, 881 (8th Cir. 2005) (internal quotation marks omitted). In short,

4  any evidence that has a rational tendency to show Bell's bias against the defendant, or her

5  self-interest in testifying for the government, may not be excluded under Rule 608(b).

6  The government also argues that nude photographs would "add nothing except an

7  element of prurience at odds with the decorum befitting a court of law and the respect due to the

8  jury" and that cross-examination of Ms. Bell on her "personal history" "would amount to a smear

9  job." (Govt. Mot., at 16.) Suffice it to say that the defense is prepared to consider this trial a

10  prurience free zone and declare the subject of sexuality off-limits, but the government must abide

11  by the rule it proposes.

12  As will be discussed below, the government intends to shoehorn into this trial intimate

13  details of the emotional and sexual relationship between Ms. Bell and Mr. Bonds on the wholly

14  spurious theory that those details constitute proof of the defendant's steroid use. (*See* Motion H,

15  *infra*.) There is no scientific basis for the admission of that evidence, and it must be excluded in

16  its entirety. Were it to be admitted, however, the defendant has a constitutional right to rebut the

17  inference the government seeks to draw from that evidence. Assume the government gains

18  admission of evidence of conflict between Ms. Bell and the defendant on the theory that any

19  anger Mr. Bonds exhibited towards Ms. Bell was due to "roid rage." Evidence that any such

20  anger was in fact prompted by issues revolving around Ms. Bell's rich sexual history would then

21  become relevant, and could not possibly be excluded under Rule 403 on the ground that it might

22  prove embarrassing to Ms. Bell. *Olden, supra* (Holding that evidence of alleged rape victim's

23  sexual history could not be excluded on ground that it was more prejudicial than probative).

24  The most "prurient" evidence the government intends to offer is Ms. Bell's description of

25  Mr. Bonds' sexual organs, on the theory that her observations can serve as corroborating

26  evidence of steroid use. From a scientific point of view, the evidentiary proffer is pure quackery,

27  but, that aside, the government cannot possibly maintain that it can inject this unseemly

28  testimony into Mr. Bonds' trial, yet prevent its impeachment by wholly relevant but equally

12

1  graphic evidence. The defense is prepared to present that impeachment evidence to the Court in

2  an in camera proceeding so the Court can consider the probative value and prejudicial effect of

3  this entire subject of inquiry.

4  ### OPPOSITION TO GOVERNMENT MOTION IN LIMINE H

5  Without citing a specific exhibit or witness, and without even attempting to describe the

6  evidence that it seeks to introduce, the government asks this Court to admit evidence of Mr.

7  Bonds's "angry, threatening, and violent communications and conduct towards Kimberly Bell."

8  (Govt. Mot., at 17.) Over the course of these protracted proceedings, the only evidence that the

9  government has ever proffered on this subject is found in the Declaration of Ms. Bell, filed on

10  February 24, 2009. Dkt.# 145. Mr. Bonds has independently moved in limine to exclude that

11  testimony on the grounds that it is irrelevant and unduly prejudicial. *See* Bonds's Motion In

12  Limine Two, Dkt.# 222 at 8. For the reasons stated in that motion and below, the testimony

13  should be excluded.

14  Clearly, evidence that Mr. Bonds was violent or threatening is subject to the general

15  proscription against character evidence. Fed. R. Evid. 404(a). Significantly, Ms. Bell does not

16  claim that Mr. Bonds became angry and threatening sometime after he allegedly commenced

17  taking steroids. Instead, she says that Mr. Bonds was always threatening throughout their

18  relationship, which she says began in 1994 — years before the government alleges that Mr.

19  Bonds took steroids. In other words, Ms. Bell describes a nuanced change in the frequency and

20  severity of Mr. Bonds' behavior — not a new or different kind of behavior — that happens to

21  correspond with the break up of their decade-long personal relationship. Given that context, Ms.

22  Bell's proffered testimony (even if credible, which it is not) fails to provide a logical link to the

23  alleged ingestion of steroids. Furthermore, as discussed in section G above, admission of the

24  testimony would require rebuttal of Ms. Bell by independent evidence, including statements in

25  her diaries and public interviews, that clearly support the conclusion that the conflicts in her

26  relationship with Mr. Bonds were *not* due to any steroid use on his part, but to the nature of their

27  relationship.

28  Consequently, the proffered evidence would not be relevant to show steroid use even if it

13

1   were supported by science. But it is not. The government argues that Ms. Bell's "testimony is
2   relevant because its *experts* will testify that uncontrollable anger, also known as 'roid rage,' is a
3   potential side effect of steroid abuse, and can lead to conduct similar to the communications
4   contained in the voice mail messages and the conduct Bell will describe." (Govt. Mot., at 17)
5   (emphasis added). In fact, the government has proffered only one expert, Larry Bowers, Ph.D.,
6   on the side effects of steroids. *See* Government Witness List, Dkt.# 181, at 2.

7         Dr. Bowers's opinion that anger and/or violence are side effects of steroids has been
8   countered by the defense expert, Dr. Ronald Swerdloff, who stated that such opinions "are
9   controversial and complicated by the inability to isolate causative factors." (Swerdloff
10   Declaration, Exhibit A to Mr. Bonds' Motion In Limine Two, at ¶ 4.d.) After reviewing the
11   studies cited by Dr. Bowers and numerous others, Dr. Swerdloff concluded that the scientific
12   evidence for such psychological effects are "controversial" and "decidedly mixed." (Swerdloff
13   Declaration, Exhibit A to Mr. Bonds' Motion In Limine Two, at ¶ 4.d.) Accordingly, the
14   admission of Ms. Bell's testimony would engender a time consuming sideshow of conflicting
15   expert opinions.

16         But there is a far more fundamental problem with the government's proffer. Even if it
17   could be concluded that steroids *can cause* anger management problems, that conclusion cannot
18   render admissible evidence of conflict in the relationship between Mr. Bonds and Ms. Bell. The
19   issue here is not whether steroid use could have affected Mr. Bonds' behavior with Ms. Bell, but
20   whether his behavior with her can constitute proof of steroid use. Under FRE 104, the Court must
21   make "a preliminary determination whether the foundation evidence is sufficient to support a
22   fulfillment of the condition;" that is, could a reasonable jury conclude from evidence concerning
23   Mr. Bonds' purported conduct with Ms. Bell that he was using steroids. Advisory Committee
24   Note for FRE 104(b). To paraphrase Judge Kozinski's point in the *Daubert* case on remand
25   (*Daubert v. Merrell Dow Pharmaceuticals*, Inc., 43 F.3d 1311, 1320 (9th Cir. 1995)), to be
26   admissible, the government's evidence must be sufficient to support the reasonable conclusion
27   that the purported conflict in the Bonds-Bell relationship was "the result of the accused cause
28   [steroid use] and not some independent factor."

14

1    But any witness, lay or expert, in possession of their cognitive faculties would readily
2  concede that, in terms of percentages, virtually none of the lamentably ubiquitous occurrences of
3  anger and conflict in emotional relationships can be attributed to steroid use, as opposed to the
4  universally common factors of alcohol abuse, financial problems, infidelity, etc. Nor could any
5  honest witness testify that steroid use necessarily results in anger or "roid rage," as opposed to
6  those conditions being a possible side effect. Indeed, the government's proffer as to Dr.
7  Bowers's testimony claims only the proposition that "uncontrollable anger, also known as 'roid
8  rage,' is a *potential* side effect of steroid abuse." (Emphasis added). That being so, no reasonable
9  jury could infer from evidence of "angry, threatening, and violent communications and conduct
10  towards Kimberly Bell" that Mr. Bonds used steroids. On the other hand, the undue prejudice
11  that would result from injecting the issue of domestic conflict into a trial concerned with a grand
12  jury investigation of an entirely different subject is obvious.

13    Given the lack of relevance of Ms. Bell's proffered testimony, the fact that it is patently
14  subjective, the fact that it constitutes prohibited character evidence and its admission would
15  involve an undue consumption of time, and the battle of conflicting expert testimony that it
16  would necessarily precipitate, the Court should exclude Ms. Bell's testimony under Rules 402,
17  403 and 404(a).[2]

18                **NON-OPPOSITION TO GOVERNMENT MOTION IN LIMINE I**

19    The defense supposes that an inquiry as to whether Mr. Anderson is available to testify
20  for Mr. Bonds will draw the obvious response that he is not, but does not oppose the Court
21  asking Mr. Anderson or his counsel the question.

22                                        //

23                                        //

24

25

26  [2] The government also posits two circumstances in which Ms. Bell's testimony regarding threats
    and violence might conceivably become relevant for rebuttal, even if the Court excludes the
27  evidence from the government's case-in-chief. (Govt. Mot., at 17.) We do not profess to
    understand either of the government's theories. We suggest that the Court need not address these
28  issues at this time.

                                        15

## OPPOSITION TO GOVERNMENT MOTION IN LIMINE J

Following the Case Management Conference on February 18, the government has still not provided any documents, nor identified any witnesses material to the "motivation evidence" described in Motion in Limine J. Defendant still does not know what evidence the government is talking about ("expected future earnings"?), nor who the witnesses will be. With respect, on the present record the motion should be denied.

## NON-OPPOSITION TO GOVERNMENT MOTIONS IN LIMINE K AND L

The government seeks orders permitting it to introduce evidence of the plea agreements concluded by Greg Anderson and James Valente as statements against penal interest not subject to the ban on hearsay. (Govt. Mot., at 18-20.) The defense does not object to the introduction of the plea agreements. It does note that to the extent that statements contained in the plea agreements of Anderson and/or Valente are admitted in the government's case in chief, Rule 806[3] will authorize defendant Bonds to impeach those statements as if they had been made from the witness stand. See, e.g., *United States v. Becerra*, 992 F.2d 960, 965 (9th Cir. 1993) ("Federal Rule of Evidence 806 permits attacks on the credibility of the declarant of a hearsay statement as if the declarant had testified."); *United States v. Arnold*, 486 F.3d 177, 194 (6th Cir. 2007) (en banc) ("As the government acknowledges, Rule 806 permits the introduction of this statement for impeachment purposes (though not for its truth), and the error is plain."); *United States v. Pagan-Santini*, 451 F.3d 258, 265 (1st Cir. 2006) ("A prior inconsistent statement is a standard

---

[3] Rule 806 states:

> When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

16

1  form of impeachment noted in Rule 806 itself.")

2  **OPPOSITION TO GOVERNMENT MOTION IN LIMINE M**

3      The government has requested that the defendant be precluded from arguing that he was
4  confused at any point in his grand jury testimony. (Govt. Mot., at 20.) As it well understands, the
5  government bears a heavy burden of proof in a false statement case such as this one. Conviction
6  requires a statement under oath which is a clearly false answer to an unambiguous question; a
7  response which is merely incomplete, misleading, or non-responsive will not suffice to prove the
8  crime. *Bronston v. United States*, 409 U.S. 352, 361- 62 (1973). A charge of false testimony
9  cannot rest on a defendant's responses to ambiguous questions. *Id.* at 362.

10      A critical issue the jury must decide, therefore, is whether the prosecutor's questioning
11  could at any relevant point be deemed confusing (as Mr. Bonds testified that it was). Viewed in
12  this light, the government's request to bar defense argument concerning confusion effectively
13  seeks a directed verdict in favor of the prosecution on a critical element of the offense, in plain
14  contravention of the Fifth Amendment, as explained in *Apprendi v. New Jersey,* 530 U.S. 466
15  (2000), *In re Winship*, 397 U.S. 358 (1970) and scores of related federal decisions.

16      Whether the defense will in fact seek to argue that the trial evidence creates a reasonable
17  doubt as to whether Mr. Bonds was confused remains to be seen. The arguments that the defense
18  will present in closing will be determined by the state of the record after the parties rest.
19  Obviously at this point in time there is no basis for the government's suggestion that the Court
20  now reconsider its order redacting the grand jury transcript. The government's suggestion that
21  the court reverse that order and admit the entire transcript with a limiting instruction is simply an
22  effort to make an end-run around the present exclusion order.

23      Finally, defendant notes that Fed. R. Evid. 106 ("Remainder of or Related Writings or
24  Recorded Statements," setting forth the "rule of completeness") does not support the
25  government's request, not least because it only authorizes an *adverse* party to introduce
26  remaining portions of a statement first introduced by another. *Id.* Nor does the Rule ever permit
27  the admission of otherwise inadmissible hearsay. *United States v. Collicott*, 92 F.3d 973, 983
28  (9th Cir. 1996).

17

1

## OPPOSITION TO GOVERNMENT MOTION IN LIMINE N

2      Following the Case Management Conference on February 18, the Government has still

3 not provided the defense with an amended Exhibit List or Witness List, nor other information

4 about how the government proposes to authenticate the 2006 "test" and establish its significance.

5 A purported 2006 "test," almost three years after Mr. Bonds's testimony before the Grand Jury,

6 for a substance that was not the subject of the Grand Jury's investigation, is so manifestly

7 irrelevant and prejudicial that nothing could make it admissible. Motion in limine N should be

8 denied.

9

## OPPOSITION TO GOVERNMENT MOTION IN LIMINE O

10      This motion is ambiguous and difficult to understand. Exactly what evidence does the

11 government want to withhold from the jury?

12      On its face the motion asks the Court "to preclude … questions regarding the defendant's

13 referral for criminal prosecution …" The defendant is Mr. Bonds. He made no "referral for

14 criminal prosecution"; he reported a crime to law enforcement and cooperated in the subsequent

15 investigation. There is a letter dated November 2, 2005 from a Justice Department prosecutor in

16 Seattle to Mr. Hoskins's lawyer adverting to a referral against Mr. Hoskins but this letter cannot

17 be "defendant's referral":

18            As you know, your client Steven Hoskins has been the target of an
             investigation by the FBI concerning aspects of his business
19            relationship with Barry Bonds. The matter was referred to this
             office under Department of Justice procedures because of a
20            possible conflict that this investigation may have raised in the U.S.
             Attorney's Office in the Northern District of California.

21 A copy of this letter is attached as Exhibit "A."

22      Is the government proposing to prohibit cross-examination of Mr. Hoskins about his

23 knowledge that Mr. Bonds had reported his fraud and embezzlement to law enforcement? Mr.

24 Bonds's reports to law enforcement about Hoskins are highly relevant to Hoskins's bias and

25 motive to lie. As the Ninth Circuit explained in *Burr v. Sullivan*, 618 F.2d 583 (9th Cir. 1980):

26            The right to confront witnesses guaranteed by the sixth and
             fourteenth amendments includes the right to cross-examine
27            witnesses to show their possible bias or self-interest in testifying...
             As the Supreme Court declared in [*Davis v. Alaska, supra*]:
28

18

> The partiality of a witness is subject to exploration
> at trial, and is "always relevant as discrediting the
> witness and affecting the weight of his testimony."
> 3A J. Wigmore, Evidence s 940, p. 775 (Chadbourn
> rev. 1970). We have recognized that the exposure of
> a witness' motivation in testifying is a proper and
> important function of the constitutionally protected
> right of cross-examination. . .

*Burr*, 618 F.2d at 586 (*quoting Davis, supra*, 415 U.S. at 316-18; internal citations omitted.)

Once Mr. Bonds reported Hoskins's crimes to law enforcement, Hoskins had a compelling reason to lie about Mr. Bonds, in the hope that he could thereby avoid criminal prosecution by becoming an informant in a criminal case against Mr. Bonds. Is the government seriously suggesting that Hoskins should be exempt from cross-examination or, if necessary, the introduction of extrinsic evidence concerning these matters?

Or perhaps Motion In Limine O is meant to say that the "no prosecution" letter of November, 2005 should be withheld from the jury. If that is what the motion is about, there are at least four good reasons why it should be denied.

1. Hoskins undeniably received a valuable benefit from the Government — a promise not to prosecute him — after he told law enforcement that he had damaging information about Mr. Bonds. This benefit was an obvious source of bias in favor of the government and against Mr. Bonds. As explained in *Burr*, 618 F.2d at 586, the partiality of a witness is "always relevant as discrediting the witness and affecting the weight of his testimony."

2. As an informer who apparently intends to describe a "confession" by Mr. Bonds, Hoskins credibility needs to be thoroughly tested by cross-examination. In *Banks v. Dretke*, 540 U.S. 668, 701 (2004), the Supreme Court explained:

> This Court has long recognized the serious questions of credibility
> informers pose. We have therefore allowed defendants broad
> latitude to probe (informants') credibility by cross examination and
> have counseled submission of the credibility issue to the jury with
> careful instructions.

3. The government itself concedes that "any communications between law enforcement and Hoskins are the proper subject of cross-examination of Hoskins ..." (Govt Mot. at 22.) The November, 2005 letter from the Justice Department is obviously a "communication between law

19

1 enforcement and Hoskins" so the government has explicitly agreed that this is a proper subject
2 for cross-examination.

3     4. Mr. Bonds is entitled to cross-examine Mr. Hoskins and introduce extrinsic evidence
4 about any explicit or tacit agreements he made with law enforcement. *United States v. Shaffer*,
5 789 F.2d 682 (9th Cir. 1986); *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009); *see also*
6 *Abel*, 469 U.S. at 51-52 (extrinsic evidence is admissible to demonstrate witness bias). The
7 government's motion makes a series of unsupported pronouncements which cannot be the basis
8 for suppressing lawful cross-examination. For instance, the government says that "no benefit
9 was accorded to Hoskins in relation to his testimony in this case…" (Govt Mot. at 22.) Hoskins
10 has never said that, according to the discovery furnished to defendant thus far. The government
11 has consistently stonewalled every request for discovery about how it came to be that the Justice
12 Department in Seattle told Mr. Hoskins's lawyer that he would not be prosecuted. If the
13 government's spurious claims of "work product" continue to shroud the process in secrecy, then
14 cross-examination will proceed on the known facts: Hoskins said that he could deliver useful
15 evidence against Mr. Bonds; Hoskins received a very large benefit from the Government; and
16 Hoskins has since tried to live up to his offers. Whether or not there was an express quid pro
17 quo, the jury may find a tacit agreement. As the Court explained in *Douglas,* 560 F.3d at 1186:

18         A deal is a deal – explicit or tacit. There is no logic that supports
        distinguishing between the two …
19

20         … Like explicit agreements, tacit agreements are likely to be
        relevant to credibility, and therefore should be disclosed to the
        jury. Indeed tacit agreements may be more likely to skew the
21         witnesses' testimony. In the case of an explicit agreement, the
        testifying witness will know what he can expect to receive in
22         exchange for his testimony, and will know the conditions he must
        fulfill. When a witness is instead led to believe that favorable
23         testimony will be rewarded n some unspecified way, the witness
        may justifiably expect that the more valuable his testimony, the
24         more valuable his reward.

25 *See also Bell v. Bell*, 512 F3d 223, 233 (6th Cir. 2008).

26         //

27         //

28

20

1   Under any of its possible interpretations, Motion in Limine O should be denied.

2   Dated: February 22, 2011                    Respectfully submitted,

3
                                                SKADDEN, ARPS, SLATE, MEAGHER, &
4                                               FLOM LLP

5                                               ARGUEDAS, CASSMAN & HEADLEY, LLP

6                                               RIORDAN & HORGAN

7
                                                By _/s/_ Dennis P. Riordan_____
8                                                      Dennis P. Riordan

9                                               By _/s/_ Donald M. Horgan_____
                                                       Donald M. Horgan
10
                                                Counsel for Defendant
11                                              Barry Lamar Bonds

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        21

# EXHIBIT A



**U.S. Department of Justice**

~~United States Attorney~~ Western District of Washington

| | |
|---|---|
| Please reply to:<br>Mark Parrent<br>Assistant United States Attorney<br>Direct Line: (206) 553-4213 | 700 Stewart Street, Suite 5220 Tel: (206) 553-7970<br><br>Seattle, Washington 98101-1271 Fax: (206) 553-0122<br><br>www.usdoj.gov/usao/waw |

November 2, 2005

VIA FAX 925-274-2910

Michael Cardoza
The Cardoza Law Offices
1111 Civic Drive, Suite 320
Walnut Creek, California  94596

Dear Mr. Cardoza:

As you know, your client Steven Hoskins has been the target of an investigation by the FBI concerning certain aspects of his business relationship with Barry Bonds.  The matter was referred to this office under Department of Justice procedures because of a possible conflict that this investigation may have raised in the U.S. Attorney's Office in the Northern District of California.

I am writing to inform you that our office's evaluation of the evidence has led to our determination that we will not be pursuing federal criminal charges against your client at this time.  We are closing our file in this matter.  This notice does not preclude our office, or the grand jury having cognizance over the investigation (or any other grand jury) from reinstituting such an investigation without notification to you or your client if, in the opinion of that or any other grand jury, or any United States Attorney's Office, circumstances warrant such a reinstitution. Please call me at 206-553-4113 if you have any questions.

Yours truly,

JOHN McKAY
United States Attorney

MARK PARRENT
Assistant United States Attorney

BB016967