UNITED STATES DISTRICT COURT

**NORTHERN DISTRICT OF CALIFORNIA**

**BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE**

```
-----------------------------)
                             )
UNITED STATES OF AMERICA,     )
                             )
               Plaintiff,     )
                             )
     v.                       )      No. Cr. 07-0732 (SI)
                             )
BARRY LAMAR BONDS,            )
                             )
               Defendant.     )      San Francisco, California
                             )      Tuesday, March 1, 2011
-----------------------------)         (46 pages)
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

| | |
|---|---|
| For Plaintiff: | MELINDA L. HAAG |
| | United States Attorney |
| | 450 Golden Gate Avenue |
| | San Francisco, California  94102 |
| BY: | MATTHEW PARRELLA |
| | JEFF NEDROW |
| | Assistant United States Attorneys |
| | |
| For Defendant: | Ruby & Schofield |
| | 125 South Market Street |
| | Suite 1001 |
| | San Jose, California 95113 |
| BY: | ALLEN RUBY |
| | |
| | Riordan & Horgan |
| | 523 Octavia Street |
| | San Francisco, California 94102 |
| BY: | DENNIS P. RIORDAN |
| | DONALD M. HORGAN |

1    <u>APPEARANCES</u> (cont.):

2                        Arguedas, Cassman & Headley, LLP
                         803 Hearst Avenue
3                        Berkeley, California 94710
                    BY:  CRISTINA C. ARGUEDAS
4                        TED W. CASSMAN

5
     For Mr. Anderson:      GERAGOS & GERAGOS, PC
6    (Witness)              644 South Figueroa Street
                            Los Angeles, California 90017
7                      BY:  MARK GERAGOS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>Tuesday, March 1, 2011</u>

2                                                    <u>(1:35 p.m.)</u>

3            (In open court; defendant present)

4            DEPUTY CLERK:  Calling criminal 07-732, United States

5    versus Barry Bonds.

6            Counsel, please state your appearance.

7            MR. NEDROW:  Good afternoon.  Jeff Nedrow, Matt

8    Parrella, for the United States.

9            MR. PARRELLA:  Good afternoon, your Honor.

10           MR. RUBY:  Allen Ruby for Mr. Bonds.  And Mr. Bonds is

11   present in court.

12           MS. ARGUEDAS:  Good afternoon, your Honor.  Cris

13   Arguedas and Ted Cassman, also for Mr. Bonds.

14           MR. RIORDAN:  Dennis Riordan and Donald Horgan for

15   Mr. Bonds as well, your Honor.

16           MR. GERAGOS:  Good afternoon, your Honor.  Mark

17   Geragos for Mr. Anderson, who's present as well.

18           THE COURT:  Good afternoon.

19           This is your final pretrial conference prior to our

20   trial commencing on Monday, March 21st.  I would suggest -- and

21   I'll take your guidance on this, Mr. Parrella or Mr. Nedrow,

22   that we first proceed with the question of Mr. Anderson's

23   testimony so that we can let Mr. Geragos go if he wants.

24           MR. PARRELLA:  That's fine with us, your Honor.

25           THE COURT:  Mr. Ruby?

```
1              MR. RUBY:  That's fine.

2              THE COURT:  Mr. Geragos?

3              MR. GERAGOS:  Thank you, your Honor.  I'll call

4    forward Mr. Anderson.

5              THE COURT:  Good afternoon, sir.

6              MR. GERAGOS:  Good afternoon, your Honor.

7              THE COURT:  Mr. Anderson, we are -- I asked you to

8    come here, and thank you for coming, because -- I know that

9    Mr. Anderson has been subpoenaed; is that right, Mr. Parrella?

10             MR. GERAGOS:  Well, actually, I've worked out an

11   arrangement with the U.S. Attorney whereby they didn't need to

12   subpoena.  They called me I, told them I'd make him available.

13   I also told them if they wanted to subpoena him for the trial,

14   that I would accept service as well.

15             THE COURT:  Okay.  So we're treating that as an

16   official binding request to you that you show up at the trial.

17   So what I wanted to talk to you about today was just that.  As

18   you know, you have been requested to come, and I'm actually

19   today ordering you -- Mr. Geragos, if you'll accept the

20   subpoena, I appreciate that -- and I'm now ordering you to

21   appear here on March 21st prior to trial at 8:30 in the

22   morning.

23             We actually will be doing voir dire that day.

24             MR. PARRELLA:  I think perhaps the 22nd might be a

25   more realistic date, actually.
```

1      THE COURT:  So I'll order then, sir, that you be here

2 at 8:30 on Tuesday, March 22nd, and at that point, I will

3 inquire of you, as I am inquiring now, but I will inquire of

4 you then whether you will be willing to testify in this matter.

5 I'm having to proceed today and will have a proceeding on the

6 22nd because in the past you've indicated you don't want to do

7 that, and that's what I want to explore with you today.

8      As you know, the Court has the power to order you to

9 testify, and it has done so in the past, and it will do -- it

10 is doing so now; it will do so again on the 22nd.

11      MR. GERAGOS:  I think we had discussed that the last

12 time when I was here before your Honor, that you have to do it

13 in this way, or I believe the law compels you to do this in

14 this way, and I've explained that to him as well.

15      THE COURT:  All right.  Thank you.  And what I wanted

16 to mention is, we are getting closer and closer to trial now,

17 so one of the things we'll be talking about today at this trial

18 is various legal issues that will come up, for example, the

19 witnesses who are likely to be called.  There's a longer string

20 of witnesses to be called here, including many of your former

21 clients, and they're going to be required to testify in this

22 case.  It's my observation, looking at it just as an outsider,

23 much of that testimony would be unnecessary if you were to

24 testify.  So I'm wanting to underscore that for you that the

25 consequence of your refusing to testify is not simply that you

1  will very likely be ordered into custody for the balance of the

2  trial as a matter of the Court's effort to compel you to

3  testify -- coerce you, effectively, into testifying -- not only

4  will that happen, but also the consequences for these other

5  folks who used to be your clients will happen as well.  So I

6  want to underscore that, and request that you consider that

7  before you make a final decision here.

8          I also would like to tell you that I guess it was -- I

9  guess it was the government's request that Mr. Bonds also

10 request that you testify, and Mr. Bonds' lawyers indicated that

11 sure, they'd like to you testify, too.

12         So the -- not only is the compulsion coming from the

13 subpoena from the government, but also Mr. Bonds' counsel have

14 indicated that they, too, request that you testify.

15         So, having said all that, Mr. Geragos, what's

16 Mr. Anderson's plan?

17         MR. GERAGOS:  He will be here on the 22nd and he will

18 not testify.

19         THE COURT:  Okay.  Is that your plan, sir?

20         MR. ANDERSON:  (Nods head.)

21         MR. GERAGOS:  He's nodding "yes".

22         THE COURT:  He's nodding "yes".

23         MR. GERAGOS:  He's taking the not testifying to the

24 nth degree, so...

25         THE COURT:  Okay.  Well, in any event, as I say, these

1   are issues that you want to you think about.  I know you're

2   thinking about all of this as we come up to the trial date.

3          So, thank you for coming in today, and I order you to

4   be here on Tuesday, March 22nd at 8:30, and we'll have further

5   discussions at that time.  But I warn you, sir, that if you

6   indicate then as you've indicated now that you do not plan to

7   testify, it is my stated intention to remand you into the

8   custody of the marshals at that time.

9          MR. GERAGOS:  Your Honor, we had discussed this last

10  time.  I indicated to the Court I don't want to litigate it now

11  because it's premature and anticipatory, but I do believe there

12  are some arguments against the Court doing that, and I

13  obviously would like to make those at that time.  I think it's

14  premature now.

15         THE COURT:  All right.  Thank you, sir.

16         MR. GERAGOS:  Thank you very much.

17         THE COURT:  You're free to go at this time.

18         MR. GERAGOS:  Thank you very much.

19         (Whereupon, Mr. Geragos and Mr. Anderson exit

20         the courtroom.)

21         THE COURT:  We have a number of matters I'd like to

22  discuss with you today.  And then if there are other issues you

23  want to raise, you can do it.

24         We are clear to begin the trial on Monday, March 21st.

25  We hear trials in this courtroom on Monday through Thursday.

1    We don't hear jury trials on Fridays, although jurors are free

2    to continue deliberations on Fridays if they wish, at the

3    conclusion of the trial.

4            We go 8:30 in the morning until 3:30 in the afternoon.

5    We have a break in the morning, a break in the afternoon.  We

6    have a lunch recess at approximately noon for approximately a

7    half hour, 45 minutes.

8            We need 12 jurors to reach a verdict.  Last time we

9    had suggested two alternates.  Does that still make sense?

10           MR. PARRELLA:  Your Honor, I would actually request

11   four.

12           THE COURT:  Four.

13           MR. PARRELLA:  If we could.  Could we fit them?  If we

14   could fit them into the jury box without too much difficulty.

15           THE COURT:  Why?

16           MR. PARRELLA:  Which would result in a total seating

17   of 16.

18           THE COURT:  Yes, I know that.  But --

19           MR. PARRELLA:  In the jury box.  I just think in a

20   matter like this where there's a lot of scrutiny and a lot of

21   media attention, occasionally jurors remember things that they

22   hadn't remembered before, they're contacted by individuals, and

23   perhaps become unfit at that juncture, or ask off at that

24   juncture.

25           And I would rather spend a little more time on the --

| | |
|---|---|
| 1 | at the beginning to get a couple of more alternate jurors than |
| 2 | to end up trying to keep someone on who may or may not be fit |
| 3 | at that point and it might raise an appellate issue. |
| 4 | THE COURT:  What says the defense? |
| 5 | MR. RUBY:  I think two alternates is fine. |
| 6 | THE COURT:  Well, perhaps in an abundance of caution, |
| 7 | we can have some extras.  All right, we'll have four |
| 8 | alternates.  That would be 16 total. |
| 9 | The government has six peremptory challenges, the |
| 10 | defendant has 10, and you'll each get one extra for the four |
| 11 | alternates.  So that would be seven for the government; and 11 |
| 12 | for the defense. |
| 13 | We will provide the questionnaire to the jury in |
| 14 | advance so that it can fill it out, and then you'll have a |
| 15 | chance to review it before the Monday.  Did we say we do that |
| 16 | on the Thursday before?  That's what I'm remembering, but I |
| 17 | can't actually -- |
| 18 | MR. PARRELLA:  Actually, I thought we were going to |
| 19 | call the jurors in on Friday, present them with the |
| 20 | questionnaire, have them fill it out.  The government -- the |
| 21 | Court will collect them, give them to the government.  We would |
| 22 | copy them, and present the copy to the defense; keep a copy and |
| 23 | present the originals back to the Court.  If you want change |
| 24 | that... |
| 25 | THE COURT:  On Friday? |

```
 1              MR. PARRELLA:  On Friday.

 2              MS. ARGUEDAS:  Thursday seems like a better idea to

 3    me.  There's a lot of questionnaires to read.

 4              THE COURT:  The only reason I had thought I said

 5    Thursday is because I do have things going on in court all day

 6    Friday, starting at 9:00 a.m.  So it was going to be a little

 7    bit difficult to take any time out of that.  If Thursday will

 8    work....

 9              MS. ARGUEDAS:  I think Thursday is better.  You had

10    said you wanted greet them.

11              THE COURT:  And if counsel wants to be present, that's

12    fine.  But you need to sort of sit anonymously in the back and

13    not say anything.

14              MS. ARGUEDAS:  That's fine.

15              MR. PARRELLA:  So Thursday at what time?

16              THE COURT:  Is David here?  I don't see him.  I would

17    think 8:30, Mr. Parrella.

18              MR. PARRELLA:  Okay.

19              THE COURT:  8:30.

20              MS. ARGUEDAS:  Great.

21              THE COURT:  And I will instruct them in the most

22    comprehensive way that I can think of not to communicate about

23    the case until Monday morning.

24              MS. ARGUEDAS:  Within a couple of days, we're going to

25    suggest to you an instruction on that subject.  The only reason
```

1    I didn't have it today is because it's in an unpublished law

2    review article, and I wanted to get permission to cite it to

3    you.

4              THE COURT:  Okay.

5              MS. ARGUEDAS:  But we'll have it to you in two days.

6              THE COURT:  And then, as I indicated to you, the --

7    some counsel for various media outlets has requested to see

8    copies of the questionnaires, I guess essentially in realtime.

9    And I received from each of you -- thank you -- some

10   information on your thoughts on that.  I think I'd better have

11   a hearing on that, because I will hear from the counsel for the

12   media folks who raised the question.

13             So, what would be a convenient time?  I can do that, I

14   was thinking early next week might be good.  Is there any time

15   that's better or worse for any of you?

16             MR. RUBY:  Tuesday morning would be difficult for me.

17   Other than that, I'll be here whenever.

18             THE COURT:  Okay.  Is Tuesday afternoon okay?

19             MR. RUBY:  That would be fine, thanks.

20             MR. PARRELLA:  That's fine with us, your Honor.

21             THE COURT:  How about Tuesday afternoon next week,

22   that would be March 8th at, say, 2:30 in the afternoon, Tracy.

23   So if you would issue some kind of a notice to that effect, and

24   then if any of the media folks that raised the question wish to

25   file anything -- they've already filed some materials with me,

1   but they've now had an opportunity to read what the parties to

2   the case have submitted.  So if they wish to file anything

3   else, they may do so by this Friday, which would be March 4th.

4           MR. RUBY:  May Mr. Bonds be excused from the March 8th

5   hearing, your Honor?

6           THE COURT:  Is there any problem with that?

7           MR. PARRELLA:  No, I have no objection.

8           THE COURT:  Yes.

9           I have received instructions and we will go over that

10  presently.

11          You need to submit your -- the government needs to

12  submit its trial exhibits by Thursday, March 17th.  I request

13  that they be in binders with tabs and an index at the front,

14  and you need to submit a copy for me, a copy for Tracy, a copy

15  for the other side and a copy for the witness.

16          The defense may do the same, but if you're going to

17  submit them in advance of trial, it should be by Thursday

18  before the Monday of trial.

19          Now, with respect to the grand jury transcript, what

20  is your suggestion with respect to what we do with it in terms

21  of presenting it to the jury?

22          MR. PARRELLA:  Well, at a foundational level, I think

23  that the sides have -- I don't want to speak too soon -- agreed

24  on a redacted version.

25          THE COURT:  There were three issues, last I knew.

1    Have those been resolved?

2             MS. ARGUEDAS:  Yes, those three have been resolved.

3    We actually -- I noticed yesterday one line that needed to

4    still be red-lined.  I'll discuss it with them afterwards.

5             THE COURT:  Okay.  Well, assuming that we can get an

6    agreement on what shall actually be in the transcript, have you

7    considered how that gets presented to the jury?

8             MR. RUBY:  I think, your Honor, once we've reached

9    closure on what the jury gets -- and then we have more to say

10   about that, unfortunately -- but once we reach closure on that,

11   if -- I don't see where it couldn't be treated like any other

12   trial exhibit.

13            THE COURT:  Well, it could be treated like a trial

14   exhibit marked; it could be read to the jury, as we do

15   sometimes with deposition transcripts and testimony.  So

16   there's any number of ways it could be handled, but that's what

17   I was really asking.

18            MR. PARRELLA:  So I think the government's position

19   would be the transcript, which is redacted and obviously would

20   appear to be so to anyone who views it itself, would be entered

21   as an exhibit, but that it would be then read to the jury.  And

22   if they wanted a read-back, it would then be taken from the

23   reporter's transcript as a read-back.  In other words -- in

24   prior perjury trials with your Honor, we've actually had

25   individuals playing the role of questioner and witness reading

| | |
|---|---|
| 1 | the Q-and-A.  And I think that worked well; it was efficient, |
| 2 | and it communicated the information well without putting |
| 3 | anything extra into the trial. |
| 4 | THE COURT:  And would you contemplate then that the |
| 5 | document itself go to the jury? |
| 6 | MR. PARRELLA:  No, we had not. |
| 7 | THE COURT:  Okay.  That was my question. |
| 8 | MR. RUBY:  We think it should be an exhibit as any |
| 9 | other trial exhibit.  This is, if there was a crime, the crime |
| 10 | is in this transcript.  I mean -- and nowhere else.  I mean, |
| 11 | that's the alleged crime.  So it's probably not too bold to |
| 12 | suggest the jury might look upon it as quite an important |
| 13 | exhibit.  And people will be referring to it throughout the |
| 14 | trial.  And it just seems fair to them to have it so that they |
| 15 | can examine it and discuss it in whatever way they think |
| 16 | appropriate, without the encumbrance of, you know, asking for |
| 17 | somebody to come in and read it. |
| 18 | THE COURT:  I'm willing to go either way.  Why don't |
| 19 | you talk to each other and let me know what you want to do.  I |
| 20 | don't think it's a matter of enormous -- I think if the defense |
| 21 | wants the whole thing to go to the jury, I'm likely to do it |
| 22 | that way.  But you can talk to each other and see what you can |
| 23 | agree to. |
| 24 | MS. ARGUEDAS:  I would like to note here and ask if |
| 25 | this is the moment in which you would like to hear discussion |

on this subject.  But we are talking now about the transcript.
The government in its exhibit list has marked something that
they call the "grand jury transcript and exhibits," and they
have provided to us the "and exhibits" part.  And they are all
exhibits that you have directly excluded.  So if you want to
get into that argument at this time -- I actually think it must
be an error.

       THE COURT:  Let's find out if it was.  Was that an
error?

       MR. PARRELLA:  If we're talking about the exhibits,
which are the reports and things that were excluded, that's not
what is referred to.  However, during the testimony
Mr. Bonds -- and it's contained in the transcript -- is shown
some physical items, and those are exhibits as well.

       THE COURT:  What items?

       MR. PARRELLA:  A vial of the Clear, and a container of
cream, of the cream.

       MS. ARGUEDAS:  What they filed and served on us is a
number of documents, all of which you excluded.  So if I'm
understanding them to say now that that was an error, we don't
have to talk about it anymore.  If we're just talking about the
vial and the thing that held the cream, fine.

       MR. NEDROW:  It wasn't any error, but we're not
intending to offer that.  As the Court just inquired on, we
haven't dealt with the final redactions.  So in an abundance of

1  caution, we included the whole thing again, and we understand

2  and accept that the Court's prior order regarding the exhibits

3  shown aren't going to get in, and that there'll be redactions.

4  So this is not an issue we see as significant.  We're going to

5  continue with counsel --

6       THE COURT:  I'll tell you what.  In going through a

7  lot of the documents that have been filed in advance of today's

8  hearing, there are a number of places where the government

9  proposes to put into evidence in this trial matters that have

10  been excluded by prior order.  Now, I would count that as a

11  mistake, not as a willful disobedience of anything.  I don't

12  know if this was the same sort of thing or not.  But -- for

13  example, when we talked about what Mr. Valente would testify to

14  at trial, that surely is an error.

15       So before we get there, I'll ask you to check on that.

16  But I -- again, I'm glad that counsel is raising the question,

17  because we need to straighten it out in advance.

18       MS. ARGUEDAS:  The Valente matter was on my list as

19  well, your Honor.  And I consider it to be inconvenient in the

20  extreme, and I think a waste of the Court's time and our time,

21  that they continually file papers with the Court that have on

22  the title "witness list" or "exhibit list", and they put things

23  on it that are not admissible.  And then we have to scurry

24  around and deal with it and bring it to your attention.  So I

25  really would hope that the Court would ask them to file an

1   accurate witness list and exhibit list with nothing on it that

2   is inadmissible.

3          THE COURT:  Or that's been previously ruled

4   inadmissible.  And in addition, with everything on it that you

5   plan to put into evidence, because I haven't seen that, either.

6   So, when can you do that?

7          MR. NEDROW:  Well, your Honor, we felt -- and we're

8   certainly happy to go through and address them piece-by-piece,

9   the aspects that weren't accurate -- but we did feel that the

10  witness list and the exhibit list we admitted were accurate.

11         THE COURT:  What about the photographs?  Are they on

12  the exhibit list?

13         MR. NEDROW:  Yes, they are, your Honor.

14         MS. ARGUEDAS:  But they haven't been provided to you.

15  We've gotten them, but you haven't.

16         THE COURT:  I haven't seen them.

17         MS. ARGUEDAS:  Could we stop there for a moment.  He

18  just said that they did not intend to put in evidence the

19  documentary exhibits that are attached to the grand jury.  They

20  don't intend to put them in evidence because they know they've

21  been excluded, but they gave them to us last Thursday as

22  exhibits.  So I don't know what the other thing he said meant,

23  when he said we thought were -- already complied with the

24  Court's order.

25         The description of what Jim Valente is going to say is

1  not possibly going to come in under your Court's order.  So I

2  don't know what he means when he says, "We think we already

3  filed an accurate witness list."  So I would like to go back to

4  that and get a date by which they will give us a full witness

5  and exhibit list, and one that doesn't have anything extra on

6  it.

7       MR. NEDROW:  Your Honor, we're happy to clear up any

8  misunderstandings of that regard within the week.  If we could

9  have till next Tuesday, the 8th, that will be fine, if that's

10  acceptable to the Court and counsel.

11       THE COURT:  How about by 5:00 o'clock on the 7th,

12  Monday the 7th?

13       MR. NEDROW:  That would be fine.

14       THE COURT:  And you'll be back on the 8th.

15       MS. ARGUEDAS:  And they'll file it, right?  Not just

16  call us and send us an e-mail?  Call and file it?

17       THE COURT:  I'd like to get something as well.

18       MR. NEDROW:  Yes, we'll file it.  Thank you.

19       THE COURT:  Okay.  Then I have a number of motions in

20  limine that we can talk about.  I'm going to start with the

21  defense motions.  Then we'll move to the government's motions.

22       Defendant's motion Number 1 was to exclude reference

23  to -- oh, the defendant's likelihood to refuse to testify

24  before the grand jury.  This has to do with the order which

25  granted Mr. Bonds immunity prior to his grand jury testimony.

```
1    I will instruct the jury -- I think the jury needs to know that

2    he was granted immunity, and why he was granted immunity,

3    because if it is provided to a person who has refused to

4    testify, which he has a constitutional right to do, that means

5    that a person may no longer refuse to testify.  I do not intend

6    to tell the jury that the government believed the defendant

7    would refuse to testify if he were not granted immunity.  But

8    I'll explain why he gets the immunity, and that will have to do

9    with his privilege against testifying -- the privilege not to

10   testify.

11           So I think it would be better just to tell them that.

12   I'll do it, I'll just tell them that.  That being the case, I

13   don't think you'd need to have the written order in the record,

14   since it does have that additional matter.

15           Defendant's -- that was "A" on Defendant's 1.

16           B of Defendant's 1:  To exclude comments on race and

17   money.  The specific portion of the transcript that's referred

18   to there, Page 145, Lines 3 through 9, that motion's granted,

19   403.

20           C, I guess of the first in lim:  To prohibit

21   speculation by Dr. Ting about steroid use.

22           Dr. Ting's going to testify at trial, correct?

23           MS. ARGUEDAS:  Right.

24           MR. PARRELLA:  Yes, your Honor.

25           THE COURT:  Well, Dr. Ting will not be allowed to
```

1    speculate, but the motion as framed is denied.  Defendants can

2    object at trial if they believe that he's been asked to

3    speculate, but he may testify, Dr. Ting may testify why he

4    didn't, if he didn't, ask defendant if he used steroids.

5    That's not speculation.

6            So in general, we're against speculation and hearsay,

7    but we'll take those things one question at a time.

8            Part D:  Prohibit Dr. Ting from testifying about a

9    discussion between Mr. Anderson and Mr. Bonds.  Denied.  In

10   part, without prejudice.  Dr. Ting may testify regarding the

11   content of defendant's statements about his dad.  Defendant may

12   object at trial if he believes Dr. Ting is adding speculation

13   about the reasons for the comments, but he may certainly recite

14   what he heard Mr. Bonds say.

15           Part E:  Prohibit Dr. Ting from testifying that the

16   defendant berated people.  Denied, in part.  Dr. Ting can

17   testify how defendant treated him.  He may testify how he saw

18   defendant treat other individuals such as Mr. Anderson if the

19   relationship between the defendant and those individuals is

20   relevant to this case.

21           F:  Prohibit Dr. Ting from testifying about his sons

22   and medical board problems.  This is denied without prejudice.

23   I'm not sure exactly what the testimony will be or what the

24   objection would be.  Doesn't look like a 403 issue to me, but

25   everything was quite cryptic.  So you may make specific

1    objections to specific questions at the time of trial, but I'm

2    not granting this motion.

3         G:  Prohibit testimony that Hoskins received

4    prescription medicines from Dr. Ting on Mr. Bonds' behalf.

5    This motion is denied without prejudice.  It appears that the

6    testimony would be that Hoskins received prescription drugs on

7    defendant's behalf.  To the extent it's intended to show that

8    the defendant is a scofflaw, that would be prohibited.  That's

9    not admissible for that purpose.  If it's relevant to other

10   issues such as whether defendant suffered from conditions that

11   could be connected to steroid use or to see what defendant's

12   relationship was with Mr. Hoskins or Dr. Ting, that might be

13   admissible.  So flat prohibition is denied, but you may make

14   specific objections at the time of trial.

15        H:  Prohibit Hoskins from testifying as to the content

16   of any out-of-court statements not previously ruled admissible.

17   Denied without prejudice.  It's just too vague to be ruled on

18   at this juncture.  Inadmissible -- hearsay will not be

19   admitted.

20        Part I:  Prohibit Kathy Hoskins from testifying about

21   defendant's relationship with Pieret Aava and showing her

22   photographs of Miss Aava.  That's denied.  It would be

23   probative of Miss Hoskins' relationship to Mr. Bonds, which in

24   turn would be probative of the veracity of her statements about

25   what she observed.  I don't think we need any photographs, but

```
1    the testimony itself would be all right.

2           2.  To prohibit Miss Hoskins from testifying about

3    defendant's disrespectful treatment of Greg Anderson.  That's

4    denied.  The Court views testimony regarding the defendant's

5    relationship with Mr. Anderson is probative of the veracity of

6    Mr. Bonds' statements before the grand jury regarding his

7    relationship with Mr. Anderson.

8           3.  The motion to prohibit Miss Hoskins from

9    testifying about the defendant's relationship with defendant's

10   wife, it seems unlikely that such testimony would be probative

11   of anything.  It is likely to be prejudicial, but the motion is

12   vague, the issues are vague, so it's denied without prejudice

13   to specific objections at the time of trial.  I'll just rule on

14   those individual objections as they come up.

15          The next part of motion Number 1 was to prohibit

16   Kimberly Bell from testifying about defendant's disrespectful

17   and abusive treatment of others.  Granted in part and denied in

18   part.  She may testify about his treatment of her, and his

19   treatment of Mr. Anderson if she observed it.  But in general,

20   his treatment of people would be irrelevant and prejudicial and

21   would be excluded.

22          The motion to prohibit Miss Bell from testifying about

23   defendant's explanation for getting married, the government

24   says it's not going to ask about this, so that's granted or

25   denied as moot.
```

1       To prohibit Ms. Bell from testifying about defendant's

2   statements about depositing of cash in increments, that's

3   denied.  I think the evidence she would provide is probative of

4   the relationship between her and him.  However, such testimony

5   could not be used to demonstrate that Mr. Bonds is a scofflaw,

6   it would not be allowed for that purpose.  And if an

7   instruction to that effect, a limiting instruction, is

8   necessary, if you get it to me, I will give it.

9       To prohibit Ms. Bell from talking about changes in

10  defendant's temperament and threats of violence, that's denied.

11  She can testify how Mr. Bonds treated her, which includes

12  changes in his behavior toward her and threats to her of

13  violence.  I think that would be relevant.

14      So that's motion Number 1.

15      Defense motion Number 2 is denied.

16      Defense motion Number 3 concerning the testimony of

17  the other professional athletes, I don't think it's a proper

18  motion to reconsider, so that objection to it is, I do not

19  believe is well-taken.  Although it's certainly not the first

20  time we've heard these arguments, it is the Court's view that

21  the -- I'm still working on this, but I'm not sure that I agree

22  with the analysis provided by any of you so far.  I don't think

23  that this evidence from the other athletes should be treated as

24  character evidence.  It isn't character evidence.  It's proof

25  of motive, opportunity, intent, preparation, plan, knowledge,

1    identity or absence of mistake or accident.  It is like an MO

2    evidence, in my view.  It would show Mr. Anderson's knowledge

3    regarding the substances he was giving out; his plan, the way

4    he worked, when he treated -- when he trained other athletes;

5    how he distributed such substances.

6         So I think that's relevant to what -- to the truth of

7    the defendant's testimony.  So my present view is to allow it

8    in.

9         Defense motion Number 4, about Mr. Novitzky.  It's

10   granted in part and denied in part.  Agent Novitzky may not

11   opine on his opinion of the truthfulness of the defendant's

12   grand jury testimony.  He's specifically precluded from saying

13   that.  Nor may he allude to or suggest the existence of the

14   materials that are being excluded from evidence in this case.

15   But if he wants to testify about the existence of

16   inconsistencies between the defendant's testimony and other

17   evidence which caused him to do further work, why, that's fair

18   game.  And he may testify as to how that impacted the grand

19   jury and the investigation.  It is relevant to the question of

20   materiality, and the government must be allowed to prove that

21   element.

22        Defendant's motion Number 5:  Undisclosed expert

23   opinion.  This is denied without prejudice.  It is not clear

24   what he refers to, but it is too broad and too vague to be

25   granted at this time, so it is denied without prejudice.

```
1              Those are the defendant's motions.

2              In addition, the United States has made a number of

3     motions.  Motion A:  To exclude interview reports and grand

4     jury transcripts as inadmissible hearsay.  Denied without

5     prejudice.  Inadmissible hearsay is inadmissible and won't be

6     admitted.  It's not clear what you're talking about here, what

7     the purpose of the offers would be.  So on a

8     document-by-document, point-by-point basis, we'll deal with

9     that as it comes in.

10             Motion B:  To exclude interjections of irrelevant

11    questions of law.  Denied without prejudice.  Irrelevant

12    questions of law are irrelevant, and will be excludable.

13    Questions designed to elicit testimony about bias or about

14    slovenly work, those are permitted.  The motion is too broad

15    and too narrow at the same time.  It's not clear what you want,

16    but in any event, it's denied without prejudice.

17             Motion C:  To exclude the testimony of Michael Rains,

18    and evidence of a promise before the grand jury testimony.

19    Denied, in part, without prejudice.  The purported promise

20    appears relevant, and the testimony regarding the purported

21    promise would be permissible.  If Mr. Rains is called as a

22    witness, the government may renew its objections.

23             Motion D:  Prohibit encouragement of jury

24    nullification.  Granted in part; denied in part.  Defendant may

25    not argue that the jury should ignore the law or nullify the
```

law.  Beyond that, relevant efforts will be admitted.

Part E:  To prohibit government agents –– to prohibit the defendant from using the testimony of government agents to impeach the cross-examination testimony of other government agents, is denied without prejudice.

Number F:  To admit photographs of the defendant. I'll reserve a ruling on that.  Miss Arguedas, did you say you got the pictures from them?

MS. ARGUEDAS:  We got photographs, but what we didn't get is whatever they think is their way of authenticating them. We don't know who or how or what.  So I consider that not being given anything very useful.

THE COURT:  What's the status on that?

MR. NEDROW:  Well, your Honor, we raised this issue just to lay out the foundational requirements for admitting photographs, which, of course, as the Court's aware, are pretty broad.  Just requires people who recognize the individual or the matter depicted in the photograph at the time to say, Yes, that looked like him during that period of time.  And we actually think we have a number of witnesses that can establish that the photograph is the defendant and explain their basis for knowing it's the defendant at the pertinent time.

If what the defense is requesting is us to give a blueprint of exactly how as to each photo, which witness we're going to use to ask which questions about the photograph, that

1    seems very specific for a witness list, as we understand it.

2    But we can certainly try and provide them a more detailed

3    description of that.

4                THE COURT:  Can you do that by Monday at 5:00 o'clock?

5                MR. NEDROW:  Yes, we'll try to do that.  Thank you.

6                THE COURT:  G:  Prohibit unfair impeachment of

7    Kimberly Bell.  Well, we generally will try to prohibit unfair

8    impeachment of every witness.  This, I guess, has to do with

9    the Playboy interview and the Playboy photographs, neither of

10   which the Court has seen.  I don't really care to see the

11   photograph.  I don't imagine it's necessary that we put that in

12   the record.  If somebody really wants to, why, show me the

13   photograph and we'll talk.  But I don't think that's necessary.

14              The article, which I also haven't seen, seems to me it

15   probably does make a difference, and if the request is that the

16   article be excluded -- again, I haven't seen it, but it doesn't

17   seem like it ought to be because it probably relates to point

18   of view, and that's probably what they want it for.

19              Number H:  Evidence of angry, threatening and

20   violent -- oh, to preclude.  I don't think the government wants

21   to admit evidence of angry, threatening and violent

22   communications and conduct toward Ms. Bell as evidence of

23   steroid use -- well, Ms. Bell can testify to the conduct.

24              MS. ARGUEDAS:  Your Honor, do you want us to -- if we

25   want to take exception to your rulings, do you want us to wait

1    or do it as you say them?

2            THE COURT:  Well, I wasn't inviting either, actually.

3    But let me just finish my list so I've covered everything, and

4    then you can preserve your rights.

5            The government wanted the Court ask Mr. Anderson if he

6    was available to the defense, and I sort of did that.

7            J:  Admit evidence of defendant's motivation to lie to

8    the grand jury.  I will reserve ruling on this.  I don't have

9    any idea of what you propose to submit.  But I'll wait and see

10   what you do.

11           K:  Admit Mr. Anderson's plea agreement.  That's

12   unopposed.  That will be granted.

13           Number L:  Admit Mr. Valente's plea agreement.  It's

14   kind of unopposed, so it's granted.  The parties disagree about

15   exactly what it's being admitted for, and you can argue with

16   each other about that -- and the Court was here when

17   Mr. Valente said what he said and he signed the plea agreement,

18   so whether that comes in for the truth of what was said or

19   something else, I'll allow you folks to argue about.

20           Number M:  To prohibit the defendant from arguing that

21   he was confused during his grand jury testimony.  That's

22   denied.

23           And I'm going to reserve ruling on the 2006 positive

24   amphetamine test.

25           Oh, Number O:  Prohibit cross-examination of Steve

1   Hoskins about defendant referring his conduct to the FBI.

2   That's denied.

3           I think that's all of them.  So, Miss Arguedas, what

4   did you say?  No exception, was it?

5           MS. ARGUEDAS:  I wanted to just complete my record.  I

6   wanted to change the Court's mind on the subject -- on a few

7   subjects.

8           But the one that I'm assigned to is the one of the

9   alleged act of domestic violence by Mr. Bonds to Kim Bell.  And

10  I would -- what this is supposedly that happened is that within

11  a couple of weeks of the end of their relationship, when

12  Mr. Bonds broke up with Ms. Bell.  A couple of weeks before

13  that, according to Kim Bell, he took her by the neck and pushed

14  her up against the wall and said, If you're ever late again,

15  I'm going to kill you.  Profanities deleted.

16          I think the government's position is that that's

17  relevant because it's some kind of steroid rage.  The -- we

18  have a lot to say on that subject that you've already ruled on,

19  but what I'm here to try to change your mind on is the fact

20  that this is not probative of very much, no matter what.

21  Because there are no other examples, ever, of Barry Bonds being

22  a guy that gets into fights, like lots of athletes are, and

23  people who have steroid rage:  They punch people out in bars

24  and they get in fights in the dugout and they, you know,

25  they're generally fighters.  So we don't have that.

1          So what this is is an act -- if it were true, which by

2     the way we contend it was not -- but if it were, it's an act of

3     domestic violence, and as an act of domestic violence it has an

4     incendiary effect on the jury.  And so its prejudicial --

5     unfair prejudicial effect is horribly outweighed, because there

6     are going to be people, and I believe the Court would know

7     people like this, who if they thought and believed that

8     somebody committed an act of domestic violence like this, they

9     wouldn't be fair to him anymore because they would hate that

10    person.  And those people are going to come in here to our jury

11    pool -- I don't even blame them if that's their attitude

12    towards domestic violence.  But it's going to skew their

13    ability to be fair in this trial about this person and whether

14    or not he told the truth to the grand jury.

15          To the extent that the government wants to maintain

16    its -- he had steroid rage, Kim Bell has other testimony on

17    that subject.  She says he -- she basically says he treated me

18    badly throughout our relationship, but she says it got extra

19    bad towards the end.  And she's -- can say "got extra bad"; it

20    got -- even he "issued threats", got extra threatening towards

21    the end.  They can accomplish their goal without putting in an

22    isolated time of domestic violence for which there's no other

23    equivalent conduct anywhere else that you would have if that

24    was because you were having steroid rage, as opposed to

25    breaking up with somebody and you're a domestic violence

1   person -- which again, I want to say:  We deny this.  But you

2   get my point.  They don't need it, and it's really prejudicial.

3           THE COURT:  All right.

4           MR. HORGAN:  Your Honor, as to defense motion

5   Number 3, I think the Court said that it was inclined to

6   consider this other athlete evidence about dealing with

7   Mr. Anderson as modus operandi evidence.  And I would just

8   point out, your Honor, that that offer of proof was never made

9   in the government's brief.  Those words never appeared there.

10  And that there is a fairly distinctive body of law about what

11  is and is not admissible under that doctrine.  So I would just

12  ask whether we would have an opportunity to very quickly brief

13  the issue.

14          THE COURT:  You have briefed this issues serially now

15  over a long period of time.  It would have helped me actually

16  if the briefing in the first instance had been more

17  comprehensive than it was.  It's kind of been strung out, and

18  makes it a real challenge to follow what's going on and what

19  the right ruling is.  So, no, I'm not soliciting any further

20  briefing on it.  I am still thinking about it.  That's actually

21  I think one of the harder issues here.  But no, I don't want

22  any further briefs.  Thank you.

23          MR. HORGAN:  Thank you, your Honor.

24          MR. CASSMAN:  Good afternoon, your Honor.  I would

25  like to take a shot at changing the Court's mind about motion

1    Number 2, side effects.  And specifically --

2              THE COURT:  Motion Number two of yours?

3              MR. CASSMAN:  Of the defense.

4              THE COURT:  Okay.

5              MR. CASSMAN:  And specifically, your Honor, I believe

6    that there are at least three -- we take exception to the

7    Court's ruling, I know the Court understands that, but we

8    believe that there are at least three of these so-called side

9    effects for which there are absolutely no relevance at all, or

10   that the reed of relevance is so slender and the potential for

11   prejudice so great, as well as the consumption of court time

12   and distraction and a circus atmosphere and lurid details.

13             Miss Arguedas is a fantastic cross-examiner, but I

14   really believe that some of the aspects that would be invited

15   to be inquired into -- that would actually have to be inquired

16   into -- with regard to testicular atrophy and sexual

17   performance are just not warranted in any courtroom, let alone

18   this courtroom, let alone this case.

19             With regard to testicular atrophy, your Honor, we --

20   it's not a battle of experts.  We have uncontroverted expert

21   opinion in the form of Mr. Swerdloff's declaration that this

22   is -- when it has occurred, this effect is so slight and so

23   difficult to discern that trained medical examiners have

24   difficulty finding it.  And they need to use a special

25   instrument specifically designed to detect it called an

1    orchidometer.  And that it's not visually acceptable, not

2    visually obtainable.

3          So if Ms. Bell testifies to these effects, if she

4    does, then either she is going to be completely contradicted by

5    the only expert that's called on this, or the details will

6    indeed be quite lurid and offensive to everybody.

7          So I'm urging the Court to reconsider that aspect of

8    its order and exclude testicular atrophy on 403 grounds;

9    exclude sexual performance on the grounds that there has been

10   no expert opinion provided to this Court that that is an effect

11   of steroids, or anything else relevant to this case.  So it

12   should be excluded on 402 and 403.

13         And exclude the psychological and -- Miss Arguedas was

14   just addressing this single instance -- and that's true, there

15   is one single instance in the entire universe of people that

16   know Barry Bonds, have seen Barry Bonds, seem him perform,

17   talked to him, there's one person who alleges an instance of

18   physical violence.  It's at the end of a romantic relationship.

19   But more than that, there is only one witness, a former jilted

20   mistress, one witness, who says that his personality changed.

21   Many people have written many things about Barry Bonds, and not

22   all of them are flattering.  But the government proposes one

23   jilted witness to suggest that his personality changed.

24         His personality hasn't changed, and that evidence is

25   irrelevant and inadmissible.  So testicular atrophy, sexual

1    performance and psychological effects, we ask the Court to

2    reconsider as to 402 and 403.

3            THE COURT:  Thank you.

4            MR. RIORDAN:  Your Honor, in the interest of helping

5    the Court, we respect your order that there will be no further

6    briefing submitted on the athletes question.  We simply point

7    out that although the government did not discuss MO as the

8    basis for admissibility, we have cited to the Court in our

9    brief *United States vs. Mayans*, 17 F.3d 1174, Ninth Circuit,

10   1994, which says, In order to establish MO as a basis for

11   admissibility, the resemblance between the uncharged and

12   charged conduct must be a signature resemblance, and

13   distinctive.

14           And we just submit that to the Court for authority on

15   ruling on the MO issue that the Court has addressed.  Thank

16   you, your Honor.

17           THE COURT:  Is *Mayans* a character case?

18           MR. RIORDAN:  *Mayans* addresses character, your Honor.

19   The particular section that addresses MO is at Page 1184,

20   17 F.3d, 1184, where the Ninth Circuit discussed resemblance

21   required between the uncharged act and the charged act to

22   establish modus operandi.

23           THE COURT:  Thank you.  Anybody else?  Do you folks

24   wish to be heard?

25           MR. NEDROW:  Your Honor, the only quick comment I'd

1   have would be on the other act -- other athlete evidence, and

2   there's a case that the defense indicated in its papers, we

3   didn't address, that actually supports the government position,

4   and I wanted to call the Court's attention --

5          THE COURT:  What is the government's position?  What

6   do you think this other athlete evidence relates to?

7          MR. NEDROW:  The other athlete evidence goes to the

8   defendant's knowledge, it goes to the plausibility of his

9   statements when he says, I didn't know what I was getting, the

10  fact that other athletes are going to say yes, I knew I was

11  getting steroids from the other -- from Mr. Anderson.  The

12  evidence goes to show his knowledge.

13          And it's -- as the Court said, it's knowledge, and

14  it's also the modus operandi evidence of his claim that he was

15  unwittingly duped into taking these drugs by Mr. Anderson, and

16  the fact that all these other athletes are going to say, Well,

17  I knew I was getting steroids from Mr. Anderson.

18          So it's modus operandi evidence, which is relevant to

19  prove the necessary element of the crime:  The defendant knew

20  when he said, I never knowingly got steroids, that that's a

21  false statement.

22          And the case I wanted to -- it's cited in McCourt, if

23  I may -- the Court cites to *Aboumoussallem*, and it's a Second

24  Circuit case, and that case is a case where the defendant was

25  allowed to put into evidence that he had been unwittingly duped

1    into engaging in conduct that involved knowingly trafficking in

2    hashish.  And it's, we think, quite parallel or even directly

3    on point here.  We have a defendant claiming he was unwillingly

4    duped into taking steroids in the *Aboumoussallem* case.  The

5    defendant was permitted to put into evidence that others had

6    been unwittingly duped by a person who was involved in hashish

7    trafficking.

8           Here, the government similarly wants to put into

9    evidence that others were informed they were getting steroids

10   when Mr. Anderson gave products to them.  And the defendant is

11   saying, Oh, I was unwittingly duped when I took these items

12   from Mr. Anderson.

13          So we just wanted to call that to the Court's

14   attention.  It's, again, *Aboumoussallem*, and we think it

15   provides the basis for the admission under the modus operandi

16   theory.

17          THE COURT:  It's cited in McCourt, you said?

18          MR. NEDROW:  Yes, it is.  Your Honor, actually it's --

19   the cite is 726, F.2d, 906, Second Circuit, 1984.

20          Thank you, your Honor.

21          MR. HORGAN:  Your Honor, I'd just point out that is

22   not a case that was cited in the brief, obviously, but if I

23   recall, that case is distinguishable, if for no other reason

24   that it is a proffered by the defendant of that 404(b) evidence

25   there rather than the other way around by the government.  So

1   there are confrontation concerns that aren't raised in that

2   context, and there are other reasons why, if the Court

3   carefully reads McCourt, it explains the reasons why that's the

4   situation we have here, 404(b).  To the extent that there is a

5   propensity offer of proof going on here, it's controlled by

6   McCourt.  It applies to third parties.  Mr. Anderson's a third

7   party.  And I think McCourt, if the Court carefully reads the

8   case, will -- distinguishes the case the government's involved

9   with.

10          MR. RUBY:  May I say something, please, your Honor?

11          THE COURT:  The visuals are great here.

12          MR. RUBY:  I know.  We had a clear offer of a

13  foundation from Mr. Nedrow that the Anderson MO was telling

14  people what they were getting.  I mean, that's what we just

15  heard.  And I would respectfully ask, you know, based on my

16  being the unlikeliest person ever to suggest more briefing:

17  Would you let us by noon tomorrow send you excerpts -- without

18  argument -- just send you excerpts of the grand jury testimony

19  of the other athletes as to what Mr. Anderson told them about

20  what they were or weren't getting?  Because if they support

21  Mr. Nedrow's offer, well, then good for them.  But if they show

22  you that the offer on which you're being asked to make this

23  very important decision is just completely wrong, well, at

24  least we wanted to ask the Court for an opportunity to do that.

25  Noon tomorrow.  No comment.  Just a letter with excerpts.

1          THE COURT:  Yeah, you may do that.

2          MR. RUBY:  Thank you.

3          THE COURT:  Okay.  Going once?  All right.

4          That brings me to the end of my list.  Is there

5    anything else you folks want to raise today?

6          MR. RUBY:  Your Honor, the Court please:  I have a

7    list, and if this is the right time, on Thursday, we received

8    another exhibit list and witness list from the government and

9    it had some new things on it and there was some omissions and

10   so on.  And I respectfully ask, and maybe the Court can't

11   answer this:  What would be most helpful to the Court in us

12   dealing with this?  I don't want to be complaining all the

13   time.  I really don't, you know.  And if what would be best

14   would be to, you know, digest as best we can the new material

15   and the new objections and then make contemporaneous objections

16   at trial, we'll do that.  And it sounds like there may be an

17   objection or two during the trial from both sides.  But I just

18   wanted to make sure we're being fair with the Court.  I mean,

19   there are issues, some more important than others, that are

20   presented by this -- these latest filings.  And if these had

21   been filed back in October, they would have been the subject of

22   motions in limine.  But we are where we are, and if there is

23   some guidance that the Court is disposed to give, we'll follow

24   it.  If not, we'll do the best we can, and I'll move on in my

25   list.

1          THE COURT:  My suggestion to you would be this:  That

2     you pick your spots.

3          MR. RUBY:  Okay.

4          THE COURT:  Obviously if there's something that you

5     feel is at risk of major error, one way or another, why then

6     that's probably appropriate to bring it to the Court's

7     attention in advance.  But it is possible for important things

8     to get lost in long lists of things that aren't so important.

9     So I think in general you probably ought to just wait till the

10    trial and let it all play out.  But if there's something

11    really, really important, of course, you should bring it to the

12    Court's attention.

13         MR. RUBY:  Thank you, your Honor.

14         Next, I'd like permission to inquire of the government

15    through the Court whether the defense has now received all the

16    discovery we're entitled to.  I tried to do this informally;

17    wasn't successful.  Probably my fault.  But I would like the

18    Court's permission to do that, just to -- maybe we have gotten

19    it, maybe we haven't.  But I think in terms of the orderly

20    management of the trial, this is something we would all like to

21    know.

22         MR. PARRELLA:  Your Honor, we've complied and continue

23    to comply with Rule 16 and Jencks Act.  I will say we certainly

24    have the latest transcript of Agent Novitzky's testimony before

25    the grand jury on the superseding indictment that we arraigned

1    the defendant on today, that has yet to be disclosed.  We can

2    do that within 24 hours.

3           But beyond that, we've disclosed thousands of pages,

4    and we'll continue to be mindful of these obligations.  If

5    there's something we discover that hasn't been disclosed that

6    had we feel should be, we will do it.

7           THE COURT:  As far as, you know, right now, have you

8    given them everything you plan to use at trial?

9           MR. PARRELLA:  In terms of exhibits?

10          THE COURT:  Yes.

11          MR. PARRELLA:  Yes.

12          MR. RUBY:  Well, I was wondering whether in the same

13   categorical way the government would affirm that they've now

14   given us all of the Rule 16 discovery that they're ever going

15   to give us.

16          MR. PARRELLA:  Your Honor, again, we've disclosed

17   everything that we're aware of.  If something else comes to our

18   attention, we'll turn it over.  So --

19          MR. RUBY:  Thank you.

20          THE COURT:  You're welcome.

21          MR. RUBY:  Same question as to *Brady* discovery.

22   That's my last discovery question.

23          MR. PARRELLA:  We haven't found any *Brady* material,

24   so....

25          MR. RUBY:  All right.  Next.  On a just sort of trial

1    management issue:  May I inquire, please, what the Court's

2    ground rules are for the foundation for a conversation?  The

3    Court may recall before it took the bench that seems like every

4    court had a different ground rule.  There was Judge Ingram --

5    rest his soul -- time, place, persons present.  That was the

6    unfailing requirement for a conversation.  And I expect a lot

7    of witnesses in this case will want to talk about, well,

8    Anderson told me this; or, Jones told me that, or -- etc.  And

9    I'm not arguing, I just want to go with the flow.  Whatever the

10   rules are for what is required before a party may testify to an

11   out-of-court conversation with anybody.

12           Is it the sort of traditional time, place, persons

13   present, or a more lax standard?

14           THE COURT:  I think that would certainly be at least

15   required.  In addition, there'd need to be some hearsay

16   exception.

17           MR. RUBY:  Thank you.  In light of what sounds like

18   the likelihood that there will be domestic violence evidence

19   that comes into the trial, what is the last date -- and I hope

20   there is a date -- by which we may submit additional requested

21   voir dire on that subject?  Because -- well, by what date can

22   we do that?  If that's as soon as possible, we'll do it soon.

23   But it's our responsibility to try to understand our jurors in

24   that respect.

25           THE COURT:  You mean voir dire you'd request the Court

1  to undertake?

2          MR. RUBY:  Well, and/or the questionnaire.  If the

3  questionnaire is in concrete and can't be changed, well, you

4  know, then there we are.  But we want to move promptly on this,

5  and we'll do it right away.

6          THE COURT:  Well, there's -- if you were jointly to

7  request that the questionnaire be changed, that can certainly

8  be done anytime prior to, say, Wednesday before the Thursday.

9  It's a simple enough matter to make copies of the

10 questionnaire.  The harder question is what to put on it.

11         MR. RUBY:  Yeah.  Failing agreement -- and we'll try

12 reach agreement; we will, really, we will.  Failing agreement,

13 what's our last date?  Friday the week before the jurors are

14 brought in?  That would be the --

15         THE COURT:  The Friday before?  Yes, which would be --

16 that would be next Friday.

17         MR. RUBY:  Yes.  Thank you.

18         Last time we had a pretrial, the Court took up the

19 subject of seating in the courtroom during the trial.  And I

20 wondered if this is the time for that to be discussed, or if

21 that's something -- well, is this the time to talk about that?

22         THE COURT:  Sure.  What do you want to know?

23         MR. RUBY:  I think that we would ask the Court,

24 please, to see that some reasonable number of seats, half a

25 dozen or so, be set aside for Mr. Bonds' family.  I mean, it

1    won't accommodate all the friends and so on, but last time it

2    seemed like space was an issue.  But will the Court consider

3    setting aside half a dozen seats for Mr. Bonds?

4               THE COURT:  Yes.

5               MR. RUBY:  Thank you.  Family, friends.

6               Thank you.  The Court's pretrial order encouraged the

7    parties to try work together on foundational issues so we spend

8    less time in front of the jury on those things.  And we'll

9    continue to do that.

10              May I ask, please, that the Court direct the defense

11   receive copies of any grand jury subpoenas which yielded

12   records, business records, medical records, which the

13   government has included on its witness list -- or on its

14   exhibit list?  I'm sorry.  So we can look at the subpoena, and

15   if it looks like something came in response to a grand jury

16   subpoena, it may -- not for sure, but it may shorten up the

17   process of reaching agreement or otherwise dealing with

18   foundation.  So that's why I'm asking for those things.

19              THE COURT:  Is that a problem?

20              MR. PARRELLA:  Well, I don't believe it's a problem,

21   but we could use a little more specificity.  If we could get

22   actually what they're requesting rather than just everything

23   that we've turned over.  We'll work on that, and hopefully be

24   able to do that.

25              THE COURT:  I want to you write Mr. Parrella a letter

1   and tell them --

2           MR. RUBY:  Will do.

3           Will you excuse me just a moment, please?  I want to

4   make sure I've covered everything.

5           THE COURT:  Yes.

6           (Pause in proceedings)

7           MR. RUBY:  Thank you, your Honor.  Mr. Riordan advises

8   me he wanted to say something.  Thank you.

9           MR. RIORDAN:  Your Honor, a confession and mea culpa:

10  We worked hard on the motions in limine, but there were a

11  couple of issues that we overlooked that I think would come up

12  at trial.  I think they're very short and succinct, and we

13  might be able to cover them here today.

14          THE COURT:  Okay.

15          MR. RIORDAN:  One is the -- a motion to or request to

16  exclude a hearsay statement in the discovery that Mr. Valente

17  would say that Mr. Anderson said to him -- made a statement

18  about, "Barry wants privacy".  And we'd move to exclude that as

19  hearsay.

20          I can just state the second, your Honor.

21          THE COURT:  Well, stick there for a minute, because,

22  of course, I don't really know what Mr. Valente is going to say

23  because this is the witness statement that was not updated.

24          MR. NEDROW:  Well, your Honor, the reference is to his

25  testimony, in part -- motion in limine -- I apologize, we

```
 1    should have corrected the witness list.  Mr. Valente, given the

 2    Court's order, of course, the government contemplates his

 3    testimony will be pretty limited.  It will be that he was the

 4    vice-president of BALCO, that they ran a business which tested

 5    blood and then distributed steroids to people.  And that on

 6    three occasions he saw Mr. Bonds at BALCO.  And it will be

 7    firsthand observations, interactions with Mr. Bonds.  And I

 8    think the statement Mr. Riordan is referring to refers to

 9    Mr. Valente coming upon Mr. Bonds and Mr. Anderson, I think --

10    if the request is to exclude a conversation just between

11    Mr. Anderson and Mr. Valente, we're not going to be intending

12    to offer that because that's in the category of the things that

13    the Court had excluded.  But if it's a circumstance where

14    Mr. Bonds is present, we do intend to have Mr. Valente testify

15    to what he saw with Mr. Bonds, and the interaction that was

16    going on there.

17              MS. ARGUEDAS:  Can I suggest this?  Given that they're

18    filing something else, and that the Jim Valente part was wrong,

19    can we ask them to be very specific about what they're going to

20    elicit from Mr. Valente?  It should be really short.  And then

21    we'll address your Honor.

22              THE COURT:  That's a good idea.  Can you could that,

23    Mr. Nedrow?

24              MR. NEDROW:  That's fine, yes.

25              THE COURT:  Just plan it out --
```

1          MR. NEDROW:  We'll lay it out very clearly.  Thank

2    you.

3          MR. RUBY:  May I ask one other thing I think everybody

4    would want me to ask:  Are there any days when the Court will

5    not be in session, other than Fridays, within a reasonable

6    timeframe of March 21st?

7          THE COURT:  Not to my knowledge.

8          MR. RUBY:  Thank you.

9          THE COURT:  I canceled everything.

10          MR. PARRELLA:  Your Honor, we have nothing -- nothing

11    from the government.

12          THE COURT:  Nothing else?

13          MR. RUBY:  Nothing else.

14          THE COURT:  All right.  Thank you.

15          (Adjourned)

16                              oOo

17

18

19                   CERTIFICATE OF REPORTER

20

21          I, Connie Kuhl, Official Reporter for the United
     States Court, Northern District of California, hereby certify
     that the foregoing proceedings were reported by me, a certified
22    shorthand reporter, and were thereafter transcribed under my
     direction into written form.

23

24    _____

25          Connie Kuhl, RMR, CRR
              Wednesday, March 2, 2011