1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3        BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

4   ----------------------------)
                                 )
5   UNITED STATES OF AMERICA,    )
                                 )
6                  Plaintiff,    )
                                 )
7       v.                       )        No. Cr. 07-0732 (SI)
                                 )
8   BARRY LAMAR BONDS,           )
                                 )
9                  Defendant.    )        San Francisco, California
                                 )        Tuesday, March 8, 2011
10  ----------------------------)            (31 pages)

11

                   TRANSCRIPT OF PROCEEDINGS
12
    APPEARANCES:
13
    For Plaintiff:        MELINDA L. HAAG
14                        United States Attorney
                          450 Golden Gate Avenue
15                        San Francisco, California  94102
                     BY:  MERRY JEAN CHAN
16                        Assistant United States Attorney

17  For Defendant:        Arguedas, Cassman & Headley, LLP
                          803 Hearst Avenue
18                        Berkeley, California 94710
                     BY:  CRISTINA C. ARGUEDAS
19
                          Riordan & Horgan
20                        523 Octavia Street
                          San Francisco, California 94102
21                   BY:  DENNIS P. RIORDAN
                          DONALD M. HORGAN
22
    For Press             Davis, Wright, Tremaine LLP
23  Organizations:        505 Montgomery Street
                          Suite 800
24                        San Francisco, California
                     BY:  DUFFY CAROLAN
25

1   Tuesday, March 8, 2011

2                                                          (2:30 p.m.)

3           (In open court)

4           DEPUTY CLERK:  Calling criminal 07-732, United States

5   vs. Barry Bonds.

6           State your appearance, please?

7           MS. CHAN:  Good afternoon, your Honor, Merry Jean Chan

8   on behalf of the United States.

9           MS. ARGUEDAS:  Cris Arguedas for Barry Bonds.  Good

10  afternoon.

11          THE COURT:  Good afternoon.

12          MR. HORGAN:  Donald Horgan for Mr. Bonds.  Good

13  afternoon, your Honor.

14          THE COURT:  Good afternoon.

15          MS. CAROLAN:  Duffy Carolan of Davis, Wright, Tremaine

16  in San Francisco for the press organizations; and I have John

17  Raess, bureau chief here in San Francisco, with me as well.

18          DEPUTY CLERK:  Who?

19          MS. CAROLAN:  John Raess, R-a-e-s-s.

20          THE COURT:  Who is that?

21          (Mr. Raess raises hand.)

22          THE COURT:  Oh, hi.  Afternoon.

23          We are having this proceeding to allow you to add

24  anything you wanted to add to the materials that you've already

25  submitted.  And I did request and receive from the parties to

1    the case their views on the various questions.

2              So, is there anything you wanted to add?

3              MS. CAROLAN:  Yes, your Honor.  We do appreciate being

4    heard on the issue.

5              It's important to note that the parties don't appear

6    to dispute that there is a right of access to the juror

7    questionnaires, and to the names of the jurors.  They're

8    instead asking the Court to make the necessary findings that

9    will justify its restrictions on their right of access that

10   they are seeking.  It appears that the parties are asking the

11   Court to delay access to the questionnaires until a verdict is

12   reached in this case as well as withhold the names of the

13   jurors until that verdict is reached.  So the appropriate

14   inquiry should be not what restrictions can there be on right

15   of access, but what justifications exist under the facts of

16   this case to limit the restrictions in any manner?

17             Ordinarily, the burden of proof is on the party that

18   is advocating the sealing or court closure to present the facts

19   to the Court that will justify the sealing.  It's not

20   necessarily incumbent on the Court to go through a very lengthy

21   trial court record to make those factual findings, although

22   certain of the Court's experience comes to bear on the issue.

23             The only evidence that has been submitted to the Court

24   to justify the proposed request for delayed access to the juror

25   questionnaires was presented by the government.  Specifically,

1    in their initial filings with the Court on Page 7, they cite to

2    the fact that the defendant in this case is a well-known sports

3    figure that's been the subject of substantial press, both

4    negative and positive.  They don't try to categorize the press

5    as prejudicial to the defendant or damaging to his fair trial

6    rights.  They cite 350 sources of press, including blogs, since

7    the third superseding indictment, a far cry from the over

8    250,000 news accounts that were referenced during a one-month

9    period by the trial court in the *Blagojevich* retrial matter

10   that the order of the district court was attached to the

11   government's supplemental brief.

12           Also, they cite the reemergence of the popularity of

13   the Giants baseball team generally, given their victory last

14   year in the World Series and the evidence of increased ticket

15   sales and the attendance at the victory parade, as well as a

16   recent preseason session, as evidence of the Giants'

17   popularity.  How that connects to the defendant's fair trial

18   rights or candor of the jurors is a little elusive to me.  I

19   think an argument can be made that that interest in the public

20   in the Giants' popularity generally has been a diversion in the

21   facts particular to this case, not something that would weigh

22   against the media in concurrent access to the voir dire

23   process, which includes the questionnaires.

24           I think if the Court is going to look at *Blagojevich*

25   factual findings as a litmus test, which appears to be what the

1    government would like the Court to do, it's important to note

2    that in this case there has not been presented any evidence

3    that any witness in the case, any court personnel or government

4    parties or their counsel have been subject to the caustic and

5    vehement type of communications by the public that were at

6    issue in the *Blagojevich* matter that seemed to be the tipping

7    point for the Court in that case.

8            THE COURT:  Well, we did have witnesses before the

9    grand jury whose transcripts were illegally leaked to the press

10   and printed all over the front page at a time when that was

11   illegal, much less prejudicial, to the grand jury process.  We

12   have a lawyer who lost his license on account of doing that in

13   this case.

14           MS. CAROLAN:  Your Honor, there has also been a

15   significant passage of time since the initial trial in this

16   matter.

17           THE COURT:  There was never an initial trial in this

18   matter.  There were a series of guilty pleas.

19           MS. CAROLAN:  Excuse me, you are correct.  Also, I

20   think it's also worth looking at the *King* case because the *King*

21   case did involve a factual record that justified a limited

22   sealing, and the Court there entered a sealing that was only

23   during the selection process itself.  As soon as the jury was

24   seated, the Court allowed access to the questionnaires and the

25   names of the jury.  It only imposed a limited sealing based on

the facts.  And the facts in the *King* case, again, are absent

here.  The *King* case involved what the court characterized as

extremely prejudicial press to the defendant, and also the

Court was exploring through the voir dire process racial bias

issues which the court had concerns that jurors would not be

forthcoming if that was to be public.

       Again, those facts only justified a very limited

sealing, until the jury was selected and impaneled.  Then the

questionnaires were released to the public, as well as the

names.

       So, this case has not risen to the level, the factual

record, available in *King*, which involved that limited sealing.

       And it's important to note that the remedy that the

parties are seeking, the sitting of an anonymous jury

historically is a very drastic remedy, limited to cases that --

generally that involve organized crime, witness-tampering, or

safety issues and concerns for the jury.

       That also does not appear to be evident in this case

to warrant the use of an anonymous jury.

       So nothing that is presented by the parties appears to

justify the extraordinary relief that the public would not be

provided with concurrent access to the questionnaires, while

they're actually being used by the parties to make peremptory

or for-cause challenges against the jurors.  That right of

access and the public's role in that is vital to our judicial

1  system.  The ability to have access to the names and the

2  questionnaires during the selection process allows the public

3  to be a check against the veracity of the information that's

4  being provided by prospective jurors.  So that their goal --

5         THE COURT:  So you would like to get these

6  questionnaires, filled out with names and addresses, and then

7  check the veracity of the information on the questionnaires

8  prior to the beginning of the voir dire process?  Is that what

9  you'd like to do?

10         MS. CAROLAN:  The press does not need the contact

11  information.  The names and the information, that is general

12  background information that goes to whether they can be fair in

13  this case, as recognized in the *Wecht* case and the *Stephens*

14  *Media* case, are vital to the public's role in the judicial

15  process itself.  It allows them to be that check.  Whether they

16  actually carry out that investigative function in this case

17  seems to be an unlikely prospect, but just the ability and the

18  fact that the process is open promotes honesty.  It gives the

19  prospective jurors the knowledge that if they are trying to get

20  on the jury for the wrong reasons, information that they

21  provide will be publicly available; it promotes honesty in the

22  process.

23         I think the *Wecht* case is particularly helpful on that

24  point, where the Court found even a delayed access to this

25  material after the trial and the right of concurrent access was

1   an important enough issue for the Court to take up on a media

2   review under the collateral order doctrine.

3           So it is incumbent upon the parties to present the

4   evidence to justify the sealing.  It doesn't appear from the

5   government's submission -- and the defendant didn't submit any

6   evidence -- that the sealing of the transcript -- of the

7   questionnaires and the withholding of the names is warranted,

8   and the public should have access concurrent.

9           A few things that address kind of alternatives, if the

10  Court is going to impose any restriction and make findings that

11  justify some restrictions, that would be suggested and were

12  suggested by the parties, that would be appropriate, and I

13  think ameliorate any concerns about juror candor, were if there

14  are particular questions on the forms that invoke deeply

15  personal matters, the Court can tell the prospective jurors

16  that they can have their answers provided in chambers with the

17  parties and outside of the public to promote their candor on

18  those particular issues.

19          I've reviewed the questionnaires.  They don't seem to

20  invoke highly personnel issues except for a few areas about

21  drug abuse and being victims of crime.  Otherwise, they're just

22  very general, background information that would be normal in

23  very many cases.

24          Nothing like the deeply personal, racial bias issues

25  that were being explored in the *King* case.

1          I'd like to reserve some time if any of the parties do

2    present the evidence; or if the Court has any questions about

3    proposed alternatives.

4          THE COURT:  All right.  Thank you.

5          MS. CHAN:  Your Honor, as the government says in its

6    filing, at least our alternative or our suggestion for the jury

7    questionnaires is to have the option of having identifying

8    information redacted, so that when prospective jurors are

9    filling those questionnaires out, they can state that they

10   don't want to be identified, and the Court can then redact that

11   information prior to giving access to the media or the public.

12         We will also suggest that yes, if there is a right of

13   access to the jury questionnaires as part of the voir dire

14   process, that voir dire process doesn't really begin until

15   prospective jurors are called into the jury box and actually

16   voir dired.  So there's no reason for the media or anybody to

17   have access to these questionnaires prior to the time on the

18   21st when the jurors are called in, the prospective jurors are

19   called in, until the time they are called into the jury box,

20   until those questionnaires are actually used.

21         So to the extent that the media or anybody else wants

22   access to these questionnaires, we think it's completely

23   reasonable for the Court to at least withhold them until the

24   time they are used; and to have those redactions so that there

25   is no concern that people will be harassed.

1          We agree that the *Blagojevich* case seems to have

2   publicity of a much higher level than what is here, but it's

3   still, I think, instructive because it is a very high-profile

4   case of a local celebrity, which we have in this situation.

5   The defendant is a local celebrity.  And even though it has --

6          THE COURT:  The defendant is an international

7   celebrity.

8          MS. CHAN:  Well, he's an international celebrity, but

9   he's also -- particularly local to this area.  You know, he's

10  not being tried in some place where he hasn't played and -- for

11  years and years.  So your point is absolutely well-taken.  So

12  he's of international stature.

13         There is an incredible amount of press coverage and

14  interest in this case.  And I think that these other cases that

15  the government has cited, while maybe they can be

16  differentiated on a variety of vectors or factors, they're all

17  instructive because they're talking about cases where you have

18  defendants who are of great interest to the media, great

19  interest to the public, high profile cases, and where you see

20  that in those cases where you might expect there would be a

21  risk that the media would hound the jurors or prospective

22  jurors, that they would go and sort of knock on their door

23  steps or sit on their front lawns, but that has actually

24  happened in many of these cases.  So the risk is not

25  speculative.

1     We think that the things that we have provided to the

2     Court provide a good foundation for finding that the risk in

3     this case is unacceptably high.  That jurors would feel

4     threatened by the prospect of being profiled.  That would then

5     get in the way of them being able to be candid during the jury

6     selection process.  That it would impede their ability to

7     follow this Court's instructions to not encounter people,

8     because even if they try to not read press accounts, if they

9     even try not to deal with people, they may be approached.  And

10    it's very hard to, you know, keep yourself walled off from the

11    world unless you're going to go into sequestration, which I

12    don't think -- which we've said is an alternative, but we don't

13    think is a great alternative in this case.

14         And then finally, we think that it would also

15    impede -- I think it would cause a high risk of jurors

16    suffering harassment.

17         And so for those reasons, we think those compelling

18    interests really dictate -- or really militate, excuse me, your

19    Honor, in favor of some sort of limitation.  It has to be

20    narrowly tailored, a narrowly tailored restriction, upon the

21    presumption of openness.  We recognize that.  And we think that

22    the Court has enough facts at its disposal to make those

23    findings, and I don't know what the Court's experience is, but

24    I've been on this case very recently, but even when people know

25    that I'm from the U.S. Attorney's office, people start asking

1    me about this case, and have very strong opinions about it.

2            So I think those factors, too, to the extent the Court

3    has experienced them personally, can also go into its finding.

4    And that's one of the reasons we submitted the *Blagojevich*

5    orders, to show that those are the kinds of things that really

6    can root a finding and guard it against appeal, which, you

7    know, which would cause an interruption in this case that I

8    think is unwarranted and undesired by both parties.

9            THE COURT:  Thank you.

10           MR. HORGAN:  Your Honor, we largely agree with the

11   government's approach.  Our request is actually that the Court

12   redact the identifying information in the questionnaire:

13   Names, places of employment, and keep those questionnaires

14   redacted until a verdict is returned, just to -- in order to

15   prevent contact with jurors for the duration of the trial.

16           THE COURT:  Just as a mechanical matter, I read what

17   you wrote about that, and there's a good deal of information in

18   there which, with effort, could identify the person filling out

19   the questionnaire.  It's not just the name and address and

20   employer.  But there's -- there are many other questions that

21   could have the same effect.

22           MR. HORGAN:  There were certain others beyond the

23   others I think the government identified.  For instance, Do you

24   have relatives in law enforcement.  And I think some of those

25   questions would disclose or permit someone to unearth the

1    identity of a juror.  It should be redacted.  Some of them, it

2    shouldn't be, your Honor:  Number of siblings, feelings about

3    the case.  That's going to be covered in the open voir dire in

4    any event.  So we wouldn't ask for necessarily redaction of

5    that.  But anything we think, in the Court's judgment, could

6    reasonably lead to identifying of a jury for the duration of

7    the trial should be -- should not be disclosed until after the

8    verdict, your Honor.

9           And I concur with the Court:  I think that the

10   publicity in this matter is on a par with that of *King*,

11   certainly, if not *Blagojevich*:  It's an international case;

12   there's continued interest; the passage of time hasn't done

13   anything to diminish it.  I point out that this is not as the

14   press organizations ever represented it:  "Their" request for a

15   truly anonymous jury.  It's a deferred disclosure.

16          We agree with the government that this information

17   could be made public, subject to exceptions the Court might

18   find.  For instance, if the juror is really insistent that

19   something not be disclosed even at the termination of the

20   trial, and a good reason for that, that, in the Court's

21   judgment, that's an accommodation that could be made, but

22   otherwise this information would all be released and part of

23   the public record.

24          But during the course of the trial, your Honor, we do

25   think that there is a palpable danger of:  It's not a concern

1    about responsible members of the press, but there are less

2    responsible members of the press, and there are members of the

3    public who won't be subject to this Court's orders who very

4    likely will go out and try to influence these jurors one way or

5    the other.  And that will obviously undermine Mr. Bonds' right

6    to a fair trial, especially since the Court has excluded

7    certain evidence in this case, and any exposure to that

8    evidence could spur an immediate mistrial, were that to happen.

9            We agree with the analysis in *King* that should these

10   jurors realize that their identifying information is going to

11   be public, whether it's before the jury's impaneled or during

12   the course of the trial, they're going to be less likely to be

13   forthcoming, and that endangers Mr. Bonds' right to a fair

14   trial as well.

15           So, there's not a case where Mr. Bonds wants, under

16   Sixth Amendment grounds, seeks disclosure of all this

17   information along with the press.  This is one of those cases

18   where those two interests are diverging.  And we think that in

19   this case, Mr. Bonds' rights to a fair trial should trump the

20   public interest, to a limited extent; and with the limitations

21   the Court sees fit to impose.

22           THE COURT:  All right.  Thank you.

23           MS. CHAN:  I wanted to supplement two things:  In our

24   filing, we talked about the kinds of information that was

25   identified, and Item 33, which talks about blog names, would

1    also go to that.  So for example, prospective jurors, if they

2    had any blogs, then the blog name would identify them.  So

3    that's another thing.

4          And then we did want to point out that to some extent

5    the -- as the Court was alluding to before, that the disclosure

6    of jury questionnaires to some extent could be in conflict with

7    the jury anonymity, a deferred disclosure of the jurors names.

8    So to the extent that those might be in conflict, that's

9    something that the Court, I guess, needs to take into

10   consideration.

11         THE COURT:  Thank you.

12         MS. CAROLAN:  Your Honor, focusing on what supposedly

13   justifies withholding of the identity of the jurors, which has

14   traditionally in this country been an open part of the court

15   proceeding, the jurors are either known or knowable to the

16   public so that the public can play that vital role, is

17   speculative statements.  This case is not *King*.  *King* turned on

18   the quality of the coverage being very prejudicial -- extremely

19   prejudicial is how the Court described the coverage in the *King*

20   case; and because of the very sensitive information that was

21   going to be invoked from the jurors that went to racial bias.

22         There is nothing that is going to be asked of the

23   jurors except for a few questions about drug abuse and being

24   victims of crime, that can be taken in camera, that invoke that

25   same type of information.

1           Mr. Bonds is an international figure.  So was Martha

2     Stewart.  But the Court in the Second District did not allow

3     for a closure of the voir dire process.  It's an open process.

4     The names should be public so the public can play that vital

5     role that it has traditionally played.  Whether it actually

6     carries an investigative report or not, the process is open to

7     promote honesty of all participants, including the jurors.

8           So we would ask that the conclusory statements that

9     are being offered here are not supported by facts that are

10    presented to the Court that would justify a finding that just

11    because Barry Bonds is an international figure, the Court can

12    sit an anonymous jury, that is unknown to the public, or seal

13    off the questionnaires for the entirety of the trial.  Those

14    questionnaires should be accessible to the public while they're

15    being used and while the public can play a role as opposed to

16    after trial when the only remedy would be an appeal by the

17    defendant based on new evidence.

18          Everyone has an interest that this proceeding be held

19    to the utmost standard; that the participants and the interest

20    in honesty and integrity be upheld in this trial.  And the way

21    to do that is to have an open process from beginning to end so

22    that the public and the press can play their role that the --

23    how the U.S. Supreme Court has repeated over and over again, is

24    not there just so that members of the public can satisfy idle

25    curiosity in a particular case, but because they have a role to

1   play in this case, as they do in every case.

2                THE COURT:  Thank you.

3                All right.  Well, that issue is submitted.  I

4   appreciate all the information you've brought.

5                I have a couple of other things I wanted to raise

6   while you're here, one of which is part of the reason that I'm

7   taking everything you say very seriously, but I'm concerned

8   about it -- in this case, unlike many cases, we have a

9   substantial -- there's substantial evidence which is being kept

10  from the potential jury, that it's not to hear, and I'm vitally

11  concerned to make sure the jury doesn't hear things that would

12  be inappropriate for it to hear.

13               That's just -- that's a fact.  It's just something I'm

14  thinking about.

15               But that brings to mind Mr. Anderson.  I need to tell

16  the jury something about why they're not going to hear from

17  Mr. Anderson, and I haven't received, to my knowledge, from

18  either of you about what you would like me to say.  I know a

19  good deal about what you don't want me to say, but I haven't

20  heard anything positive.  Have you given it any thought?

21               MS. CHAN:  Your Honor, the parties have.  The parties

22  have communicated, or I guess Mr. Ruby sent Mr. Parrella a

23  letter, and they've actually sort of negotiated some language

24  about what they wanted to do.  I'm not aware of exactly what

25  the final state of the negotiations were, but I know there's

1    agreed-upon language which is pretty simple which states

2    essentially that Mr. Anderson is unavailable as a witness.

3    And, pursuant to the model jury instructions, that -- the jury

4    is not to give -- is not to use that as evidence in any way or

5    form.

6              MS. ARGUEDAS:  That's correct.  And I -- each time the

7    Court has mentioned this to us, you have said, I have to tell

8    them something about why he's not available.  And what you're

9    going to wind up getting from both sides is something that

10   says:  He's not available, and you may not consider the fact

11   that he's not available, essentially.  Which I recognize is not

12   what you have asked for.  I don't think there is anything you

13   can say about why he's not available.

14             THE COURT:  I guess my concern would be, if either

15   party -- and it wouldn't likely be the government -- were to

16   point at his absence as a reason to -- as a reason to find

17   something, I'd be worried about that.

18             MS. ARGUEDAS:  In other words, if we were to say, You

19   didn't hear from Greg Anderson and therefore you should

20   conclude that he didn't give him the Clear and the cream...?

21             THE COURT:  Right.

22             MS. ARGUEDAS:  I would not --

23             THE COURT:  Or he didn't tell him anything or

24   whatever.

25             MS. ARGUEDAS:  I think we would not make such an

1  argument, and we understand that we would not be able to make
2  such an argument.  At points, it has seemed as though the
3  government wanted to go further than that and infringe upon our
4  right to say:  You haven't heard evidence beyond a reasonable
5  doubt to show that he was given human growth hormone, let's
6  say.  We can make that argument.  And we think we can.
7          THE COURT:  I guess my nightmare scenario would be:
8  The government didn't call Anderson, he didn't tell you
9  anything.  So you wouldn't say that.
10         MS. ARGUEDAS:  Both Mr. Ruby and I know that we cannot
11 say that.  But --
12         THE COURT:  So, I mean, I guess the "why", you know --
13 that's why.  And that's my anxiety about the why, is just that
14 there be an attribution of that sort.  If you both agree that
15 that won't be an issue, then I guess it doesn't matter why,
16 it's just that he's unavailable.
17         MS. ARGUEDAS:  I think you'll be satisfied with the
18 joint instruction we'll provide to you.  It says we're asking
19 the Court to tell the jury that they may not draw any inference
20 from the absence of his live testimony.  Since of course his
21 plea agreement is going to be in evidence, and that's like
22 evidence from him.  So I think then what we're going to give to
23 you is something that you'll be satisfied with.
24         MS. CHAN:  Well, your, Honor our concerns were that,
25 you know, because we're not able to draw any -- we can't really

1    use that as evidence, one way or the other, and if the

2    government were to use his absence as evidence, that would

3    violate, you know, a number of sort of confrontation rights and

4    issues like that. So we think sort of a broad kind of

5    instruction like that, a bland instruction, would be sort of

6    most suitable at the outset.

7            However, we'd want to reserve our ability to perhaps

8    proffer or bring up another, let's say, curative instruction,

9    if the defense does do something that we think crosses the

10   line. And we don't think that that just means pointing and

11   saying "Anderson", we think that there is a line. It's a very,

12   very thin line, but there's a line between saying, They haven't

13   met reasonable doubt -- you know, They haven't proven to you

14   beyond a reasonable doubt, and saying, in sort of more

15   elliptical terms, alluding to this whole: Well, who was it who

16   gave it to him? Who gave it? You haven't heard testimony from

17   anybody who gave it to him, for example. That wouldn't

18   specifically mention Anderson, but to the government, that

19   would be essentially the same thing. So in that situation, you

20   know, we would reserve the right to at that point maybe stop

21   the proceedings and provide the Court with a proposed curative

22   instruction at that point, either to disregard the defendant's

23   argument, or something else.

24           But we -- our initial instruction or proposed

25   instruction is a bland, sort of broad one.

1          THE COURT:  Well, we can proceed then.

2          MS. ARGUEDAS:  I had a couple of things, and one is

3    exactly on this subject, and that is about the Google

4    instruction.  We also are endlessly worried about what evidence

5    is going to be in front of our jury.  And we've submitted to

6    you what we colloquially are calling the "Google Instruction",

7    and the government submitted something that was the Ninth

8    Circuit version of the same thing.  And I just wanted to make a

9    couple of points about what we are driving at and what we are

10   asking about you.  And that is -- the reason why we think our

11   instruction is better, is for three points:

12         One is, we think we have used plain language, and we

13   think that's very important.  And the legalese in the Ninth

14   Circuit doesn't.

15         Secondly, our instruction has the Court telling the

16   jurors why they are -- you are issuing the order that you are

17   issuing.  And that just seems obvious to me that if you tell

18   people why you're telling them what to do, and it's rational,

19   they're going to be more likely to follow it.  So that's what

20   else we're driving at.

21         Thirdly, our instructions has you giving very heavy

22   consequences at the end of it that they would face if they

23   violated.  And that I think also is obvious.

24         So it's not that we're so wedded to every word in what

25   we've given you, but those are the three points that we're

1    trying to get across.

2          Beyond that, you know, people have done a lot of

3    different things across the country.  I was reading in the

4    newspaper that some judges have confiscated everybody's

5    devices, every day.  This law professor who kind of wrote the

6    instructions we submitted to you, before we modified it, he

7    talks about the concept of digital sequestration, which I never

8    thought of before.  But it's -- they get to go home, but they

9    get told that they can't go on the internet, period, the end,

10   about everything.  It's a lot easier than the old-fashioned

11   sequestration.

12         So there really are a lot of possibilities.  We

13   haven't proposed anything to you except for the Google

14   instruction, but I guess I wanted to just put them into the

15   Court's mind as we all think about how we're going to handle

16   this.

17         THE COURT:  Right, and I've been thinking about those

18   things.  One point you make I completely agree with, which is

19   explaining to the jury why it is we're making whatever

20   restrictions we are, imposing whatever restrictions we are on

21   their conduct.  And I think -- I mean, all of you have tried a

22   lot of cases, and I'm continually struck by and impressed with

23   how hard juries work and how honest they are and how diligently

24   they strive to do exactly what they're supposed to do in their

25   cases.  So I think it's extremely important we explain why we

```
1    are saying what we're saying.  We will have a much higher
2    likelihood of getting their cooperation in it.
3             And I haven't studied the instruction you gave me --
4    it's in my box; I haven't looked at -- and if you gave me -- I
5    know what the regular one says.  And if you gave me something
6    else, I haven't looked at it either.
7             MS. CHAN:  Your Honor, the government agrees in
8    principle with that proposed instruction.  We had a couple of
9    points which are in our filing.  We pointed out we take
10   exception to their instruction.  There are some things in
11   the -- the benefit of that's colloquial.  On the other side,
12   it's -- sort of, I think, overemphasizes the danger and the
13   difficulty in a way that could be counterproductive.  So we
14   raise three objections to it.
15            Other than that, we agree.  You know, plain language
16   is better.  Explaining why, explaining consequences are better.
17   And what we actually tried to do is we tried to modify 1.8,
18   which is the model jury instruction, to reflect those things.
19   We think it's better to start off with 1.8.  That's what's been
20   sort of recognized in this district as the model jury
21   instruction.
22            So I think we're principally in agreement, but we do
23   take exception to some aspects of their proposed instruction.
24            THE COURT:  Well, we'll get to that.  I haven't got to
25   that yet.
```

1    MS. ARGUEDAS:  The reason I'm bringing it up today is

2    we're asking you to give it when you do your first reading with

3    the jurors, which I think is going to be on Thursday.  So -- I

4    don't think we're going to see you between now and then.

5         THE COURT:  Okay.

6         MS. ARGUEDAS:  So anyway, that's all I wanted to say

7    about it.

8         THE COURT:  We don't have the final -- your final

9    version of the questionnaire yet either, right?

10        MS. ARGUEDAS:  I don't think it's changing.

11        MS. CHAN:  The last version that I had was what I

12   submitted as an exhibit for the media proceedings.

13        THE COURT:  Okay.

14        MS. CHAN:  That's the last one we've had.  I don't

15   know if there will be any more changes.

16        MS. ARGUEDAS:  I don't think there are any changes

17   from us.

18        THE COURT:  Okay.

19        MS. ARGUEDAS:  I had two other points.  One is:  We

20   would ask the Court to issue an order, a reciprocal order, to

21   affect both of us, that whatever side is calling witnesses will

22   tell the other side on the Friday before the Monday who their

23   witnesses are going to be and in what order they're going to be

24   called.  And --

25        THE COURT:  For the whole week, you mean?

1          MS. ARGUEDAS:  For the whole week.  As best they can,

2     obviously.  But -- and we would like that to start the Friday

3     before Monday the 21st.

4          THE COURT:  Have you talked to counsel about that?

5          MS. ARGUEDAS:  We sent that as an e-mail to the

6     government, and it was the single subject of the e-mail and it

7     was four sentences long, but we've received no response.  And

8     so I thought that if the Court indicated that it was in

9     agreement with that concept, that would help us.

10         MS. CHAN:  Your Honor, I'm not in a position to

11    represent -- well, I don't know when the e-mail was sent.  I

12    know that Mr. Parrella and Mr. Nedrow have made every effort to

13    be very responsive in a timely fashion to defense counsel, but

14    I'm not in a position to represent that that would not pose

15    some difficulty.  So I would ask that at least they have the

16    opportunity to respond.  I wouldn't see that any reasonable

17    arrangement couldn't be come to, but I'm not in a position to

18    articulate what might be a problem.

19         THE COURT:  Can you get back to them by close of

20    business tomorrow?

21         MS. CHAN:  Yes.

22         THE COURT:  Do that.  If there's a problem -- I've

23    very often required that 48 hours' notice would be given, which

24    would be two days instead of four days.  I've never ordered

25    four days because in my experience, four days is a long time.

1    Two days is a less long time.  But you can work it out.

2           MS. ARGUEDAS:  For example, the -- we won't be hearing

3    witnesses until Tuesday, probably.  They know who they're going

4    to call first.  So maybe they could tell us on Friday who

5    Tuesday is going to be.

6           THE COURT:  Yes.  What I would think might work is the

7    two-day running notice.  That whatever the next court day is,

8    for the next two days you need to tell who you plan to call.

9    Because you would have planned that far in advance.  So the

10   Friday before you could tell Tuesday and Wednesday.  Tuesday

11   you could say what Wednesday and Thursday would be, that sort

12   of thing.  That's kind of what I meant by 48 hours' notice is

13   that you'd have an idea of what the next two days hold, the

14   next two court days.

15          MS. CHAN:  I'll definitely communicate that to them,

16   and we'll get back to the defense.

17          THE COURT:  Sure.

18          MS. CHAN:  On the issue of argument, I wanted to ask

19   the Court -- actually, I wanted to ask defense counsel if they

20   were planning on having multiple counsel argue?  So for

21   example, during the closing argument, if it was their plan to

22   both Miss Arguedas and Mr. Ruby somehow split that argument up,

23   or if one of them would be taking up the argument.

24          THE COURT:  Argument?  That's a long time away.

25          MS. ARGUEDAS:  Too far away to predict, I'm afraid.

```
 1          THE COURT:  But you're surely not talking about

 2   opening, because that would not be argument at all, right?

 3          MS. CHAN:  Well, actually, either one, so if they're

 4   planning on splitting sort of, you know, doing half one person

 5   half the other, we think that we'd like to know if that's going

 6   to be the case.  So -- that's sort of a logistical issue,

 7   but -- or if the Court would even permit that.

 8          THE COURT:  It would be very unusual for an opening

 9   statement to be divvied up that way.  It would not be so

10   unusual for closing argument, although it would be unusual if

11   there's only one closing argument that it should be split.

12          You can talk to each other about that.  If you find

13   yourself dissatisfied with the amount of information you have,

14   you can always complain to me.

15          MS. CHAN:  Thank you.

16          MS. ARGUEDAS:  Lastly, the exhibit list and witness

17   list that we got yesterday at 5:00 o'clock does raise some

18   issues.  We're mindful that the Court suggested that we pick

19   our spots, and we definitely intend to do that, but -- for

20   example, there are new things on the exhibit list.  There are

21   things that definitely need to be discussed with the Court and

22   motions need to be filed about them.  So for example, there's

23   voicemails, Kim Bell's voice message machine, has like 10

24   voicemails on it.  That's on their exhibit list.  That's never

25   been on it before.  So what I was thinking was if we could
```

1    reserve time with the Court to get on your calendar, then we

2    would work it out with them in terms of briefing schedule.  And

3    I was thinking, without having talked to any of the other

4    lawyers, that we ought to come in here on the Thursday before

5    the Monday that trial starts, thinking that then we're not

6    troubling you on Friday when you have your regular calendar,

7    and it gives us the most amount of time to submit briefs and

8    for you to read them.

9              MS. CHAN:  Is that the Thursday when the jury

10   questionnaires will be filled out?

11             MS. ARGUEDAS:  Right.  So like I'm thinking you would

12   go and greet the jurors, one person from each side would go

13   with you; then we would come back here and have an oral

14   argument about whatever we have filed.

15             MS. CHAN:  Your Honor, I mean, I think we're in

16   principle in agreement -- would agree to having some sort of

17   schedule to do that.  Except that there really aren't too many

18   additions to the exhibit and witness list.  The single

19   addition, I believe, is -- are these voicemails.  And that was

20   because -- in reaction to the Court's ruling stating that

21   the -- any physical -- that physical sort of choking encounter

22   was to be excluded.  And so we felt in order to demonstrate the

23   roid range, we needed something more than just testimony.

24   That's something that the defense has had in their possession.

25   These are going to be authenticated by Kim Bell.

1          MS. ARGUEDAS:  Are we arguing it now?  Because if

2    we're arguing it now, then I want to go first.

3          THE COURT:  Sounds like it to me.

4          MS. ARGUEDAS:  Since I'm going to be making the

5    motion.

6          THE COURT:  I think that's fine.  On Thursday before

7    the trial starts, if there are one or two salient issues you

8    want to raise, we'll do that.  I'm not soliciting a rerun of

9    everything we've already done two or three times.

10          MS. ARGUEDAS:  Understood.

11          MS. CHAN:  And we might just find out what are the --

12    if there's a preview of the witness list issues?  Are we

13    talking about one motion are we talking about three motions?

14          THE COURT:  I don't know.

15          MS. ARGUEDAS:  What time on Thursday, your Honor?

16          THE COURT:  11:00?

17          MS. ARGUEDAS:  Thank you.

18          MS. CHAN:  Is there going to be a briefing schedule,

19    your Honor, prior to that?

20          MS. ARGUEDAS:  I was suggesting that we would work it

21    out without the Court's involvement, but if you want to set

22    one, that's okay, too.

23          THE COURT:  You want to pick one now?

24          MS. CHAN:  I think that would be preferable, yes.

25          THE COURT:  Since today's already Tuesday.  Can you

```
1    file by this Friday whatever you want to file?

2              MS. ARGUEDAS:  Yes.

3              THE COURT:  And then by Tuesday, you file anything

4    you're going to file; and then we'll have a hearing on

5    Thursday.

6              MS. CHAN:  Yes, your Honor.

7              THE COURT:  Tracy, that would be 11 o'clock on

8    Thursday.  We'd need a court reporter.

9              DEPUTY CLERK:  Tuesday the 15th.

10             MS. CHAN:  No time for reply.

11             DEPUTY CLERK:  The opposition is when?

12             THE COURT:  The opposition is Tuesday.  Anything --

13   any moving papers would be this coming Friday, which I guess is

14   the 11th.

15             DEPUTY CLERK:  Then Tuesday the 15th.  And then a

16   hearing at 11:00 on the 17th.

17             THE COURT:  Right.

18             MS. ARGUEDAS:  Just on that point, I personally have

19   not received the actual voicemails that they've mentioned.

20   It's possible that Mr. Ruby had and I don't know it.  But if I

21   could just ask the government to make sure Mr. Ruby has them

22   and then he'll get them to me today so that I know which

23   voicemails they're talking about.  They were talking about 10,

24   and there's like 50 in total in the world.

25             MS. CHAN:  The transcripts, I think, are cached in the
```

```
1    exhibit list, in the exhibit binder.

2              THE COURT:  Okay.  Anything else?

3              MS. ARGUEDAS:  That's it.

4              THE COURT:  You will hear from me shortly, whatever

5    the plan turns out to be.  Thank you.

6              MS. CAROLAN:  Thank you very much, your Honor.

7              MS. ARGUEDAS:  Thank you.

8              MS. CHAN:  Thank you, your Honor.

9              THE COURT:  Oh, when are you going to get me the plain

10   vanilla Anderson statement that you've been describing?

11             MS. CHAN:  When would the Court like that?

12             MS. ARGUEDAS:  I think it's been agreed to, so...

13             MS. CHAN:  Tomorrow, maybe end of the day?

14             THE COURT:  Tomorrow's fine.

15             MS. CHAN:  Okay.

16             THE COURT:  Thank you.

17             MS. CHAN:  Thank you.

18             (Adjourned)

19                         CERTIFICATE OF REPORTER

20

21             I, Connie Kuhl, Official Reporter for the United
     States Court, Northern District of California, hereby certify
     that the foregoing proceedings were reported by me, a certified
22   shorthand reporter, and were thereafter transcribed under my
     direction into written form.

23

24             _____

25                    Connie Kuhl, RMR, CRR
                      Friday, March 11, 2011
```