1
2
3
4

# GERAGOS & GERAGOS
A PROFESSIONAL CORPORATION
LAWYERS
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90071-3480
TELEPHONE (213) 625-3900
FACSIMILE (213) 625-1600

5    MARK J. GERAGOS Bar No. 108325
     Attorneys for Witness
6    GREG FRANCIS ANDERSON

7

8    **UNITED STATES DISTRICT COURT**

9    **NORTHERN DISTRICT OF CALIFORNIA**

10   **SAN FRANCISCO DIVISION**

11

| 12 | UNITED STATES OF AMERICA, | ) | Case No.: CR 07-0732 SI |
| 13 | | ) | |
| 14 | Plaintiff, | ) | Trial Date:  March 21, 2011 |
|    | v. | ) | Time:         8:30 a.m. |
|    | | ) | Place:        Courtroom 10 |
| 15 | BARRY LAMAR BONDS, | ) | *Honorable Susan Ilston* |
| 16 | | ) | |
|    | Defendant. | ) | **MOTION TO DETERMINE THAT** |
| 17 | | ) | **FURTHER CUSTODIAL SANCTIONS** |
|    | | ) | **WOULD BE PUNITIVE RATHER** |
| 18 | In re Trial Subpoena of | ) | **THAN COERCIVE** |
| 19 | GREG FRANCIS ANDERSON. | ) | |
|    | | ) | Date:        March 22, 2011 |
| 20 | | ) | Time:        11:00 a.m. |
|    | | ) | Place:       Courtroom 10 |
| 21 | | ) | *Honorable Susan Ilston* |

22

23                    **INTRODUCTION**

24          With great respect to this Court, Greg Anderson presents himself in

25   accord with this Court's Order made on March 2, 2011.  In that proceeding,

26   through counsel, Mr. Anderson advised this Court he would not testify.  Mr.

27   Anderson's position remains the same.

28

1  The purpose of this pleading is to set forth the "just cause" which precludes
2  a finding of civil contempt.  In the alternative, Mr. Anderson submits that his past
3  and continuous refusal to cooperate with the Prosecution establishes that further
4  incarceration, under the guise of civil contempt, is punitive rather than coercive.  In
5  other words, in these circumstances, civil contempt has lost its power to coerce Mr.
6  Anderson, the witness/contemnor, to testify in this trial.
7  Mr. Anderson's past conduct demonstrates that imprisoning him again will
8  not compel him to testify in this case.

9  **STATEMENT OF CASE**

10  Mr. Anderson has never publicly discussed any matter in any way related to
11  BALCO.  The BALCO case became public in 2003.  For 7 years and 6 months,
12  Mr. Anderson has said nothing.

13  In the original criminal case *United States v. Anderson*, Case No. CR 04-
14  0440 SI, Mr. Anderson would not and did not "cooperate" (talk) with the
15  Prosecutors.  Mr. Anderson served 3 months in prison and 3 months home
16  confinement.  Thereafter Mr. Anderson has appeared in this Court under command
17  of various subpoenas.  Mr. Anderson has not spoken.  Mr. Anderson has been
18  taken into custody and imprisoned at the Dublin Federal Correctional facility on
19  three separate occasions by this Court under the authority of 28 U.S.C. § 1826.

20  Specifically, Mr. Anderson has been imprisoned and restrained as follows:

| Location | Time Period | Duration |
|----------|-------------|----------|
| Atwater Penitentiary | Dec. 1, 2005 to Feb. 28, 2006 | 3 months |
| Home Confinement | Apr. 2006 to June 2006 | 3 months |
| Dublin Federal Prison | July 5, 2006 to July 20, 2006 | 15 days |
| Dublin Federal Prison | Aug. 28, 2006 to Oct. 5, 2006 | 1 month, 7 days |
| Dublin Federal Prison | Nov. 20, 2006 to Nov. 15, 2007 | <u>11 months, 21 days</u> |
| | **Total Time:** | 18 months, 15 days |
| | | (1 year, 6 months, and 2 weeks) |

- 2 -

1      To date, Mr. Anderson has spent almost 1 year, 6 months and 2 weeks

2 imprisoned and restrained.

3

4               **ARGUMENT**

5 **I.**    **MR. ANDERSON HAS "JUST CAUSE" BECAUSE THE SUBPOENA VIOLATES THE PLEA AGREEMENT IN *UNITED STATES V. GREG***

6     *ANDERSON.*

7      Civil Contempt proceedings are governed by 28 U.S.C. § 1826.  28 U.S.C. §

8 1826 provides:

9           Whenever a witness in any proceeding before or ancillary
10        to any court or grand jury of the United States refuses
*without just cause shown* to comply with an order of the
11        court to testify or provide other information, including any
book, paper, document, record, recording or other material,
12        the court, upon such refusal, or when such refusal is duly
brought to its attention, may summarily order his
13        confinement at a suitable place until such time as the
witness is willing to give such testimony or provide such
14        information. No period of confinement shall exceed the life
of –
15        (1)   the court proceeding, or
(2)   the term of the grand jury, including extensions,
16           before which such refusal to comply with the court
order occurred, but in no event shall the confinement
17           exceed eighteen months.

   28 U.S.C. § 1826 (emphasis added).
18

19      The Government's violation of the plea agreement in *United States v.*

20 *Anderson*, Case No. CR 04-0440 SI provides witness of Anderson's just cause.

21 This Court accepted Mr. Anderson's plea in that case on July 15, 2005.  Thereafter

22 on October 18, 2005, this Court sentenced Mr. Anderson to serve 3 months in

23 prison and 3 months home confinement.  The Presentence Report made clear that

 Mr. Anderson would not "cooperate" with the Prosecution.
24

25      In the BALCO case, the very prosecutors who now prosecute Mr. Bonds

26 proffered various plea agreements to Mr. Anderson's then attorney, J. Tony Serra.

 The various plea agreements asked that Mr. Anderson identify various athletes by
27

28 name.  Mr. Serra told these very prosecutors that Mr. Anderson would not identify

 anyone, ever.

1   Thereafter the Government relented.  The Government changed the plea
2   agreement and deleted identification of any individuals.  Further the Government
3   conveyed to Mr. Serra that Mr. Anderson's acceptance of the revised plea
4   agreement would conclude his involvement in the BALCO prosecution.
5   Mr. Anderson relied on the Government's representations to his attorney.
6   Mr. Anderson "accepted" a plea deal based upon his belief that in so doing, his
7   involvement in the BALCO case ended.
8   Mr. Anderson's reliance on the Government's representations, to his then
9   attorney, was foreseeable.  Mr. Anderson's belief that his plea deal ended his
10  involvement was also reasonable.
11  The Government specifically misrepresented to Mr. Anderson what they
12  intended to do.  That is not right.  The Government's misleading and disingenuous
13  actions towards Mr. Anderson provides him with "just cause".
14  The United States Supreme Court has ruled on the way in which a plea
15  bargain, specifically prosecutorial violation of a plea bargain, should be dealt with.
16  In *Santobello v. New York,* 404 U.S. 257 (1971), the Court examined a case in
17  which a defendant negotiated with prosecutors to plead guilty to a lesser included
18  offense, in exchange for the prosecutor's agreement to make no recommendation
19  as to the sentence to be imposed.  The plea was accepted by the court, but at trial, a
20  new prosecuting attorney appeared and recommended the maximum sentence.  The
21  Supreme Court first noted the value inherent in the plea bargain process, before
    stating,

> This phase of the process of criminal justice, and the
> adjudicative element inherent in accepting a plea of guilty,
> must be attended by safeguards to insure the defendant
> what is reasonably due in the circumstances.  The
> circumstances will vary, but a constant factor is that when
> a plea rests in any significant degree on a promise or
> agreement of the prosecutor, so that it can be said to be part
> of the inducement or consideration, such promise must be
> fulfilled.

27  *Id.* at 262.  *Santobello* was remanded for reconsideration in light of the agreement.
28  In the instant case, Mr. Anderson entered into the plea agreement for the sole

reason that he believed it would be the end of it all for him.  Mr. Anderson knew at the time that he entered his plea that he would most probably be sentenced to prison.  And in fact, Mr. Anderson was sentenced to prison.  Mr. Anderson served 3 months in Atwater Penitentiary and 3 months home confinement.  Mr. Anderson also knew when he entered the plea that he would not at any time have to identify athletes.  He gave the Government their pleas and served his time with the expectation that at no time would the Government ever again ask him about specific athletes.

The United States Attorney's Office knows this.  Anderson's motivation is evidenced by the plea agreements drafted by the prosecution that he rejected.  The Prosecutors cannot now claim otherwise.

Anderson also received such a guarantee from his defense counsel, J. Tony Serra.  Mr. Serra made clear to the Government that Anderson would never cooperate with the Government at any time.  It was when the Government relented on the identification of athletes that Anderson agreed to enter the plea bargain.  The surrounding circumstances demonstrate that Mr. Anderson was solely concerned with putting an end to his involvement in the situations and he reasonably believed and understood that this was the case when he accepted the plea agreement.  The defendant's understanding at the time of the plea controls.  *United States v. Anderson*, 970 F. 2d 602, 607 (9th Cir. 1992).

The Court of Appeals for the Ninth Circuit has confronted a remarkably similar case in *United States v. Singleton,* 1995 U.S. App. LEXIS 3302 (9th Cir. 1995).  In keeping with the guidelines of *Santobello*, the Court found that the agreement provided just cause and precluded the Government from compelling the testimony of the witness.  *Singleton* is a Rule 36-3 case.  A copy of the case is attached hereto.  The case is relevant because it bears a striking resemblance to the instant case.  In *Singleton,* just as in the instant case, the defendant refused to testify before a grand jury because of the plea agreement he had previously entered into with the United States Attorney's Office.

1   The defendant in *Singleton* said that the plea agreement and evidence in the

2   form of preliminary negotiations and offers rejected by the defendant demonstrated

3   his motivation that his plea was predicated on the fact that he not be required to

4   cooperate in any form.  The *Singleton* court found that, "If the Government were

5   allowed to issue the grand jury subpoena to Singleton and hold him in contempt for

6   refusing to testify, [he] would not get the full benefit of the bargain." *Id.* at 11.

7   The import of *Singleton* is not the holding per se, but the fact that the Northern

8   District United States Attorney's Office was put on notice that what they did to

9   Singleton was not acceptable.

10   The *Singleton* Court wrote:

11   > The Government warns that acceptance of the district
   > court's holding would result in a per se prohibition against
12   > issuing grand jury subpoenas to any defendant who
   > declines to voluntarily cooperate with a federal criminal
13   > investigation.  Such a prohibition can be avoided if the
   > Government clearly discloses at the outset of plea
14   > negotiations that refusal to cooperate with the Government
   > does not guarantee immunity from grand jury subpoenas.
15   > Furthermore, the Government should disclose that if the
   > defendant refuses to answer a grand jury subpoena, he may
16   > be found in contempt and may have to serve a longer
   > sentence than bargained for in the plea agreement.  Such
17   > clarification will assist the defendant in making a more
   > accurate decision and can lead to a stable plea agreement
   > that reflects the understanding of both parties.
18
19   *Id.* at 11.

20   The United States Government is an institutional litigant.  The United States

21   Government and this United States Attorney's Office is on notice that what they

22   did to Anderson herein is an unacceptable practice.  As the drafter of the

23   agreement, in light of their prior experience in the *Singleton* case, they cannot now

24   complain.  As stated in *United States v. Garcia,* 956 F.2d 41, 44 (4th Cir. 1992),

25   "courts ought not rigidly apply commercial contract law to all disputes concerning

26   plea agreements."  The Government made a representation to Anderson.  If the

27   Government should now claim otherwise or attempt to interpose commercial

28   contract law or some twisted theory to justify their outrageous behavior Anderson

is denied a benefit that was an important basis – the most important basis – for his

decision to accept the plea agreement.

The Government was and is on notice per the discussion within *Singleton* that they cannot extract a plea agreement in which the defendant believes that he cannot be compelled to cooperate and thereafter subpoena him to testify in a case. The terms of Anderson's plea agreement, as supplemented by parol evidence restricts the Government from compelling Anderson's testimony. Therefore, Anderson cannot be held in contempt for his refusal to comply with the subpoena.

Having pled guilty to two felonies, having served 3 months in Atwater Federal Penitentiary and thereafter having served 3 months home confinement, having registered as a drug offender, having provided his DNA sample, and having been subjected to endless public ridicule, Mr. Anderson simply asks that the Government be held to their end of the bargain. Anderson did all that and then some to end his involvement in BALCO. The foregoing constitutes just cause. Under these circumstances Mr. Anderson is not a contemnor.

## II.  FURTHER IMPRISONMENT WILL NOT COMPEL MR. ANDERSON TO TESTIFY.

As noted above, Mr. Anderson has been restrained and imprisoned for more than 18 months. To justify imprisonment of a civil contemnor it must be shown that incarceration will serve a coercive purpose. Based on past events, history establishes that jailing Greg Anderson will not compel him to testify.

A civil contemnor may not be jailed for longer than 18 months. 28 U.S.C. § 1826. 28 U.S.C. § 1826 is Congress's legislative acceptance of the restraint imposed by the United States Supreme Court in *Shillitani v. United States*, 384 U.S. 364 (1966), limiting the power of federal judges to jail recalcitrant witnesses.

Although the longest period of time a civil contemnor can be jailed by law is 18 months, Section 1826 does not require a judge to imprison a recalcitrant witness for 18 months. A judge may summarily imprison a recalcitrant witness until the witness testifies or for the life of the court proceedings, but in no event

- 7 -

1   longer than "eighteen months". 28 U.S.C. § 1826; *Shillitani, supra*, 384 U.S. at
2   364.

3       A civil contempt sanction is a coercive device imposed to secure compliance
4   with a court order. *Shillitani, supra*, 384 U.S. at 368. "At the least, due process
5   requires that the nature and the duration of commitment bear some reasonable
6   relation to the purpose for which the individual is committed." *Jackson v. Indiana*,
7   406 U.S. 715, 738 (1972). When it becomes obvious that civil contempt sanctions
8   are not going to compel compliance, they lose their remedial characteristics.
9   *Soobzokov v. CBS*, 642 F.2d 28 (2d Cir. 1981). When civil confinement has lost its
10  coercive effect and "consequently no longer bears a reasonable relationship to the
11  purpose for which the contemnor was committed, due process requires that he be
12  released." *In re Grand Jury Investigation*, 600 F.2d 420, 424-25 (3d Cir. 1979).

13      Section 1826 was partly enacted to ensure that civil contempt power is not
14  abused by administering it to punish an "intractable witness beyond that point
15  where it becomes evident that his testimony cannot be coerced through further
16  confinement." *Id.* at 427. "Since criminal penalties may not be imposed in civil
17  contempt proceedings, the contemnor must be released when the incarceration has
18  lost its coercive force." *Matter of Fed. Grand Jury February 1987 Term (Griffin)*,
19  677 F.Supp. 26, 28 (D. Me. 1988). The purpose of incarcerating a civil contemnor
20  is to compel them to do something. The purpose is coercive. But if the person will
21  not be coerced then the civil contempt should be ended. *Shillitani, supra*, 384 U.S.
    at 371.

22      The court's inquiry as to whether civil contempt has lost its coercive impact
23  must be conducted on an individualized basis "rather than application of a policy
24  that the maximum eighteen month term must be served by all recalcitrant
25  witnesses." *Griffin, supra*, 677 F.Supp. at 28. It is a judge's obligation not to jail a
26  civil contemnor when it becomes clear that the incarceration is no longer coercive.
27  *Simkin v. United States*, 715 F.2d 34, 37 (2d Cir. 1983). It is obvious in the present
28  case that civil contempt has lost its coercive purpose and has instead evolved into a

1   punitive device. *Griffin, supra*, 677 F.Supp. at 28. Mr. Anderson has had 7 years

2   and 6 months to talk and he has steadfastly refused.

3        The reason why a recalcitrant witness is recalcitrant is not the determinative

4   factor in deciding whether imprisonment would be punitive rather than coercive.

5   The focus of the inquiry is whether there  is a realistic possibility that

6   imprisonment might cause the contemnor to testify. *Id*. The burden lies on the

7   witness to demonstrate that there is no "realistic possibility" that continued

8   confinement may cause the witness to testify. *Griffin, supra,* 677 F.Supp. at 28.

9   "[As long as] the judge is persuaded, after a conscientious consideration of the

10  circumstances pertinent to the individual contemnor, that the contempt power has

11  ceased to have a coercive effect, the civil contempt remedy should be ended."

12  *Simkin, supra*, 715 F.2d at 37.

13       Mr. Anderson has more than met this burden by his conduct. Mr. Anderson

14  has already been willing to miss events that are sacred to many and that would

15  have a compelling effect on most. Through it all, Mr. Anderson has remained

16  dedicated to his principles and maintains his silence. The proceedings against Mr.

17  Bonds are expected to last approximately 2 weeks. There are no changed

18  circumstances to indicate that the threat of 2 weeks of civil contempt will actually

19  have any coercive effect which would compel Mr. Anderson to testify. Rather, 2

20  weeks of incarceration will be a walk in the park for Mr. Anderson compared to the

21  over 18 months he has served thus far. Common sense should prevail here. Mr.

    Anderson should not be imprisoned for the Bonds trial.

22       Furthermore, Jack Trimarco, a retired Federal Bureau of Investigations

23  ("FBI") profiler and an expert in the areas of Polygraph Examination, Hostage

24  Negotiation, Psychological Profiling, and Interrogation has opined that based on

25  his training and experience, Mr. Anderson will not testify in any proceeding related

26  to the BALCO prosecution and that incarceration of Mr. Anderson would prove to

27  be a futile measure, as further jail time would not have any coercive effect on his

28  decision to testify. *See* Declaration of Jack Trimarco, ¶ 12.

1    To imprison Mr. Anderson knowing that incarceration will not realistically
2 compel him to testify would be a punitive act prohibited by Section 1826.
3 Imprisonment, without regard to its coercive effect, or lack thereof, upon Mr.
4 Anderson, will improperly convert the civil remedy into a criminal penalty.
5 *Simkin, supra,* 715 F.2d at 38.

6                                    **CONCLUSION**

7    The law allows for imprisonment of a recalcitrant witness only if
8 imprisonment is coercive.  After years of having the threat of incarceration
9 hovering over him, as well as serving over 18 months in prison and home
10 confinement (most of the time as a recalcitrant witness), Mr. Anderson has not
11 talked.  Mr. Anderson should not be jailed again.  Mr. Anderson will not talk.  That
12 fact is the one truth of this entire debacle.

13
14 Dated: March 22, 2011                    Respectfully submitted,
15                                          GERAGOS & GERAGOS, APC
16
17                                          _____/s/ Mark J. Geragos_____
18                                          MARK J. GERAGOS
                                            Attorneys for Witness
19                                          Greg Francis Anderson
20
21
22
23
24
25
26
27
28

 **LexisNexis·**

LEXSEE 1995 U.S. APP. LEXIS 3302

UNITED STATES of AMERICA, Plaintiff-Appellant, v. HENRY E. SINGLETON, Defendant-Appellee.

No. 94-10474

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*1995 U.S. App. LEXIS 3302*

January 12, 1995, Argued and Submitted, San Francisco, California
February 16, 1995, FILED

**NOTICE:** [*1] THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION AND MAY NOT BE CITED TO OR BY THE COURTS OF THIS CIRCUIT EXCEPT AS PROVIDED BY THE 9TH CIR. R. 36-3.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *47 F.3d 1177, 1995 U.S. App. LEXIS 19401.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of California. D.C. No. CR-91-00537-FMS. Fern M. Smith, District Judge, Presiding.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For UNITED STATES OF AMERICA, Plaintiff - Appellant: William P. Schaefer, AUSA, USSF - OFFICE OF THE U.S. ATTORNEY, San Francisco, CA.

For HENRY E. SINGLETON, Defendant - Appellee: David A. Nickerson, Esq., Sausalito, CA.

**JUDGES:** Before ALDISERT, ** CHOY and SCHROEDER, Circuit Judges.

   ** The Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

**OPINION**

   **MEMORANDUM ·**

   * This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by *Ninth Circuit Rule 36-3.*

   The United States of America ("Government") appeals the district court's denial of the Government's motion, pursuant to *28 U.S.C. § 1826,* for an order of civil contempt directed at Henry E. Singleton ("Singleton") for his refusal to comply with a grand jury subpoena. Having jurisdiction under *28 U.S.C. § 1291,* [*2] we affirm the district court's decision.

   **I**

On January 28, 1992, Singleton was indicted for various drug offenses including conspiracy to distribute heroin. During pretrial proceedings, Singleton, represented by Tony Serra, Esq., refused to consider any plea offer that included a *United States Sentencing Guidelines § 5K1.1* provision contemplating Singleton's assistance to the Government. The Government offered various plea agreements, including one with a fifteen-year minimum period of incarceration but without a *§ 5K1.1* provision. Singleton rejected all Government offers, and the case proceeded to trial. All Government plea offers became void at that time.

On September 14, 1992, jury selection commenced. On the same day, the Government filed an Allegation of Prior Conviction, informing Singleton that he would face enhanced penalties of a minimum mandatory of twenty-five years if convicted. The Government contends that three days later, Singleton reinitiated negotiations for a plea agreement. Singleton counters, however, that the Government reinitiated plea negotiations by dropping its demand that any plea agreement include cooperation.

The second set of plea negotiations took [*3] place in the district court's chambers, where the presiding judge had an opportunity to listen to the discussion between the prosecutor and Mr. Serra. On the basis of that conversation, the district court found that Singleton had a firm position that he was not going to cooperate with the Government in any manner.

The negotiations resulted in a written plea agreement executed on September 17, 1992. In exchange for a plea of guilty, Singleton received certain concessions from the Government, including mandatory minimums, Sentencing Guideline calculation stipulations, dismissal of remaining counts of the indictment, and the return of Singleton's residence to his family. The plea agreement does not contain any provision regarding cooperation, and paragraph 19 of the plea agreement provides:

> This agreement constitutes all the terms of the plea bargain between the government and the defendant, and the government has made no other representations to the defendant or his attorney.

Singleton contends that the plea agreement does not explicitly mention cooperation because everyone understood that he had always refused any hint of cooperation. The district court found that the plea agreement [*4] itself contained no ambiguities whatsoever but identified the comments made by the two attorneys during plea negotiations as one source of confusion outside the plea agreement. On March 24, 1993, Singleton was sentenced to fifteen years of incarceration, and the Government returned his residence to his family.

On September 9, 1993, the Government issued a grand jury subpoena to Singleton. On September 20, 1993, Singleton moved to quash the subpoena on the ground that it violated the terms of the plea agreement, and the Government filed its opposition on October 1. On October 6, 1993, the district court conducted a hearing but did not make a decision at that time.

On November 19, 1993, after both Singleton and the Government filed supplemental letter briefs, the district court denied Singleton's motion to quash. Although Singleton's motion for reconsideration was denied on December 8, 1993, the district court signaled its agreement with Singleton's argument that the plea agreement precluded the Government from seeking grand jury testimony on matters arising out of the indictments. Subsequently, Singleton was called before the grand jury on January 11, 1994, where he refused to answer [*5] any of the Government's questions.

On July 28, 1994, the Government requested the district court to issue an order to show cause why Singleton should not be held in contempt, and Singleton filed his opposition on September 16, 1994. On September 23, 1994, the district court held oral arguments. The district court acknowledged that the plea agreement was clear on its face regarding cooperation but nevertheless concluded that Singleton believed that he would not be called before the grand jury. On September 27, 1994, the district court entered an order denying the Government's motion for contempt. The Government timely appeals.

## II

The Government contends that the district court erred in denying its motion for an order of civil contempt because the plea agreement between the Government and Singleton does not prohibit the enforcement of a federal grand jury subpoena.

We review the district court's finding of fact regarding the terms of the plea agreement under a clearly erroneous standard. *United States v. Helmandollar, 852 F.2d 498, 501 (9th Cir. 1988)*. This court "must affirm the trial court's determinations unless [this court is] left with the definite [*6] and firm conviction that a mistake has been committed." *Id. at 501* (quoting *United States v. McConney, 728 F.2d 1195, 1200* (9th Cir.), *cert. denied, 469 U.S. 824, 83 L. Ed. 2d 46, 105 S. Ct. 101 (1984)* (quotations omitted)). The district court was required to determine "what the defendant reasonably understood to be the terms of the agreement when he pleaded guilty." *United States v. De La Fuente, 8 F.3d 1333, 1337 (9th Cir. 1993)*. The defendant's understanding at the time of the plea controls. *United States v. Anderson, 970 F.2d 602, 607 (9th Cir. 1992), amended, reh'g denied, 990 F.2d 1163 (9th Cir. 1993)*. A claim that the Government breached the terms of the plea agreement, which is a question of law, is subject to de novo review.

*United States v. Fisch, 863 F.2d 690, 690 (9th Cir. 1988)*.

The plea agreement between Singleton and the Government is clear on its face and does not contain any provision indicating that the Government agreed [*7] to forego its grand jury subpoena power or that Singleton reserved some affirmative right to refuse to cooperate. Parol evidence exists, however, to suggest that Singleton agreed to the plea agreement only because he believed that the plea agreement included an affirmative right to refuse to cooperate with the Government. The Fourth Circuit, in *United States v. Garcia, 956 F.2d 41 (4th Cir. 1992)*, barred the Government from compelling testimony on the basis of parol evidence even though the plea agreement was unambiguous on its face.

In *Garcia,* the Government sent a letter to the defendant's counsel memorializing an oral agreement. The letter stated that, "In return for this guilty plea to Count One of the Indictment, the Government will (a) not require as part of the plea agreement that the defendant cooperate with law enforcement, . . . ." *Id. at 42*. Although the plea agreement did not contain any provision stating that the defendant was not required to cooperate, the Fourth Circuit admitted the parol evidence and found that the Government could not compel testimony.

In this case, parol evidence comes not from a letter [*8] written by the Government, but from the district court's own observation of the plea negotiations. The district court made a finding of fact as to Singleton's objective belief regarding the terms of the plea agreement. On the basis of its own observations of the discussion between Mr. Serra and the prosecutor during plea negotiations, the district court concluded that Singleton's agreement to plead guilty was influenced by his understanding that he would not be required to cooperate with the Government. The district court recognized that Singleton had a firm position on his refusal to cooperate.

The district court could not remember specific statements which led to this impression, but stated that after observing the negotiations, it had a firm impression that Singleton was not going to cooperate with the Government. While such impressions are difficult to evaluate for clear error, difficulty of review does not mandate the conclusion that the impression was clearly erroneous. Furthermore, in this case, outside factors support the district court's impression that Singleton could have reasonably believed the terms of his plea agreement to include immunity from grand jury subpoenas.

[*9] Given the fact that the § 5K1.1 provision was included in previous discussions where various cooperation agreements were contemplated, it is not unreasonable for Singleton to have believed that an absence of a § 5K1.1 provision indicated that he would not be required to cooperate with the Government. The Government erroneously asserts that previous plea discussions should be entirely ignored when interpreting the plea agreement that was finally signed. While it is true that previous plea offers were no longer available, prior discussions had an obvious effect on Singleton's understanding of the terms of the signed plea agreement.

Singleton has testified that he understood cooperation to include revealing and testifying against coparticipants in his offenses. Singleton's understanding of "cooperation" to include compelled testimony is plausible as the *Garcia* court found. The Fourth Circuit in *Garcia* rejected the argument that "cooperation" means only voluntary cooperation and not compelled testimony and found that the term "cooperate" is ambiguous in the context of a plea agreement:

> In short, there is no general rule that, as a matter of law, "cooperate" in a plea agreement [*10] means only "voluntary" cooperation. The government knows the

word "voluntary," and could have avoided any ambiguity by using it .
. . .

*Garcia, 956 F.2d at 45.*

The Government tries to distinguish *Garcia* by emphasizing Garcia's lack of English fluency. The structure of the *Garcia* opinion, however, indicates that the Fourth Circuit first concluded that the term "cooperate" in a plea agreement does not necessarily mean only "voluntary" cooperation. The court then used the defendant's lack of English fluency as an additional support for its conclusion.

Singleton's belief regarding cooperation was further buttressed by the fact that he pled guilty in exchange for a fifteen-year sentence. In earlier plea negotiations, he was informed that he would not be allowed less than a fifteen-year sentence without an agreement to cooperate. The district court's finding of fact that Singleton reasonably understood one of the terms of the plea agreement to be that he would not have to cooperate, voluntarily or involuntarily, with the Government is not clearly erroneous.

The Government warns that acceptance of the district court's holding would result in a *per* [*11] *se* prohibition against issuing grand jury subpoenas to any defendant who declines to voluntarily cooperate with a federal criminal investigation. Such a prohibition can be avoided if the Government clearly discloses at the outset of plea negotiations that refusal to cooperate with the Government does not guarantee immunity from grand jury subpoenas. Furthermore, the Government should disclose that if the defendant refuses to answer a grand jury subpoena, he may be found in contempt and may have to serve a longer sentence than bargained for in the plea agreement. Such clarification will assist the defendant in making a

more accurate decision and can lead to a stable plea agreement that reflects the understanding of both parties.

If the Government were allowed to issue the grand jury subpoena to Singleton and hold him in contempt for refusing to testify, Singleton would not get the full benefit of the bargain. There is no question that Singleton received a favorable plea agreement and that his is not a case where the Government is offering nothing in exchange for something. However, if Singleton were compelled to testify, he would be denied a benefit that was an important basis for [*12]  his decision to accept the plea agreement and without which he may have gone to trial.

**III**

We find that the terms of Singleton's plea agreement, as supplemented by parol evidence, restrict the Government from compelling Singleton's testimony. Therefore, Singleton cannot be held in contempt for his refusal to comply with the grand jury subpoena. We **AFFIRM** the district court's order denying the Government's motion for an order of civil contempt against Singleton.

**AFFIRMED.**

1

# GERAGOS & GERAGOS

A PROFESSIONAL CORPORATION
LAWYERS
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90071-3480
TELEPHONE (213) 625-3900
FACSIMILE (213) 625-1600

MARK J. GERAGOS Bar No. 108325
Attorneys for Witness
GREG FRANCIS ANDERSON

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR 07-0732 SI |
| Plaintiff, | Trial Date:  March 21, 2011<br>Time:           8:30 a.m.<br>Place:          Courtroom 10<br>*Honorable Susan Ilston* |
| v. | |
| BARRY LAMAR BONDS, | |
| Defendant. | **DECLARATION OF JACK TRIMARCO IN SUPPORT OF GREG ANDERSON'S MOTION TO DETERMINE THAT FURTHER CUSTODIAL SANCTIONS WOULD BE PUNITIVE RATHER THAN COERCIVE** |
| In re Trial Subpoena of | |
| GREG FRANCIS ANDERSON. | Date:       March 22, 2011<br>Time:       11:00 a.m.<br>Place:      Courtroom 10<br>*Honorable Susan Ilston* |

### DECLARATION OF JACK TRIMARCO

I, Jack Trimarco, hereby declare and state:

1.    I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify to such matters.

2.    I submit this expert declaration in support of Greg Anderson's Motion to Determine that Further Custodial Sanctions Would Be Punitive Rather than Coercive.

3.    I have had almost 21 years of service with the Federal Bureau of Investigation ("FBI"). Specifically, I was the Program Director for the Los Angeles branch of the FBI Polygraph Unit for 8 years, an FBI profiler for over 7 years, and served  as the Los Angeles FBI Office Polygraph Unit Chief before my retirement.

4.    Post-retirement, I became the U.S. Department of Energy Polygraph Program's Inspector General.

5.    I am a Board Certified Forensic Examiner and member of the Ethics Committee for the California Association of Polygraph Examiners.

6.    I serve as a member of several nationally acclaimed Polygraph and Forensic Examiner Associations and was recently recognized for outstanding leadership and dedicated leadership by the American Association of Police Polygraphists.

7.    I am also a licensed Private Investigator.

8.    I have conducted training as an expert in the areas of Polygraph Examination, Hostage Negotiation, Psychological Profiling, and Interrogation for numerous state and federal government law enforcement agencies.

9.    I have consulted, conducted polygraph examinations, and testified as an expert witness in numerous high profile FBI investigations involving terrorists, espionage, and fraud.

10.    I have conducted polygraph examinations in top-secret security

- 2 -

matters on behalf of the U.S. Department of Justice in the United States and abroad.  I have also worked with various Sheriff's Departments throughout California.

11.     Attached hereto is a true and correct copy of my curriculum vitae.

12.     Based on my experience with witness interrogation and interviews of thousands of witnesses, combined with my experience as an FBI profiler, it is my opinion that Greg Anderson will not testify in any proceeding related to the BALCO prosecution.  Furthermore, it is my opinion that incarcerating Mr. Anderson has already shown to be a futile gesture as Mr. Anderson has adapted to his incarceration on multiple prior occasions.  In fact, it would seem to be axiomatic that putting Mr. Anderson back in custody would have no coercive effect whatsoever on his will to testify.  Based on the thousands of interviews and polygraph examinations I have conducted and my experience as a profiler, it is readily apparent to me that the threat of more jail time has no effect on Mr. Anderson's decision.  In my experience the best determinate of a person's future behavior is that person's past behavior.

I declare under penalty of perjury according to the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on this twenty-first day of March, 2011, at Beverly Hills, California.

_____/s/ Jack Trimarco_____
JACK TRIMARCO

03/21/2011 16:50 FAX @001

*When you need to impress someone with the truth...*

# JACK TRIMARCO
## & ASSOCIATES
## POLYGRAPH / INVESTIGATIONS, INC.

9454 Wilshire Blvd., 6th Floor
Beverly Hills, CA 90212
**(310) 247-2637**
email: jtrimarco@aol.com
www.jacktrimarco.com

CA P.I. # 20970

Edward I. Gelb, Ph.D.
Los Angeles, California

Ronald W. Hilley
San Francisco, California

Ronald R. Homer
San Francisco, California

Richard W. Kelfer
Orlando, Florida

William K. Teigen
Dallas, Texas

Kenneth A. Vardell
Boulder, Colorado

Jack Trimarco was the Program Manager for the Federal Bureau of Investigation Polygraph Unit at the Los Angeles Field Office from 1990 until his retirement in 1998 as a Special Agent, after almost 21 years of service. He is the former Inspector General for the U.S. Department of Energy Polygraph Program and is currently a member of the Ethics Committee, California Association of Polygraph Examiners (C.A.P.E.). Mr. Trimarco is nationally recognized for his success as a polygraph examiner. Following his training with the Department of Defense and the F.B.I., he has conducted more than 3,000 polygraph examinations throughout the world.

Among cases in which he consulted, or actually conducted polygraph examinations for the F.B.I., were the Oklahoma City Bombing; the "Unabomber"; Campaign Contributions to the Democratic National Committee; the Dr. Peter Lee Espionage Case; the Marquisha Candler Kidnap/Murder; the Rosemary Banuelos Kidnap/Murder; the Assassination of D.E.A. Agent Enrique Camarena in Mexico; "Whitewater"; the Dr. Wen Ho Lee Espionage Case; J.D.L. Odeh Bombing Death; the World Trade Center Bombing (1993); numerous cases involving classified foreign terrorists and espionage; "Fed buster"; Princess Cruises Extortion; Gerald Gallegos Serial Killer; Bank of America, Davis, California, hostage standoff; V.A. Hospital, Brentwood, California, hostage standoff; Top 10 Fugitive, Claude Dallas; Top 10 Fugitive, Daniel Barney; Charles Keating Fraud Investigation; Bombing of Pan Am Flight 103; L.A.P.D. Rampart Scandal.

During his F.B.I. career, Jack Trimarco also specialized as a Psychological Profiler working with noted author and former head of the F.B.I.'s Behavioral Science Unit, John Douglas. The assistance offered included unknown offender profiles, threat assessments, overall crime analysis, trial strategies, and expert testimony. Jack Trimarco is recognized as an expert in the fields of Polygraphy, Interviewing and Interrogation. He has taught more than 70 seminars on these topics throughout the United States and has conducted training for the F.B.I. Academy, C.I.A., U.S. Attorney's Offices, U.S. Department of Justice, I.N.S., American Polygraph Association (A.P.A.), California Association of Polygraph Examiners (C.A.P.E.), American Association of Police Polygraphists (A.A.P.P.), the Department of Defense Polygraph Institute (D.O.D.P.I.), and many other state and federal governmental law enforcement agencies.

| | |
|---|---|
| **RECENT AWARDS** | Jack received the prestigious 2010 Holly Canty Memorial Award from the American Association of Police Polygraphists (A.A.P.P.) for outstanding leadership and dedicated service to the A.A.P.P. and the polygraph profession. The vote by the Board of Directors was unanimous. |
| **MAJOR CASE INVOLVEMENT** | Dr. Wen Ho Lee Espionage Case; The "Unabomber"; "Whitewater"; Oklahoma City Bombing; World Trade Center Bombing (1993); numerous cases involving classified foreign terrorists and espionage. "Fed buster"; Princess Cruises Extortion; Gerald Gallegos Serial Killer; Bank of America, Davis, CA hostage standoff; V.A. Hospital, Brentwood, CA hostage standoff; Enrique Camarena assassination; Top 10 fugitive, Claude Dallas; Top 10 Fugitive, Daniel Barney; Charles Keating Fraud Investigation; Bombing of Pan Am Flight 103; Dr. Peter Lee Espionage Case; L.A.P.D. Rampart Scandal. |
| **POLYGRAPH EXPERIENCE** | Former Inspector General, Department of Energy Polygraph Program, 2000-2002; Polygraph Unit Chief, F.B.I. Los Angeles Field Office 1990-1998. Conducted more than 1,100 polygraph examinations in connection with F.B.I. investigations. Selected by the U.S. Department of Justice and the F.B.I. to conduct polygraph examinations in sensitive intelligence matters and criminal investigations throughout the U.S. and abroad. Formerly held top-secret security clearance. Established private practice in 1998. Conducted more than 70 seminars/ presentations on interviewing/interrogation and polygraph related matters throughout the United States. Conducted training at the F.B.I. Academy, C.I.A., and U.S. Department of Justice. |
| **POLYGRAPH TESTIMONY AS AN EXPERT WITNESS** | California vs. Renee Lloyd (1993) Superior Court, San Bernardino County; U.S. vs. Noe Orozo Viveros (1994) U.S. District Court, Central District of California; U.S. vs. Samson Gillette (1999), U.S. District Court, Central District of California; California vs. Catarino Gonzales (2001) Superior Court, Los Angeles County; California vs. Gary Bearman (2003) Superior Court, Orange County. |
| **PROFESSIONAL MEMBERSHIPS** | Member of the Ethics Committee, California Association of Polygraph Examiners (C.A.P.E.); Board Certified Forensic Examiner, American Board of Forensic Examiners; American Polygraph Association (A.P.A.); Advanced and Specialized Polygraph Examiner, American Association of Police Polygraphists; Diplomat, American Academy of Forensic Sciences; Lifetime Member, American College of Forensic Examiners; National Association of Legal Investigators (N.A.L.I.); Society of Former Special Agents of the Federal Bureau of Investigation; California Association of Licensed Investigators (C.A.L.I.); Ventura County Bar Association; Los Angeles County Bar Association; San Fernando Valley Bar Association; and Criminal Courts Bar Association (sustaining member). |

**EDUCATION**

Montana State University at Billings, B.S., Psychology, 1976, High Honors; Montana State University at Billings Graduate School, Psychology (1977); Jacksonville University, Jacksonville, Alabama, attended Graduate School, Psychophysiology, 1990 (no graduate degrees).

**EMPLOYMENT**

United States Air Force (USAF), 1967-71; USAF "Airman of the Year"–Italy, 1968; Yellowstone County Sheriff, Billings, Montana, Patrolman 1971-1973 and Detective 1973-78; Federal Bureau of Investigation, Special Agent, 1978-1998. Received numerous commendations for exceptional performance. Nominated twice for F.B.I. Medal of Valor; F.B.I. Polygraph Unit Chief (Los Angeles-Retired); Former Inspector General, Polygraph Program, U.S. Department of Energy-Office of Counterintelligence (2000-2002); Ventura County District Attorney's Office (Forensic Polygraph Examiner) (2000-present); Certified Polygraph Examiner (A.P.A.); California State Private Investigator #20970; ongoing polygraph activities: Ventura County Public Defender's Office; Ventura County Sheriff's Department; Orange County Public Defender's Office; Federal Public Defender's Office (Central District of California); Oxnard Police Department.

**AREA OF EXPERTISE**

F.B.I. Polygraph Examiner; F.B.I. Hostage Negotiator; F.B.I. Psychological Profiler; F.B.I. Defensive Tactics/Firearms Instructor; F.B.I. S.W.A.T. Team Member; F.B.I. Interrogation Instructor and Homicide Investigation Instructor.

**POLYGRAPH TRAINING**

Department of Defense Polygraph Institute, 14-week polygraph course. Attended 56 polygraph training seminars conducted by the F.B.I. or professional polygraph organizations within the United States. Instructed at numerous federal, state and local agencies, national and state polygraph associations, private and professional groups.

**MEDIA EXPERT APPEARANCES**

Over one-hundred appearances on national television programs, including: Dr. Phil, Oprah, Greta Van Susteren, Nancy Grace, The O'Reilly Factor, Hannity & Colmes, Catherine Crier, Good Morning America with Diane Sawyer, Fox News, Jane Vellez-Mitchell.