MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Deputy Chief, Criminal Division

MERRY JEAN CHAN (CABN 229254)
MATTHEW A. PARRELLA  (NYSBN 2040855)
JEFFREY D. NEDROW (CABN 161299)
Assistant United States Attorneys

450 Golden Gate Ave., Box 36055
San Francisco, CA 94102
Telephone: (415) 436-7200
Facsimile:  (415) 436-7234
Email: merry.chan@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 07-0732-SI |
| | ) | |
| Plaintiff, | ) | **UNITED STATES' OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTION FOR** |
| v. | ) | **JUDGMENT OF ACQUITTAL AND/OR** |
| | ) | **A NEW TRIAL ON COUNT FIVE** |
| BARRY BONDS, | ) | |
| | ) | Date:   August 26, 2011 |
| Defendant. | ) | Time:   11:00 a.m. |
| | ) | Judge: Honorable Susan Illston |

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.  THIS COURT SHOULD DENY THE DEFENDANT'S MOTION FOR A JUDGMENT OF
ACQUITTAL UNDER FED. R. CRIM. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. Standard for a Rule 29 motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. Legal requirements of Count Five, Obstruction of Justice
(18 U.S.C. § 1503). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

C. There was sufficient evidence to convict the defendant of Count Five. . . . . . . . . . . . 5

1.  Anderson provided the defendant with PEDs, including injectables. . . . . . . . . . . 5

2.  The defendant knew Anderson had provided him with PEDs,
including injectables. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

3.  The defendant acted to keep his PED use secret. . . . . . . . . . . . . . . . . . . . . . . 10

4.  The defendant intended to keep his knowledge about
Anderson's supply of PEDs to athletes secret from the grand jury. . . . . . . . . . . 10

5.  The defendant's grand jury testimony was intentionally obstructive  . . . . . . . . . 12

6.  Statement C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

D. An endeavor to obstruct justice is sufficient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

E. The jury rejected the defendant's interpretation of Statement C. . . . . . . . . . . . . . . . 17

F. Obstruction of justice has no falsity requirement. . . . . . . . . . . . . . . . . . . . . . . . . . 17

II. THIS COURT SHOULD DENY THE DEFENDANT'S MOTION FOR A NEW TRIAL UNDER
FED. R. CRIM. P. 33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. Standard for a Rule 33 motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B. The trial evidence does not preponderate heavily against the jury's verdict. . . . . . . . 18

C.   There was no constructive amendment of the Third Superseding Indictment
and the defendant had adequate notice of the charge in Count Five. . . . . . . . . . . . . 18

D.   The jury instructions were not erroneous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E.   The government's closing argument was not misleading. . . . . . . . . . . . . . . . . . . . . . 22

III.  THE DEFENDANT WAIVED ANY ARGUMENT THAT HIS IMMUNITY ORDER DID NOT
BAR HIS PROSECUTION FOR OBSTRUCTION OF JUSTICE . . . . . . . . . . . . . . . . . . . . . . . . . . 22

A.   The defendant has waived the argument, without good cause. . . . . . . . . . . . . . . . . . 22

B.   The defendant's immunity order does not bar his prosecution for obstruction
of justice on the basis of truthful but evasive or misleading statements. . . . . . . . . . 23

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Bronston v. United States*, 409 U.S. 352 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Bruce v. Terhune*, 376 F.3d 950 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Crain v. United States*, 162 U.S. 625 (1896). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dunn v. United States*, 284 U.S. 390 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Kastigar v. United States*, 406 U.S. 441 (1972).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Stirone v. United States*, 361 U.S. 212 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Abascal*, 564 F.2d 821 (9th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Aguilar*, 515 U.S. 593 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 17

*United States v. Bettencourt*, 614 F.2d 214 (9th Cir. 1980).. . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*United States v. Browning*, 630 F.2d 694 (10th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Dann*, No. 10-10191, slip op. 9723 (9th Cir. July 22, 2011). . . . . . . . . . . . . . . 15

*United States v. Davis*, 663 F.2d 824 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Duran*, 41 F.3d 540 (9th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Fleming*, 215 F.3d 930 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Griffin*, 589 F.2d 200 (5th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

*United States v. Hartz*, 458 F.3d 1011 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Jenkins*, 633 F.3d 788 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Khatami*, 280 F.3d 907 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Ladum*, 141 F.3d 1328 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Lench*, 806 F.2d 1443 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Lindsey*, 634 F.3d 541 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Matthews*, 589 F.2d 442 (9th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Miller*, 471 U.S. 130 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*United States v. Murray*, 751 F.2d 1528 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*United States v. Padilla*, 639 F.3d 892 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Pimentel*, 654 F.2d 538 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Powell*, 469 U.S. 57 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Remini*, 967 F.2d 754 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Safavian*, 528 F.3d 957 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Shipsey*, 190 F.3d 1081 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*United States v. Stanton*, 501 F.3d 1093 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Thomas*, 612 F.3d 1107 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . 1, 20, 23, 24, 25

*United States v. UCO Oil Co.*, 546 F.2d 833 (9th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Washington Water Power Co.*, 793 F.2d 1079 (9th Cir. 1986). . . . . . . . . . . . . 17

*Yeager v. United States*, 129 S. Ct. 2360 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

**FEDERAL STATUTES**

18 U.S.C. § 1503. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 1621. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 1622. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 1623. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

18 U.S.C. § 6002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Fed. R. Crim. P. 12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fed. R. Crim. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2,14

Fed. R. Crim. P. 33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**MISCELLANEOUS**

Model Crim. Jury Instr. 9th Cir. 8.131 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Kevin F. O'Malley et al., Federal Jury Practice and Instructions § 48:03 (5th ed. 2011). . . . . . 21

**INTRODUCTION**

On April 13, 2011, after a two-week trial, a federal jury convicted the defendant of obstruction of justice, in violation of 18 U.S.C. § 1503.  Docket # ("Dkt.") 373 at 2; Dkt. 375. The jury unanimously found, beyond a reasonable doubt, that the defendant made Statement C "corruptly, that is for the purpose of obstructing justice," and that Statement C was material and "intentionally evasive, false or misleading."  Dkt. 356 at 10.

Sufficient evidence supports this verdict.  *See* Trial Transcript ("Tr.") 1764-65, 1776, 1813 (denying motion for judgment of acquittal on all counts made at close of government's case-in-chief).  The grand jury subpoenaed the defendant to receive his evidence on Greg Anderson's ("Anderson") distribution of performance-enhancing drugs ("PEDs") to professional athletes.  When asked the critical question of whether Anderson had ever given him anything injectable, the defendant gave Statement C, a lengthy discourse on how his friendship with Anderson was based on their staying out of each other's "business," instead of directly answering the question.  Under the standard explained in *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (clarifying *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)), a rational juror could reasonably infer from the entirety of the trial evidence, viewed in the light most favorable to the prosecution, that Statement C was an evasive, misleading, and false answer.  The defendant had knowingly received injectable PEDs from Anderson, whose "business" was in fact intermingled with the defendant's, and the defendant intentionally tried to hide this from the grand jury.  Although the trial evidence supports a finding that Statement C was evasive, misleading, *and* false, a finding that Statement C obstructed justice by any one of those three means would support the conviction.  Section 1503 does not require falsity.  This Court should deny the defendant's motion for a judgment of acquittal on Count Five.

This Court should also deny the defendant's motion for a new trial on Count Five.  The evidence supports the jury's guilty verdict, and this Court has already previously rejected the defendant's unmeritorious claims of constructive amendment and insufficient jury instructions.

Finally, the defendant's attack on Count Five as barred by his immunity order is untimely and foreclosed by *United States v. Thomas*, 612 F.3d 1107, 1125-27 (9th Cir. 2010).

1

**ARGUMENT**

2     **I.   THIS COURT SHOULD DENY THE DEFENDANT'S MOTION FOR A JUDGMENT OF**
      **ACQUITTAL UNDER FED. R. CRIM. P. 29**

3

4          **A.     Standard for a Rule 29 motion**

5          This Court may not grant the defendant's motion for a judgment of acquittal under Fed.

6    R. Crim. P. 29 unless it first views the trial evidence – both circumstantial and direct – in the

7    light most favorable to the prosecution, and then determines that *no* rational trier of fact could

8    have found the essential elements of the crime beyond a reasonable doubt from the evidence, so

9    viewed.  *Nevils*, 598 F.3d at 1163-64; *United States v. Lindsey*, 634 F.3d 541, 552 (9th Cir. 2011)

10   (logical inferences, but not mere speculation, from circumstantial evidence may support

11   conviction).

12         Holding that a reviewing court "may not usurp the role of the finder of fact," the Ninth

13   Circuit has specifically and unequivocally "overrule[d]" as "error" precedent holding that a

14   reviewing court should consider innocent interpretations of the evidence and grant a judgment of

15   acquittal when it believes an innocent interpretation to be equally or more reasonable than the

16   government's incriminating explanation.  *Nevils*, 598 F.3d at 1164, 1166-67.  Rather, where the

17   evidence supports conflicting inferences, this Court "'must presume . . . that the trier of fact

18   resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"

19   *United States v. Jenkins*, 633 F.3d 788, 801 (9th Cir. 2011) (quoting *Jackson*, 443 U.S. at 326).

20   A single, uncorroborated witness's testimony may be sufficient to support a conviction.  *See*

21   *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004).

22         This Court must consider the "entire record" in this light, not just one portion of the trial

23   evidence, such as the grand jury testimony.  *United States v. Stanton*, 501 F.3d 1093, 1094-95

24   (9th Cir. 2007).  This Court's task is not altered by the fact that the jury hung on the three false

25   declarations counts.  A jury "speaks only through its verdict," and a jury's "failure to reach a

26   verdict" on deadlocked counts "is evidence of nothing – other than, of course, that it has failed to

27   decide anything."  *Yeager v. United States*, 129 S. Ct. 2360, 2367-68, 2370 (2009).  "A host of

28   reasons – sharp disagreement, confusion about the issues, exhaustion after a long trial, to name

but a few – could work alone or in tandem to cause a jury to hang," and "conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return." *Id.* at 2368.  Indeed, even "a logical inconsistency between a guilty verdict and a verdict of acquittal does not impugn the validity of either verdict." *Id.* at 2362 (citing *Dunn v. United States*, 284 U.S. 390, 393 (1932)); *see United States v. Powell*, 469 U.S. 57, 60, 63-66 (1984) (acquittal on some counts did not require reversal of inconsistent conviction on other counts, because acquittal may have resulted from jury's unreviewable power to return verdict of not guilty for impermissible reasons).

### B.     Legal requirements of Count Five, Obstruction of Justice (18 U.S.C. § 1503)

This Court instructed the jury that to find the defendant guilty of Count Five, it had to find beyond a reasonable doubt that (1) the defendant corruptly, that is, for the purpose of obstructing justice, (2) obstructed, influenced, or impeded, or endeavored to obstruct, influence, or impede the grand jury proceeding in which defendant testified, (3) by knowingly giving material testimony that was intentionally evasive, false, or misleading.  Dkt. 356 at 10.

As this Court has recognized, the key to 18 U.S.C. § 1503 is corrupt intent.  *See* Dkt. 73 at 8.  Unless a jury finds the defendant acted with corrupt intent, it may not convict him of obstruction of justice, even if it otherwise finds the defendant made a false statement that had the effect of impeding a grand jury investigation.  *See* 18 U.S.C. § 1503; *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (Section 1503 requires that "[t]he action taken by the accused must be with an intent to influence . . . grand jury proceedings"); *cf. Arthur Andersen LLP v. United States*, 544 U.S. 696, 705-08 & n.6 (2005) (wrongful intent is key to whether persuading someone to withhold information from government meets 18 U.S.C. § 1512's "knowingly corruptly persuades" requirement); *United States v. Khatami*, 280 F.3d 907, 911 (9th Cir. 2002) ("corruptly persuades" under 18 U.S.C. § 1512 requires proof that defendant's persuasion was done with "inappropriate or improper purpose" such as "impeding an ongoing criminal investigation"); *compare Bronston v. United States*, 409 U.S. 352, 359-62 (1973) (defendant's state of mind is "relevant only to the extent that it bears on whether 'he does not believe (his answer) to be true'" in false declaration crimes); 18 U.S.C. § 1623 (requiring that defendant

1  knowingly made false declaration).

2      Contrary to the defendant's argument, Dkt. 396 at 8-12, falsity is not and never has been a

3  requirement for an obstruction of justice conviction.  The Omnibus Clause of Section 1503,

4  under which Count Five was charged, never mentions truth or falsity, but covers any corrupt

5  "endeavor[] to influence, obstruct, or impede" the due administration of justice.  Dkt. 213 at 9;

6  18 U.S.C. § 1503(a); *Aguilar*, 515 U.S. at 598-99; *see United States v. Rasheed*, 663 F.2d 843,

7  852 (9th Cir. 1981) (obstruction of justice statute "was designed to proscribe all manner of

8  corrupt methods of obstructing justice," including destruction or concealment of subpoenaed

9  documents).  The Ninth Circuit has observed that Section 1503 covers non-coercive witness

10 tampering, such as urging a witness to withhold evidence – something that does not necessarily

11 involve any false statements.  *United States v. Ladum*, 141 F.3d 1328, 1338 (9th Cir. 1998).

12 Indeed, given Section 1503's origins as a contempt statute, early litigation concerned whether it

13 covered false testimony at all.  *See United States v. Griffin*, 589 F.2d 200, 204 (5th Cir. 1979)

14 (Section 1503 covers all testimony hindering grand jury's attempts to gather evidence, including

15 evasive testimony that deliberately conceals knowledge and false testimony that blocks flow of

16 truthful information).

17      By contrast, Section 1623 applies only to a knowingly-made "false material declaration"

18 to a grand jury.  18 U.S.C. § 1623(a).  Hence, while a statement's literal truth is a defense to a

19 false declaration charge, *Bronston*, 409 U.S. at 360, it is not a complete defense to an obstruction

20 of justice charge.  *See United States v. Safavian*, 528 F.3d 957, 968 (D.C. Cir. 2008) ("[e]ven a

21 literally true statement may be misleading and so, unlike § 1001(a)(1), literal truth may not be a

22 complete defense to obstruction" under Section 1505); *United States v. Browning*, 630 F.2d 694,

23 696, 699 (10th Cir. 1980) (literal truth no defense to obstruction under Section 1505); *see also*

24 *United States v. Remini*, 967 F.2d 754, 755 (2d Cir. 1992) (noting district court's ruling that

25 literally true but evasive and misleading testimony would support Section 1503 prosecution).

26      A conviction under Section 1503 also requires a finding that the obstructive testimony

27 was material – *i.e.*, it bears a reasonable relationship to the subject of the grand jury's inquiry.

28 *Thomas*, 612 F.3d at 1129.  A statement is "material if it had a natural tendency to influence, or

1   was capable of influencing, the decision of the grand jury." Dkt. 356 at 10.

2        **C.**    **There was sufficient evidence to convict the defendant of Count Five**

3      On December 4, 2003, the defendant gave testimony to the grand jury, questioned

4   primarily by AUSA Jeff Nedrow, and occasionally by AUSA Ross Nadel. Tr. 280; Trial Exhibit

5   ("Exh.") 37 at 1, 10. The defendant was told that he was a witness in an investigation into

6   alleged illegal activities undertaken by Victor Conte ("Conte") and Anderson, including

7   conspiracy to possess or distribute illegal substances, and money laundering. Exh. 37 at 4.

8   When asked the critical question if Anderson had ever given him "anything that required a

9   syringe to inject yourself with," the defendant gave the following answer (Statement C):

10           A: I've only had one doctor touch me. And that's my only
11                personal doctor. Greg, like I said, we don't get into each
                  others' personal lives. We're friends, but I don't – we don't sit
12                around and talk baseball, because he knows I don't want –
                  don't come to my house talking baseball. If you want to come
13                to my house and talk about fishing, some other stuff, we'll be
                  good friends, you come around talking about baseball, you go
14                on. I don't talk about his business. You know what I mean?
                  . . .

15           Q: Right.

16           A: <u>That's what keeps our friendship. You know, I am sorry, but</u>
17                <u>that – you know, that – I was a celebrity child, not just in</u>
                  <u>baseball by my own instincts. I became a celebrity child with a</u>
18                <u>famous father. I just don't get into other people's business</u>
                  <u>because of my father's situation, you see . . .</u>

19  Exh. 37 at 42.

20      The totality of the trial evidence, including the rest of the defendant's grand jury

21  testimony, viewed in the light most favorable to the prosecution, showed that the underlined

22  portion of the defendant's answer was evasive, misleading, and false, and that the defendant gave

23  this answer for the purpose of withholding material evidence from the grand jury – namely, that

24  since around 1998, Anderson had provided him with PEDs, including injectable anabolic steroids

25  ("steroids") and human growth hormone ("HGH").

26        *1.*    *Anderson provided the defendant with PEDs, including injectables*

27      The evidence at trial showed that Anderson provided the defendant with PEDs, including

28  injectables. Around 1998 or 1999, the defendant, who played for the San Francisco Giants

baseball team, began working with Anderson, a weight-trainer at a local gym whom Stan Conte ("Stan Conte"), the Giants's athletic trainer, believed was ill-qualified to work with a professional athlete such as the defendant.  Tr. 226, 390-91, 1093-94, 1096, 1474; Exh. 37 at 12. Beginning in 2000, Anderson accompanied the defendant to spring training.  Tr. 1095, 1101.  As of the time of the defendant's grand jury testimony, the defendant was still working with Anderson.  Exh. 37 at 15.

According to PED expert Dr. Larry Bowers, non-therapeutic doses of steroids allow athletes to gain muscle mass and improve recovery time to avoid "need[ing] . . . rest between periods of exercise and" to allow for "more intense exercise during each of those periods."  Tr. 584-85, 595-96, 598-99, 631, 635, 646, 651.  Steroids may be administered through intramuscular injections into large muscles such as the back of the arm or buttocks, through ingestion, or sublingually (under the tongue).  Tr. 618-19, 725; Exh. 7.  HGH, typically injected into a fold of abdominal skin with a small needle, confers similar benefits to steroids in that it promotes muscle growth and recovery, but it gives users a leaner look, is not a steroid, and is virtually undetectable.  Tr. 624, 633-34, 653-55, 724; Exh. 10.  HGH is particularly potent when used in combination with steroids.  Tr. 634.

In what he believed to be a private conversation with the defendant's childhood friend, personal assistant since 1993, and confidante, Steve Hoskins ("Hoskins"), Anderson acknowledged that he provided the defendant with PEDs, explaining that when using injectable steroids on the defendant, he was careful to "move" the injection location "all over the place" to avoid the phenomenon of puddling and abscesses, and that everything he now used on the defendant was "undetectable."  Tr. 373, 380-88, 423-25, 441, 618-21, 725, 754, 1474; Exh. 7; Exh. 20 (*see* transcript).

What Hoskins and Kimberly Bell ("Bell"), the defendant's long-time mistress, witnessed during the 2000 to 2002 spring trainings was consistent with Anderson's admission.  Both saw Anderson and the defendant lock themselves in a bedroom together on a number of occasions, Tr. 412-17, 747-49, 770, 780-82.  On those occasions, Anderson carried a kit resembling what was later found in his residence to contain alcohol wipes, numerous syringes, and vials of liquid.

1   Tr. 249-51, 780-82.  Hoskins once saw Anderson emerge with a syringe and needle.  Tr. 412-17.

2       Between 2001 and 2003, Kathy Hoskins ("Kathy"), a childhood friend whom the

3   defendant paid to shop and pack clothing for him, also saw Anderson and the defendant

4   disappear frequently into an office at the defendant's house, and once witnessed Anderson give

5   the defendant an injection in the abdominal area.  Tr. 1548, 1551-55, 1557-62.

6       Anderson also furnished and administered an oral substance and a cream to the defendant.

7   Tr. 1113, 1506-07; Exh. 37 at 24.  It was reasonable to infer that the oral substance was

8   tetrahydragestrinone ("THG"), nicknamed "the Clear," a sublingual "designer steroid,"

9   specifically designed to elude anti-doping tests, that anti-doping agencies only discovered in

10  2003.  Tr. 602, 605-08, 1035, 1620, 1624.  The transdermal substance was "the Cream," which

11  contained testosterone and epitestosterone in approximately the same ratios that the body

12  naturally maintains, used to mask the imbalance in the testosterone-epitestosterone ratio caused

13  by steroid use.  Tr. 616-17, 623.

14      Shortly after the defendant began working with Anderson, he changed in ways consistent

15  with steroid and HGH use.  Around 1999, Hoskins, Stan Conte, and Bell all noticed that the

16  defendant's muscles got "significant[ly]" "bigger."  Tr. 421, 763, 1093-94, 1102-03, 1126.  He

17  gained eleven pounds between October of 1998 and 1999.  Tr. 1499-1500.

18      Around the same time, the defendant also began exhibiting side effects associated with

19  PED use.  Side effects of steroids, which are chemical variants of testosterone, include excess

20  hair growth on the body, male pattern baldness, acne on the upper back and chest, bloating,

21  testicular atrophy, impotence, and enhanced aggressiveness.  Tr. 599-600, 639-44, 647-48, 683-

22  84, 714-17, 723-24, 1519.  Bell and Kathy noticed that the defendant's "hair was falling out

23  quickly and he ended up shaving it all off" and began waxing his chest.  Tr. 1548, 1553-54, 1566.

24  Stan Conte and Bell noticed "[s]ignificant" acne on the defendant's shoulders and back.  Tr. 763-

25  66, 1103, 1124.

26      Bell, who was "physically intimate" with the defendant from 1994 until 2003, observed

27  other changes in the defendant around 1999 through 2001.  Tr. 747-49, 763, 765-66.  His

28  stomach became "very bloated" and he was concerned that it was obvious; his testicles became

smaller and differently shaped; and he began having "trouble keeping an erection." Tr. 763-66.
In addition, starting around 1998, the defendant became "increasingly aggressive, irritable,
agitated, very impatient, almost violent." Tr. 766-68. By the time their relationship ended in
2003, Bell was "terrified" and "[t]hought [the defendant] would kill me." Tr. 929.

Large amounts of HGH in the body may cause increase in a fully grown adult's foot,
hand, and skull size. Tr. 651-52, 656, 710-11. Hoskins noted that around 1999, the defendant's
shoe and glove size increased. Tr. 420-21. Giants's equipment manager Miguel Murphy
confirmed that in 2002, the defendant's hat size increased, even though he had begun to shave his
head. Tr. 732-37, 742-43.

A urine sample collected from the defendant in June of 2003 later tested positive for THG
and clomiphene, a drug primarily used for female fertility issues, also used to reboot natural
testosterone production in male steroids users and prevent the development of breasts. Tr. 622-
23, 643-44, 1026, 1040-43, 1056, 1072, 1085-89, 1275, 1739-40, 1744-45; Exh. 11; Exh. 21;
Exh. 24 (pages 3-8, 19-23 admitted); Exh. 39. As of 2003, anti-doping testing for Major League
Baseball ("MLB") did not test for clomiphene. Tr. 1039.

> 2.    *The defendant knew Anderson had provided him with PEDs, including injectables*

The trial evidence showed that the defendant was well aware that he was receiving PEDs,
including injectable ones, from Anderson. Around the time he began working with Anderson,
the defendant asked Hoskins to go to his orthopedic surgeon, Dr. Arthur Ting ("Ting"), for
research on Winstrol. Tr. 395-98, 603, 754, 771, 1098-1100, 1470-72, 1474, 1486. Hoskins
conveyed to the defendant documents Ting provided on the steroid and its side effects. Tr. 408-
09, 1475-77; Exh. 19 (not offered for truth). Another time, the defendant directed Hoskins to get
information from Ting about the steroid Deca (Decadurabolin). Tr. 568-69, 603-04.

Ting told Hoskins that steroids were bad for the defendant and were responsible for his
1999 elbow injury. Tr. 567, 569, 1471, 1491-92, 1516. The defendant reiterated this explanation
of his elbow injury to Bell. Tr. 744, 760-61. He explained that he used steroids to recover more
quickly. Tr. 763. The defendant also explained to Bell that steroid use was responsible for Mark

1   McGuire's home run record.  Tr. 761, 1219.  About two years later, in 2001, when he was

2   approximately 37 years old, the defendant hit a record 73 home runs.  Exh. 37 at 12-13, 72.

3       Obviously, the defendant was with Anderson when they disappeared alone behind closed

4   doors for Anderson to administer injections.  Tr. 412-17.  And on the occasion during the 2002

5   baseball season when Kathy saw Anderson inject the defendant in the abdomen with what could

6   be inferred was HGH, the defendant assured Anderson that Kathy was "my girl" and "she don't

7   say nothing to nobody," explaining to Kathy that the injection was a little something for when he

8   went on the road, and that "we can't detect it, you can't catch it."  Tr. 1560.

9       Anderson's practices also informed the defendant that he was being provided with PEDs.

10  A number of professional baseball players who knew Anderson as the defendant's trainer

11  contacted Anderson to sign up for the same program that helped the defendant to be successful.

12  Jason Giambi ("Giambi") asked Anderson to get on the training program that the defendant was

13  on so that he could prolong his career.  Tr. 1175-76, 1179.  Randy Velarde ("Velarde") also knew

14  Anderson as the defendant's personal trainer and in 2002, Velarde's last season of professional

15  baseball, contacted Anderson to "get me on his program."  Tr. 1264, 1266-67, 1270-71.

16  Anderson agreed.  Between the end of 2002 and August of 2003, Anderson took blood and urine

17  samples from Giambi, informed him that he had tested positive for a steroid that would be

18  detected by MLB testing, and then supplied him with less-detectable injectable testosterone,

19  syringes, a calendar for using the steroid, and vitamins.  Tr. 1180, 1182, 1184, 1186, 1191-92,

20  1198.  Anderson also sold Giambi the Cream and the Clear and a calendar for using these

21  substances together to elude MLB anti-doping testing.  Tr. 1189-91, 1194.  After testing

22  Velarde's blood, Anderson started him on a program of oral steroids.  Tr. 1266-67.  Later,

23  Anderson sold Velarde injectable PEDs, including HGH.  Tr. 1269-70.

24      Anderson's program was similar for Marvin Benard ("Benard") and Jeremy Giambi.

25  Anderson tested both players' blood and sold them PEDs, including HGH, syringes and needles,

26  and what Anderson described as "undetectable steroids" that would elude MLB testing: a

27  sublingual substance called the Clear and a transdermal substance called the Cream.  Tr. 1204,

28  1208-12, 1222, 1230-31, 1235-37, 1240-43.  Anderson also injected Benard.  Tr. 1232-33, 1243.

### 3. *The defendant acted to keep his PED use secret*

The trial evidence showed that he sought to keep his PED use secret. The defendant asked Hoskins to pay Anderson in the same manner that he distributed money to his mistresses. Tr. 373, 380-88, 391-93, 1474. He almost always disappeared behind closed doors when Anderson gave him injections. He did not want his father to know about his use of PEDs, denied using them to his father, and instructed Anderson, "Don't say anything to my dad." Tr. 423, 1484-85, 1488. The defendant was concerned that side effects – such as bloating and hair loss – would make his use of PEDS obvious and tried to hide his hair loss by shaving his head and waxing his chest. The defendant used substances that were then undetectable or helped to mask otherwise detectable substances: HGH, the Cream, the Clear, and clomid. The defendant also had Anderson regularly test his blood and urine at BALCO Labs, which would reveal whether the PEDs he was using were detectable. Tr. 1184, 1235, 12367, 1480-81; Exh. 37 at 17-18.

### 4. *The defendant intended to keep his knowledge about Anderson's supply of PEDs to athletes secret from the grand jury*

The trial evidence also showed that in 2003, when the risk increased that his PED use would be exposed, the defendant took additional steps to protect his secret, culminating in an effort to thwart the grand jury's investigation into BALCO and Anderson. In 2003, four things happened that increased the likelihood that the defendant's PED use would be found out. First, MLB began testing its players for steroids. Tr. 1035, 1041-42, 1056, 1072. Second, worried that the defendant's PED use was "getting out of hand" after having witnessed the defendant tell Anderson that he would inject himself if Anderson would not, Hoskins became vocal in trying to "stop him from taking steroids." Tr. 418-19, 422, 529. Hoskins spoke to the defendant himself, Ting, Anderson, and the defendant's father about his concerns over the defendant's PED use. Tr. 422-24. Third, a search executed at Anderson's residence on September 3, 2003, revealed HGH, syringes, the Cream, the Clear ("THG"), documents and diskettes connecting Anderson with professional athletes, and $60,000 in currency in a safe. Tr. 238-45, 250-53, 263-64. And fourth, the defendant was subpoenaed to testify before the grand jury. Tr. 1105-06.

The defendant acted to neutralize these threats. The defendant peddled a cover story. In response to media queries, the defendant stated that he had tested negative for steroids. Exh. 37 at 93-94. In a 2003 interview for Muscle & Fitness magazine, he attributed his physical conditioning to dietary supplements that Conte and Anderson provided after analyzing his blood for deficiencies. Exh. 37 at 83-84, 147.

And the defendant cut off relationships with anyone, other than Anderson, who could affirmatively contradict his story. The defendant instigated an ultimately fruitless federal investigation against his "best friend" Hoskins for stealing from him, and in March of 2003, cut off their decade-long relationship and life-long family relationship. Tr. 290, 295, 450-51, 553, 754, 1569-71. Around the same time, the defendant also ended his relationship with Kathy, who had seen Anderson inject him in the abdomen. Tr. 1566-67. Similarly, in the spring of 2003, the defendant abruptly terminated his decade-long intimacy with Bell – to whom he had confided his use of steroids – telling her in a phone call to "disappear." Tr. 769.

In October of 2003, the defendant approached Stan Conte, who had also been subpoenaed to testify before the grand jury, about the recent raid on BALCO and search of Anderson's home. Tr. 1105-06. The evidence showed that the defendant tried to influence Stan's testimony by persuading Stan that he had known nothing about Anderson's involvement with steroids and to prime Stan to be sympathetic towards Anderson. The defendant stated that "it was unfair what the government was doing to" Anderson, he "trusted" Anderson, "he didn't know anything about the steroids," and Anderson "was only selling the steroids to help his kid." Tr. 1106.

Stan responded that "since he and I were both grand jury witnesses we probably shouldn't be having the conversation." Tr. 1106. The defendant nevertheless "continued," claiming that Anderson had put the defendant's initials on some calendars to protect other players, and that the $60,000 that had been found at Anderson's home was money the defendant had given him to hold for use with the defendant's girls. Tr. 1106-08. In response to Stan's opinion that PEDs made for an unlevel playing field, the defendant suggested that Stan's son, an athlete, could get a performance-enhancing cream by reporting erectile dysfunction to his doctor. Tr. 1107-08.

5.     *The defendant's grand jury testimony was intentionally obstructive*

The trial evidence shows that the defendant tried to feed the grand jury an elaborate version of the same cover story he had fed the media and with which he had primed Stan Conte.

Before the grand jury, the defendant consistently tried to avoid answering questions touching on Anderson's distribution and administration of PEDs to him.  For example, when AUSA Nedrow asked whether Anderson had told the defendant what the Cream was, the defendant launched into a discourse on how he had suffered from "bad arthritis.  I've played 18 years, bad knees, surgeries, so on. . . . ."  Exh. 37 at 35.  The diversion almost succeeded.  AUSA Nadel had to step in and state, "Just going back to Mr. Nedrow's original question.  Did Mr. Anderson ever tell you what that substance was?"  Exh. 37 at 36.

When forced into giving a direct answer, the defendant lied.  He testified that to his knowledge, Anderson never talked to him about using or gave him steroids, HGH, or clomid, never gave him syringes, needles, or anything injectable to help with recovery, and never injected him with anything or drew any fluids from him.  Exh. 37 at 28, 41-44, 47-49, 51-54, 56, 68, 80, 101-02.  He told the grand jury that Anderson had led him to believe that the cream was just a lotion and the clear was flax seed oil, and that he had no reason to believe otherwise.  Exh. 37 at 24-32.  The defendant's denial of knowledge that Anderson had distributed PEDs to him was inconsistent with aspects of the federal investigation of BALCO and Anderson, and had the potential to affect the investigation.  Tr. 292-95.

To explain why he, an elite athlete whose body was his livelihood, would simply take substances without knowing what they were, the defendant fed the grand jury a convoluted backstory, often through nonresponsive answers:  "[T]here's a lot of companies and people that come up with a lot of gimmicks with us" professional athletes, which the defendant would try just to "make them happy."  Trial Exh. 37 at 39-40.  He explained that he did not generally ask questions because, as an athlete, "I put a lot of trust in a lot of people."  Exh. 37 at 94-95.

The defendant particularly trusted Anderson because their relationship was not a business relationship.  Although Anderson had done year-round weight-training with him beginning of the end of the the 1998 baseball season, and was with him "every day" that he was not on the road,

the defendant contended that he had not paid Anderson; the $15,000 Anderson received annually was not a salary, but a "gift" the defendant had insisted on making towards Anderson's child's tuition. Exh. 37 at 14-16, 60-62, 71-72, 136, 139, 145-46. Rather, theirs was a personal friendship stemming from "childhood." Exh. 37 at 13 ("Since we were children."), 14 ("we were childhood friends"), 14 ("we're friends, grew up together"), 19 ("I didn't ask Greg a bunch of questions. We are friends, we grew up together . . . ."), 21 ("I have no idea their personal relationship or any – their relationship. I don't get into anyone's business like that."), 24 ("Let him be happy. We're friends."), 25 ("But Greg packaged it up for me, so I never saw the actual bottles that he was taking [the pills] from. . . . But I had no reason to doubt what he was giving me, because we were friends."), 26 ("And I didn't think the stuff worked. I was, like: 'Dude, whatever,' but he's my friend, you know?"), 31 ("I'm not the type of person to pry into people's business. And I really believe my friends."), 31-32 (stating that he would take any substance offered by a friend without asking questions), 42 ("Greg, like I said, we don't get into each others' personal lives. . . . That's what keeps our friendship."), 48 ("[H]e would never jeopardize our friendship like that."), 49 ("Greg wouldn't jeopardize our friendship that way."), 51 ("He wouldn't jeopardize our friendship that way."), 52 ("Our friendship is a little bit different."), 54 ("I don't think Greg would do anything like that to me and jeopardize our friendship."), 86-87 (explaining that he did not ask Anderson about investigation "because it keeps our friendship as it is"), 95 ("We're friends. We don't need contracts."), 124-25 ("I said we didn't discuss each others' personal lives. I mean, we're friends. . . . I mean, we were friends, we grew up together."), 135 (stating that he did not consider Anderson an employee but "a friend"), 136 ("You know, we're friends, so you, know you, just give and get.").

The defendant's trust in Anderson was his explanation for why he provided Anderson urine for four tests at BALCO without knowing or asking why Anderson was testing it. Exh. 37 at 17-20. It was his explanation for why he took various pills that Anderson gave him without asking what they were. Exh. 37 at 100. It was his explanation for why he never questioned what the cream and oil were that Anderson gave him. Exh. 37 at 29, 36, 55-56, 88-89. Plus, he had been too distracted and distraught by his father's cancer to pay close attention to what was

1    happening.  Exh. 37 at 23-24 ("[I]n 2003 . . . – my dad died of cancer, you know, and everyone

2    knows that. . . .   I was fatigued, tired, just needed recovery."), 29 ("Yes, 2003, because I was

3    battling with the problems with my father and the – just the lack of sleep, lack of everything."),

4    97 ("It was toward the end of 2000, . . . when my father was going through his cancer.").

5        While friendship might explain the defendant's trust in Anderson, it also suggested that

6    the defendant must be aware of Anderson's involvement with steroids.  The defendant had an

7    answer for this too:  By virtue of his unique background as a life-long celebrity, the defendant

8    kept a certain distance from his friends – he did not ask questions and stayed out of their

9    business.  Exh. 37 at 42.  That was why the defendant had no knowledge about Anderson's

10   involvement with PEDs.  It was the defendant's explanation for why he had no evidence to give

11   the grand jury about Anderson's involvement with steroids.

12           6.      *Statement C*

13       Statement C was a prime example of the defendant's pattern of parrying and justifying

14   when asked questions about Anderson and Conte that had the potential to expose the defendant's

15   PED use.  AUSA Nedrow asked if Anderson ever gave the defendant anything requiring a

16   syringe to inject himself with.  Exh. 37 at 42.  This was a "yes or no" question.  But instead of

17   giving a "yes or no" answer, the defendant evaded the question by talking about how only his

18   personal doctor touched him, and launched into a distracting explanation of how a person (*i.e.,*

19   Anderson) could only be friends with him because "we don't get into each others' personal

20   lives," "he know . . . don't come to my house talking baseball," and "I don't talk about his

21   business."  *Id.*  And the defendant had learned this approach to friendships because he had grown

22   up with a famous father.  *Id.*  The diversion tactic succeeded to some degree, as the prosecutor

23   responded, "Right."[1]  *Id.*  AUSA Nedrow was ready to move on to other areas of questioning

24   without having ever received an answer to the injection question.  Exh. 37 at 43.  The defendant

25   only answered the injection question when AUSA Nadel interceded and refocused the discussion

26   on injections.  Exh. 37 at 43-44.

27

28       [1]  Under the Rule 29 standard, this Court may not accept the defendant's interpretation of
         AUSA Nedrow's "Right" as encouragement.  *See* Dkt. 396 at 12, 14.

U.S. OPP. TO DEF. RULE 29 AND 33 MOTIONS
[CR 07-0732-SI]                                        14

The discourse in Statement C served another purpose:  to mislead the jury.  The defendant had previously denied knowing that the lotion and liquid Anderson had administered to him were the Cream and the Clear, or that Anderson had provided him with HGH.  Exh. 37 at 31-41.  To counteract the implausibility of these denials, the defendant explained that "what keeps our friendship" is that he and Anderson kept out of each other's business.  Exh. 37 at 42.  Since friendships generally imply the very opposite, the defendant explained that, "sorry," he was different.  He was not only a celebrity because of his own baseball accomplishments, but "became a celebrity child with a famous father," and "because of my father's situation, you see," "I just don't get into other people's business."  *Id.*

In fact, the evidence showed that Statement C – "<u>That's what keeps our friendship</u>." – was false.[2]  Exh. 37 at 42.  Keeping out of each other's business was not what kept the defendant's and Anderson's friendship.  Anderson had supplied the defendant with PEDs since roughly 1998, Anderson was constantly helping the defendant with his baseball career, and Anderson received money for this.  The basis for the defendant's relationship with Anderson was the overlap in their businesses:  Anderson's business was the defendant's business.

As this Court recognized when it left Statement C as a basis for Count Five while eliminating three other statements the government had offered to support a conviction under Count Five, the trial evidence was sufficient to allow the jury to find that the defendant had the intent to obstruct, influence, or impede the grand jury proceeding, and that he carried out this intent by giving Statement C – material testimony that was intentionally evasive, false, or misleading.  Tr. 1872-89, 1911-13; Dkt. 355; Dkt. 356 at 10-11.  A rational juror could reasonably find from all the evidence presented at trial that the defendant gave the testimony

---

[2]  Contrary to the defendant's argument, Dkt. 396 at 6, that the government did not focus on falsity at trial does not preclude it as a basis for the jury's verdict.  *United States v. Dann*, No. 10-10191, slip op. 9723, 9745 n.3, – F.3d. – (9th Cir. July 22, 2011) (government did not waive right to argue that evidence of defendant's intent to coerce defendant with threat of particular harms supported guilty verdict, even though government did not emphasize this evidence at trial).  The jury was instructed that the lawyers' arguments were not evidence and that it could find Statement C evasive, misleading, or false.  Dkt. 356 at 3, 10.

1   underlined in Statement C to intentionally evade the question whether Anderson provided athlete

2   clients with injectable substances; to intentionally mislead the grand jury into believing the

3   defendant's testimony that, despite his close association with Anderson, the defendant knew

4   nothing about Anderson's alleged distribution of PEDs; and to deceive the grand jury with

5   intentionally false testimony about what kept the defendant's "friendship" with Anderson.  *See*

6   Tr. 1976-82 (arguing that defendant's statements evaded by refusing to answer questions and

7   misled by suggesting that defendant had no reason to believe substances from Anderson were

8   illicit).  A rational juror could reasonably find that Statement C was material testimony because it

9   thwarted the grand jury from receiving the defendant's true evidence about Anderson's

10  distribution of PEDs.  A rational juror could also reasonably find, in light of all the trial evidence

11  of the defendant's knowing receipt of PEDs from Anderson and the defendant's determined

12  efforts to keep his PED use secret, that the defendant gave the testimony underlined in Statement

13  C with the intent and for the purpose of obstructing, influencing, or impeding the grand jury's

14  investigation into Anderson's and Conte's PED distribution.  There is sufficient evidence to

15  uphold the jury's verdict on Count Five.  *See United States v. Lench*, 806 F.2d 1443, 1444-46

16  (9th Cir. 1986) (evidence "overwhelmingly" supported Lench's conviction of obstructing justice

17  where it showed that Lench had moved subpoenaed documents to avoid their discovery and

18  denied their existence, and these documents were evidence of Lench's criminal bid rigging).

19          **D.      An endeavor to obstruct justice is sufficient**

20          The defendant argues that because he was ultimately forced to give an answer to the

21  injection question, the fact that he gave Statement C before getting to that answer cannot, as a

22  legal matter, count as obstruction of justice.  Dkt. 396 at 18-19.  There is no support for his

23  contention.  First, the defendant presumes that the evidence shows that he later answered the

24  question truthfully.  *See* Dkt. 396 at 7, 13.  Under the appropriate Rule 29 standard, the evidence

25  should be viewed in the light most favorable to the prosecution, and in that light, the evidence

26  shows that the defendant lied when he stated that Anderson neither injected him nor provided

27  him with any injectable substances.  Second, even if the defendant were ultimately cornered into

28  giving a truthful answer, that would still not necessarily undermine his conviction for obstruction

of justice.  "One need not succeed in obstructing justice to be convicted of violating § 1503:  an endeavor suffices."  *United States v. Fleming*, 215 F.3d 930, 936 (9th Cir. 2000) (quoting *Aguilar*, 515 U.S. at 599 (internal quotation marks omitted)); *United States v. Washington Water Power Co.*, 793 F.2d 1079, 1085 (9th Cir. 1986) ("'[I]t is not necessary to show that a defendant actually obstructed justice . . . the statutory focus is on an endeavor.'" (quoting *United States v. Murray*, 751 F.2d 1528, 1534 (9th Cir. 1985)); *Griffin*, 589 F.2d at 204 (justice may be impeded by "*delaying* the punishment of the guilty" (emphasis added)).

### E.    The jury rejected the defendant's interpretation of Statement C

The defendant argued to the jury that any non-responsive answers he gave stemmed from his innocent tendency to ramble, not any intentional effort to thwart the grand jury's investigation. Tr. 2005-06; *see* Dkt. 396 at 1 (characterizing Statement C as "at worse, a digression" and "a bit of meandering").  The jury rejected the defendant's explanation.  It was entitled to do so, and this Court must accord that factual determination appropriate deference. *See United States v. Matthews*, 589 F.2d 442, 445 (9th Cir. 1978) (where question could be interpreted in two ways, one of which rendered defendant's answer true and the other false, question of defendant's understanding of question should be presented to jury).

### F.    Obstruction of justice has no falsity requirement

As discussed above, the evidence supports a finding that Statement C was false and made to support the defendant's lies regarding his receipt of PEDs from Anderson and his knowledge about Anderson's invovlement with PEDs.  *See supra* Argument.I.C.  However, even if the statement were truthful, that would not foreclose the jury's guilty verdict on Count Five as a legal matter.  *See* Dkt. 396 at 18.  The jury could consider the truthfulness of the statement in determining whether the defendant made them innocently or to obstruct the grand jury investigation.  The jury determined that the statement was made with the intent necessary for a conviction under 18 U.S.C. § 1503.  There is no legal bar to the jury's determination, since there is no literal truth defense to a charge of obstruction of justice.  *See supra* Argument.I.B.

**II.   THIS COURT SHOULD DENY THE DEFENDANT'S MOTION FOR A NEW TRIAL UNDER FED. R. CRIM. P. 33**

**A.     Standard for a Rule 33 motion**

Upon a defendant's timely motion, a judge "may vacate the judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The Court does not abuse its discretion in denying a motion for a new trial unless its decision is based on an error of law, or a factual finding that is illogical, implausible, or without support in inferences that may be drawn from the facts of the record. *United States v. Hinkson*, 585 F.3d 1247, 1261-63 (9th Cir. 2009).

**B.     The trial evidence does not preponderate heavily against the jury's verdict**

There is no merit to the defendant's argument that, regardless of its determination of his motion for a judgment of acquittal, this Court should grant him a new trial on Count Five based on the trial evidence. Dkt. 396 at 17-20. A new trial is warranted only "in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981). Here, the full weight of the trial evidence supports the conclusion that the defendant gave his grand jury testimony with the intent, and to the effect of, impeding the grand jury's investigation into Anderson's and Conte's distribution of PEDs. *See supra* Argument.I.C. There is no basis for the defendant's assertion that the only evidence relevant to Count Five is the grand jury transcript itself, and that the jury did not rely on "any of the fact-finding and credibility determinations that are the unique province of the jury." Dkt. 396 at 19.

**C.     There was no constructive amendment of the Third Superseding Indictment and the defendant had adequate notice of the charge in Count Five**

Contrary to the defendant's claims, and as this Court has previously found, there was no constructive amendment of Count Five to warrant a new trial.[3] Dkt. 223 at 3-4. Nor was there any deficiency in notice to the defendant of the charge in Count Five. *See* Dkt. 396 at 21-23.

---

[3] The defendant claims that a constructive amendment of Count Five entitles him to a judgment of acquittal. Dkt. 396 at 13. Constructive amendment may entitle a defendant to a new trial, but not a judgment of acquittal. *See United States v. Shipsey*, 190 F.3d 1081, 1088-89 (9th Cir. 1999) (remanding for new trial based on constructive amendment).

The original Indictment charged the defendant with obstruction of justice in Count Five. Dkt. 1 at 10. The defendant moved to dismiss the charge as duplicitous. Dkt. 21 at 22-23. In response to this Court's finding that the Indictment was deficient, the government obtained a Superseding Indictment, Count Fifteen of which charged the defendant with obstruction of justice. Dkt. 37; Dkt. 47 at 15-16. The defendant moved to dismiss the charge, arguing that it was duplicitous if based on the statements charged as false in Counts One through Fourteen, and that it failed to give him adequate notice to prepare a defense, if based on statements not specifically listed in the Superseding Indictment. Dkt. 61-1 at 18-19; Dkt. 66 at 13-14.

This Court denied the defendant's motion, finding that because Count Fifteen "requires proof of an element that is not included in the false declaration counts, i.e. corruptly influencing, obstructing, and impeding the due administration of justice," it was not multiplictious. Dkt. 73 at 8; *see* Dkt. 64 at 19. And because the count "rests solely on defendant's grand jury testimony," the defendant had adequate notice of the charges against him. Dkt. 73 at 7-8; *see* Dkt. 64 at 20.

A Second Superseding Indictment charged the defendant with obstructing justice in Count Eleven. Dkt. 52; Dkt. 77 at 12-13. The defendant challenged the charge, again arguing in relevant part that to the extent it was based on statements other than those charged in Counts One through Ten, the charge gave him inadequate notice and compromised "his right to a unanimous verdict absent specification of the factual bases for conviction." Dkt. 194 at 5. The government had "submitted jury instructions . . . listing as possible bases for conviction" both the statements charged as false in Counts One to Ten "and twelve other portions" of the defendant's grand jury testimony, including testimony about how his stay-out-of-each-other's-business approach to Anderson had its roots in the defendant's celebrity childhood in response to a question about whether Anderson gave him anything injectable (then Statement F). Dkt. 194 at 6, 7-8. However, the defendant maintained that because these additional statements had not been listed in the indictment, he had not been given adequate notice and the government could not prove that the grand jury had relied on any of these additional statements. Dkt. 194 at 11, 13, 15; Dkt. 209.

//

//

On February 10, 2011, in anticipation of the new trial date of March 21, 2011, and to include the element of materiality in the obstruction of justice count, as required by *United States v. Thomas*, 612 F.3d 1107, 1129 (9th Cir. 2010), a Third Superseding Indictment was filed, in which obstruction of justice was charged in Count Five. Dkt. 175; Dkt. 213 at 9, 223 at 1.

On February 15, 2011, this Court denied the defendant's motion regarding the obstruction of justice count. Dkt. 223 at 1-4. This Court noted that the defendant's arguments were similar to those previously adjudicated. Dkt. 223 at 2; *see* Dkt. 203 at 3. It explained that Count Five was limited to the defendant's December 4, 2003 grand jury testimony, and so the defendant had sufficient notice of "what he must be prepared to meet" at trial. Dkt. 223 at 3; *see* Dkt. 203 at 6. The specific statements set forth in the jury instructions "are set out to guide the Petit Jury in its deliberations and guarantee that they agree unanimously as to how defendant obstructed justice," and did not constitute a constructive amendment of the charge because they "*narrow* the permissible grounds for conviction" instead of expanding them. Dkt. 223 at 3-4 (original emphasis). The cases the defendant cited for the proposition that "multiple statements cannot be included together in a single count all discuss charges for making a false statement," but that was a "different type[] of crime[]" than obstruction of justice, and "the logic of these cases does not transfer." Dkt. 223 at 4.

This Court's ruling is correct. A defendant has the right to be tried only on the charges set forth in an indictment by a grand jury. *United States v. Shipsey*, 190 F.3d 1081, 1085-86 (9th Cir. 1999). Only the specific means alleged in the indictment may form the basis for conviction, even if other bases are available under the statute at issue. *See Stirone v. United States*, 361 U.S. 212, 214-18 (1960). Where the proof at trial is narrower than what is charged in the indictment, the proof clearly conforms to one of the theories of the offense contained within the indictment, the defendant has clear notice of this theory, the defendant is not surprised or deprived of a fair trial, and there is no constructive amendment. *See United States v. Miller*, 471 U.S. 130, 132-36, 138 (1985) (no constructive amendment where indictment alleged that Miller defrauded insurer by both consenting to burglary and lying to insurer, but proof at trial was only of lying).

In this case, Count Five charged the defendant with obstruction of justice based on "Grand Jury testimony that was intentionally evasive, false, and misleading, including but not limited to the false statements made by the defendant as charged in Counts One through Four." Dkt. 213 at 9. By limiting the statements the jury could base its conviction of Count Five to specific excerpts of the entire grand jury testimony, this Court only narrowed the indictment. The defendant was on notice that he was responsible for the statements made in the scope of his grand jury testimony, and had notice well before trial that the government specifically intended to offer Statement C as a basis for his conviction. *See* Dkt. 194 at 6, 7-8. There was no constructive amendment or notice deficiency to warrant a new trial.

### D.    The jury instructions were not erroneous

The defendant argues that because the jury instructions did not require the jury to find that a statement was "evasive, false, *and* misleading," to be obstructive, and did not include language requiring the jury to base its conviction on the totality of the defendant's grand jury testimony, this Court should grant him a new trial. Dkt. 396 at 21; *see* Tr. 1864-66, 1898, 1908-09; Dkt. 344 at 5; Dkt. 345 at 2. These two issues were fully litigated, and the jury instructions reflect this Court's careful consideration. *See supra* Statement of the Facts.D.

This Court adopted the disjunctive with respect to "intentionally false, evasive, or misleading" in recognition that while the indictment had alleged in the conjunctive these three different means of obstructing justice, the jury was entitled to convict on any one of these means.[4] Dkt. 355; Tr. 1864-66, 68-81, 1888-90, 1898, 1908-09; *see* Dkt. 354 (citing *Crain v. United States*, 162 U.S. 625, 634-36 (1896) (cited in *Miller*, 471 U.S. at 136), *overruled on other grounds*, *Garland v. State of Washington*, 232 U.S. 642, 646-47 (1914); *United States v.*

---

[4] "Intentionally evasive, false, and misleading" is not an element of 18 U.S.C. § 1503. *See, e.g.*, Model Crim. Jury Instr. 9th Cir. 8.131 (2010); Kevin F. O'Malley et al., Federal Jury Practice and Instructions § 48:03 (5th ed. 2011). This Court need not instruct on surplusage, and any difference between the indictment and jury instructions was at most a harmless variance, given that the evidence actually proved that Statement C was evasive, false, and misleading. *See United States v. Hartz*, 458 F.3d 1011, 1015-16, 1019-23 (9th Cir. 2006) (no constructive amendment where indictment mentioned specific firearms, instructions referred only to "a firearm," but evidence was limited to firearms particularized in indictment).

*Bettencourt*, 614 F.2d 214, 219 (9th Cir. 1980) ("[A] jury may convict on a finding of any of the elements of a disjunctively defined offense, despite the grand jury's choice of conjunctive language in the indictment."); *United States v. Abascal*, 564 F.2d 821, 832 (9th Cir. 1977) (same); *United States v. UCO Oil Co.*, 546 F.2d 833, 838 (9th Cir. 1976) (same)).

This Court also rejected the proposed "totality" language because it was concerned that the jury would be misled into believing that to convict on Count Five, it had to find the entirety of the defendant's grand jury testimony obstructive. Tr. 1867, 1871; Dkt. 354 at 3; Dkt. 355. That wording choice was well within the Court's discretion. *United States v. Padilla*, 639 F.3d 892, 896 (9th Cir. 2011) (defendant is not entitled to any particular form of instruction).

### E. The government's closing argument was not misleading

The defendant appears to suggest that the government's closing argument on Count Five gives this Court a basis for granting a new trial. Dkt. 396 at 26. But the defendant did not object during the argument, Tr. 1980, and there was nothing improper or misleading about the argument. The government simply advanced its interpretation of the defendant's grand jury testimony as obstructive of justice, as it was entitled to do. The defendant's disagreement with the government's interpretation of the evidence is no basis for granting a new trial.

### III. THE DEFENDANT WAIVED ANY ARGUMENT THAT HIS IMMUNITY ORDER DID NOT BAR HIS PROSECUTION FOR OBSTRUCTION OF JUSTICE

The defendant argues that his immunity order barred his prosecution for obstruction of justice by means of true, but evasive or misleading statements. Dkt. 396 at 23-25. The defendant waived this argument by failing to raise it prior to trial. In any case, the argument is meritless.

### A. The defendant has waived the argument, without good cause

The defendant waived his argument that his immunity order barred his prosecution for obstructing justice because he failed to make the argument prior to trial, and Fed. R. Crim. P. 12 states that the failure to make a motion alleging a defect in instituing the prosecution before trial constitutes a waiver that the Court may only relieve for good cause. Fed. R. Crim. P. 12(a)(3)(A) & (e). The defendant has not provided the Court with "any legitimate explanation for his failure to make a timely objection." *United States v. Davis*, 663 F.2d 824, 831 (9th Cir. 1981). Indeed it

is difficult to imagine any such explanation given that the defendant repeatedly moved to dismiss the obstruction of justice count prior to the 2011 trial.  Tr. 138.

In 2008, the defendant argued that the government should not be permitted to base its obstruction of justice prosecution on any statements other than those charged as false statements. Dkt. 73 at 8.  This Court denied the defendant's motion.  Dkt. 73 at 8-9.  In 2011, more than two months before trial began, the defendant objected to listing Statement C in the jury instructions as a possible basis for conviction because it would allow the jury to convict him for a statement that was not false.  Dkt. 194 at 7-8, 11-12.  Noting the similarity between this and the defendant's 2008 motion, this Court denied the motion.  Dkt. 223 at 1-4.

Nothing since the start of trial has changed to justify permitting the defendant to attack the obstruction of justice count as barred by the defendant's immunity order.  The defendant has long possessed his December of 2003 immunity order.  Exh. 38 (unredacted).  No new facts have surfaced.  There is no good cause to excuse his failure to attack the obstruction of justice count on the basis of his immunity order, and he has waived the argument.

### B.    The defendant's immunity order does not bar his prosecution for obstruction of justice on the basis of truthful but evasive or misleading statements

The evidence supports a finding that Statement C was false.  But in any case, *Thomas*, 612 F.3d 1107, forecloses the defendant's argument that his immunity order barred his prosecution for obstruction of justice based on evasive or misleading, but truthful statements.

The defendant's immunity order was granted on the basis that, "[i]n the judgment of the United States Attorney, Barry Bonds is likely to refuse to testify on the basis of his Fifth Amendment privilege against self-incrimination."  Exh. 38 (unredacted) at 1.  The order provided that "the testimony and other information compelled" from the defendant, as well as "any information directly or indirectly derived from such testimony may not be used against him in any criminal case, exception a prosecution for perjury, false declaration, or otherwise failing to comply with this order."  *Id.* at 2.

The defendant received the order "through [his] lawyer" and was advised about it prior to the grand jury proceeding.  Exh. 37 at 7, 11-12.  At the grand jury proceeding itself, the prosecutor read the order to the defendant, explicitly advising him that "an exception" to the immunity is "if there were a prosecution for perjury, false declaration, false statements or otherwise failing to comply with this cord [sic]."  Exh. 37 at 8-10.  The defendant stated that he understood and had no questions.  Exh. 37 at 10-12.

*Thomas* held that immunity governed by 18 U.S.C. § 6002 pertains only to prosecutions based on the testimony compelled or forced by the grant of immunity.  612 F.3d at 1125-27; *see Kastigar v. United States*, 406 U.S. 441, 453 (1972) (immunity from use and derivate use granted under Section 6002 "is coextensive with the scope of the privilege against self-incrimination").  In Thomas's case, it did not protect her from being prosecuted for obstruction of justice based on her "*unforced* decision to testify in an untruthful and misleading manner," which constituted non-compliance with the immunity order.  *Thomas*, 612 F.3d at 1125-27 (original emphasis).

As in *Thomas*, the defendant's immunity order made clear that the basis for its grant was the defendant's likelihood of refusing to testify on the basis of his Fifth Amendment privilege against self-incrimination.  *Thomas*, 612 F.3d at 1127; *see* Exh. 38 (unredacted).  The defendant was therefore immunized only against prosecutions based on truthful, self-incriminating testimony.  *Id.* at 1127-28.  The defendant was not immunized against being prosecuted for obstructing justice on the basis of Statement C.  Even if it were truthful, Statement C was decidedly unforced testimony designed to withhold truthful evidence from the grand jury.

The defendant volunteered the non-responsive Statement C instead of answering the prosecutor's straightforward question about whether Anderson had provided him with any injectable substances.  The government was entitled to prove, and the jury was entitled to find – as it did – that Statement C was not innocent rambling, but that the defendant deliberately made Statement C to obstruct justice.  Read in the context of the (redacted) grand jury testimony and other evidence offered at trial, the jury could find that the defendant did not want to admit that Anderson had provided him with injectable substances, and so instead of answering the question, tried to distract the prosecutors and grand jurors from their investigation with insights into his

experience as a life-long celebrity.  The jury could also find that Statement C served another purpose – to make his lies more believable.  The defendant ultimately testified that Anderson had provided him with various substances, but that the defendant had no knowledge what these substances were.  That the defendant had allowed this to occur could only be understood in the context of the defendant's reluctance to "get into other people's business" because of his unique upbringing as a "celebrity child."

The defendant argues that because the statement underlying the obstruction of justice conviction in *Thomas* was both false and misleading, *Thomas* is limited to false statements.  Dkt. 396 at 29-30.  His interpretation reduces the *Thomas* opinion to surplusage.  Section 6002 explicitly permits "a prosecution for perjury" or "giving a false statement," under whatever section of the United States Code such a prosecution might be brought.[5]  18 U.S.C. § 6002.  The question that *Thomas* addressed was whether Section 6002's exception for a prosecution for "otherwise failing to comply with the [immunity] order," encompasses "prosecution for obstruction of justice under 18 U.S.C. § 1503 for false and/*or* misleading grand jury testimony." 612 F.3d at 1125-26 (emphasis added).  *Thomas* concluded that it does.  The "otherwise" clause of Section 6002 permits prosecution for "conduct that 'frustrates the purpose of the grant of immunity.'" *Thomas*, 612 F.3d at 1126 (quoting *United States v. Duran*, 41 F.3d 540, 545 (9th Cir. 1994) (Section 6002 immunity does not bar prosecution for conspiracy to commit perjury)). Conduct need not involve false statements to frustrate the purpose of the grant of immunity.  For example, Section 6002 does not bar prosecution for contempt, even though the failure to testify obviously does not involve false statements or perjury.  *See id.* (Ninth Circuit has held that "otherwise" clause of Section 6002 permits prosecution of contempt and other crimes).

//

//

//

//

---

[5]  *See*, *e.g.*, 18 U.S.C. §§ 1621 (perjury), 1622 (subornation of perjury), 1623 (false declarations before grand jury or court).

1

## CONCLUSION

2    For the above-stated reasons, the government respectfully requests that the defendant's

3 motion for judgment of acquittal and/or a new trial on Count Five be denied.

4

5 DATED:  July 27, 2011                    Respectfully submitted,

6                                          MELINDA HAAG
                                           United States Attorney
7
                                                  /s/
8                                          _____
                                           MERRY JEAN CHAN
9                                          MATTHEW A. PARRELLA
                                           JEFFREY D. NEDROW
10                                         Assistant United States Attorneys

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28