ALLEN RUBY, SB #47109
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301
Telephone: 650-470-4500
Facsimile: 650-470-4570

CRISTINA C. ARGUEDAS, SB #87787
TED W. CASSMAN, SB #98932
ARGUEDAS, CASSMAN & HEADLEY
803 Hearst Avenue
Berkeley, CA 94710
Telephone: 510-845-3000
Facsimile: 510-845-3003

DENNIS P. RIORDAN, SB # 69320
DONALD M. HORGAN, SB #121547
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: 415-431-3472
Facsimile: 415-552-2703

Attorneys for Defendant
BARRY BONDS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>BARRY LAMAR BONDS,<br><br>Defendants | Case No.: CR 07-0732 SI<br><br>DEFENDANT'S SENTENCING MEMORANDUM<br><br>Date: December 16, 2011<br>Time: 11:00 a.m.<br>Hon: Susan Illston |

Defendant Barry Bonds respectfully submits his Sentencing Memorandum pursuant to Local Rule 32(b).

---

DEFENDANT'S SENTENCING MEMORANDUM                                                   1

I. **INTRODUCTION**

Both Mr. Bonds and the Government have affirmed the accuracy and thoroughness of the Presentence Investigation Report ("PSR") – a rare substantive agreement in this contentious case – under Local Rule 32-4(c)(1). Although Mr. Bonds does not believe that the recommended period of location monitoring is necessary, he does not object to the Sentencing Recommendation. As discussed below, the agreed facts in the PSR amply support the Sentencing Recommendation.

II. **THE GUIDELINES DEPARTURES/VARIANCES RECOMMENDED BY THE PROBATION OFFICE ARE WARRANTED IN LIGHT OF THE FACTS IN THE PSR.**

The PSR identifies four factors which "are present in this case, and taken together, form the basis for a departure/variance to a recommendation for a probationary sentence in lieu of imprisonment." Sent.Rec. 3.

The first is whether or not the count of conviction over-represents the seriousness of the offense behavior under USSG §5K2.0(a)(3). As pointed out in the PSR, the base offense level 14 for obstruction of justice embraces, among other things, using threats or force to intimidate or influence a juror or federal officer, or causing a witness bodily injury or property damage in retaliation for providing evidence in a federal proceeding. See background commentary to USSG §2J1.2. Mr. Bonds does not dispute that he was convicted of a serious offense. The seriousness of 18 U.S.C. §1503 is not challenged by observing that his offense conduct was less egregious than using intimidation or force to influence testimony, or retaliating against a witness.

Second, the PSR also concludes that Mr. Bonds' history of prior good works may warrant departure or variance under USSG §§5K2.08(a)(4) and 5H1.11. Most of Mr. Bonds' charitable and civic contributions, financial and otherwise, have taken place away from the public eye. He has deliberately chosen not to use the many years he has devoted to causes that he values to enhance his public stature as an athlete and celebrity.

Because a prior history of good works is not often included in a Guidelines analysis, it bears emphasis that the Probation Office did not merely rely upon the many letters documenting Mr. Bonds' extensive charitable activities. See, for example, letters from D.L and M.L dated

DEFENDANT'S SENTENCING MEMORANDUM                                                                 2

September 25, 2011, J.H. dated October 20, 2011 and T.R dated September 27, 2011. The Probation Office sought and obtained corroboration from different sources, including interviews with associates and employers, that "he has a significant history of charitable, civic and prior good works." Sent.Rec. 3.

Third, the PSR asserts that Mr. Bonds' conviction appears "to be an aberration when taken in context of his entire life." USSG §5K2.20. Sent.Rec. 4. The Probation Office is neither naive nor soft-hearted: it describes Mr. Bonds' behavior as "illegal and criminal in light of his conviction for obstruction of justice." But one reason the PSR commands respect is its insistence that an appropriate sentence for Mr. Bonds be based upon the conduct for which he was convicted: "The behavior for which Mr. Bonds is to be sentenced relates to his obstruction of justice conduct before the Grand Jury. The sentence to be imposed should not be about steroid use and how this use impacts his stature [as a baseball player] …" Sent.Rec. 2.

Mr. Bonds is 47 years old. He was convicted of one count of obstruction of justice which occurred during the afternoon of December 4, 2003. The Guidelines permit consideration of whether or not his conduct was an aberration, notwithstanding its seriousness.

The PSR carefully notes that no single one of these factors is or should be dispositive. Intead, they should be "taken together", along with considerations of uniformity of sentencing (discussed below), to support a recommendation for a probationary sentence. Sent.Rec. 2-3. What is especially significant is that all of these factors point in the same direction—i.e., toward probation. The PSR identifies no factors in the Guidelines or elsewhere which would enhance or increase the severity of an appropriate sentence for Mr. Bonds.

### III. THE RECOMMENDED SENTENCE FOR MR. BONDS COMPLIES WITH 18 U.S.C. §3553 (a)(6).

*United States v. Booker*, 543 U.S. 220 (2005) instructs District Courts to fashion appropriate sentences by considering the factors in 18 U.S.C. §3553(a). This is the "overarching statutory charge for the District Court." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). Guidelines are advisory. *Gall v. United States*, 552, U.S. 38, 49-50, n.6 (2007).

The PSR discusses all of the factors in §3553(a), and analyzes at length §3553(a)(6), the

need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

The PSR notes that four individuals have been sentenced for false statements to the Grand Jury or investigators in the BALCO case: Tammy Thomas, Trevor Graham, Dana Stubblefield and Marion Jones. Ms. Thomas was convicted of obstruction of justice and multiple counts of perjury. Mr. Graham, Mr. Stubblefield and Ms. Jones were convicted of false statements to investigators. Only Ms. Jones received a custodial sentence.

The PSR points out that although Mr. Graham was convicted for making a false statement, "his underlying conduct of supplying actual drugs to athletes and lying to them about the substances, and the fact that he was a coach who significantly influenced athletes' lives, makes his case very serious." The PSR also says that "it is difficult to consider the Jones sentencing as she was sentenced in another district by a different judge…" Ms. Jones was convicted of multiple false statements in two unrelated criminal investigations. One of them was BALCO, but the other was a fraudulent check-cashing scheme under investigation in New York. Here is how the Government's Sentencing Memorandum in the New York case described the effect of her false statements:

> Jones was very nearly a witness for the Government in the criminal trial before Your Honor. It is difficult to articulate how catastrophic would have been her perjurious testimony had the Government not fortuitously learned, at the eleventh hour, of the falsity of her statements. The defendant's false statements derailed the Government's investigative efforts and were highly material to its criminal investigation.

Government's Sentencing Memorandum, December 21, 2007, at page 8 attached hereto as Exhibit "A". Ms. Jones was not sentenced for "similar conduct" to Mr. Bonds within 18 U.S.C. §3553(a)(6) because of her multiple convictions, one of which was unrelated to BALCO.

Taking the relevant comparators into account, the PSR concludes that:

> Graham's behavior significantly negatively impacted the lives of others, while the conduct of Stubblefield, Thomas and Bonds

DEFENDANT'S SENTENCING MEMORANDUM        4

affected the proper and ordered functioning of the criminal justice system. Because the Court must consider 18 U.S.C. §3553(a) factors when imposing a sentence, it is believed that pursuant to 18 U.S.C. §3553(a)(6), in order to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, a probationary sentence for Mr. Bonds, with a condition of home confinement, addresses this issue.

Sent Rec. 4.

The recommendation comports with common sense as well as the statute. Mr. Stubblefield received a less severe sentence than is recommended for Mr. Bonds. In turn the recommended sentence for Mr. Bonds is less than the sentence received by Ms. Thomas, who was convicted of multiple perjury counts when Mr. Bonds was not. Accordingly, uniformity supports the PSR's recommendation for probation and location monitoring.

### IV. THE PSR'S RECOMMENDATION FOR COMMUNITY SERVICE IS BASED UPON MR. BONDS' LONGSTANDING COMMITMENT TO HELPING OTHERS.

The PSR recommends community service, specifically directed to youth-related activities, because "it is believed that Mr. Bonds can use his status, as well as his past record of giving to youth-related causes for some beneficial and significant impact to society." Sent. Rec. 5.

Mr. Bonds' capacity and willingness to contribute to the community is verified by many of the letters submitted on his behalf. To take only one example, here is what K.S. of Children's Hospital said in her letter of September 28, 2011:

> I have had the privilege to get to know Barry Bonds over the last several years as the wonderful benefactor of our new Barry Bonds Family Foundation playroom and as the most special visitor to the Children's Hospital. Barry is always unfailingly kind and attentive to the many young children who flock to his side. Most often these are unannounced and unpublicized visits. Frequently he will go to the bedside of a particularly ill child and gently give him/her words

of encouragement to "never give up". He pays special attention to parents as well and it is obvious, that as a parent, he appreciates the heavy burden and stress that a child's illness places on their family. I have been a nurse for 20 years and have met many special visitors but Barry stands out as a person who instantly gains rapport with children. He has an infectious smile and never treats the children as if their illness somehow makes them different. What they feel from him is that they are special! When we had the grand opening of the BB Family Foundation Playroom all the children were lined up waiting to enter the newly renovated room. When the door opened and Barry was standing there a little girl yelled "Mr Barry Bonds!!" and ran up to hug him. I am not sure who had the bigger smile, her or him. It was a moment I won't soon forget. Barry Bonds is a hero to us at the UCSF Benioff Children's Hospital. Our gratitude for his efforts and willingness to help out at any time is impossible to fully articulate. I consider being a character witness for Barry Bonds a privilege.

The PSR's recommendation correctly foresees a significant benefit to the community.

## V.  CONCLUSION

We respectfully asks the Court to adopt the PSR's finding that there are four bases for downward departure and/or variance, and to impose a probationary sentence in accordance with the recommendation of the Probation Office

Respectfully submitted,

DATED: December 5, 2011                Skadden, Arps, Slate, Meagher & Flom LLP

*/s/ Allen Ruby*

Allen Ruby, Attorney for
Defendant Barry Bonds

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

   -v.-                                  S6 05 Cr. 1067 (KMK)

MARION JONES,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York

SCOTT N. SCHOOLS
United States Attorney for the
Northern District of California

E. DANYA PERRY
DANIEL W. LEVY
MATTHEW A. PARRELLA
JEFFREY D. NEDROW
JEFFREY R. FINIGAN
Assistant United States Attorneys
   - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA

-v.-                                    S6 05 Cr. 1067 (KMK)

MARION JONES,

              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

In advance of the sentencing of defendant Marion Jones ("Jones" or the "defendant"), the Government respectfully submits this Sentencing Memorandum. For the reasons set forth below, the Court should impose a sentence within sentencing range stipulated to by the parties.

### I. Jones' False Statements In Connection With The Northern District of California Criminal Investigation

#### A. Introduction

On October 5, 2006, Jones pled guilty to Count One of the Information, charging her with a violation of 18 U.S.C. § 1001. The United States Probation Office has prepared a Presentence Report (the "PSR") for this defendant that contains a determination that the total offense level was 4 and that the defendant's Criminal History Category was I. The PSR also states that the applicable Sentencing Guidelines range was 0 to 6 months' imprisonment. The Government agrees with the Sentencing Guidelines calculations contained in the PSR.

#### B. Factual Background

A federal criminal investigation ("the criminal investigation") commenced in the Northern District of California concerning the distribution of anabolic steroids and other illegal performance-enhancing drugs and the related money laundering of proceeds from said distributions centered around Balco Laboratories, Inc. ("BALCO"), a Burlingame, California

corporation performing blood-testing, among other functions. The criminal investigation subsequently expanded to include investigations into whether various witnesses committed perjury before the grand jury and whether witnesses made false statements to federal agents in the course of the federal agents' duties.

As part of the criminal investigation, on or about September 3, 2003, a federal search warrant, issued out of the Northern District of California, was executed at the BALCO premises. Among other things, investigators obtained evidence concerning Jones and her relationship with BALCO, Trevor Graham (Jones' former athletic coach), and other professional athletes. Internal Revenue Service - Criminal Investigation ("IRS-CI") special agents seized a multi-page ledger containing the names of BALCO's client-athletes. This ledger also listed the corresponding doses each client-athlete was taking and information transcribed from urine test results for those client-athletes on tests conducted by Quest Diagnostics for the presence of anabolic steroids and masking agents. Throughout the ledger abbreviated entries appear, such as, "Nor," "Tren," and "IOC." See Affidavit of Jeffrey Novitzky ¶ 2 (sworn to on Dec. 19, 2007) ("Novitzky Aff.").

Specifically listed on two pages of the ledger is the name "Marion J," referring to the BALCO client-athlete Marion Jones, the defendant in this matter. See Novitzky Aff., Exh. A. Under the "Marion J" entry on each page are multiple notations indicating the use of both Norbolethone and THG during the time period from September of 2000 through June of 2001. James Valente ("Valente"), the former vice president of BALCO, has provided the government with information that he was the creator of this ledger and that the entries for "Marion J" referred to Marion Jones. Valente also stated that the ledger represented the use of these drugs by these client-athletes, as well as the results of the tests for the presence of anabolic steroids conducted

on these client-athletes' urine samples. Valente also provided specific information of his knowledge of Marion Jones' receipt of "the clear," the nickname used by BALCO and its client-athletes for Norbolethone and THG. Novitzky Aff. ¶¶ 3-4.

On September 3, 2003, Victor Conte ("Conte"), the president of BALCO, provided both verbal and written consent to federal agents to search a storage locker he retained at a personal storage facility in Burlingame, California. IRS-CI agents seized multiple items from Conte's storage locker, including several boxes of yellow manila folders labeled with the names of client-athletes. These folders contained multiple documents referring to specific athletes, including a yellow manila folder labeled "Marion Jones." Within that folder were several monthly calendars that contained the initials "MJ" on them. Novitzky Aff., Exh. B. Calendars for the months of March through July of 2001 were seized within the Marion Jones folder labeled with the initials "MJ." Contained throughout the "MJ" calendars on multiple dates were the handwritten letters E, C, G, and I.

IRS-CI agents have learned through BALCO employees, other BALCO client-athletes, and emails and notes seized during the course of the investigation, that these calendars containing the above-referenced handwritten letters are "doping calendars," created for the BALCO athlete-clients as a guideline for their use of athletic performance-enhancing drugs received from BALCO. The handwritten letters on the doping calendars were shorthand for the names of the actual performance-enhancing drugs, where "E" represented erythropoietin or EPO, "C" represented "the clear" or the designer steroids Norbolethone and THG, "G" represented human growth hormone, and "I" represented Insulin. Each of these drugs has athletic performance-enhancing benefits when administered according to a doping program. Novitzky Aff. ¶ 5.

3

Also contained within the manila folder labeled "Marion Jones" were blood test reports that were labeled with Marion Jones' name and date of birth. Information from these tests was used to make contact with a phlebotomist in Raleigh, North Carolina, who confirmed that she withdrew blood from Marion Jones on multiple occasions, sent the blood for testing by American Medical Laboratories, Inc., and that those test results were the same blood test results seized from Conte's storage locker. Novitzsky Aff. ¶ 6.

The use of EPO, which is reflected in the "doping calendars" found within the manila folder labeled with "MJ," Novitzky Aff., Exh. A, artificially stimulates the production of red blood cells within the user's body. EPO is administered by injection only and is typically injected subcutaneously, just under a fold of skin in the abdomen area. The hematocrit level in one's blood, which is the percentage of red blood cells in a specified blood volume, is a marker used to measure the effectiveness of EPO.

The data contained on the blood test reports of Marion Jones was provided to Dr. Michael Sawka, the Chief of Thermal and Mountain Medicine in the U.S. Army's Research Institute of Environmental Medicine. Dr. Sawka is an expert on the use of EPO and its effects on the body. After reviewing this data, Dr. Sawka stated that, with conservative calculations, the increase in hematocrit levels between two of the tests, taken approximately 2 weeks apart, showed approximately three times the amount of red blood cells added than what could normally be expected to be produced naturally. Novitzky Aff. ¶ 8. Examination of the "doping calendars," Novitzky Aff., Exh. B, reveals an approximate two-week use of "E," or EPO, corresponding to the dates contained within the blood test reports reviewed by Dr. Sawka.

### C. The Defendant's False Statements

As part of the criminal investigation, on November 4, 2003, an IRS-CI special agent interviewed Jones, in the presence of her attorneys, in San Jose, California. Prior to the interview, a letter immunity agreement between Jones and the United States Attorney's Office for the Northern District of California covering Jones's interview was completed. The letter immunity agreement specifically stated that Jones was not immunized from prosecution for making false statements during the interview.

As part of the criminal investigation, defendant Jones was interviewed regarding the following matters, among others, which were material to the Balco investigation: (a) whether Jones had ever taken athletic performance-enhancing drugs; (b) whether Jones had ever seen and used a performance-enhancing drug referred to as "the clear;" and (c) whether Jones had received the items referred to in (a) and (b) from Trevor Graham. Jones stated, in sum and substance, that: (a) she had never taken athletic performance-enhancing drugs; (b) she had never seen and ingested a performance-enhancing drug, referred to as "the clear;" and (c) she had never received any such items from Trevor Graham. Each of these statements was false, and the defendant knew each was false at the time she made them.

### D. Conclusion

The defendant's use of performance-enhancing drugs encompassed numerous drugs (THG, EPO, Human Growth Hormone) and delivery systems (sublingual drops, subcutaneous injections) over a substantial course of time. Her use of these substances was goal-oriented, that is, it was designed to further her athletic accomplishments and financial career. Her false statements to the IRS-CI agent were focused, hoping not only to deflect the attention of the

investigation away from herself, but also to secure the gains achieved by her use of the performance-enhancing substances in the first place. The false statements to the IRS-CI agent were the culmination of a long series of public denials by the defendant, often accompanied by baseless attacks on those accusing her, regarding her use of these substances.

The context of the defendant's use of performance-enhancing substances, as detailed in the documents seized from BALCO, shows a concentrated, organized, long-term effort to use these substances for her personal gain, a scenario wholly inconsistent with anything other than her denials being calculated lies to agents who were investigating that same conduct.

## II. Jones False Statements In Connection With The Southern District of New York Criminal Investigation

### A. Factual Background

As the Court is aware from presiding over the trial of Steven Riddick ("Riddick"), Nathaniel Alexander ("Alexander"), and others, this case arose from a long-term investigation in this District of a massive check fraud scheme. The originators in this scheme had nearly unlimited supplies of bogus checks and were constrained only by the need to recruit account-holders willing to deposit the checks and launder the proceeds back to the originators. One of the originators in this case was Douglas Shyne, who through an intermediary, was introduced to Timothy Montgomery ("Montgomery") in 2005. Montgomery was a world-class athlete who was at the time residing with the defendant, herself a celebrated athlete. In the Spring of 2005, Montgomery himself deposited a counterfeit check into his own account and in turn recruited others to deposit into their respective accounts additional counterfeit checks in high-dollar amounts. One of these account-holders was the athletic coach who trained both Montgomery and the defendant, Riddick, and another was Riddick's officemate and friend,

6

Alexander. Among other things, Alexander deposited a counterfeit chk for $850,000 into a business bank account he held, and wrote a number of proceeds checks drawn from the bogus check. One of those checks, in the amt of $25,000, was made out to the defendant, and was endorsed and deposited by her. Montgomery also enlisted his sports agent, Charles Wells, to deposit two checks for over $1,000,000 into Wells's bank accounts, and as noted, Montgomery himself deposited a counterfeit check for $200,000 into a business bank account he held -- an account that had been largely dormant until that time. Significantly, just days before the deposit of this check, Jones was added as a signatory to this account and as an officer of Montgomery's "business."

### B. The Defendant's False Statements

In preparing for the trial of the check fraud case, agents from Immigration and Customs Enforcement and members of the United States Attorney's Office met with the defendant, along with her attorney, at the United States Attorney's Office for the Southern District of New York, on two separate occasions. At the first meeting, held on August 2, 2006, the defendant denied any knowledge of the $25,000 check from Alexander. This was false, as Jones well knew that she had indeed received, endorsed, and deposited that check. On that same date, and again at a meeting on September 5, 2006, the defendant stated that she was unaware that Montgomery had received any large checks during 2004 and/or 2005. This, too, was false, as she well knew that Montgomery had indeed received a fraudulent check in the amt of $200,000 in 2005. In fact, as noted above, the defendant was added as an officer and co-signer on the account into which that check was deposited for the very purpose of receiving proceeds from that check. Relatedly, in the meetings at the U.S. Attorney's Office on those two dates, the defendant denied knowledge of

7

Montgomery's involvement in a check fraud scheme, when in fact she had had explicit discussions with him about this scheme and was aware of his involvement.

### C. Conclusion

Jones was very nearly a witness for the Government in the criminal trial before your Honor. It is difficult to articulate how catastrophic would have been her perjurious testimony had the Government not fortuitously learned, at the eleventh hour, of the falsity of her statements. The defendant's false statements derailed the Government's investigative efforts and were highly material to its criminal investigation.

III.   **Conclusion**

For the reasons set forth above, the Court should impose a sentence within sentencing range of 0 to 6 months' imprisonment stipulated to by the parties.

Dated: December 21, 2007
      New York, New York

> Respectfully submitted,
>
> MICHAEL J. GARCIA
> United States Attorney for the
> Southern District of New York
>
> By: _____/s/_____
> E. Danya Perry/Daniel W. Levy
> Assistant United States Attorneys
> Telephone: (212) 637-2434/(212) 637-1062
>
> SCOTT N. SCHOOLS
> United States Attorney for the
> Northern District of California
>
> By: _____/s/_____
> Matthew A. Parrella/Jeffrey D. Nedrow/
> Jeffrey R. Finigan
> Assistant United States Attorneys
> Telephone: (408) 535-5042/(408) 535-5045/
> (415) 436-7232

## AFFIRMATION OF SERVICE

DANIEL W. LEVY, pursuant to 28 U.S.C. § 1746, declares under the penalty of perjury:

I am employed in the Office of the United States Attorney for the Southern District of New York.

On December 21, 2007, I caused the foregoing GOVERNMENT'S SENTENCING MEMORANDUM and the accompanying AFFIDAVIT OF JEFFREY NOVITZKY, together with the exhibits attached thereto, to be served via Clerk's Notice of Electronic Filing upon the following attorney, who is a filing user in this case:

> Henry John DePippo, Esq.
> Nixon Peabody LLP
> Clinton Square
> P.O. Box 31051
> Rochester, New York 14603
>
> Counsel to defendant Marion Jones

with a courtesy copy of the same by electronic mail to:

> F. Hill Allen, Esq.
> Tharrington Smith, LLP
> 209 Fayetteville Street
> Raleigh, North Carolina  27602
>
> Counsel to defendant Marion Jones

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 21, 2007, at New York, New York.

_____/s/_____
Daniel W. Levy