ALLEN RUBY, SB #47109
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301
Telephone:650-470-4500
Facsimile: 650-470-4570

CRISTINA C. ARGUEDAS, SB #87787
TED W. CASSMAN, SB #98932
ARGUEDAS, CASSMAN & HEADLEY
803 Hearst Avenue
Berkeley, CA 94710
Telephone: 510-845-3000
Facsimile: 510-845-3003

DENNIS P. RIORDAN, SB # 69320
DONALD M. HORGAN, SB #121547
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: 415-431-3472
Facsimile: 415-552-2703

Attorneys for Defendant
BARRY BONDS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR 07-0732 SI |
| Plaintiffs, | RESPONSE BY DEFENDANT TO GOVERNMENT'S SENTENCING MEMORANDUM |
| vs. | Date: December 16, 2011 |
| BARRY LAMAR BONDS, | Time: 11:00 a.m. |
| Defendants | Court: Hon. Susan Illston |

Defendant Barry L. Bonds respectfully submits his response to the Sentencing

Memorandum of the Government (U.S. Sent. Mem.).

I. **INTRODUCTION**

The Government's Sentencing Memorandum acknowledges the accuracy of the detailed factual presentation in the Presentence Report ("PSR"). Moreover, the Government offers no additional factual information to support its argument that the sentencing recommendation of the PSR should be disregarded. The argument itself does not really come to grips with the reasons articulated by the Probation Office why the recommended sentence comports with 18 U.S.C. § 3553(a).

II. **THE PSR ANALYZES FOUR DISTINCT GROUNDS FOR DEPARTURE AND/OR VARIANCE FROM A GUIDELINES SENTENCE.**

The PSR identifies three potential bases for downward departure under the Guidelines: whether the offense level attributed to the count of conviction overrepresents the seriousness of the offense behavior (U.S.S.G. § 5K2.0(a)(3)), whether the Court concludes that Mr. Bonds' civil, charitable or public service work merits significant consideration (U.S.S.G. § 5K2.0(a)(4) and 5H1.11), and whether or not the Court feels that Mr. Bonds' actions in this case constitute aberrant behavior from an otherwise law-abiding lifestyle (U.S.S.G. § 5K2.20). The PSR also identifies 18 U.S.C. § 3553(a)(6), the need to avoid unwarranted sentence disparities, as a variance factor. The Probation Officer determined that "all four of these factors are present in this case" (Sent. Rec. 3), and "cumulatively lead" the Probation Officer to recommend probation. *Id.* at 4.

Neither the PSR nor the Government's Sentencing Memorandum identifies any evidence which might lead to an upward departure or an aggravated sentence. The seriousness of obstruction of justice is emphasized in the PSR, echoed in the Government's Sentencing Memorandum, and not disputed by Mr. Bonds. But even the Government does not argue that the seriousness of the offense of conviction overrides the departure/variance factors in the PSR.

III. **THE GOVERNMENT'S ARGUMENT ABOUT THE FACTS OF THE CASE DOES NOT OVERCOME THE ANALYSIS IN THE PSR.**

The thrust of the Government's argument is twofold: Mr. Bonds had a "plan" to mislead the Grand Jury, and he made multiple false statements to the Grand Jury.

The "plan" argument is still murky. It seems to depend upon the Government's

1  interpretation of the trial testimony of Stan Conte.   There was no evidence at trial as to when

2  Mr. Bonds or Mr. Conte was subpoenaed to the BALCO Grand Jury.   Mr. Conte never testified at

3  the BALCO Grand Jury.   Mr. Conte characterized Mr. Bonds' statements to him as the kind of

4  "rambling" he was accustomed to from Mr. Bonds. But basically the "plan" argument is

5  superfluous – by its verdict the jury found that Mr. Bonds acted with "corrupt intent" which is

6  presumably the whole point of the plan argument anyway.

7       The argument that Mr. Bonds repeatedly lied to the Grand Jury raises a different kind of

8  issue. The jury declined to convict Mr. Bonds of making false statements, and we believe that the

9  offense of which Mr. Bonds was convicted is not interchangeable with the offenses of which he was

10  not convicted. But there is another reason why the accusations of false statements should not affect

11  Mr. Bonds' sentence:  throughout the BALCO case, defendants have been sentenced only for the

12  offenses of which they were convicted – by verdict or guilty plea – and not unconvicted offenses.

13       According to the PSR, Trevor Graham was a coach who actually supplied drugs to athletes.

14  Sent. Rec. 4.  Mr. Graham received probation. According to the Court at the sentencing of Tammy

15  Thomas, James Valente "who was in the business and made money off of this, got three years

16  probation."  Moreover, "Remi Korchemni, who was a coach and he fed steroids to his athletes, got

17  one year probation."  Thomas Sentencing Transcript at page 10, attached as Exhibit A.

18  Mr. Korchemni was convicted of misbranding of a drug while held for sale.

19       Each of these defendants received probation for the offense of which he was convicted,

20  irrespective of related conduct that was arguably more serious. The Government seems to be

21  arguing that Mr. Bonds should be treated differently, and that he should be imprisoned based upon

22  conduct beyond his conviction.  That would be unfair and unwarranted.

23  **IV.   THE JONES, THOMAS AND ELLERMAN SENTENCES DO NOT SUPPORT THE**

24  **      GOVERNMENT'S ARGUMENT.**

25       The PSR notes that the conviction of Marion Jones was based upon her conduct in two

26  separate investigations, three years apart. PSR, p. 3.  The comments of the New York Court at

27  sentencing make it clear that multiple offenses were a key factor in the sentence:

28

> Now, another factor here in terms of looking at the seriousness of
> the offense is that the false statements here occurred twice
> involving two different investigations in opposite parts of the
> country and involving very different subject matters, and in both
> instances, as is clear from the charging instrument in this case, the
> questions that were asked were clear, they were concise, but they
> were important … and so I don't think that the criminal conduct
> here can be written off as a momentary lapse of judgment, a one-
> time mistake, but, instead, in a repetition in an attempt to break the
> law.

Sentencing Transcript, pp. 38-39.  It also bears mention that the sentencing court expressed "some

doubts about the truthfulness of the entirety of [the defendant's] statement before the court under

oath during her allocution," although these doubts were not incorporated into the sentence.

Transcript at p. 41.

This Court was also well aware of the circumstances of Ms. Jones' plea at the time it

sentenced Ms. Thomas to probation.  Thomas Sentencing Transcript at p. 10.  The PSR is correct in

its view that Ms. Jones is not an appropriate comparator for § 3553(a)(6).

As to Ms. Thomas, the Government says that she had "personal challenges" which

distinguish her from Mr. Bonds.  U. S. Sent. Memo. at p. 6.  Beyond observing that the Probation

Office views Mr. Thomas as an appropriate comparator, we cannot comment on her personal

challenges because her probation report is not a matter of public record..  At the time of her

sentencing, apparently, the Government did not view her personal challenges as an impediment to

its recommendation of a 30-month prison sentence for Ms. Thomas.  Ms. Thomas received

probation notwithstanding her convictions of obstruction of justice and three additional false

statement counts.

Finally, the Government does not enhance its credibility by comparing Mr. Bonds to Troy

Ellerman.  U. S. Sent. Memo., pp. 6-7.

The Government previously sought to compare Mr. Ellerman to Ms. Thomas, and in fact

asserted that his conviction was "very similar to the convictions that this defendant suffered."  The

Court immediately observed that it viewed "what Mr. Ellerman did (sic) far more serious … than

what was in the courtroom in this case."  Thomas Sentencing Transcript at pp. 14-15.

Mr. Ellerman pleaded guilty to four counts – two counts of criminal contempt, one count of

1   filing a false declaration and one count of obstruction of justice.  His criminal conduct spanned

2   more than a year.  The United States Attorney for the Northern District of California wrote to the

3   Probation Office on June 1, 2007, that

4
> Mr. Ellerman attempted to use his own illegal dissemination of the
> grand jury transcripts to destroy the government's prosecution of
5    this case and, as a necessary collateral impact, to destroy the
> professional and personal reputations of the law enforcement
6    professional involved in the investigation.  That he succeeded only
> in being a distraction and drain on government resources was not
7    for wont (sic) of effort, but only because his accusations were
> abjectly false and because Judge Illston correctly saw through
8    them.

9   Letter from Scott Schools and others dated June 1, 2007, page 2, attached as Exhibit B.

10   The letter went on to say that

11
> Mr. Ellerman's false claims of government misconduct have
> emboldened others to make false and groundless accusations
12    against the law enforcement professionals in this case … Mr.
> Ellerman's obvious indifference to the impact his false accusations
13    might have on the reputations and lives of others is one of the more
> unsettling, and disturbing, aspects of this conduct …
14

15   *Id.* at pg. 3

16   In addition, "Mr. Ellerman's conduct has impacted this case and undoubtedly others by casting

17   doubt on the efficacy of the government's ability to maintain grand jury secrecy for its witnesses."

18   Id at pg. 3.

19       The PSR correctly concluded that under 18 U.S.C. § 3353(a)(6), Mr. Bonds' sentence

20   should be compared to the probationary sentences of Mr. Stubblefield, Ms. Thomas and

21   Mr. Graham.

22   **V.**    **CONCLUSION**

23       Mr. Bonds respectfully submits that the recommendation of the Probation Office is

24   appropriate.

25                            Respectfully submitted,

26   DATED: December 13, 2011         Skadden, Arps, Slate, Meagher & Flom LLP

27

28                            Allen Ruby, Attorney for
                                      Defendant Barry Bonds

# EXHIBIT A

Pages 1 - 28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

UNITED STATE OF AMERICA,              )
                                      )
                Plaintiff,            )
                                      )
  VS.                                 )  No. CR 06-0803 SI
                                      )
TAMMY THOMAS,                         )
                                      )  San Francisco, California
                Defendant.            )  October 10, 2008
                                      )
_____)


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          JOSEPH P. RUSSONIELLO
                            United States Attorney
                            450 Golden Gate Avenue
                            San Francisco, California  94102
                     BY:    **MATTHEW A. PARRELLA, AUSA**
                            **JEFFREY D. NEDROW, AUSA**

**For Defendant:**          COLEMAN & BALOGH, LLP
                            225 Bush Street, Suite 1600
                            San Francisco, California  94104
                     BY:    **ETHAN A. BALOGH, ESQUIRE**

**Also Present:**           **Christina Carrubba, U.S. Probation**




**Reported By:**     *Katherine Powell Sullivan, CSR # 5812*
                     *Official Reporter · U.S. District Court*

```
 1              P R O C E E D I N G S

 2   OCTOBER 10, 2008                            12:51 P.M.

 3              THE CLERK:  Calling criminal 06-803,

 4   United States v. Tammy Thomas.

 5              MR. PARRELLA:  Good afternoon, Your Honor.

 6              Matt Parrella and Jeff Nedrow.

 7              MR. NEDROW:  Good afternoon, Your Honor.

 8              THE COURT:  Good afternoon.

 9              MR. BALOGH:  Good day, Your Honor.  Ethan Balogh on

10   behalf of Ms. Thomas.  She's present, out of custody.

11              MS. CARRUBBA:  Good afternoon, Your Honor.  Christina

12   Carrubba, with Probation.

13              THE COURT:  Okay.  We have several motions that are

14   on.  And, in addition, in the event they're denied, we have

15   sentencing.

16              And so let's do the motions first.  I have read them

17   all and I am inclined, Mr. Balogh, to deny them.  So I'll be

18   happy to hear anything you want to add to your papers.

19              MR. BALOGH:  Unless the Court has questions or an

20   area of inquiry it's interested in, I'll submit on the record.

21              THE COURT:  Thank you.

22              Mr. Parrella.

23              MR. PARRELLA:  As will the government.

24              THE COURT:  They're denied.  Thank you, sir.

25              I did, however, find them well done and interesting
```

1    to read.  And, actually, some of those have factored into --

2    into my thinking on the other job we have to do today, which is

3    sentencing.  But I deny the motions.

4           All right.  I think it would be appropriate for

5    Ms. Thomas to come up, please.

6           Ms. Thomas, you've been convicted of three counts of

7    18 U.S.C. 1623(a), which is perjury, and one count of 18 U.S.C.

8    1503, which is obstruction of justice.  You were convicted on

9    April 8th of this year, after a jury trial and verdict.

10          You were convicted on three counts of perjury, found

11   not guilty on two counts of perjury.  You were found guilty of

12   obstruction based on four out of nine possible findings by the

13   jury.

14          I have read and reviewed the presentence report and

15   sentencing recommendation and addendum, and the attached

16   letters, and the government's sentencing memo and request for

17   upward departure, and the defendant's sentencing memo and

18   motion for downward departures, and the defendant's response to

19   the government's memo.

20          Is that everything?

21          **MR. BALOGH:**  There were letters --

22          **THE COURT:**  I read a lot of letters, as well.

23          **MR. BALOGH:**  That's fine.

24          **THE COURT:**  Is that everything, Mr. Parrella?

25          **MR. PARRELLA:**  Yes, Your Honor.

```
 1          THE COURT:  Okay.  Ms. Thomas, did you have a chance
 2   to read the report that was prepared about you?
 3          THE DEFENDANT:  Yes, Your Honor.
 4          THE COURT:  Okay.  Now, I'm going to give you my
 5   preliminary view on the objections to the PSR that are pending.
 6   I'm referring now to the report itself, which has listed the
 7   various objections that were made.
 8          Objection number 1 by the government, which is that
 9   the report should reflect in detail the defendant's prior
10   perjury during her testimony to the U.S. Anti-Doping Agency on
11   August 20, 2002, that's overruled.
12          Objection number 2, the government would like the
13   report to reflect that the defendant filed a false lawsuit
14   against Dr. Don Catlin.  That's overruled.
15          The defendant objection number 1, the defense
16   objects, generally, to the approach with respect to determining
17   the offense conduct.  That's overruled.
18          Objection number 2, the defense objects to the
19   allegations in paragraph 5 and the account of defendant's
20   involvement in a physical altercation.  That's overruled.
21          Objection number 3 -- and I'll talk about this more
22   when I talk about my evaluation of the guideline provisions.
23   Objection number 3 concerns paragraph 16 --
24          MR. BALOGH:  Your Honor --
25          THE COURT:  Yes.
```

```
 1        MR. BALOGH:   I think the probation officer has

 2   skipped over what was objection number 3, which is about

 3   paragraph 9, which it doesn't recite in its objection section.

 4   You would have to refer to my letter of September 17, 2008, the

 5   first paragraph of page 2.

 6        We went in order and sort of -- that one was

 7   unresolved by the probation officer, but it was omitted from

 8   the addendum, as noted in my sentencing papers.

 9        MS. CARRUBBA:   For clarification, Your Honor, I added

10   a sentence at the bottom of paragraph 9, that detailed what

11   defendant states.

12        THE COURT:   "The defendant asserted that these

13   documents were sent by Arnold and Conte without her knowledge."

14        MS. CARRUBBA:   Yes, Your Honor.

15        THE COURT:   Does that take care of it?

16        MR. BALOGH:   Well, not the entire objection.   My

17   objection is set forth on the first paragraph of page 2 of the

18   objections to the PSR, to the draft PSR.

19        THE COURT:   And where would I find that in your

20   sentencing papers?

21        MR. BALOGH:   Excuse me?

22        THE COURT:   Where would I find that in your

23   sentencing papers?

24        MR. BALOGH:   Where I refer that the probation office

25   did not recapitulate all my objections, and I would be relying
```

1   on the letter submitted to the Probation Office, which she

2   presented to the Court.

3           **MS. CARRUBBA:**  I did not submit that letter to the

4   Court, Your Honor.  We don't normally --

5           **MR. BALOGH:**  I -- oh, that --

6           **THE COURT:**  You need to tell me what it is you are

7   concerned about.

8           **MR. BALOGH:**  That's unfortunate, Your Honor.  I had

9   understood -- just so we're clear about why we are where we are

10  right now, I understood that when we had objections, as opposed

11  to the probation office recapitulating our objections in their

12  addendum they set forth what our objections are fully, which

13  are sometimes far more detailed than described in the report.

14  And my understanding was they had an obligation to give that to

15  the Court.

16          **THE COURT:**  I do not believe I received that.  So

17  just tell me what your problem is with paragraph 9.

18          **MR. BALOGH:**  Well, basically, it recapitulates the

19  special agent's report and contains the same conflation of

20  facts that were presented at trial.  I gave certain examples.

21          For example, Ms. Thomas was not called before the

22  Balco grand jury, quote, to provide testimony about her

23  knowledge and involvement with Balco, its employees and

24  associates, including Arnold.  The grand jury transcript

25  reveals that she was not questioned in this regard nor

1   confronted with any documents seized from Balco.

2          Similarly, the documents, quote, indicating a

3   relationship between Ms. Thomas and Conte were e-mail exchanges

4   relating to Ms. Thomas's search for expert assistance with her

5   USADA arbitration, and were not related to any receipt of any

6   substance from Balco.  These documents were made a trial

7   exhibit and are available for the Probation Office inspection.

8          Similarly, the, quote, urine test, quote, documents

9   referred to in paragraph 9 will reflect material sent by Arnold

10  to Conte without Ms. Thomas's knowledge.

11         Paragraph 9 should be rewritten to reflect all of

12  these facts as presented at trial.  The current formulation is

13  objectionable, and we object.

14         **THE COURT:**  Thank you.  That's overruled.

15         I appreciate the additional sentence that's been

16  added there.

17         Now, back to the ones that were listed.  And I'm on

18  page 2 of the addendum.  What's listed as objection number 3 is

19  the objection to paragraph 16, to the effect that there was no

20  evidence to reflect the assertion that the defendant's false

21  statement caused additional hours of investigation.  That's

22  sustained.  And I'll talk about that more in a moment.

23         Objection number 4 --

24         **THE CLERK:**  What objection did you just --

25         **THE COURT:**  Number 3.

1       **THE CLERK:**  Number 3.

2       **THE COURT:**  Defense counsel objects to paragraphs 19

3   and 30, for failing to recommend acceptance of responsibility.

4   That's overruled.

5       Objection number 5, on the guideline sentencing --

6       **MR. BALOGH:**  That's withdrawn.

7       **THE COURT:**  That's withdrawn.  Okay.

8       Objection number 6 is the drug testing.  And that's

9   overruled.

10      Objection number 7 is overruled.

11      Objection number 8 is overruled.

12      So beyond those, are there any other objections to

13  the pre-sentence report?

14      **MR. BALOGH:**  Nothing that hasn't been presented in my

15  memorandum.

16      **MR. PARRELLA:**  Not from the government, Your Honor.

17      **THE COURT:**  I do disagree with the probation report.

18  And I forgot to mention this to you earlier so I'll just tell

19  you now.

20      On guideline 2J113B2, it requires the addition of

21  offense levels if the statement resulted in substantial

22  interference with the administration of justice.

23      In my view, at most, the government demonstrated

24  materiality of the statements in describing the further steps

25  that were taken to convict Patrick Arnold, but did not

1  demonstrate at trial facts supporting any substantial

2  interference over that.

3          So I am not inclined to add those particular points.

4  Therefore, I would come to a guideline calculation as follows:

5          The probation report had 17.  I come to 14, offense

6  level 14, category 1, which would be a range of 15 to 21 months

7  in prison, a supervised release guideline of two to three

8  years.  The guidelines don't authorize probation.  The statute,

9  however, authorizes one to five years probation.  A fine

10  guideline of 5,000 to $50,000, and a mandatory special

11  assessment of $400 per count.

12          The probation officer has recommended 24 months in

13  custody based on a different -- a different guideline analysis,

14  and two years of supervised release.

15          The government has urged an upward departure based on

16  its view that the prior USADA testimony was also perjurious and

17  that, therefore, a 30-month sentence would be appropriate.  And

18  the defendant has requested five years of probation and 500

19  hours of community service and no custodial time.

20          I'll tell you my views, and then I'll be happy to

21  hear from all of you.

22          In my view, the sentencing factors set out in 3553(a)

23  lead me to the conclusion that a sentence of six months home

24  confinement as a condition of five years of probation is an

25  appropriate sentence in this case.

1            There are a number of reasons for that.  First, the
2   drug dealers in this case, which are like -- like the pushers,
3   in my view, who started this, got sentences much different from
4   the sentence that's urged for Mr. Thomas.

5            Mr. Conte got four months in prison.  Mr. Anderson
6   got three months.  Remi Korchemni, who was a coach and he fed
7   steroids to his athletes, got one year probation.

8            Jim Valente, who was in the business and made money
9   off of this, got three years probation.  Patrick Arnold, who
10  the perjury counts that Ms. Thomas was convicted of, who was at
11  the center of those, was a dealer in these substances, and he
12  got three months in prison.

13           And I think it would be inconsistent with my
14  obligations in sentencing to impose a sentence, for example,
15  ten times longer than Mr. Conte's sentence on -- or
16  Mr. Anderson's, almost ten times Mr. Conte's sentence on
17  Ms. Thomas.

18           Maryanne Jones was convicted of false statements and
19  check kiting.  Now, she pled, which is different from going to
20  trial, but she was sentenced to six months in custody.

21           And, in addition, now, I have -- I have not granted
22  the defendant's motion to dismiss the indictment for
23  misconduct.  I don't think it's appropriate to grant it.

24           But I do find it curious that if all the government
25  wanted to do was track down the steroid producers like Patrick

1   Arnold, that they didn't follow up with the defendant or with

2   her attorney at the time, didn't call Dalton or Wierman or some

3   of these others.  At least there wasn't evidence that that did

4   happen.  So I'm taking that into account in assessing an

5   appropriate sentence here.

6          The defendant did provide some information to the

7   government that was helpful.  In addition, she did not testify

8   in trial in this court and did not testify at all, much less

9   falsely.

10          In addition, the defendant has been diagnosed post

11   conviction with various medical conditions.  Many of these are

12   hard and expensive to manage.  They would be particularly

13   difficult to manage in a prison setting.

14          The report indicates that she's taking five different

15   prescription medications, some psychotropic.  Currently,

16   they're being provided free.  That wouldn't happen in a

17   custodial setting.  And those are very difficult to monitor in

18   a custodial setting.

19          So I think that the factors in 3553(a)(2), reflecting

20   the seriousness of the offense for adequate deterrence and

21   protection of the public from further crimes of defendant, and

22   to provide defendant with needed training and treatment, I

23   think the home confinement, six months with the -- well, we'll

24   talk about electronic monitoring.

25          I think the probation officer had some -- you wanted

1   me to waive the cost of the electronic monitoring?

2          **MS. CARRUBBA:**  Yes, Your Honor.

3          **THE COURT:**  Electronic monitoring would be the

4   appropriate thing, and the five years probation.

5          **THE CLERK:**  That's a part of the probation -- part of

6   the condition of probation, is six months?

7          **THE COURT:**  Six months home confinement.  Plus 500

8   hours of community service, as suggested by the defendant.

9          So that's my thinking.  But I'll be happy to hear,

10  first, from Mr. Balogh.

11         **MR. BALOGH:**  I would rather go second, rather than --

12         **THE COURT:**  First?

13         **MR. BALOGH:**  Than first.  The government -- my guess

14  is the government is going to make a stronger pitch.  If they

15  don't convince you, I don't -- seeing my track record of

16  changing your mind, Your Honor, so if they don't change it,

17  then I'll probably have much less to say.

18         **THE COURT:**  All right.  Mr. Parrella.

19         **MR. PARRELLA:**  Thank you, Your Honor.

20         First of all, just in addressing the Court's

21  comparison of this defendant's conviction of false declarations

22  before a grand jury with the convictions of the defendants in

23  the original Balco case, let's not forget those sentences were

24  guideline sentences, were sentences that the Sentencing

25  Commission determined were appropriate for that amount and that

```
 1   type of controlled substance.

 2           So it wasn't as if the government granted some

 3   benefit to them.  Those were absolutely right in the middle of

 4   the guidelines for that.

 5           And I might add that as a result of the Balco case

 6   the guidelines have been increased in a number of different

 7   ways for the distribution of steroids.  Those sentences today

 8   would not be guideline sentences.

 9           However, looking at the guideline evaluation for

10   false testimony before a grand jury and false declarations, I

11   should say, and for obstruction of justice, we see the

12   guidelines are much more serious.

13           And that is because the Sentencing Commission has

14   decided there's a different harm here.  It is not just a harm

15   that is contemplated by a distribution of controlled substance

16   charge where you go directly.  The harm is measured directly by

17   the amount of drugs that are distributed or that can be proved

18   to have been distributed and also by the type.

19           That is why the Balco guideline range for the

20   original defendants was relatively low.  And, as I said, that's

21   changed.

22           The guidelines contemplate a different harm.  They

23   contemplate a harm by a person committing perjury before a

24   grand jury of striking at the integrity of the system.  The

25   integrity of the system and the perceived fairness of the
```

1   system are really what's at threat here.

2             And as a result of that, the guidelines contemplate

3   this as a much more serious crime than perhaps other ones.  It

4   is a serious crime.

5             The integrity of the system is being hit at.  It's

6   unfair to other witnesses.  It's unfair to witnesses in other

7   cases.  That's not the case for a distribution of controlled

8   substance case.

9             This case has a tremendous impact because it's a

10  perjury case, has tremendous impact on all governmental

11  investigations and all investigations that involve witnesses.

12            I think a real -- a better comparison, rather than

13  looking at the distributors who got a guideline sentence, is to

14  look at the Maryanne Jones sentencing, which was a thousand and

15  one.  The guideline range was zero to six.  And she was

16  sentenced to six months with, I believe, 400 hours of community

17  service, as well, besides the supervised release.  And, more

18  importantly, the sentence of Troy Ellerman in this courthouse,

19  who was convicted of false declarations and obstruction of

20  justice.  Very similar to the convictions that this defendant

21  suffered.

22            **THE COURT:**  I view what Mr. Ellerman did far more

23  serious --

24            **MR. PARRELLA:**  That's true.

25            **THE COURT:**  -- than what was in this courtroom in

1    this case.

2         **MR. PARRELLA:**  As do I, Your Honor.

3         However, there's an aggravator.  And the aggravator

4    in what Mr. Ellerman did is that he was an attorney and he

5    tried to skew the course of a case.

6         The aggravator in this particular case is that this

7    defendant committed perjury on a prior occasion, and then

8    committed perjury in the grand jury in order to skew the

9    investigation away from herself.

10        So while maybe the amounts, the quantity of the

11   sentence should be different to reflect the difference between

12   Mr. Ellerman and this defendant, I believe they both have

13   aggravators that are -- both of them slightly different but

14   they equally have aggravators.  And that's a much more

15   analogous situation.

16        Mr. Ellerman's was a guideline sentence.  This is a

17   guideline sentence.  What we're recommending is a guideline

18   sentence.

19        I will address the upward departure.  The upward

20   departure -- and I make that as only a way of trying to

21   quantify this prior perjury that she committed, it's clear

22   that -- that that -- that testimony before the USADA

23   arbitration board was under oath.  It's clear that it was false

24   in the examples that we submitted.  There's no doubt about it.

25        The upward departure was designed to separate this

1   defendant's case from the case of somebody else who might have

2   committed perjury and doesn't have a prior perjury.  I mean,

3   that's -- that's just manifestly not fair to that other person

4   to not take this into account.

5           And that separation, the way I quantified it, was to

6   say:  Let's view it as a separate count of perjury, process it

7   through 3D1.4, and see what amount the guidelines would --

8   would grant for it.

9           I understand Probation feels that an upward departure

10  isn't warranted.  But at some point this has to be taken into

11  account, because it is just not treating this defendant -- it

12  is just not taking into account the history of this defendant

13  in terms of that.

14          I mean, we have a defendant here who, to our

15  knowledge, has been put under oath twice.  She's lied both

16  times on the central issue of both things.  I think that

17  deserves a more rigorous message than home detention.  I think

18  it deserves custody.

19          I think the issue of the lawsuit against

20  Dr. Catlin -- and we don't need to flesh out the whole thing.

21  All we need to know is, after the USADA hearing, she brought a

22  lawsuit against Dr. Catlin.  It was dismissed in summary

23  judgment.

24          The inference that I draw from that, and I submit to

25  the Court, was that was done to try and tarnish Dr. Catlin and

1   try and then force USADA to withdraw her lifetime athletic ban.

2          That is manipulation of the system.   That's what that

3   is.   That's what she did in the USADA hearing.   That's what she

4   did at the grand jury.   And to -- to not take those two things

5   into account I don't think is proper.

6          Her actions impacted the investigations of Patrick

7   Arnold and the Balco investigation.   Agent Novitzky testified

8   as to what needed to be done.   The Court was present throughout

9   here.

10          I don't know if we can put a price tag on that.   But

11  the guidelines, the application notes, are very general.   Just

12  basically says that substantial expenditure of government

13  resources.   And that's what happened here.

14          The mere fact that the defense argues that, well,

15  they could have submitted an indictment against Patrick Arnold

16  anyway, even though she lied, that's just not taking into

17  account what if we had some people on the grand jury who -- as

18  opposed to the arbitration board, what if we had some people

19  there who believed her?   They might have been confused.   They

20  might not have returned an indictment.

21          I mean, that's our job.   When we have something like

22  that, we have to put the brakes on it.   We having to go check

23  it out.   And that's what we did.

24          To say that's not substantial interference I don't

25  believe is recognizing the work that needs to go in.   And it's

1   also allowing the defendant some sort of a right to be indicted

2   at a certain time.

3          And, I mean, this by -- under Patrick Arnold's, that

4   when we reach a quantum of evidence that despite other evidence

5   might reach probable cause, well, then he has to be indicted,

6   that's not the case and it's not the law.  So I don't believe

7   it should be -- it should be applied.

8          The defense argues -- I'll do it now so we don't end

9   up going back and forth in their sentencing memo -- a few

10  things.

11         One, continually, on and on, the defense has argued

12  in his opening statement, he has argued that the defendant was

13  stripped of her Fifth Amendment rights.  It was this, it was

14  that rather.  And, in fact, somehow has twisted around the fact

15  that there was a grant of immunity to this defendant into what

16  he calls the fact that she lied under grant of immunity is a

17  mitigating factor.  Well, that's exactly wrong.  That's a crazy

18  mirror image of what it is.

19         It is an aggravating factor that she was given

20  immunity from the use of her statements and, yet, she still

21  continued -- she chose to lie.

22         She was not given immunity at the USADA hearing.  So

23  here she got more.  In the grand jury in this case, she got

24  more than she obtained in the USADA hearing, and still chose to

25  lie.

1          She was freed up by that grant of immunity,

2    court-ordered immunity to tell the truth.  Couldn't do it;

3    obstructed justice and committed perjury in the counts she was

4    convicted of.

5          The fact as argued by the defendant as part of this

6    argument that she lacked the choice to testify, I just think is

7    a completely specious argument, and we submit that the Court

8    should reject it.

9          It's based on the argument that she wasn't confronted

10   by certain documents in the grand jury.  I think counsel might

11   have mentioned this even today.

12         Well, let's pull back a little bit and look at that

13   argument.  The defendant has no right to be confronted with the

14   government's evidence to see if she can get away with lying.

15   That's not the purpose of the grand jury presentation.  The

16   purpose of a grand jury presentation is to bring a person who

17   has legitimate information in.

18         We had had the documents that were found at Balco,

19   the e-mails, the faxes that were found at Balco, clearly tying

20   her in to Patrick Arnold and Victor Conte in same way, shape or

21   form.  Absolutely legitimate inquiry.

22         The fact we didn't lay out the entire case to her

23   beforehand, so she could pick and choose the areas we didn't

24   have evidence on at that time, so she could lie about them but

25   not lie about the e-mail because now she knows we have it,

1    that's specious.  And I think it should be rejected.

2            In summary, this -- this is a situation where you

3    have a person who lied at the USADA hearing, lied at the grand

4    jury, since that time has shifted blame to virtually everyone

5    in the case except her.

6            She chose to lie on these occasions.  She wasn't

7    tricked.  She wasn't trapped.  She might have out thought

8    herself, thought she was smarter than she was when she did

9    this, and thought she was going to walk away with it.

10           But the -- the government's actions afterwards are

11   not part of the calculation here, in my opinion.  We have

12   decisions to make on investigatory resources.  This is a large

13   investigation that went in many, many different directions.  We

14   have limited resources to do.

15           So for the defendant to argue that we didn't go to

16   her and give her a chance to recant, so somehow she shouldn't

17   be convicted of perjury, that perjury count shouldn't stand,

18   again I think is a specious argument.

19           The defendant's actions here impacted the

20   investigations that we've talked about, Patrick Arnold and

21   Balco, corrosive to the ability of the government to

22   investigate and prosecute crimes, and unfair to the other

23   witnesses in the case.  It's a serious matter that the

24   government believes requires a serious message.

25           We do not believe that six months home detention is

1   the proper message in this case.  We're again recommending the

2   30 months that we have in our -- in our sentencing memo, and

3   we'll submit with that.

4          **THE COURT:**  Thank you.

5          Mr. Balogh.

6          **MR. BALOGH:**  Your Honor, if the Court believes my

7   comments would be of assistance to it, I will make a statement.

8   If the Court is of resolve that the sentence its indicated is

9   the one that will be imposed, we will submit on the record.

10         **THE COURT:**  Well, I am pretty much resolved that what

11  I suggested is appropriate.

12         **MR. BALOGH:**  I thank you for the opportunity.

13         **THE COURT:**  Ms. Thomas, did you want to say anything?

14         **THE DEFENDANT:**  Sure, yeah.

15         **THE COURT:**  All right.

16         **THE DEFENDANT:**  Thank you for listening.

17         The Lord knows that the last place I ever wanted to

18  be was here in this courtroom facing a sentence for the

19  mistakes that I have made in the past.

20         I hope this court also knows I'm deeply sorry and

21  ashamed of the mistakes I have made, and I work very hard every

22  day to deal with the many issues that I have to deal with from

23  the very first time my coach gave me steroids.

24         I feel that I have already been punished

25  substantially for my conduct.  I pray that you will let me

```
1   remain out of jail.  I have a lot of work, a lot of good work
2   still left to do.  And I hope that you will let me do this
3   today.
4           Thank you.
5           THE COURT:  Thank you.
6           MR. BALOGH:  May I ask one thing, before you impose
7   sentence and judgment?
8           With respect to if there is a home detention portion
9   of probation sentence, would Ms. Thomas be permitted to go to
10  work or school during that period?
11          THE COURT:  Oh, yes.
12          MR. BALOGH:  That is the only issue I'm concerned
13  about.  If that's resolved, then I will again submit on the
14  record.
15          THE COURT:  It would be my contemplation that, yes,
16  the home -- home detention allows people being out for work and
17  for school, for medical appointments, for going to church, for
18  the appropriate life activities, but nothing for fun.
19          MR. BALOGH:  No frivolity.
20          THE COURT:  No.
21          MR. BALOGH:  That's perfect.  Thank you.
22          THE COURT:  Well, I will say, I haven't changed my
23  mind about the sentence.  I just find that it would be -- in
24  light of all the things that I know, all the testimony I heard
25  in this case, all the other cases that we have had together in
```

1   this series, that it would be excessive to sentence Ms. Thomas

2   to 30 months in custody, which would be ten times longer than

3   the underlying miscreants here.

4          And for the reasons that I mentioned earlier, and

5   including Ms. Thomas's health issues, I think that the

6   appropriate sentence is five years probation, six months home

7   confinement, and a 500 hour community service requirement.

8          I'll note that five years probation is five times

9   longer than Mr. Korchemni's probation.  And he was a coach who

10  gave steroids to his athletes.  So it seems to me that's the

11  fair sentence in this case, and that's what I'll do.

12         Having said that, it's a serious offense.  Perjury is

13  a really, really serious offense.  One thing Mr. Parrella said

14  with which I agree entirely is that it debilitates the system.

15         And so it's not that I don't recognize the offense as

16  a serious one.  I do.  And I think, actually, it's going to

17  have very serious consequences for you beyond what it's already

18  had.

19         This has been like water torture to you, I imagine,

20  because it's been going on for so many years.  And I think

21  that's taken a toll on your health.

22         But, in addition, I know that what you want to do is

23  practice law, or that's what you've been going toward.  I

24  suspect it is going to make that either impossible or very

25  difficult.  That's just the way it is.

1            And I don't think that the verdicts were unfair.  I

2  think the verdicts were properly found.

3            But I think we have to take all that into account in

4  assessing the punishment here, so that's what I am doing.  So

5  I'm going to do what I had suggested.

6            Pursuant to the Sentencing Reform Act of 1984, it is

7  the judgment of the Court that Tammy A. Thomas is hereby

8  sentenced to a period of five years probation.

9            While on probation, the defendant shall not commit

10 another federal, state or local crime, shall comply with the

11 standard conditions that have been adopted by this court,

12 except that the mandatory drug testing provision is suspended,

13 and shall comply with the following additional conditions:

14           She shall have six months of home confinement on --

15 the defendant shall participate in the home confinement with

16 the electronic monitoring program and shall abide by all

17 requirements of the program for a period of six months.

18           Other location verification methods may be used in

19 conjunction with this program.  The cost of monitoring shall be

20 waived.

21           The defendant is restricted to her residence at all

22 times except for activities which have been pre-approved by the

23 probation officer, including employment, education, religious

24 service, medical, substance abuse or mental health treatment,

25 attorney visits, court appearances, or court-ordered

1    obligations.

2            During the term of home confinement, the defendant

3    shall abstain from the use of alcohol, and shall submit to drug

4    or alcohol testing as directed by the probation officer.

5            The defendant shall pay any special assessment that

6    is imposed by this judgment and that remains unpaid at the

7    commencement of the term of supervised release.

8            The defendant shall participate in a mental health

9    treatment program as directed by the probation officer.

10           The defendant is to pay part or all of the cost of

11   this treatment at an amount not to exceed the cost of treatment

12   as deemed appropriate by the probation officer.   Payment shall

13   never exceed the total cost of mental health counseling.   The

14   actual copayment schedule shall be determined by the probation

15   officer.

16           The defendant shall submit her person, residence,

17   office, vehicle, or any other property under her control to a

18   search.   Such a search shall be conducted by a U.S. probation

19   officer at a reasonable time and in a reasonable manner based

20   upon reasonable suspicion of contraband or evidence of a

21   violation of a condition of release.   Failure to submit to such

22   a search may be grounds for revocation.

23           The defendant shall warn any residents that the

24   premises may be subject to searches.

25           The defendant shall not own or possess any firearms,

 1    ammunition, destructive devices, or other dangerous weapons.

 2            The defendant shall cooperate in the collection of

 3    DNA as directed by the probation officer.

 4            It is further ordered that the defendant shall pay to

 5    the United States a special assessment, which shall be due

 6    immediately.

 7            **THE CLERK:**  The special assessment amount?

 8            **MR. BALOGH:**  400.

 9            **THE COURT:**  $400.

10            **THE CLERK:**  Is it $400?

11            **THE COURT:**  The Court finds that the defendant does

12    not have the ability to pay a fine, and orders the fine waived.

13            In addition, the Court orders that the defendant

14    participate in 500 hours of community service at the direction

15    of the -- as determined by the probation officer.

16            Is there anything else for today?

17            **MR. PARRELLA:**  Not from the government, Your Honor.

18            **MR. BALOGH:**  Yes, there is for today.

19            Before we leave, we want to -- there were exhibits

20    that were lodged with the trial court as part of the trial.

21            We would like to re-lodge them.  They were returned

22    to us by the Court's clerk, including the photographs and the

23    photograph rejected by the Court.

24            If this case were reviewed by the Ninth Circuit, they

25    may request whatever was lodged with the trial court, for their

```
 1    review.  And I don't see how they're going to see rejected

 2    exhibits unless they are within the clerk's office.  I can't

 3    present them to the Ninth Circuit absent them being lodged with

 4    this court.

 5              THE COURT:  What are you saying?

 6              THE CLERK:  Uhm, we had -- I have never had

 7    not-admitted exhibits submitted to the Court.

 8              THE COURT:  Well, you could just attach them to your

 9    papers, couldn't you?

10              THE CLERK:  You're supposed to do that at a later

11    point.

12              MR. BALOGH:  My concern is this.

13              THE CLERK:  You should talk to the Court of Appeals.

14              MR. BALOGH:  I'll talk to the Court of Appeals.  May

15    we lodge them with the Court pending that time, so I don't have

16    to come down here again with the luggage?

17              THE CLERK:  We don't keep those.

18              MR. BALOGH:  After I've addressed this with the Ninth

19    Circuit Court of Appeals, if there is an issue may I have the

20    opportunity to re-calendar this matter, even though it would be

21    a closed matter, to address it with the Court?

22              THE COURT:  Sure.

23              I don't know, maybe Mr. Parrella would know how to

24    deal with it.  You can talk to him.

25              MR. PARRELLA:  That's fine.
```

```
 1              MR. BALOGH:  Thank you, Your Honor.

 2              THE COURT:  Thank you.  Good luck.

 3              MR. PARRELLA:  Right to appeal.

 4              THE COURT:  Oh, yes.  You have a good lawyer here and

 5    I know he's told you this already, but I want to make sure

 6    you're aware of it, that if you want to appeal this matter, you

 7    have a really short time frame to make that decision, ten days,

 8    I think it is, from today.

 9              So if you plan to appeal, make sure your notice of

10    appeal is filed within ten days of today.

11              THE DEFENDANT:  It will be.

12              MR. BALOGH:  Thank you, Your Honor.

13              MR. PARRELLA:  Thank you, Your Honor.

14              MR. NEDROW:  Thank you, Your Honor.

15              THE COURT:  Thank you for reminding me.

16              (The proceedings were adjourned.)

17                         -   -   -   -

18                    CERTIFICATE OF REPORTER

19              I certify that the foregoing is a correct transcript

20    from the record of proceedings in the above-entitled matter.

21    DATE:    Tuesday, November 18, 2008

22
                        s/b Katherine Powell Sullivan
23                   _____

24         Katherine Powell Sullivan, CSR #5812, RPR, CRR
                        U.S. Court Reporter
25
```

# EXHIBIT B





**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

*150 Almaden Boulevard, Suite 900*
*San Jose, California  95113*

June 1, 2007

Ms. Lynne E. Richards
U.S. Probation Officer, United States Probation Office
450 Golden Gate Avenue, Suite 17-6884
San Francisco, CA 94102-3487

RE: <u>United States v. Ellerman</u>
CR: 07-0080-JSW

Dear Ms. Richards:

This letter is submitted on behalf of the federal agents and prosecutors in the BALCO investigation who were directly affected by Troy Ellerman's perjurious and obstructive conduct in this case. Mr. Ellerman's illegal conduct significantly impacted the investigation and prosecution of the BALCO case, and has continued to negatively impact the government's ongoing efforts to investigate and prosecute matters associated with BALCO. We write to request that the Probation Office and the Court consider these facts in determining the appropriate sentence in this case.

From 2002 through the present date, members of the investigative team assigned to this case have been investigating steroid-distribution activities associated with BALCO. This investigation initially led to the criminal indictment against Victor Conte, James Valente, Greg Anderson, and Remi Korchemny in <u>United States v. Conte</u>, CR 04-0044-SI. As the Probation Office and the Court are aware, the government expediently provided grand jury material pursuant to a protective order. Mr. Ellerman's illegal leaks, false statements to the Court, and efforts to obstruct justice by seeking dismissal of the indictment based upon the leaks he himself sponsored followed throughout 2004 and continued until he was relieved as counsel in 2005.

Mr. Ellerman's criminal conduct directly affected the government's investigation and prosecution of BALCO and matters related to it. In June 2004, Judge Illston ordered the government to conduct an internal inquiry into the handling of the grand jury transcripts following the publication of the grand jury transcript of Tim Montgomery's testimony. In response to this request, the government questioned all staff, attorneys, and supervisors in this office involved in handling the grand jury material, and submitted approximately a dozen declarations to the Court. The government conducted the same procedure with all agents handling the material, including IRS agents and staff. This process took a considerable amount of time, energy, and effort, and resulted in persons normally uninvolved with the litigation process, e.g. support staff and clerical workers, having to face direct questioning regarding their conduct and to sign sworn statements.



After these declarations were submitted in July 2004, Mr. Ellerman continued to publicly, and falsely, accuse the government of participating in the unauthorized distribution of BALCO discovery material to the media, referring to members of the prosecution team at one point as "unadulterated punks." Mr. Ellerman also directly raised these concerns in communications with government counsel. These false accusations fostered further unfounded public accusations from other grand jury witnesses and lawyers involved in the case that government officials were involved in the leaks. As a consequence, this office initiated investigative steps to determine the identity of the person or persons involved in the leaks, and in late 2004 devoted considerable attorney and agent time and effort to investigating aspects of the leak of the Montgomery transcript. The resulting diversion of resources, energy and time necessarily undercut the time the government otherwise would have devoted to the BALCO prosecution and other cases which were under review and investigation.

In October 2004, Mr. Ellerman filed the motion to dismiss the indictment based in part upon the leaks he himself had sponsored. While the motion lacked any factual support, the government nonetheless took it very seriously and devoted significant time and effort to responding to its allegations. As the motion was filed in concert with multiple other defense motions, the government again was put in the position of diverting energy and resources from other important matters in order to respond to the false accusations.

Judge Illston conducted the motions hearing on December 1, 2004. At that hearing, Mr. Ellerman and others argued for the dismissal of the indictment, and repeated their false accusations of government misconduct in disseminating the grand jury material. After hearing oral argument, Judge Illston took the motion under submission. Two days later, on December 3, 2004, Mr. Fainaru-Wada and Mr. Williams published portions of the Barry Bonds and Jason Giambi transcripts. The timing of this publication must be viewed as nothing less than a direct attempt to influence Judge Illston with respect to her deliberation on the pending motions. Following the leaks of the Bonds and Giambi transcripts, this office was recused from any further investigation of the matter, and the investigation was transferred to the Central District of California. The transfer of the leak investigation to another District caused yet another significant investment of resources, including the necessity of multiple additional Assistant United States Attorneys and federal agents familiarizing themselves with the case, and the extensive leak litigation before this Court throughout 2006 prior to Mr. Ellerman's guilty plea.

On December 3, 2004, the date of the publication of portions of the Bonds/Giambi transcripts, Mr. Ellerman personally informed members of the BALCO team in a telephone call that he believed *Victor Conte* had committed the leak, and apologized for accusing the government of sponsoring the leak. This belated "apology" was a cynical effort by Mr. Ellerman to both appease the government (after falsely smearing the reputation of the government officials involved), and to focus the investigation toward Mr. Conte and away from himself.

In sum, Mr. Ellerman attempted to use his own illegal dissemination of the grand jury transcripts to destroy the government's prosecution of this case and, as a necessary collateral impact, to destroy the professional and personal reputations of the law enforcement professionals involved in the investigation. That he succeeded only in being a distraction and drain on

government resources was not for wont of effort, but only because his accusations were abjectly false and because Judge Illston correctly saw through them.

The impact of Mr. Ellerman's illegal conduct continues to be felt in this investigation. Mr. Ellerman's false claims of government misconduct have emboldened others to make false and groundless accusations against the law enforcement professionals in this case. While these accusations are uniformly without merit, time and effort is required to deal with the distractions caused by such accusations. Mr. Ellerman's obvious indifference to the impact his false accusations might have on the reputations and lives of others is one of the more unsettling, and disturbing, aspects of this conduct, and we would request that the Court consider that aspect when Mr. Ellerman provides comments on his own behalf at sentencing.

Perhaps most importantly, Mr. Ellerman's conduct has impacted this case and undoubtedly others by casting doubt on the efficacy of the government's ability to maintain grand jury secrecy for its witnesses. In this particular investigation, a number of witnesses testified before the grand jury with great candor based upon their understanding of the secrecy provisions of Federal Rule of Criminal Procedure 6(e), and the government's assurances that the transcripts would only be disseminated to the extent necessary in prosecuting the case. Mr. Ellerman's violation of the Court's protective order, and his false accusations against the government, have given rise to specific occasions in this case where grand jury witnesses have expressed concerns about testifying in the grand jury based upon apprehension that the transcript will become public. Given the publicity engendered by this case, it is likely that Mr. Ellerman's conduct has caused other grand jury witnesses to have similar concerns in other grand jury investigations unrelated to this case. In this way, Mr. Ellerman's conduct has adversely impacted one of the more important mechanisms used by the federal government to investigate criminal conduct.

The American federal judicial system is a cornerstone of our democracy, and arguably the fairest and most effective means of administering justice ever created. But it is only as good as the integrity of the people involved in it. It requires honorable, honest, professionals to work properly. Mr. Ellerman's falsehoods, and his blatant efforts to manipulate the system through those falsehoods, undermine both the ability of the system to function effectively and the trust of the public in the institution as a whole. We concur with the Court's observations that this conduct strikes at the "core" of the judicial system, and we respectfully request that the Court impose a sentence reflective of the seriousness of this conduct.

Respectfully Submitted,

SCOTT N. SCHOOLS
United States Attorney

JEFFREY D. NEDROW
MATTHEW A. PARRELLA
JEFFREY R. FINIGAN
Assistant United States Attorneys